IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| | ) | Case No. 04-B-24393 |
| VICKI E. ESRALEW | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | | |
| ROLLIN J. SOSKIN, EUGENE | ) | |
| TERRY, NICOLE TERRY and | ) | |
| TERRY'S COMPANY, INC. | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding |
| | ) | No. 04 A 3774 |
| | ) | |
| VICKI E. ESRALEW, | ) | Judge Goldgar |
| Defendant. | ) | |

## PLAINTIFFS' LOCAL RULE 7056-2 STATEMENT OF FACTS

The Plaintiffs, Rollin J. Soskin, Eugene Terry, Nicole Terry and Terry's Company, Inc., by and through their attorney, Thomas C. Crooks, pursuant to Local Rule 7056-2, provide the following facts in opposition to Debtor's Motion for Summary Judgment.

**Vicki Esralew and Kids Count**

1.     The Debtor, Vicki Esralew worked in a media firm, where media time was purchased, beginning in the early 1980s. In the early to mid 90s Esralew began working as an account executive for WGN selling radio time to advertisers. In approximately 1989 Esralew left WGN and started her own advertising agency. (Esralew dep. pp. 6-8).

2.     Esralew operated her own ad agency until 1993 when she began to put all her efforts into the business which grew into Kids Count. (Esralew dep. p. 14).

3. Between 1993 and 1999 several lawyers did legal work for Kids Count. At the time a group of investors headed by Alan Young came into Kids Count, Wes Nissen from Katten Muchin & Zavis prepared an operating agreement for Kids Count. (Esralew dep. pp. 19-21).

4. The time came when Esralew was separating her business from Alan Young's group and it was necessary at that time to bring in another lawyer, Jonathan Rothchild, because Wes Nissen, who represented Alan Young, had a conflict of interest and could not represent Esralew as well as Alan Young. Esralew understood the concept of conflict for an attorney. (Esralew dep. pp. 23-25).

5. Allan Young's investment group brought in an investment of One Million Dollars or more in 1995 or 1996. During this time period Esralew drew a salary of $170,000.00 per year. (Esralew dep. pp. 30-31, 34).

6. After Kids Count ended its relationship with Alan Young's investment group, Esralew began looking for new investors. (Esralew dep. p. 41).

7. Harris and Associates, through an entity called "Hudsucker Partners," was the next group to invest in Kids Count. They invested $300,000.00 in the company, pursuant to a note convertible into an equity ownership. The note also contained restrictions on Kids Count's ability to borrow, take in new investors or owners, or to use Kids Count assets as collateral, among other limitations. This debt was recently discharged in bankruptcy. (Esralew dep. pp. 45, 53; Resnick Aff. ¶¶ 4-7).

8. After ending their relationship with the Allan Young group, Esralew was introduced to a man named Bob Bernard and began negotiating an agreement whereby Mr. Bernard would put a great deal of money – millions – into Kids Count in exchange for a percentage of ownership. Ultimately Esralew did not enter into the agreement because she was

discouraged from doing so by an individual, whose name she does not recall, who was advising her at the time. (Esralew dep. pp. 58-62).

### Soskin's Relationship with Esralew

9. Rollin J. Soskin first did legal work for Vicki Esralew and Bob Aren in the summer of 1988 when they were referred to him for estate planning. (Soskin dep. pp. 7-9; Soskin Aff. ¶ 2).

10. The estate planning work led to some corporate work during which Mr. Soskin incorporated an entity for Esralew entitled "Enivar Woods" and became registered agent for Esralew's business, Capital Advertising. (Soskin dep. pp. 7-9; Soskin Aff. ¶ 3).

11. In 1993 Soskin did a closing on a townhome in Northbrook purchased by Esralew and Aren. (Soskin dep. p. 10; Soskin Aff. ¶ 4).

