Excerpts of the Deposition of Rollin J. Soskin

1                IN THE UNITED STATES BANKRUPTCY COURT
              NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3     IN RE:

4     VICKI E. ESRALEW,                No. 04 B 24393
              Debtor.
5     ---------------------------
      ROLLIN J. SOSKIN, EUGENE
6     TERRY, NICOLE TERRY, and
      TERRY'S COMPANY, INC.,
7
              Plaintiffs,
8
         vs.                           No. 04 A 3774
9
      VICKI E. ESRALEW,
10
              Defendant.
11

12

13

14                      2004 Examination of ROLLIN J.

15    SOSKIN taken before CAROL RABER, Certified

16    Shorthand Reporter, pursuant to the Federal Rules

17    of Civil Procedure and the Bankruptcy Code

18    pertaining to the taking of depositions, at Suite

19    1100, 105 West Madison Street, in the City of

20    Chicago, Cook County, Illinois, commencing at

21    approximately 1:00 p.m., on the 10th day of

22    November, A.D., 2005.

23

24

                CAROL RABER & ASSOCIATES (312) 446-6926

1    APPEARANCES:

2    MR. THOMAS C. CROOKS
      Three First National Plaza
3    Suite 1950
      Chicago, Illinois 60602
4    Tel:  (312) 641-2260
      Fax:  (312) 641-5220
5    on behalf of the plaintiffs;

6    COHEN & KROL, by
      MS. GINA B. KROL
7    105 W. Madison Street
      Suite 1100
8    Chicago, Illinois 60602
      Tel:  (312) 368-0300
9    Fax:  (312) 368-4559
      On behalf of the defendant.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                           I N D E X

2

3      WITNESS:                          PAGE:

4      ROLLIN J. SOSKIN
            Examination by Ms. Krol        4

5      EXHIBITS:                         MARKED:

6      Soskin Exhibit No. 1              18
          Memorandum of Agreement

7      Soskin Exhibit No. 2              56
          Memorandum of Agreement

8      Soskin Exhibit No. 3              65
          Letter of 2/24/99

9      Soskin Exhibit No. 4              99
          First Amended Adversary Complaint

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    (WHEREUPON, the witness

2                    was duly sworn.)

3                    ROLLIN J. SOSKIN,

4     having been called as a witness by the

5     Defendant, having been first duly sworn, was

6     examined and testified as follows:

7          MS. KROL:  For the record, this

8     deposition is being taken in the adversary

9     proceeding captioned Rollin J. Soskin, Eugene

10    Terry, Nicole Terry and Terry's Company v. Vicki          01:09PM

11    Esralew, case number 04 A 3774.

12          Further, this deposition is being taken

13    pursuant to Bankruptcy Rule 2004, notice of

14    deposition having been properly served upon the

15    deponent and by agreement of the parties.          01:09PM

16                    EXAMINATION

17    BY MS. KROL:

18       Q.   Could you state your name and address,

19    please?

20       A.   Sure.  Rollin, R-o-l-l-i-n, J. is my          01:09PM

21    middle initial, Soskin, S-o-s-k-i-n, 9933 Lawler,

22    L-a-w-l-e-r Avenue, Suite 312, Skokie, Illinois

23    60077.

24       Q.   Mr. Soskin, what is your occupation?

1        A.   I am an attorney is my primary

2   occupation?

3        Q.   Do you have a secondary occupation?

4        A.   Yes.   I am trustee of many trusts.

5        Q.   Are you also a licensed accountant?          01:10PM

6        A.   Licensed, no.   I am a Certified Public

7   Accountant, however, by virtue of having passed

8   the CPA exam.

9        Q.   Do you practice accounting?

10        A.   I do not hold myself out as a Certified     01:10PM

11   Public Accountant for purposes of doing any kind

12   of a certified audit, which is the only thing I

13   would be required to have a license for.

14        Q.   Do you do tax preparation?

15        A.   Yes.                                        01:10PM

16        Q.   So you do render some accounting

17   services?

18        A.   I render services, even tax services, as

19   a tax attorney.

20        Q.   When did you become licensed to practice    01:10PM

21   law?

22        A.   (Brief pause.)

23        Q.   I always have to count backwards, I

24   know.

1        A.   May -- I believe 1979.

2        Q.   And when did you become a CPA?

3        A.   I sat for the exam in May 1975 and

4   passed it.

5        Q.   And what states are you licensed to          01:11PM

6   practice law in?

7        A.   Currently just Illinois.

8        Q.   Do you practice accounting in any other

9   state?

10       A.   I have clients for whom I do tax work as      01:11PM

11   a tax attorney in many states.

12       Q.   Have you sat for the CPA exam in any

13   other state?

14       A.   That's not required.

15            So the answer is no.  The answer is no.       01:11PM

16       Q.   So once you pass it, you're good to go?

17       A.   You're a CPA by virtue of passing the

18   test.  If you want to be licensed to do certified

19   audits or do other accounting functions when

20   you're not an attorney, then you would be              01:11PM

21   licensed in every state that requires you to have

22   a license to practice there.  But I'm not

23   licensed in any state as a CPA.

