Excerpts of the Deposition of Eugene Terry

Page 1

```
 1              UNITED STATES BANKRUPTCY COURT
 2              NORTHERN DISTRICT OF ILLINOIS
 3                    EASTERN DIVISION
 4   ------------------------------------------------
 5   SOSKIN,
 6
 7         Plaintiff,
 8
 9      vs.                        Case Number 04-B-24393
10
11   ESRALEW,
12
13         Defendant.
14   ------------------------------------------------
15
16              Deposition of Eugene Terry
17
18                  December 6, 2005
19
20                       -at-
21
22                 Crooks Law Office
23              Three First National Plaza
24                     Suite 1950
25                   Chicago, Illinois
```

### Page 54

1 that she was a creative kind of person, that she would
2 develop the products, okay? That whatever was involved in
3 regard to management she would perform, that it was really
4 -- what she needed was direction, okay, help on -- on
5 certain things which she was in my opinion frightened of,
6 okay?
7    Q. You were aware that she was desperate for a --
8 someone to come in to run the company, the day to day
9 running of the company, is that correct?
10   A. Yeah, she wanted somebody to -- yes. She was
11 desperate for money more than she was desperate for somebody
12 to run the company.
13   Q. Why did you wink at me?
14   A. Wink at you?
15   Q. We are taking a video dep --
16   A. Because -- yes, I winked because I assumed that
17 you knew that -- that --
18   Q. I don't assume anything, Mr. Terry.
19   A. Okay, then I won't wink anymore.
20   Q. I think that's probably something your attorney
21 would tell you not to do.
22   A. But no, I could have changed my -- because you're
23 such an attractive -- so I could have done that.
24   Q. Okay. You practiced law for a considerable period
25 of time, didn't you, Mr. Terry?

### Page 55

1    A. Yes.
2    Q. Let me ask you one question before we go there.
3    A. Okay.
4    Q. You said that you had suggested that Mr. Soskin is
5 going to work so many hours in the company. That was
6 something that you had made a suggestion of, correct? Do
7 you recall that?
8    A. Suggest? No, I insisted on it.
9    Q. And how many hours was he supposed to work?
10   A. Boy, I don't remember the exact terms but it was
11 written down as something. In the final agreement -- is it
12 in here or -- one minute. Here we go. Here, 60 hours --
13 look at paragraph eight. In -- in Exhibit number 1, which
14 is the memo I wrote, number eight relates to the hours.
15   Q. And that was done at your -- put in there at your
16 insistence?
17   A. The 60 -- yeah, I believe the 60 was put in at my
18 insistence. I knew I wanted him involved for the reason
19 that I just gave. As -- whether it was 60 or 20, I believe
20 it was my suggestion 60.
21   Q. Do you think you put in 60 hours? Is that 60
22 hours --
23   A. It's the last -- the second to the last paragraph.
24   Q. Mm-hmm. 60 hours a month?
25   A. A month, yeah. Well, I meant a month.

### Page 56

1    Q. Do you think he put in 60 hours a month?
2    A. I do.
3    Q. Did you ever see billing from him indicating that
4 he had put in 60 hours a month?
5    A. No.
6    Q. Now, let me ask you a question about the
7 infomercials. Did Vicki Esralew work on that infomercial?
8    A. Yes. To the best of my knowledge, yes.
9    Q. Do you think she gave her best effort to make that
10 infomercial a success?
11   A. Yes.
12   Q. Why do you think the infomercial didn't work,
13 didn't generate the sales that you had hoped or that
14 everyone I guess had hoped?
15   A. Okay. There were several reasons. Number one, I
16 was told that we were going to be on before Christmas --
17 Christmas season was the -- and I think in one of the memo
18 you'll find the term Christmas season which would be before
19 Christmas, because that was the big period when -- as we all
20 know that's when people are out shopping and buying things.
21 That was the most important thing. We never succeeded in
22 that, okay? As I recall the first commercial was the 28th,
23 I believe, of December. It might even have gone to January.
24 I'm not certain. That was the first one that we had.
25 Number two, the -- the -- the times that we had, okay, might

### Page 57

1 have been better used, the time that was involved was better
2 used, okay? And she was checking the times that were being
3 used, okay, and the various reasons why --
4    Q. Let me -- let me back you up --
5    A. -- we were on at 3:00 in the morning instead of
6 2:00 in the morning.
7    Q. Let me back you up. You say she. You mean Vicki
8 Esralew --
9    A. Vicki, yes.
10   Q. -- was checking the times?
11   A. Yes, we would get the --
12   Q. Let me -- let me ask you a question. Do you know
13 Robert Blagman?
14   A. Do I know -- yes.
15   Q. And who is Robert Blagman?
16   A. Robert Blagman is the person that the company
17 hired to produce -- to be involved in producing the
18 infomercial and putting on the -- choosing the times -- a
19 medium (sic) buyer I think the term used.
20   Q. Media buyer?
21   A. I think he's -- he was -- would be involved in the
22 medium buying, advice in regard to the infocommercials,
23 generally things of that nature because as I understood it
24 that particular thing we weren't experts on.
25   Q. When you say we weren't experts?

Page 86

1   Q. No, the preface paragraph. The very first
2  paragraph.
3   A. Yes, it says Terry's Company.
4   Q. Is there some reason that you're aware of that
5  Terry's Company, that no legal representative for Terry's
6  Company executed that agreement?
7   A. No.
8   Q. Okay. How did Terry's Company become a part of
9  this transaction?
10   A. I had various entities. One of the entities I had
11  was Terry's Company, Inc. That was the successor to
12  Precision Carbide Tool which I had sold, okay? It had cash
13  in it. I hadn't determined for state tax purposes, income
14  tax purposes, liability purposes whether I would make the
15  investment in my wife's name only, in my name only, in
16  Terry's, in partial, etcetera, etcetera. So that was the --
17  the -- at that date -- you have to understand this was done
18  in a very short period of time so you don't -- I didn't have
19  time to talk to my estate planning people whether it was
20  better to have it in this one or that one, who owns what.
21  So we put in all the names that might be involved. That's
22  how -- how I came up with Terry's Company, why it should be
23  in there.
24   Q. But it didn't sign the agreement?
25   A. No. As Terry's Company, Inc., no.

Page 87

1       MS. KROL: Okay. I don't have anything --
2   A. I don't think so.
3   Q. I'm sorry, are you done?
4   A. It says Kids -- Vicki -- no -- yes. No, it did
5  not sign it.
6       MS. KROL: Okay, fine. I'm done. Thank you very
7  much for your time.
8       WITNESS: Oh, okay. Thank you.
9       RECORDER: Hearing nothing further it sounds like
10  we're going off the record for today at 4:17. And this tape
11  is one hour and 21 -- 20 -- no, one hour and 53 minutes.
12  Going off the record for today.
13
14           CERTIFICATION
15    I certify that the foregoing is a correct
16    transcript from the record of proceedings
17        in the above-entitled matter.
18
19        M. Douglas Lokken
20        December 19, 2005