12. After the closing on the townhome in 1993, Soskin was asked by Esralew and Aren to forward his corporate files to another lawyer and he had no contact with Aren or Esralew until the summer of 1998 when he ran into Vicki Esralew at his synagogue. At this time Esralew indicated that she wanted to have her estate plan reviewed and updated. (Soskin dep. p. 13; Soskin Aff. ¶ 4-6).

### Esralew Looking for Investors

13. After the estate planning was completed, Esralew told Soskin that she was looking for investors in her company as well as someone to help with management of the company, so that she could concentrate on the creative end of the business. As a result, Soskin introduced Esralew and Aren to his friends, Gene and Nicole Terry, and the group entered into a series of conversations concerning what financial assistance the Terry's could provide to Esralew. (Soskin dep. pp. 20-29; Soskin Aff. ¶ 7-9).

3

14. After a series of four to six meetings, Aren, Esralew, the Terrys and Soskin agreed to enter into an agreement whereby the Terrys would loan certain sums of money to Esralew's business entity, Kids Count Entertainment LLC, and Soskin would provide both business and legal services to the entity at a bargain rate, for which he would immediately receive 2% of the company. (Soskin dep. pp. 20-29; Soskin Aff. ¶ 9).

15. During the meetings Esralew gave a prospectus to Soskin and the Terrys providing information about Kids Count. (Soskin Aff. ¶ 9).

16. The Terrys, because they were investing substantial amounts of money in the company and did not know Esralew or Aren, insisted that Soskin remain involved with management of the company before they would agree to invest. (Terry dep. p. 55; Soskin dep. p. 24; Soskin Aff. ¶ 9).

**The Parties Come to an Agreement**

17. As a result of the four to six meetings, on November 16, 1998, Eugene Terry faxed a proposal to Soskin. Paragraph 7 of the proposal stated that "[w]e recognize you as attorney for Vicki and KC…" When Soskin saw this provision it became clear to him that the parties had to have separate legal counsel. (Soskin Aff. ¶10 ).

18. All parties met the night of November 16, 1998 to discuss Terry's proposal as well as the need for Esralew and Aren to have independent counsel. During the meeting Soskin told Esralew and Aren that they had to consult with independent counsel of their choosing before entering into the agreement. Esralew said that they had used two lawyers recently, one for the purchase of a new home in the summer of 1998 and one during an anticipated deal that had fallen through in the fall of 1998. She said they would consult with one of these attorneys. (Soskin dep. p. 32-34; Soskin Aff. ¶ 10).

4

19. As a result of Terry's proposal and each party's input during the meeting on November 16, 1998, Soskin prepared the first draft of the agreement. The draft was faxed to all parties on November 18, 1998. (Soskin Aff. ¶ 12).

20. After a first draft of the agreement was created and sent to everyone in the group, Esralew proposed changes to the agreement relating to the amount of time Soskin and the Terrys had to exercise their options to buy a percentage of the company and creating obligations on Soskin and the Terrys in the event the business were sold. (Soskin dep. pp. 63-65). Esralew told Soskin that these changes had been recommended by the attorney she had consulted. (Soskin Aff. ¶ 13).

21. The original draft gave the Terry's the option to convert their $250,000.00 investment in Kids Count from a loan to a 10% ownership interest. The original draft gave Soskin an option to purchase an 8% interest in Kids Count for the price of $200,000.00. Esralew asked that there be a time limit placed on the exercise of these options. (Soskin dep. pp. 18-19, 64-65, Ex. 1; Soskin Aff. ¶ 14).

22. As a result, the following language was added to paragraphs 6 and 7: "In the event of a refinancing in excess of two million dollars or recapitalization of Kids Count with a new value in excess of two million dollars Kids Count may demand that Soskin [or Terry] exercise or waive his option within one hundred twenty (120) days of notice." (Soskin dep. pp. 18-19, 64-65, Ex. 1; Soskin Aff. ¶ 14).