24       Q.   You are a plaintiff in the adversary

1    proceeding I previously alluded to, correct?

2        A.   Yes.

3        Q.   When did you first meet Vicki Esralew?

4        A.   I believe it was time in about 1988.  It

5    could have been -- somewhere between 1986 and          01:12PM

6    '88, but I believe it was 1998.

7        Q.   What was the reason for that meeting?

8        A.   She and her husband were referred to me

9    by an attorney, a friend of mine, who lives and

10   practices in Arizona, because they had moved back      01:12PM

11   here and needed to have some estate planning

12   done.

13       Q.   And did you act as an attorney for Vicki

14   Esralew at that time?

15       A.   Yes.                                           01:12PM

16       Q.   And what was the scope of your

17   representation initially?

18       A.   Initially I believe it was to prepare

19   wills and trusts for them or to review their

20   existing wills and trusts to see if they needed        01:13PM

21   to be revised for Illinois.  That was that, and

22   there was also either the creation of a

23   corporation or the review and servicing of an

24   existing corporation called Capital Advertising,

1   which Vicki used to operate, sort of like an

2   advertising agency.

3        Q.   Do you have a specific area of law that

4   you practice in primarily?

5        A.   I would say I'm a general practitioner          01:13PM

6   with a heavy emphasis currently on estate

7   planning, tax, and business transactions.  It's

8   always been pretty much that emphasis, although

9   the estate planning has become bigger and bigger

10  to where it's dwarfing anything else.  Anything a     01:14PM

11  businessman needs we can do.  If he needs a

12  divorce or has a criminal matter or a labor law

13  problem, we refer him to somebody who specializes

14  or concentrates their practice in that area.

15        But for most things, we can do anything          01:14PM

16  that a businessman needs.

17        Q.   After your initial representation of

18  Vicki, did you continue to represent her in other

19  matters?

20        A.   Well, if you are asking if there is a        01:14PM

21  time when that representation ceased, the answer

22  is yes.

23        Q.   Okay.

24        A.   There were -- from the time she first

1    came to my office, she made me the registered

2    agent -- or shortly after the first time, she

3    made me the registered agent of Capital

4    Advertising.

5           That meant that every year I would get          01:14PM

6    the annual report form from the Secretary of

7    State, through my law firm that I was practicing

8    with at that time, and I prepare the annual

9    reports and the annual minutes of the

10   corporation.                                           01:15PM

11          Shortly -- sometime shortly thereafter,

12   she had an idea for another business.  So we set

13   up a corporation which was called Enivar Roads,

14   E-n-i-v-a-r, which is "ravine" backwards.  She

15   was going to sell some sort of discount coupons      01:15PM

16   and get a piece of the action from retailers in

17   Hubbard Woods, or something like that.  But I

18   don't think she ever went forward with it,

19   although I believe she later changed that

20   corporation -- not with me -- to become Kids         01:15PM

21   Count Entertainment, LLC.  Or maybe it was with

22   me, but I don't think so though.

23          So when I created that corporation for

24   them, I acted as registered agent of that

1    corporation and I, of course, then prepared the

2    annual reports and annual minutes for that

3    corporation.

4              The only other representation that I had

5    of them that I recall prior to 1994 when I left          01:15PM

6    -- our contact and association ceased for an

7    extended period of time -- was involving purchase

8    or sale -- it must have been the purchase of

9    their town home in Northbrook.  And some later

10   time they looked at a property, a lot, in               01:16PM

11   Northbrook to build a home on, but ended up not

12   buying it.  I think that pretty thoroughly covers

13   everything that I ever did for them during that

14   first period of acquaintance.

15        Q.   That would be from approximately either       01:16PM

16   '86 or '88?

17        A.   I'd say '88.

18        Q.   '88 to 1994?

19        A.   Actually it would be sometime in mid-'93

20   is my best recollection.  I think sometime after        01:16PM

21   that I was asked -- the only contact that I had

22   was to send all of the records to some other

23   lawyer.

24        Q.   Do you know who that other lawyer was?

CAROL RABER & ASSOCIATES (312) 446-6926

1     A.   Not offhand, no.

2     Q.   Was there some --

3     A.   I'm sure there's a copy of the letter in

4  all of documents that I produced to you, though.

5     Q.   Do you recollect the reason why you                01:16PM

6  ceased representing Ms. Esralew in 1993?

7     A.   Sure.   They engaged other counsel

8  primarily because they had started raising money

9  from other investors for the business, and those

10 investors either had attorneys of their own or      01:17PM

11 attorneys that they wanted new entities to use or

12 the new venture to use.