23. The original draft contained a provision in ¶ 10 which gave the Terrys and Soskin the right to "tag along" in the event that Esralew sold enough of her shares in the business such that she controlled less than 51%. Under these circumstances the Terrys and Soskin would be able to sell their interest for the same price, if they chose. Esralew wanted the right to force

5

Soskin and the Terrys to sell when and if she sold. As a result, the second draft of the agreement contained "bring along" rights for Esralew and Aren in ¶ 10. (Soskin dep. pp. 64-65, Ex. 1; Soskin Aff. ¶ 15).

24. The second draft of the Memorandum of agreement was faxed by Soskin to the Terrys, Esralew and Aren on November 19, 1998. The second draft agreement contains the changes to ¶¶ 6, 7 and 10 requested by Esralew. The second draft also contains changes to ¶¶ 3, 8 and new ¶¶ 14 and 15. All of these changes were made as a result of input from Esralew, Aren, the Terrys and Soskin. (Soskin dep. pp. 18-19, 64-65, Ex. 1; Soskin Aff. ¶ 16).

25. After the second draft was circulated Esralew requested that the time limit for the Terrys and Soskin to exercise their options be further reduced to 90 days. Soskin hand wrote those changes, and others suggested by the parties, on the second draft. All of the hand written changes on the second draft, including all of the changes requested by Esralew, were included in the final agreement which was executed by the parties. (Soskin dep. pp. 18-19, 64-65, Ex. 1; Soskin Aff. ¶ 17).

26. Although the agreement called for Soskin to receive some compensation for the work he did for Kids Count he was never paid. (Soskin Aff. ¶ 23).

27. At Esralew and Aren's urging, the parties had worked to reach an agreement quickly so that the Terry's funds would be available to produce a TV commercial to sell Kids Count's products for Christmas. The commercial did not reach TV in time for the Christmas sales season and, as a result, did not generate the sales which the parties had hoped for. (Soskin dep. pp. 24-26, Soskin Aff. ¶ 18; Esralew dep. pp. 104-05).

**Problems Begin**

6

28.     In the Spring of 1999 the Terrys and Soskin were still interested in building the business despite the poor response to the commercials. (Soskin Aff. ¶ 19).

29.     Esralew, however, repeatedly told Soskin and the Terrys that she was not interested in building the business from the bottom up by firming up and expanding Kids Count's sales to retail stores. Esralew wanted to seek out new investors who could invest enough money to buy out Soskin and the Terrys. During this same time period Esralew and Aren stopped meeting with Soskin and the Terrys in violation of the Memorandum of Agreement, ¶ 12. (Soskin Aff. ¶ 20).

30.     In early May of 1990 Soskin had a telephone conversation with Aren in which they discussed the deteriorating relationship between Aren and Esralew, on one side, and the Terrys and Soskin, on the other. Aren said he and Esralew were looking for new investors to buy out the Terrys and Soskin. During the conversation Aren asked if he and Esralew should get separate counsel for use during the anticipated break up and Soskin said that they should. Aren said they would use an attorney named Peter Weil. When asked, Aren confirmed that he and Esralew had used Weil when reviewing the proposed Memorandum of Agreement in November of 1998. (Soskin Aff. ¶ 21).

31.     As a result of Soskin's conversation with Aren as described above, Soskin wrote a letter dated May 5, 1999 putting in writing his statement to Aren that all parties should get separate counsel. (Soskin Aff. ¶ 22).

**Peter Abruzzo**

32.     During October, November and December of 1998 Esralew was negotiating with Peter Abruzzo to get him involved in the management of Kids Count so she could be free to create products. Esralew instructed Abruzzo to keep their negotiations a secret from Soskin and

7

the Terrys. It was not until January of 1999 that Abruzzo learned that Esralew had been negotiating with Soskin and the Terrys concerning management input. (Abruzzo Aff. ¶¶ 1-5).