13    Q.   Did you continue to represent Vicki

14 Esralew in personal matters after that period of

15 time?                                               01:17PM

16    A.   No.   Didn't have any contact with her

17 whatsoever after some time --

18         And the contact in those last couple of

19 years, '92 and '93, even before that, was

20 probably just a letter, Here's your annual report  01:17PM

21 and minutes that we filled out from what's in our

22 records.   And if you have any questions or

23 changes, call me.   Otherwise, sign them and file

24 them.

CAROL RABER & ASSOCIATES (312) 446-6926

1      So we probably had very little personal

2   contact from 1991 or '92 on, that I can think of,

3   unless it was the time they were looking at that

4   lot.  And from '93 or so, after they requested

5   the records be sent somewhere else, I didn't hear          01:18PM

6   from them, to my recollection, until I ran into

7   them in June or July of 1998.

8      Q.  During that initial period, say '88 to

9   '93, did you have a written retainer agreement

10   with Vicki Esralew?                                        01:18PM

11      A.  I personally didn't.  If one existed, it

12   was with the firm I was with at that time which

13   was -- let's see, it had several different name

14   changes over the years.  But essentially it was

15   Evans, Soskin & Lowenstein.                                01:18PM

16      And I don't recall if we had a retainer

17   agreement or not.  It would have been our

18   practice to have one, though, but I wouldn't have

19   it unless it was among what I sent.

20      But I think those records -- if there          01:18PM

21   are any other records pertaining to -- I think I

22   took all of my records that I had, all my files

23   when I left Evans' office downtown.  So -- and I

24   don't recall seeing a retainer agreement.

CAROL RABER & ASSOCIATES (312) 446-6926

1        Q.   And just for the record, I don't recall

2   seeing it in the documents that you have

3   produced.

4        A.   I don't think so.  Although, again,

5   there may have been a master retainer file in          01:19PM

6   Evans' office.

7        Q.   From mid-'93 to June or thereabouts of

8   '98, did you represent any business entities

9   owned, controlled or operated by Vicki Esralew?

10       A.   No.                                            01:19PM

11       Q.   After 1998, did -- at some point after

12   that, you were re-engaged by Ms. Esralew?

13       A.   Well, we ran into each other at our

14   synagogue.  They joined, and the children were of

15   age to go to religious school.  And she said, Oh,     01:20PM

16   it's fate that we met again.  We're about to do

17   this whole big deal to sell 25 percent of our

18   company to some venture capitalists for 7 or

19   $8 million; but we need to some estate planning

20   and put some of the kids' -- some of the company      01:20PM

21   into the kids' names; and we need to update and

22   revise our estate planning.

23            And during that time she invited me to

24   come see her operation and everything else, and

1    she instructed me to bill her company for the

2    time for everything, I think, including the

3    estate planning.  And so we became re-acquainted.

4         And I guess your question was were we

5    engaged to provide additional services.  At some          01:20PM

6    point during that summer or fall, they asked me

7    to analyze their situation, propose an

8    appropriate estate plan, to consult with another

9    lawyer they knew who had already made some

10   recommendations to them.  And, ultimately, we          01:21PM

11   drew up amended trusts and updated powers of

12   attorneys and all the wills.

13        Q.  Was there a written retention agreement

14   entered into between you and she about that time?

15        A.  Not that I recall.  If there was, it          01:21PM

16   would be among the documents that I produced.  I

17   would have to go look through it to know that.

18        Q.  When did you first become aware of Kids

19   Count Entertainment?

20        A.  You need to be more specific.  There are          01:21PM

21   two Kids Count Entertainments.

22        Q.  I know.  Either.  Let's say LLC.

23        A.  Well, it's a difficult question to

24   answer.  The first part of the answer is Kids

1      Count -- I knew Kids Count was -- when I ran into

2      her in the summer of 1998 and she brought me to

3      her office, I might have -- I might, or might

4      not, have noticed that now Kids Count

5      Entertainment now had a LLC at the end.  I don't          01:22PM

6      recall.

7             I don't know if I actually knew it was a

8      LLC or that the form had changed until after --

9      until November of 1998, although it's possible

10     that I saw the LLC --                                     01:22PM

11            No, I take that back.  I would have had

12     to know because in order to -- no, I'm thinking

13     for a second.

14            They kept both companies going.  The

15     corporation became the manager of the LLC.  And I        01:22PM

16     had to know something about that once they

17     started talking about the estate planning.

18            So I would say I became aware of the

19     existence of the LLC probably in July or August

20     of 1998.                                                 01:23PM

21        Q.   And what did you understand the purpose

22     of this company to be?

23        A.   Well, I understood it to be the same

24     purpose that Kids Count Entertainment had been --

1    the creation and sale of child friendly

2    nonviolent/educational product.

3        Q.    Did you have anything to do with the

4    organization of this LLC?

5        A.    None, no.                                        01:23PM

6        Q.    Do you know who the members of the LLC

7    were at its inception.