33. Esralew also asked Abruzzo to find investors for the company and promised she would sell him part of her interest in the company if he would find investors. In April of 1999 Abruzzo made a connection between Esralew and an investor who was interested in putting in money. After Esralew met with the investor and he indicated an intent to invest, she told Abruzzo that she would not be selling a part of the company to him. (Abruzzo Aff. ¶¶ 7-8).

### Robert Blagman

34. Robert Blagman was hired in the Fall of 1998 to produce a television commercial for Kids Count Entertainment, L.L.C. He dealt directly with Vicki Esralew and her husband, Robert Aren. (Blagman Aff. ¶ 2).

35. Based upon conversations Blagman had with Esralew during October and November of 1998, Esralew knew that if they started filming the television commercial immediately after Thanksgiving it would not provide enough time to complete the post production work and have the commercial on the air in time for an effective Christmas sales campaign. (Blagman Aff. ¶ 3).

36. In the Fall of 1998 there were outstanding invoices to Kids Count based on work Blagmen's company had done. After November 22, 1998 Blagman was directed by Esralew to resubmit the bills and they were then paid. (Blagman Aff. ¶ 4).

37. In December of 1998 and early 1999 Blagman traveled to Chicago three times in order to meet with potential investors in Kids Count. Esralew said that she was hoping to get financing in order to buy out Soskin and the Terrys and move forward without them. Esralew

8

told Blagman she wanted to get financing through Peter Abruzzo or contacts made through a Dr. Leonard Makowka. (Blagman Aff. ¶ 5).

38. Each time Blagman traveled to Chicago to meet with the potential investors he was instructed by Esralew not to let Soskin or the Terrys know he was coming to town and not to tell them that them was working with Esralew and Aren to find other investors to replace them. (Blagman Aff. ¶ 5).

39. During December of 1998 and January of 1999 Blagman was constantly given direction by Esralew that contradicted what he was being told by Soskin. Esralew directed Blagmen to lie to Soskin. Blagman was told by Esralew to withhold information about Peter Abruzzo and Dr. Makowka from Soskin and the Terrys. (Blagman Aff. ¶ 6).

40. Based upon the dealings Blagman had with Esralew the second half of 1998 and first half of 1999 he came to the conclusion that she uses people for their money and then drops them so she can look for the next person to give her money. (Blagman Aff. ¶ 8-9).

**Kids Count Prospectus**

41. The prospectus provided to Soskin and the Terrys described Esralew herself as the primary asset of Kids Count:

> [Esralew's] unique talent for populating imaginative situations with captivating characters, adding creative learning experiences, and envisioning products that appeal to both children and parents is the driving force behind Kids Count…Vicki's advertising expertise and ablility to express her personal mission is a distinct competency that plays a vital role in gaining business and promoting media attention.
> . . . . .
> The second aspect of this strategy is to take advantage of the charisma and on-screen presence of Company founder, Vicki Esralew…Vicki featured as the "spokesmom" for her line of products…by establishing Vicki Esralew as the

9

"mom on a mission," a whole new area of wholesome product endorsements should arise… (Soskin Aff. ¶ 9, Ex. A. p.4)

. . . . .

Each time Vicki is featured on television with her Kids Count message and product, consumer response is impressive. (Soskin Aff. ¶ 9, Ex. A. p.15).

. . . . .

Vicki's appearances and interviews will also be an important component as the growing brand seeks national attention. (Soskin Aff. ¶ 9, Ex. A. p.25).

. . . . .

One of Kids Counts competetive advantages is Vicki as a credible spokesman. Her radiant personality shines through radio, TV and newspaper stories…Vicki's genuine appeal and verifiable impact on sales… (Soskin Aff. ¶ 9, Ex. A. p.57).

42.     The Kids Count prospectus said that "Kids Count is under negotiations with its international marketing partner to take the product line international. .." (Soskin Aff. ¶ 9, Ex. A. p.5). Esralew admitted at her deposition that this was not true. (Esralew dep. pp. 235-36).