8        A.    At its inception, no.  I think I know

9    who some of them are.  I don't know how they took

10   their ownership interest.  I'm pretty sure Alan        01:24PM

11   Young was involved, either personally or through

12   something calls Feels Good, LLC.  I suspect --

13   well, Kids Count Entertainment, Inc., was the

14   manager and probably a member.  I later learned

15   of someone named Robert Lieper, L-i-e-p-e-r, who      01:24PM

16   had owned and probably sold Nevada Bob's golf

17   company.  I believe he was -- at some point was a

18   member of that company.

19        Again, I don't know at the inception who

20   was involved, but I suspect it was created when       01:24PM

21   Alan Young and his group invested over a million

22   dollars into the company.

23        Q.    When did you first become aware of Kids

24   Count Entertainment, Inc., the corporation?

CAROL RABER & ASSOCIATES (312) 446-6926

1    A.   I don't recall.  I don't know if I did

2    the name change or if somebody after I sent the

3    records did the name change.  I may have done the

4    name change.  I remember it was originally Enivar

5    Roads.                                                    01:25PM

6    Q.   And so were you the incorporator of the

7    original corporation?

8    A.   The incorporator?

9    Q.   The attorney that assisted.

10   A.   I was definitely the attorney, or                  01:25PM

11   someone at my firm at my direction.  But, yeah,

12   we definitely set up Enivar Roads.

13   Q.   Do you remember when that was?

14   A.   I would say somewhere around 1990.  But,

15   again, that should be among the records that I           01:25PM

16   produced.

17   Q.   And who were the officers of that

18   corporation?

19   A.   I have no independent recollection

20   except that I am sure it was Vicki or Vicki and          01:25PM

21   Bob.  There wouldn't be any reason to have anyone

22   else.  Oh, I wouldn't be surprised, however, if I

23   was an assistant secretary in any of those

24   corporations.  That was a frequent practice of

1    practice of myself, as well as many other

2    attorneys, so that clients could have a second

3    signature if they needed one on corporate

4    documents and if the other person -- if there was

5    only one person available.                                    01:26PM

6          Q.  Were you a shareholder in that

7    corporation?

8          A.  No.

9          Q.  Were you a director?

10         A.  No.  If anything, I would call myself a      01:26PM

11    convenience signer.  Probably assistant secretary

12    would be --

13         Do you understand what I'm saying when

14    you need a second signature?

15         Q.  I understand.                                 01:26PM

16         A.  You know, a stock certificate or a

17    corporate document.

18         MS. KROL:  Can you mark that as Deposition

19    Exhibit 1, please.

20                    (Exhibit No. 1 marked               01:26PM

21                    for identification.)

22    BY MS. KROL:

23         Q.  Mr. Soskin, I'm going to show you what

24    has been marked as Soskin Deposition Exhibit 1.

1          Do you recognize that document?

2      A.   I recognize it as a copy of a document

3  that is called the Memorandum of Agreement

4  between Vicki Esralew, Robert Aren, Eugene Terry,

5  Nicole Terry, Terry's Company, Inc., and myself          01:27PM

6  and Kids Count Entertainment, Inc., and Kids

7  Count Entertainment, LLC, which we executed on/or

8  about November 22nd, 1998.

9          So the answer is, yes, I do.

10     Q.   Who drafted that document?          01:27PM

11     A.   It was a joint effort.

12          If you're asking who typed it, I did.

13  If you're asking who participated in the language

14  and in the negotiation of it, I would say Vicki

15  Esralew, Robert Aren, Eugene Terry and myself.          01:27PM

16     Q.   Were there drafts that preceded that

17  agreement?

18     A.   Yes.

19     Q.   How many drafts?

20     A.   At least two, possibly three, to the          01:28PM

21  best of my recollection.

22     Q.   Where was that document signed?

23     A.   Where?  I don't recall for sure.  I'm

24  pretty confident it was at the Arens' house.  But

CAROL RABER & ASSOCIATES (312) 446-6926

1    I'm not sure.  It could have been at the Terrys

2    house, it could have been at my office.  I think

3    it was at the Arens house though.  You know,

4    you're talking about seven years ago to the

5    month.                                                    01:28PM

6        Q.   Who created the initial draft of the

7    document?

8        A.   I did.  I typed it.  I mean, creation

9    contemplates more than just typing something

10   up in legal language though.                              01:29PM

11            In terms of who sat and discussed the

12   terms, it would be Vicki Esralew, Bob Aren,

13   Eugene Terry, Nicole Terry and myself.

14       Q.   When did that meeting take place?

15       A.   There was actually a number of meetings     01:29PM

16   that led to -- it was a process.

17       Q.   Can you take me through that process?

18       A.   Sure.  I had my final meeting with Vicki

19   and Bob to sign the last of their estate

20   documents in October.                                    01:29PM

21       Q.   October.  Could you give me the year,

22   please?