43.     The Kids Count prospectus said that "The Company plans to continue retail distribution through…Sears." (Soskin Aff. ¶ 9, Ex. A. p.5). Esralew admitted at her deposition the only sales through Sears had been three years earlier, in 1996, for only a couple of months. (Esralew dep. pp. 238-39).

44.     The Kids Count prospectus said that "Kids Count recently entered into an agreement with NAC Marketing Company to sell our complete family of products on radio infomercials." (Soskin Aff. ¶ 9, Ex. A. p.57). Esralew testified that she was not sure, but she might have done a radio interview arranged by NAC once. (Esralew dep. p. 247).

45.     The Kids Count prospectus said that "Now [Interactive Kids has] selected *Jack's Attic* CD-ROM to be featured in their 1998 mailings." (Soskin Aff. ¶ 9, Ex. A. p.56). Esralew

10

testified that she had no recollection of Interactive Kids doing any marketing for Kids Count even when she was prompted with a suggestion that they had been a "featured item." (Esralew dep. p. 245).

46. The Kids Count prospectus said that *Jack's House* was going to be promoted in a mid 1999 mailer going to 6 million credit cardholders. (Soskin Aff. ¶ 9, Ex. A. p.56). Esralew testified that the credit card mailer was something they wanted to do, talked about doing. (Esralew dep. pp. 245-56).

/s/ Thomas C. Crooks  
Thomas C. Crooks  
Attorney for Plaintiffs

Thomas C. Crooks  
Attorney for Plaintiffs  
ARDC #00547336  
Three First National Plaza, Suite 1950  
Chicago, IL 60602-4298  
Office (312) 641-2260  
Facsimile (312) 641-5220  

\\Ma01\Data - Clients\Crooks, Thomas\Kid's count\Motions\summary judgment\Local Rule 7056-2 Statement of Facts.doc

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| | ) | Case No. 04-B-24393 |
| VICKI E. ESRALEW | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | | |
| ROLLIN J. SOSKIN, EUGENE TERRY, NICOLE TERRY and TERRY'S COMPANY, INC. | ) ) ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) ) | Adversary Proceeding No. 04 A 3774 |
| | ) | |
| VICKI E. ESRALEW, | ) | Judge Goldgar |
| Defendant. | ) | |

## NOTICE OF FILING

TO:  Cohen & Krol                                 Office of the U.S. Trustee
     105 W. Madison Street, Suite 1100            227 W. Monroe Street, Suite 3350
     Chicago, IL 60606                            Chicago, IL 60606

　　　PLEASE TAKE NOTICE that on February 21, 2006, Thomas C. Crooks electronically filed Plaintiffs' Local Rule 7056-2 Statement of Facts and attachments with the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, 219 S. Dearborn Street, Chicago, Illinois, a copy of which is hereby served upon you.


　　　　　　　　　　　　　　　　　　　　　/s/ Thomas C. Crooks
　　　　　　　　　　　　　　　　　　　　　Thomas C. Crooks
　　　　　　　　　　　　　　　　　　　　　Attorney for the Plaintiffs

Thomas C. Crooks
ARDC #00547336
Three First National Plaza, Suite 1950
Chicago, IL 60602-4298
Office (312) 641-2260
Facsimile (312) 641-5220

CERTIFICATE OF SERVICE

      I hereby certify that on February 21, 2006 I electronically filed the foregoing Plaintiff's Local Rule 7056-2 Statement of Facts and attachments and Notice of Filing with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

TO:    Cohen & Krol                                    Office of the U.S. Trustee
        105 W. Madison Street, Suite 1100     227 W. Monroe Street, Suite 3350
        Chicago, IL 60606                           Chicago, IL 60606

                                              /s/ Thomas C. Crooks
                                              Thomas C. Crooks
                                              Attorney for the Plaintiffs