23       A.   1998.  They signed the last document.

24   They started me asking me if there was anybody I

1    knew that might be interested in investing in

2    their company.  They asked me about people that I

3    -- that were clients of mine, people that weren't

4    clients of mine but who we both knew to be from

5    wealthy families.                                           01:29PM

6              Of course, I told her that I would have

7    to ask them.  But I told her I would give it

8    thought.  Because I liked her concept, I liked

9    her, I thought of her as an honest person at the

10   time, and I thought her idea had merit and that      01:30PM

11   she just needed some -- you know, she needed

12   proper investment and somebody to help her.

13             So as I left there, I actually thought

14   about the Terrys, who had sold their business,

15   who were relatively young, had money -- when I        01:30PM

16   say "relatively young," I guess they were in

17   their sixties -- but they were brilliant people,

18   successful in business, with money to invest and

19   would love the idea of nonviolent educational

20   children's products.                                  01:30PM

21             So I -- and this is after we finished

22   the estate planning project -- I had mentioned it

23   to the Terrys, I asked them if they would be

24   interested, and I then ultimately introduced

1    them.

2        Q.   When did you introduce the Terrys to

3    Vicki Esralew?

4        A.   I can't give you the exact date offhand,

5    but I'm sure it was during the first 10 days of          01:30PM

6    November 1998.

7              So continuing the process.  They met,

8    they liked each other.

9              Vicki is very charismatic and was very

10   enthusiastic about her products and also had             01:31PM

11   impressed the Terrys as somebody who was creative

12   but couldn't run a business.  So the Terrys said

13   they were interested enough to spend some time

14   seeing how such a deal could be successful.

15             And so we met on several occasions at          01:31PM

16   the Arens' house.  I think we met once at the

17   Terrys' house.  We once had a marathon meeting at

18   my house that must have gone 10 hours.  I

19   remember Gene Terry was so happy I brought in

20   corned beef and roast beef from a good deli that         01:32PM

21   he said -- he commented about it.

22             So during that meeting at my house we

23   already had some projections from Vicki about

24   various products and what she thought the sales

1     could be if she did her infomercial and what

2     kinds of costs were involved and how to prepare

3     and make an infomercial to, you know, what

4     advertising time would cost on TV.  And we came

5     up with a big spreadsheet that showed possible          01:32PM

6     projected revenues and expenses based on certain

7     assumptions.

8              Vicki had initially provided Mr. Terry

9     with all kinds of pieces of paper, you know, and

10    tried to explain her projections.  And it just          01:32PM

11    wasn't going to be in a form that an investor

12    like Mr. Terry would want to analyze an

13    investment.  So they asked me if I would join

14    them to do that and help with it.

15             And I would point out at this point          01:33PM

16    there was no discussion of my involvement as an

17    owner at that time.  And it first became an issue

18    of whether or not I would even be paid for any of

19    this time or any of these services that when we

20    were doing the cash projections and Gene Terry          01:33PM

21    said, Well, we're going to have legal and

22    accounting and other expenses and I need to have

23    somebody to take the business end of this off of

24    it, and I won't even consider the investment

1    unless you are going to be there, meaning me.

2         So we came up with all kinds orf

3    projections.  And at that point there was a

4    projection Vicki wanted $12,000 a month, I think;

5    and I forget what my initial projection of the        01:33PM

6    amount was that was budgeted for me.  But I can

7    tell you it was ultimately substantially reduced

8    and that I never got paid a penny by this company

9    for all the time and work I spent on it.

10        Q.   So it was Mr. Terry that insisted that     01:33PM

11   you become involved in the project?

12        A.   Absolutely.

13        Q.   And back in October of '98 when you were

14   finishing up the estate planning and Vicki

15   approached you about investors, did she tell you     01:34PM

16   why she was interested in finding investors?

17        A.   Why she was interested in finding

18   investors?  She was convinced that if she made an

19   infomercial and got it on the air by Christmas,

20   she would be able to sell -- well, I should say      01:34PM

21   she convinced us that she was convinced that if

22   she got her infomercial on the air, it would be a

23   huge success and that we would all make a fortune

24   between then and Christmas or we would recognize

1    huge success between then and Christmas.

2        Q.   Can you tie in for me the need for the

3    investors to this infomercial?  She had an

4    existing operating company, didn't she?

5        A.   Well, I'm not sure to what extent it was    01:35PM

6    operating.  I know she had some sales to Zany

7    Brainy and some other educational children's

8    stores.  I don't know -- all I know is when we

9    met up with her, she didn't have any financial

10   statements for the last four or five months.  But    01:35PM

11   they had just brought a brand new big house and

12   seemed to be optimistic about their likelihood

13   for success.  But they obviously -- but they at

14   some point during this process told me they had

15   borrowed some money from the guy across the    01:35PM

16   street, $75,000, Steve Santowski (phonetic), and

17   they had a payment to Alan Young to finish the

18   buyout of his interest.

19        So, you know, they gave us the

20   impression they were replacing investors that    01:35PM

21   wanted out.  And, of course, they also told us

22   that they needed money to do this commercial over

23   and above the money to buy people out or pay

24   people off.

1          Q.    Now this was in about the beginning of

2    November you said of '98?

3          A.    This whole "do you know anybody" -- from

4    the time they asked me if I knew anybody that

5    might be interested in investing until the time          01:36PM

6    we signed the agreement was about three weeks.

7          Q.    And that agreement was signed

8    November 22nd?

9          A.    Correct.  It was all within a three-week

10   period.  It was pretty intense.  I mean they were     01:36PM

11   talking every day without me and with me.  I mean

12   they involved me when they wanted me.

13              But they were in contact.  From the time

14   that I introduced them, they were talking every

15   day and she was giving him information and he was     01:36PM

16   asking more questions.  And finally, it wasn't

17   coming into an order or format that he could put

18   together.

19         Q.    And that's when he asked you to get

20   involved?                                              01:36PM

21         A.    That's when they asked if I could assist

22   them in putting together an organized projection,

23   if I would join them to do that.

24         Q.    And did you do that?

1    A.   Yes.   That's the meeting that took place

2  -- the marathon meeting that took place in my

3  house.   And I'm sure among the documents I gave

4  are big spreadsheets, however they were copied.

5  But they were big spreadsheets when they left my          01:37PM

6  house.

7    Q.   So, in addition, how did you collect the

8  information to create these spreadsheets?

9    A.   From what Vicki had given Gene.

10         And then the three of us sat there, and        01:37PM

11  I said, What about this?   And Gene and Vicki

12  would give an answer.   And Gene would say, What

13  about that?   And Vicki would give an answer.   And

14  Gene would say, That's not reasonable, let's use

15  this number because it's more conservative.             01:37PM

16         And we actually sat and developed

17  projections that gave Gene and Terry an idea of

18  how much money would be needed and what the

19  likelihood of -- you know, what his likely

20  expenditure would be to determine if this thing        01:37PM

21  would make it or not and what his likely reward

22  was if it worked out.   Like any other investor

23  it's a risk/reward analysis.   How much do I have

24  to risk, and what's my upside and what's my

CAROL RABER & ASSOCIATES (312) 446-6926

1    downside.

2         Q.   And he tried to be conservative in that

3    respect?

4         A.   Well, I don't know what he tried to be.

5              I think that he liked Vicki and was                    01:38PM

6    looking to help her if it made sense to him.   I

7    wouldn't say he was being conservative or --

8              What's the opposite of conservative,

9    radical or aggressive?

10             I think he decided he liked Vicki and                 01:38PM

11   her ideas.   I know Nicole liked Vicki and her

12   ideas.

13             We had a Hanukah party and invited their

14   family.   The Terrys welcomed them into their

15   family.                                                         01:38PM

16        Q.   Now you said earlier that Vicki was

17   charismatic and she had a lot of ideas but was

18   not a business person.

19        A.   Well, she was apparently incapable of

20   keeping records without somebody else doing it.                 01:38PM

21   I can't say she wasn't a businesswoman.   She went

22   out and sold a ton of things.   She came up with

23   these ideas, she created the product.   She gave

24   us 40 other things she had in process.   She

1   apparently at some point had a deal to -- but

2   Gene Terry said if he was going to be involved,

3   he wanted her freed up to do the creative and

4   actually finish some of the things that she

5   started as opposed to running the business.          01:39PM

6         I wouldn't say she wasn't business

7   minded; but she couldn't do everything, and she

8   was trying to.

9         Q.  Was Mr. Terry a businessman?

10        A.  Yes.  He had -- when I first met him, he   01:39PM

11   was a lawyer but he wasn't practicing law.  He

12   owned part of a manufacturing company that made

13   diamond tip drill bits.  And he was the chairman

14   of that company and his primary focus was the

15   operation and growth of that company.               01:39PM

16        Q.  And that's the business that you alluded

17   to that was sold?

18        A.  Yes, that's one of the businesses they

19   sold.

20        Nicole Terry had a business of her own        01:39PM

21   that she built up and sold.

22        Q.  What kind of a business was that?

23        A.  It was -- they imported machines that

24   tested the level of certain metals in other

1    products.

2           For example, how much tin is in a tin

3    can is important to Campbell Soup.  So they'll

4    buy a piece of equipment that will measure the

5    amount of tin in a tin can.                           01:40PM

6           So she imported these precision testing

7    equipment pieces and sold them.  And she sold her

8    company for a nice amount of money.

9           And they both had their office in the

10   office where I was practicing law.                    01:40PM

11        Q.   Were you ever law partners with Gene

12   Terry?

13        A.   Yes.  Well, we were co-shareholders of a

14   law practice at one time, but he was never an

15   active attorney during that time.  He owned part     01:40PM

16   of a firm that I bought into by buying out

17   another fellow names Bill Lange who was then

18   about 75 years old.  And so Gene was a

19   non-practicing lawyer that by virtue of having

20   owned part of it owned part of a law firm that I     01:40PM

21   bought into.  That didn't last very long.

22        Q.   So at this 10-hour meeting at your

23   home --

24        A.   I'm not sure it was 10.  It might have

1  been seven or eight.  It seemed like a marathon.

2      Q.   Whatever.  This long meeting, was anyone

3  else besides you, Vicki, and the Terrys present?

4      A.   Well, I'm sure on and off my wife was

5  there.  And probably --                                    01:41PM

6           This was 1998?

7      Q.   I'm sorry, I thought you said '98.

8      A.   I'm sorry, '98.  My kids were probably

9  in and out of the house or around in the house,

10  but they weren't involved in any of the meeting.          01:41PM

11           I don't recall if anybody else was

12  there.  Bob and Vicki and Nicole and Gene and I

13  were all there at least part of the time.  And

14  Gene and Vicki and I were probably there the

15  entire time.                                              01:41PM

16      Q.   So this meeting concludes and then what

17  happens?  Was there an agreement reached at this

18  meeting?

19      A.   I don't think so.  I think that Gene

20  took the numbers home and started to think about          01:41PM

21  it.  And I think he wrote a letter to me which

22  you have seen which says, All right, I've decided

23  I'm willing to go forward, and I will recognize

24  you as Vicki's attorney, and here's some of the

CAROL RABER & ASSOCIATES (312) 446-6926

1    terms I would be interested in.

2          And, of course, you've got that letter

3    because Vicki's used it in many pleadings to act

4    as though I was her attorney, which I wasn't.

5          Because it was that letter that                    01:42PM

6    immediately caused me to say, Hold on here.  If

7    you want me to be in this deal, I'm nobody's

8    attorney, I'm my own attorney, and everybody had

9    better get their own.

10          It was that letter that prompted that.            01:42PM

11   It was discussed numerous times with everybody.

12   And Gene said, No, I will be my own lawyer.  And

13   Vicki said, I've got other advisors and she

14   represented to us that she used other lawyers and

15   advisors to advise her.                                   01:42PM

16       Q.   Do you have some documentation to

17   support that assertion that you were not her

18   attorney?

19       A.   That I --

20       Q.   That she had other attorneys?                    01:42PM

21       A.   I have -- well, I have affidavits that I

22   previously filed from the Terrys of those

23   representations by Vicki and Bob.

24       Q.   Do you have independent third party --

CAROL RABER & ASSOCIATES (312) 446-6926

1        A.   Let me answer the question, okay.

2            I have the name of one attorney that she

3    said she had consulted.  I have it written down

4    because I can never remember his name.  He used

5    to be in Lincolnshire though.                          01:43PM

6            I have telephone memoranda or notes of

7    telephone conversations with her where she told

8    us that she consulted with her brother-in-law.  I

9    don't remember, I think that one of her brothers

10   is David Dorfman, who is an attorney -- I'm         01:43PM

11   sorry, he's a businessman; and his wife, Bob's

12   sister, is an attorney.

13           And Vicki has another brother-in-law --

14   I'm not sure, Howard, maybe -- who is a

15   businessman.  Plus they had numerous other           01:43PM

16   lawyers before us.

17           So when they told us they were

18   consulting with other attorneys, we had no reason

19   to doubt them, number one.  And number two --

20      Q.   When did these conversations about her       01:43PM

21   outside counsel take place?

22      A.   From the moment I got that letter up to

23   the time that --

24      Q.   Mr. Terry's letter?

1        A.   Yes, up to the time that just before the

2    signing of that agreement.

3             And that's why there was a provision

4    about it.  It was inserted into our agreement.

5    I can point it to you right here.                          01:44PM

6             In the exhibit you have shown me,

7    paragraph 11, it says "Each party hereto" -- and,

8    of course, that includes Vicki and Bob -- "has

9    made such investigation of the facts and

10   circumstances and the condition of Kids Count and    01:44PM

11   of the other parties and has engaged such

12   attorneys, accountants or professionals, as they

13   determined in their own discretion to be

14   necessary or prudent in the circumstances."

15            And then they go on to waive any actual     01:44PM

16   or apparent conflict on my part from my

17   participation of bringing them -- bringing

18   Esralew, Aren, and Kids Count together with the

19   Terrys, or from the services of Soskin to, by in

20   regard to Kids Count, Terry or Esralew, or any of   01:44PM

21   them.

22        Q.   A --

23             I cut you off.

24        A.   Okay, paragraph 11 specifically

1    contemplated exactly what we were talking about.

2         And specifically they represented that

3    they had done what they wanted to do, and that I

4    didn't represent them or anybody else.

5         Q.  I'm not sure that I agree with your          01:45PM

6    interpretation of that paragraph, but that's a

7    subject for the judge to determine.  I don't

8    think that we need to argue it or belabor it.

9              I understand --

10        A.  Okay, but it does say that they made          01:45PM

11   their own investigation and they agreed to hold

12   me harmless and they agreed I didn't represent

13   them.

14        Q.  No, I don't think they agreed that you

15   don't represent them.                                  01:45PM

16        A.  It says they "agree to hold Soskin

17   harmless resulting from any claims that Soskin

18   represented one party or the other or was subject

19   to a conflict of interest as between any of the

20   parties."                                              01:45PM

21        Q.  Right.  So if you didn't represent them,

22   there wouldn't be a potential for a conflict of

23   interest.

24             And, Rollin, you know what, we're not

1     A.   You asked me if I had any basis for that

2   and I said yes, I had --

3     Q.   What is that independent basis?

4     A.   She came back to us with changes to the

5   first draft of this agreement that I don't think          02:15PM

6   in a million years she would've come up with

7   herself without having run this by some

8   experienced financial professional or business

9   person that would have suggested these

10   modifications that she wanted made to this          02:16PM

11   agreement.

12     Q.   Do you have a copy of those changes that

13   were suggested?

14     A.   Sure.   It's among the documents that I

15   produced.   But I think I can tell you what they          02:16PM

16   are.

17     Q.   Okay.

18     A.   There were two additions that had to be

19   made that she wanted, at least the two things

20   that stick in my mind that she wouldn't have come          02:16PM

21   up with.

22          And you've received in your documents

23   the original early drafts of these things that

24   went back and forth and the ones that had the

1    notes for the changes and that show the fax

2    headers with the dates.

3           At the end of paragraph 6 and at the end

4    of paragraph 7, in each of those two places, a

5    sentence was added that says "In the event of a          02:16PM

6    refinancing in excess of $2 million or a

7    recapitalization of Kids Count with new value in

8    excess of $2 million, Kids Count may demand that

9    Terry, or in the other case Soskin, exercise or

10   waive his option within 90 days of notice."             02:16PM

11          She also, I believe, came to us and said

12   that she wanted what are called bring-along

13   rights:  If she decided to sell the company, she

14   could force us to be sell ours as well.  That is

15   reflected in paragraph 10.  And she said she              02:17PM

16   wanted bring-along rights.  We said, all right,

17   then we want tag-along rights so that if you to

18   sell your interest we can be bought out at the

19   same price if we want to.

20          Q.  And that was language that was suggested       02:17PM

21   by Vicki?

22          A.  Yes.  Well, not -- I don't know whose

23   exact words.  Those were the concepts that she

24   said she was told she had to have in there before

1   she could sign it.

2       Q.   Were you contacted by another

3   professional businessman, attorney, or CPA?

4       A.   For the third time, no.

5       Q.   But I'm going to ask you.  I've asked          02:17PM

6   you about Kids Count, I've asked you about

7   Terrys.  I don't think I've asked you about

8   anyone on behalf of Vicki Esralew.

9       A.   I think you did, but that's okay, I will

10  answer you again.                                        02:18PM

11          No.

12      Q.   Thank you.

13  MS. KROL:  All right, would you mark this as

14  Soskin Deposition Exhibit 3, please.

15                       (Exhibit No. 3 marked               02:18PM

16                        for identification.)

17                       (Discussion off record.)

18  BY MS. KROL:

19      Q.   Mr. Soskin, I'm showing you what's been

20  marked as Soskin Exhibit No. 3.  Do you recognize        02:20PM

21  that document?

22      A.   I do.

23      Q.   What do you recognize that to be?

24      A.   It's a letter dated May 5th, 1999 which

CAROL RABER & ASSOCIATES (312) 446-6926

1    STATE OF ILLINOIS  )
                       )  SS:
2    COUNTY OF C O O K  )

3          I, CAROL RABER, Certified Shorthand

4    Reporter for the State of Illinois, do hereby

5    certify that on the 10th day of November, 2005

6    A.D., the deposition of the witness, ROLLIN J.

7    SOSKIN called by the Defendant, was taken before

8    me, reported stenographically and was thereafter

9    reduced to typewriting through computer-aided

10   transcription.

11         The said deposition was taken at

12   105 W. Madison Street, Suite 1100, Chicago,

13   Illinois, and there were present Counsel as

14   previously set forth.

15         The said witness, ROLLIN J. SOSKIN,

16   was first duly sworn to tell the truth, the whole

17   truth, and nothing but the truth, and was then

18   examined upon oral interrogatories.

19         I further certify that the

20   foregoing is a true, accurate and complete record

21   of the questions asked of and answers made by the

22   said witness, at the time and place hereinabove

23   referred to.

24         The signature of the witness was

CAROL RABER & ASSOCIATES (312) 446-6926

1    reserved.

2              The undersigned is not

3    interested in the within case, nor of kin or

4    counsel to any of the parties.

5              Signed this 21st day of

6    November, 2005.

7

8    _____

9    CAROL RABER, C.S.R.
     License No. 084-02819

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CAROL RABER & ASSOCIATES (312) 446-6926