Excerpts of the Deposition of Vicki E. Esralew

Case 04-03774    Doc 42-3    Filed 02/21/06    Entered 02/21/06 16:44:14    Desc Esralew
deposition excerpts    Page 2 of 29
TEXTNET Internet Court Reporters          888-TEXTNET Toll Free          www.textnet.com

Page 1

1          UNITED STATES BANKRUPTCY COURT

2                    FOR THE

3          NORTHERN DISTRICT OF ILLINOIS

4    ------------------------------------------------------------

5

6    Rollin J. Soskin, Eugene Terry,

7    Nicole Terry and Terry's Company,

8

9          Plaintiffs,

10

11       vs.                          Case No.   04-B-24393

12

13   Vicki E. Esralew,

14

15          Defendant.

16   ------------------------------------------------------------

17

18             Deposition of Vicki E. Esralew

19

20                  November 28, 2005

21                      -at-

22               Crooks Law Office

23            Three First National Plaza

24         70 West Madison Street, Suite 1950

25                  Chicago, Illinois

Case 04-03774    Doc 42-3    Filed 02/21/06    Entered 02/21/06 16:44:14    Desc Esralew
deposition excerpts    Page 3 of 29
TEXTNET Internet Court Reporters          888-TEXTNET Toll Free          www.textnet.com

## Page 2

1          APPEARANCES
2
3          For Plaintiffs:
4          Thomas Carl Crooks
5          Crooks Law Office
6          Three First National Plaza
7          70 West Madison Street, Suite 1950
8          Chicago, Illinois
9
10          For Defendant:
11          Gina Marie Krol
12          Cohen and Krol
13          105 West Madison Street, Suite 1100
14          Chicago, Illinois
15
16          Also Present:
17          Rollin Soskin
18          Eugene Terry
19
20          RECORDER: We're now on the record. My name is
21 Tracey Field. I'm employed by Textnet Court Reporters.
22 Today's date is November 28th, 2005, and the time as it
23 appears in the camera is 1:15 p.m. We are Crooks Law Office
24 in Chicago, Illinois, appearing in the matter of the United
25 States Bankruptcy Court for the Northern District of

## Page 3

1 Illinois, Rollin J. Soskin, Eugene Terry, Nicole Terry and
2 Terry's Company, Inc. versus Vicki E. Esralew. Ms.
3 Esralew, at this time would you please raise your right hand
4 to be sworn?
5          (Oath administered)
6          RECORDER: Thank you. Will the attorneys please
7 state their appearances for the record?
8          MR. CROOKS: Thomas --
9          MS. KROL: Gina -- oh, I'm sorry.
10          MR. CROOKS: Go ahead.
11          MS. KROL: Gina Krol for Vicki Esralew.
12          MR. CROOKS: Thomas Crooks on behalf of the
13 plaintiffs.
14          RECORDER: And also present are Rollin Soskin and
15 Eugene Terry. You may proceed.
16          MS. KROL: Thank you. And as we were indicating
17 off the record, I do have an objection to Mr. Terry being
18 present today. His deposition is scheduled to be taken by
19 me later in the week. And inasmuch as he has not yet given
20 his deposition, I am concerned that his presence today would
21 somehow prejudice the testimony he might give in the
22 deposition to be taken later in the week. So I do have that
23 objection.
24          MR. CROOKS: Okay. And our position is he is a
25 party to the lawsuit and has a right to be present for any

## Page 4

1 and all depositions.
2          Let the record reflect that this is the deposition
3 of Vicki Esralew who is the debtor and a party to the
4 lawsuit. It's taken pursuant to the federal rules of civil
5 procedure, the local rules as well as the rules of
6 bankruptcy, and this date was set by agreement of the
7 parties.
8          EXAMINATION
9 BY MR. CROOKS:
10          Q. Ms. Esralew, could you just state your name
11 officially for the record?
12          A. Vicki Esralew.
13          Q. And what's your date of birth?
14          A. 12/26/1958.
15          Q. And your Social Security number?
16          A. 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.
17          Q. Now I'm going to ask you a series of question that
18 relate to the litigation. And a couple of ground rules that
19 your attorney's probably already gone over with you, but I
20 just want to go over to make sure. When I ask you
21 questions, I'm going to let you answer them. I don't have
22 any intention of cutting off your answers or limiting your
23 answers, though I would ask that you just focus and answer
24 the question as it is asked. If I cut your answer off
25 before you've completed it, please tell me that I've done

## Page 5

1 that, and I'll let you finish your answer. In fact, if
2 later in the deposition you think of something that which
3 should have been included in an earlier answer, you can
4 bring that to my attention. I will let you add it. If the
5 answer to a question is yes or no, please say yes or no as
6 opposed to nodding your head or saying uh-huh or mm-hmm just
7 so it's clearly a yes or a no. If you need a break for any
8 reason, just let us know. We'll be happy to accommodate
9 you. If I ask a question badly and you don't understand it,
10 just tell me you don't understand it. I'll be happy to
11 rephrase the question or tell you what information I'm
12 looking for. If you go ahead and answer the question, I'll
13 assume you did understand it. Is that fair?
14          A. Fair.
15          Q. Okay. If you could, summarize your educational
16 background.
17          A. I graduated from University of Illinois in 1980.
18          Q. Was that here at Circle Campus or Champagne?
19          A. Champagne.
20          Q. And what was your degree in?
21          A. Communications, school.
22          Q. And that was a bachelor's degree?
23          A. Yes.
24          Q. Any graduate education?
25          A. No.

Case 04-03774   Doc 42-3   Filed 02/21/06   Entered 02/21/06 16:44:14   Desc  Esralew
deposition excerpts   Page 4 of 29
TEXTNET Internet Court Reporters        888-TEXTNET Toll Free                 www.textnet.com

Page 6

1    Q.  And what was your first employment when you got
2  out of school in 1980?
3    A.  I worked at Blair Television.
4    Q.  And what kind of work was that?
5    A.  Secretarial.
6    Q.  Those communication degrees are handy, huh?
7    A.  Not much.
8    Q.  How long did you work as a secretarial -- as a
9  secretary for Blair Television?
10    A.  About 18 months.
11    Q.  And what was your next job?
12    A.  I worked at a media firm that I think's out of
13  business called Harrington Reuter and something.
14    Q.  Where were they located?
15    A.  Chicago.
16    Q.  When you say media firm, what did they do?
17    A.  I was a secretary.  They did -- they bought media
18  time around the country.
19    Q.  Like for advertising?
20    A.  It was -- I was a secretary to -- yes, for
21  commercials for clients.
22    Q.  Okay.  Who did you directly do your secretarial
23  work for?
24    A.  Somebody named Nina.  I have no clue of her last
25  name.  It was in 19 I don't know '82 maybe.

Page 7

1    Q.  Do you know the name of the principal person
2  involved in that entity?
3    A.  No clue.
4    Q.  Did they buy just television media time or radio
5  time as well?
6    A.  I'm not sure.  They were a big company.  I worked
7  in an office here.  I think they were nationwide.  I think.
8    Q.  Why did you leave that job?
9    A.  I went to go work at WGN radio.
10    Q.  What did you do for WGN?
11    A.  I was an account executive.
12    Q.  And what were you selling?
13    A.  Radio time.
14    Q.  Who was your supervisor?
15    A.  Somebody named Bob Sparr.
16    Q.  What was the last name?
17    A.  Sparr.
18    Q.  Do you know how to spell that?
19    A.  S-p-a-r-r I believe.
20    Q.  And how long did you have that position?
21    A.  I was there for about eight years, maybe eight and
22  a half years, maybe eight years.
23    Q.  And why did you leave that position?
24    A.  I left there because I wanted to write children's
25  books on validating feelings.

Page 8

1    Q.  Why did you have to leave your job in order to do
2  that?
3    A.  I worked about six days a week and I had no time
4  to -- it was just a dream of mine I wanted to pursue.
5    Q.  Now -- so that would be approximately 1990?
6    A.  Approximately '89 maybe.
7    Q.  Okay.  Were you married at the time?
8    A.  Yes.  I had just gotten married.
9    Q.  You married Bob Aren?
10    A.  Yes.
11    Q.  Where were you living at the time?
12    A.  Northbrook, Illinois.
13    Q.  Okay.  So did -- you left your job at WGN to write
14  children's books?
15    A.  Mm-hmm.
16    Q.  Did you write children's books?
17    A.  Years later.  I didn't write them then.
18    Q.  What did you do right after --
19    A.  One of my clients --
20    Q.  -- WGN?
21    A.  One of my clients who was Fannie May Candies asked
22  me to handle their advertising, so I started an ad agency.
23    Q.  What was the name of that ad agency?
24    A.  It was called Capital Advertising.
25    Q.  Did you have that plan in mind at the time you

Page 9

1  left WGN?
2    A.  Don't really remember.  I wanted to write books
3  and they asked me to do it, and I needed to put food on the
4  table, so I started an ad agency.
5    Q.  Was your husband Bob working at the time?
6    A.  Yes, I believe he was a trader at the time.
7    Q.  And how long did your ad agency remain in
8  business?
9    A.  Until I'm guessing, to the best of my
10  recollection, maybe '96.
11    Q.  So approximately seven years?
12    A.  Mm-hmm.
13        RECORDER:  Is that a yes?
14    A.  Approximately.
15        THE WITNESS:  Pardon me?
16        RECORDER:  If you could say yes or no instead of
17  mm-hmm.
18    A.  Approximately.
19    Q.  What did you do for the ad agency?
20    A.  I wrote commercials.  I hired kids to do --
21  produce the commercials or adults to produce the
22  commercials.  A lot of the commercials the personalities
23  just read out loud.  I did -- I -- there wasn't really
24  invoicing.  I'd get the invoice from the radio station.  I'd
25  just put it in the envelope and give it to the client.  I

Case 04-03774    Doc 42-3    Filed 02/21/06    Entered 02/21/06 16:44:14    Desc  Esralew
deposition excerpts    Page 5 of 29
TEXTNET Internet Court Reporters                888-TEXTNET Toll Free                www.textnet.com

## Page 10

1  wasn't really doing a lot of bookkeeping because I'm not a
2  bookkeeper, but I would just pass that along.  And then I
3  bought radio time for them.
4      Q.  Did you strictly do radio buying in your own ad
5  agency?
6      A.  No.
7      Q.  You did television time buying as well?
8      A.  Maybe one percent.  Maybe one time in the seven
9  years.
10     Q.  And for what client was that?
11     A.  I may have done one schedule for Nevada Bob's Golf
12  on TV.  I might have done one television schedule, but I
13  think it was -- mostly it was radio, 99 percent of it was
14  radio.  I think I did a few newspaper ads in local papers,
15  but radio was what I knew.
16     Q.  Now other than Fannie May, did you have any other
17  customers or clients?
18     A.  Nevada Bob's Golf.
19     Q.  Nevada Bob's Golf.  Anybody else?
20     A.  I did a media schedule one time for somebody who
21  needed help with Kraft.  I don't know where it came from,
22  but I remember checking the radio schedule for Kraft.  And I
23  did a demo commercial, which didn't go anywhere, for
24  somebody at Sunbeam.
25     Q.  Was that a TV commercial or radio commercial?

## Page 11

1      A.  Radio.  I was always radio.
2      Q.  How many employees did you have at -- at your high
3  point with that company?
4      A.  There was maybe a period of time, short, that I
5  had somebody helping for a couple months, but it was me.
6      Q.  Was your business a corporation?
7      A.  Ask Rollin, he set it up.  I don't remember.  An
8  LLC, I don't know if that's a corporation or an S Corp or a
9  -- it might have been an S Corp, I don't know.
10     Q.  What's your understanding of an S Corp?
11     A.  One's an S Corp, one's an LLC, I don't know other
12  -- other than one's an S Corp, one's an LLC.  I don't know
13  if it's corporation.  I just know it says S Corp or LLC, I
14  don't really know the difference.
15     Q.  Did you have an accountant for your business?
16     A.  I don't remember.  I mean, Rollin, were you doing
17  the accounting for Capital?  You incorporated it.  I don't
18  really remember who the accountant was.
19     Q.  Were you making money when you were in business?
20     A.  For the Cap -- the radio advertising, yes.
21     Q.  Give me an idea for the seven years that you --
22  seven or eight years, whatever that number was, that you had
23  this business, what was your annual income and I mean from
24  this business during that time period?
25     A.  I didn't have an annual income.  I booked media

## Page 12

1  time, so I made 15 percent whatever the schedules did.  And
2  I don't recall what people -- what Fannie May spent or
3  Nevada Bob's spent.
4      Q.  Do you remember what number was on your tax return
5  at the end of any of those years?
6      A.  No clue.
7      Q.  Even approximately?
8      A.  No clue.  I know about what they booked.  We could
9  pull out a calculator and do the math.  In a year they
10  booked probably five or six or seven hundred thousand
11  dollars to maybe eight hundred thousand dollars.  Maybe.
12     Q.  That --
13     A.  To the best of my recollection.  It was I don't
14  know 10 years ago, 12 years ago.
15     Q.  And you received 15 percent.
16     A.  I made 15 percent less expenses.  The way I set it
17  up, I would -- if there was any costs I had associated, I
18  would pay those costs.  If I had kids doing commercials or
19  adults doing commercials, I would pay that.  If I had
20  producers going into a studio, I'd pay that.  That's just
21  how I set it up.
22     Q.  Out of your 15 percent?
23     A.  Mm-hmm.
24     Q.  That's a yes?
25     A.  Yes.

## Page 13

1      Q.  Do you remember having financial difficulties
2  during the time period when you ran the business?
3      A.  The advertising agency?
4      Q.  Yeah.
5      A.  No.  I just remember working 20 hour days.
6      Q.  And was your husband Bob working as a trader
7  during the time period you were running your own ad agency?
8      A.  He stopped working as a trader and was a stay-at-
9  home dad, and I don't recall exactly when.  My guess, which
10  is just a guess, was maybe '92, '91, after my son was born.
11     Q.  So fairly early on in the period you were running
12  this ad agency he became a stay-at-home dad?
13     A.  Yes, by our choice.
14     Q.  Can you -- can you tell me why that decision was
15  made?  In other words, he gave up a job as a trader to stay
16  home with -- when your first child was born, you stayed out
17  there in the working world as opposed to you staying home
18  with the child and him staying out working as a trader?  Do
19  you know why that was decided that way?
20     A.  Yes, the agency was more successful than his
21  trading.  He did not do that well with trading.  He was risk
22  averse, and it's hard to be a trader and be risk averse.
23     Q.  Now eventually that business ended, correct?
24     A.  Yes.
25     Q.  Why is that?

Case 04-03774   Doc 42-3   Filed 02/21/06   Entered 02/21/06 16:44:14   Desc  Esralew
deposition excerpts   Page 6 of 29
TEXTNET Internet Court Reporters            888-TEXTNET Toll Free                     www.textnet.com

Page 14

1    A.  Because I started up a business that I'd dreamt
2  about, it was the wanting to write children's books.  And I
3  started it up, and I worked on that business.  And I believe
4  I started it in '93, and I learned how to make products from
5  the ground up between 10, 11 at night until about three in
6  the morning for about a year and a half, and I just didn't
7  have the physical strength to -- to do both after about a
8  year and a half.
9    Q.  So you started the new business while you were
10  still running the ad agency?
11    A.  Yes.
12    Q.  Eventually you just put all your efforts into the
13  new business?
14    A.  Yes.
15    Q.  Were there any partners in the ad agency?
16    A.  No.
17    Q.  You were the sole owner?
18    A.  Yes.
19    Q.  Did your husband receive a salary out of that
20  business?
21    A.  The ad agency, no.
22    Q.  Now what was your new entity, this new business
23  you started?  Did it have a name?
24    A.  I believe when I first started it.  Rollin Soskin
25  set it up, it was called Enivar Roads, which is a name I

Page 15

1  made up.  It was Ravine spelled backwards.  And I was --
2  made it up to bring in supplemental income, and it was like
3  a coupon -- like kind of showing the best on the north
4  shore, like a coupon place that they do charity things
5  with.  I never did anything with it except set it up and try
6  to write a brochure.  But I didn't have the ability to sell
7  or the work involved.
8       I took that entity, whatever that was, an S Corp,
9  an LLC, I don't recall, and I did a name change or Rollin
10  Soskin did a name change to Kids Count.  And I don't frankly
11  recall if it was Kids Count, Inc.  or Kids Count, LLC, it
12  was one of them.
13    Q.  And why did you make that name change?
14    A.  Well, Enivar Roads meant nothing to anybody, and
15  it was set up to be a company to do like the best of the
16  north shore type of coupon thing with charity.  I did not do
17  anything with that, as I just said.  I wanted to pursue this
18  dream I had about making the type of tools that I thought
19  kids desperately needed, and I used that business entity and
20  I wanted to put a name that was fitting to the name.  So I
21  never considered using Enivar Roads because it meant nothing
22  to anybody.  It was made up name.
23    Q.  Were there any -- did you have any partners or
24  investors in the Enivar Roads business?
25    A.  No.

Page 16

1    Q.  Where did you get the capital to start that
2  company?
3    A.  I don't think there was really any capital to
4  start Enivar Roads except maybe $25 to print up a brochure
5  at Kinko's.
6    Q.  And if you could --
7    A.  I don't know.
8    Q.  -- explain to me what did Enivar Roads do?  You
9  said this north shore coupon business that --
10    A.  Enivar Roads didn't do anything.  It was an idea
11  that I had.  Do you want me to really repeat the same thing
12  I said --
13    Q.  No.
14    A.  -- twice?
15    Q.  No.  I sure don't.
16    A.  Okay.  It didn't do anything.
17    Q.  What -- what were you intending to have it do?
18    A.  The same thing I just said twice.  To set up -- it
19  was an idea to have a coupon, like the entertainment book
20  coupon or something.  But I don't -- it might have been
21  before the entertainment book or after, I really don't
22  recall.  It was a long time ago.  And I wanted to do
23  something that could give parents that were on a budget a
24  coupon to go to places.
25    Q.  Now when you did the name change to Kids Count,

Page 17

1  LLC or Inc., whichever it was, at that time did you have any
2  investors in the business?
3    A.  When I first set up the business, I do not believe
4  so.
5    Q.  At some point did you have investors or partners
6  in Kids Count?
7    A.  Yes.
8    Q.  Okay.  Tell me who they are, when they came in.
9    A.  To the best of my recollection because I started
10  it in 1993, at some point Bob Leeper came into Kids Count.
11    Q.  Did he buy a percentage of the company?
12    A.  He -- I don't know if the right way is saying buy
13  a percentage of the company, but he put money in the
14  business and he was going to get five -- or did get five
15  percent of Kids Count.
16    Q.  How much money did he put in the business?
17    A.  I don't recall how much he put in altogether.  He
18  put some money in.  He lent some money, that was a bank
19  note.  I don't recall, but it was all listed in whatever
20  memorandum that had debts and had people that invested.
21    Q.  Did you have a written --
22    A.  I don't want to guess.
23    Q.  -- agreement with Mr. Leeper?
24    A.  Did I, Rollin?  You were our attorney.  I don't
25  know.

Case 04-03774   Doc 42-3   Filed 02/21/06   Entered 02/21/06 16:44:14   Desc  Esralew
deposition excerpts   Page 7 of 29
TEXTNET Internet Court Reporters
888-TEXTNET Toll Free
www.textnet.com

Page 18

1    Q.  I appreciate -- I understand you're looking at
2  Rollin and asking him questions, but he's really not allowed
3  --
4    A.  Well, I mean he was our attorney.  I -- I don't --
5  do I have a written agreement?  If he gave him an agreement,
6  like a subscription agreement or something?
7       MR. SOSKIN:  Can we go off the record for a
8  second?  I never had anything --
9         (Off the record)
10      RECORDER:  We're back on the record.
11      THE WITNESS:  I'm adjusting myself.  Sorry.
12  Sorry.  Okay.
13   Q.  All right.  The -- the last question was whether
14  or not you had a written agreement with Mr. Leeper regarding
15  his investment in Kids Count.
16   A.  I don't recall.  I'd have to ask the attorney.
17   Q.  Did you have an attorney that handled the day to
18  day legal business of Kids Count?
19      MS. KROL:  During what time period?
20   Q.  Well, from the beginning after it became Kids
21  Count and then going forward.
22   A.  Rollin Soskin was handling legal work, ultimately
23  was doing accounting for us.
24   Q.  And when was he doing legal work or accounting for
25  Kids Count?

Page 19

1    A.  Well, I know he'd set up the name change in 1993.
2  I don't think there was much legal work to do and accounting
3  work except at the end of the year or the end of the
4  quarters or whenever you do the legal and accounting work.
5       Did we have an attorney on staff day to day before
6  Rollin or in between when Rollin set it up, I don't recall.
7  I don't think there was much legal work with the company.
8    Q.  I'd be shocked if you had one on staff, but did
9  you have an attorney that did any work for Kids Count from
10  1993 --
11   A.  Well, can I ask you a question?
12   Q.  Well, let me finish my question.  Then I'll let
13  you ask me a question.  From '93 through '99, was there any
14  lawyer that did any legal work for Kids Count?
15   A.  There were several lawyers.
16   Q.  Okay.  Tell me who they were.
17   A.  To the best of my recollection, I -- I know that
18  -- could you help -- could somebody answer when was Kids
19  Count, Inc. and when was Kids Count, LLC?  Because that's a
20  total blur to me.  Rollin could answer that.  But that could
21  help because there was -- there was Kids Count, Inc., which
22  was Bob Leeper who was an investor in or who loaned money
23  and became an investor in.
24   Q.  So it started out Kids -- my understanding is it
25  started out Kids Count, Inc.

Page 20

1    A.  Okay.
2    Q.  And later there was the LLC.
3    A.  Because there was --
4    Q.  I couldn't tell you the dates off the top of my
5  head.
6       MS. KROL:  And I don't recall the dates either.
7    Q.  Okay.  And let me ask you this.  Did it become an
8  LLC when Alan Young became involved, does that ring a bell?
9    A.  Yeah.  Oh, of course.
10   Q.  Okay.
11   A.  Yeah.  I just don't -- because I get -- I don't
12  know --
13   Q.  Okay.
14   A.  -- LLC, shmell-L-C.  I mean I don't know.  So when
15  Alan Young came in, we --
16   Q.  What -- you know what, I didn't ask you about Alan
17  Young yet though.
18   A.  Okay.
19   Q.  I'll get to him.  I'm looking for the question --
20  the answer to the question any lawyers that did any work for
21  Kids Count Entertainment, Inc.
22   A.  Yes.  When Alan Young came in there was a lawyer
23  that introduced me to him and Wes Neisen from Katten,
24  Muchin, Zavis.
25   Q.  And Wes Neisen was a lawyer in the Chicago area?

Page 21

1    A.  Yes.
2    Q.  What work did he do for Kids Count?
3    A.  I -- to the best of my recollection, he -- he did
4  a boilerplate -- what do you call it -- operating agreement
5  or subscription agreement, and that's when Alan Young -- he
6  introduced me to him.  That's when he came into invest.  So
7  that was the lawyer that worked on setting up -- maybe
8  that's when we changed.  I really frankly don't remember
9  from one to the next.
10   Q.  So Wes Neisen was brought in specifically to draft
11  up an agreement for Alan Young?
12   A.  Wes Neisen was somebody -- it wasn't that he was
13  brought in.  I'm a creative person.  I'm not a business CEO
14  person.  I knew his wife a little bit through preschool.
15  And my husband, because he was a stay-at-home dad, knew his
16  wife too from preschool.  And he heard about I think what we
17  were doing from his wife, and asked about it and said can I
18  introduce you to some investors.  So he wasn't like
19  officially brought in.  He was like met at a preschool
20  morning class or something like that.
21   Q.  Were you looking for investors at the time?
22   A.  I -- for -- I'm sure that I was because we needed
23  money to run the business and to build a business.  I
24  couldn't be the only employee in a business.
25   Q.  Now let me ask you, when you first started Kids

Case 04-03774   Doc 42-3   Filed 02/21/06   Entered 02/21/06 16:44:14   Desc  Esralew
deposition excerpts   Page 8 of 29
TEXTNET Internet Court Reporters          888-TEXTNET Toll Free                    www.textnet.com

## Page 22

1 Count Entertainment, Inc., you said you'd been working in
2 evenings for some years prior to actually forming the
3 company. When you formed the company did you have any
4 product?
5    A.  Well, it's not correct what you said. We actually
6 formed the company because we had that Enivar Roads and then
7 it went to Kids Count.
8    Q.  Okay.
9    A.  So it was formed, but it was really
10 developmental. I was learning how to produce software. I
11 didn't produce it. I came up with the ideas and we had
12 people program it and draw it. I'm not a programmer.
13    Q.  Okay. Was any of that product created before you
14 did the name change to Kids Count Entertainment, Inc.?
15    A.  I think so. I think I had a software game that
16 was -- again, I'm fuzzy with Inc. and LLC or LLC and Inc.
17    Q.  And what was the name of that game, if it had a
18 name?
19    A.  Jack's House. It had a name.
20    Q.  It was Jack's House.
21    A.  Mm-hmm.
22    Q.  Okay.
23    A.  I know I made that and we had a diskette version
24 in December of '95. I remember that.
25    Q.  Okay. Other than Wes Neisen, did anyone else do

## Page 23

1 legal work for Kids Count Entertainment, Inc.?
2    A.  I'm sure there were other attorneys that did legal
3 work for Kids Count Entertainment, Inc. One that I recall
4 when -- when Wes Neisen -- part of the deal was we -- I
5 needed somebody to run the company. I -- I needed help.
6 I'm not a CEO person.
7       And when he brought in the investor, the deal was
8 they would bring somebody in to run the company, which I
9 desperately wanted. They decided not to bring anybody in to
10 run the company and I was running myself into the ground.
11 It did not work out after I don't know how many months, and
12 everybody agreed we should part ways.
13       So Wes Neisen could not represent us because he
14 was the client of Alan Young and he was conflicted out. So
15 we had to bring in another attorney to represent us to
16 separate the deal. And that guy's name was Jonathon
17 Rothchild or John Rothchild or Rothschilds, something.
18    Q.  How did you find out that there was a problem in
19 that Mr. Neisen represented Alan Young and therefore he
20 couldn't represent you --
21    A.  He told us.
22    Q.  -- in the breakup?
23    A.  Or told me.
24    Q.  Okay. What -- what did you understand that that
25 meant?

## Page 24

1    A.  I didn't understand much of anything because I was
2 a harried mom of three working 18 to 20 hours a day. I just
3 knew I had to get another attorney.
4    Q.  Did you understand why?
5    A.  He told me I needed to get another attorney.
6    Q.  Did you understand why he was telling you that?
7    A.  He told me I needed to get another attorney. As a
8 layman who's never been to one day of law school I
9 understood I needed to get another attorney.
10    Q.  Is it your testimony that you didn't understand
11 why you needed to get another attorney?
12    A.  He said he represented Alan Young and I needed to
13 get another attorney.
14    Q.  Did you know what that meant?
15    A.  That I -- I'm not a moron. That I needed to get
16 another attorney.
17    Q.  No, I understand --
18    A.  I don't know where --
19    A.  -- you knew what that meant.
20    A.  -- you're going. I'm just trying --
21    Q.  All right. I think you do know where I'm going.
22 And here's where I'm going.
23    A.  Why don't you tell me where you think I know where
24 you're going.
25    Q.  When he said, "I represent Alan Young" --

## Page 25

1    A.  Mm-hmm.
2    Q.  -- "You need to get another attorney," did you
3 understand why his representing Alan Young meant that you
4 needed to get another attorney?
5    A.  In absolutely what he said, yes, that he
6 represented Alan Young and I needed to get another attorney.
7    Q.  But did you understand the significance of his
8 representing Alan Young and why that meant you had to get
9 another attorney?
10    A.  When we were separating with Alan Young?
11    Q.  Correct.
12    A.  Yes.
13    Q.  As I understand it that's when this happened,
14 right?
15    A.  Yes. Because he said I needed to get another
16 attorney. He was representing him and he couldn't represent
17 both of us.
18    Q.  Do you understand why he couldn't represent both
19 of you?
20    A.  As a layman, I could understand why he couldn't
21 represent both of us because he said I needed to get another
22 attorney.
23    Q.  Well, did you understand --
24    A.  I'm sorry this is so comical to everybody laughing
25 on the other side.

Page 26

1  Q.  You used the word conflict --
2  A.  Mm-hmm.
3  Q.  -- a minute ago.
4  A.  Mm-hmm.
5  Q.  Did you understand that if he was Alan Young's
6  attorney and Alan Young was parting ways with you and your
7  company that that created a conflict?  He couldn't advise
8  you what to do --
9  A.  I could understand --
10  Q.  -- while advising Alan Young what to --
11  A.  Yes.
12  Q.  -- do?
13  A.  Mm-hmm.
14  RECORDER:  I need you to talk one at a time if you
15  can.
16  THE WITNESS:  Sorry.
17  RECORDER:  Thank you.
18  A.  It's very distracting with the smiling and the
19  laughing.  Is there anything you can put up or something?
20  Q.  Now I haven't heard any laughing.  I'm not looking
21  over to my right, so I don't know if anybody's smiling.
22  A.  Can we switch places?
23  Q.  No, I'm sorry, we can't.
24  A.  Okay.
25  Q.  All right.  So you understood that Wes Neisen

Page 27

1  could not.
2  A.  Excuse me.  Can we be excused?
3  MS. KROL:  Do you need a break?
4  THE WITNESS:  I need a break because I need to up
5  -- something up there.  It's just very distracting.
6  RECORDER:  Go off the record?
7  THE WITNESS:  I'm sorry.  Can we take a break?
8  MR. CROOKS:  Yeah, you can take a break if you'd
9  like to take a break.
10  RECORDER:  Off the record.
11  (Off the record)
12  RECORDER:  We're back on the record.
13  MS. KROL:  If there's any commentary, I would ask
14  that you not make any verbal noises or any faces that might
15  somehow distract or disrupt Ms. Esralew.
16  MR. CROOKS:  Could you read back the last
17  question?
18  RECORDER:  Sure.  One moment please.
19  (Record replayed aloud)
20  RECORDER:  Thank you.  We're back on the record.
21  Q.  Ms. Esralew, just so it's clear to me.  Wes
22  Neisen, you said he drafted some document when he brought in
23  Alan Young to be an investor in your company, correct?
24  A.  Yes.
25  Q.  Was he representing Kids Count when he drafted

Page 28

1  that document?
2  A.  Yes, he was part of -- for us to go with Alan
3  Young, he wanted us to use his attorney.  So I believe --
4  I'm not 100 percent sure -- but I believe that's when we
5  switched from Rollin Soskin to Wes Neisen.  I think.
6  Q.  Now so I understand your testimony, you said was
7  it Alan Young that wanted you to use his attorney?
8  A.  Yes.
9  Q.  Did --
10  A.  I believe so.
11  Q.  Did Wes Neisen then do any other legal work for
12  Kids Count after he drafted the agreement and brought Alan
13  Young in?
14  A.  I would think so, but I don't recall what legal
15  work was done.
16  Q.  You just don't recall the specifics?
17  A.  I had nothing to do with that.  I made the
18  products.
19  Q.  Well, who did have something to do with that?
20  A.  At that time, probably nobody.  That was the
21  problem.  We were going to bring somebody in to run the
22  business.  I'm -- I am what I am.  I wish I was a CEO kind
23  of person.  I'm not.  And that was part of the deal to bring
24  someone in, and we never did.
25  Q.  Okay.  But whatever legal work or legal questions

Page 29

1  that came up, Wes Neisen handled those for Kids Count at
2  least up until the point where you and Alan Young --
3  A.  Yes.
4  Q.  -- had a falling out?  That's a yes.  What caused
5  Alan Young to part ways with you and your company?
6  A.  We needed somebody to run the company, and I -- I
7  could not run it myself.  I was making products.
8  Q.  You mean the day to day business kind of stuff?
9  A.  Yes, everything outside of running products.
10  That's not my thing.  I don't know how to do that.  It was
11  not a one man show.  So I was focused on making the
12  products.  And I believe that Alan's -- it was -- we have
13  just different philosophy on business and how you speak to
14  people, and it was very stressful.
15  Q.  Was Al -- did Alan Young come in and try to be
16  that person to run the company?
17  A.  I don't believe so.
18  Q.  Was your agreement with Alan Young, was part of
19  that agreement that someone was going to be brought in
20  through Alan Young to run the company?
21  A.  I don't know if it was part of an agreement.  It
22  was a verbal thing that everybody said, if we want to grow
23  the business, we should have somebody run the company.  I'm
24  a mom who had a dream, not a major in finance or marketing
25  or accounting or an attorney.  So I don't think it was

Case 04-03774    Doc 42-3    Filed 02/21/06    Entered 02/21/06 16:44:14    Desc Esralew
deposition excerpts    Page 10 of 29
TEXTNET Internet Court Reporters                888-TEXTNET Toll Free                www.textnet.com

Page 30

1 written in any agreement. I think it was just clear we
2 needed somebody to run the company. I'm not one to do that.
3     Q.  Did Alan Young do anything with regard to running
4 the company or did he just provide some money?
5     A.  He was -- he put together a group of people, and
6 the managing person of the group. So he would be the one
7 calling to say what's new, what's going on. And then I
8 would assume he would report to his group. He didn't have
9 an office there. He would come in and visit when he was
10 around the neighborhood.
11    Q.  Did Kids Count have an office at that point?
12    A.  Yes.
13    Q.  Where were you located?
14    A.  On Dundee Road in Northbrook.
15    Q.  And who were these people in Alan Young's group?
16    A.  They were investors that were friends of his that
17 he brought in.
18    Q.  So he actually brought in a group of investors
19 that put money into the company --
20    A.  Mm-hmm.
21    Q.  -- correct? Is that right?
22    A.  Yes. I'm sorry.
23    Q.  How much money total was put in by Alan Young's
24 group?
25    A.  To the best of my recollection, like a million

Page 31

1 dollars, a million one hundred thousand or fifty thousand.
2     Q.  And as best you recall, when was that done?
3     A.  In '95 or '96. It's probably been written up
4 somewhere. I really don't recall exactly when.
5     Q.  Is it likely that that's when Kids Count, Inc.
6 became Kids Count, LLC?
7     A.  When Wes Neisen introduced me to Alan and they --
8 he -- Wes Neisen wrote up the documents, I believe that's
9 when it was changed. I'm not 100 percent sure.
10    Q.  Okay. And how long did Alan Young and his group
11 continue to work as investors and cooperatively with Kids
12 Count?
13    A.  I'm not exactly sure. I would say maybe a year,
14 maybe a little less, maybe a little more. I don't exactly
15 recall.
16    Q.  Were any new products developed during that year?
17    A.  We worked on a software game called Jack's Attic.
18 That was a monster. It was a big game.
19    Q.  Is this a -- a computer game?
20    A.  Yes. And actually, you know what, I don't know,
21 I'm guessing that's around when Alan Young came in because
22 that game was like two years to make. It was a big game.
23    Q.  At the end of approximately one year when your
24 relationship with Alan Young ended, was that game completed?
25    A.  Jack's House, Jack's Attic, yes, it was -- that

Page 32

1 was completed.
2     Q.  Was it out on the market?
3     A.  Actually, you know, I don't know if it was
4 completed to tell you the truth. I know -- I could tell you
5 the other products if you want because that was completed.
6     Q.  What products did you have at the time?
7     A.  That was I believe -- I'm not sure -- I believe it
8 was before Alan Young came in that I made the other things,
9 the other products.
10    Q.  What were those?
11    A.  Jack's House diskette version, Jack's House CD-Rom
12 version, a exercise video and a music CD. That I believe
13 was all before Alan Young came in.
14    Q.  And then after he came in you were working on
15 Jack's Attic?
16    A.  Yes, there was about two years. So it was a -- it
17 was a big project. So we were probably working on it
18 before. And you know what, I don't know if it was completed
19 when I -- maybe there's things I could look through to find
20 out. I don't recall.
21    Q.  Now you testified earlier that you broke up the
22 relationship with Alan Young or it was broken up because he
23 had different management style, talked to people
24 differently, things like that?
25    A.  Yes.

Page 33

1     Q.  Anything else that caused the -- the break up with
2 Alan Young's group and Kids Count?
3     A.  It just didn't work. It was very stressful.
4     Q.  What was it about Alan Young or his group that
5 made it stressful?
6     A.  I'm not a CEO. I'm a mom with a dream. The deal
7 was they would bring somebody in to run the company. It was
8 as if I was a dog that had a lot of resilience until I had
9 nothing left. I think they called me a racehorse, that they
10 wanted to come in first and they'd keep beating me every
11 step of the way to get there. And it was just -- it was
12 just sad. It was sad that I kept putting up with the
13 workload and sad that I didn't put my foot down about
14 bringing somebody in.
15    Q.  Well, who was preventing you from bringing someone
16 in?
17    A.  The way the deal was written, which I was actually
18 very much for, we were -- I would run things by. So I -- I
19 don't know people to bring in. I actually was hoping they
20 would introduce me to somebody or help interview somebody,
21 and we didn't.
22    Q.  Because you had -- you had over a million
23 dollars. So you had money to hire somebody to run the
24 company --
25    A.  We had --

Case 04-03774   Doc 42-3   Filed 02/21/06   Entered 02/21/06 16:44:14   Desc Esralew
deposition excerpts   Page 11 of 29
TEXTNET Internet Court Reporters                888-TEXTNET Toll Free                www.textnet.com

Page 34

1    Q.  -- correct?
2    A.  Yes. But I remember him saying that I could do
3 it, I could do it, I could do it. And we had a staff of
4 people making software, a small staff, but that's what was
5 just doing, making software. And I was trying to do a lot,
6 wear a lot of hats there. And I'm good at some hats and I
7 have no skills in other hats --
8    Q.  Were you --
9    A.  -- period.
10    Q.  Were you drawing a salary during the period --
11    A.  Yes.
12    Q.  -- that -- and how much was your salary?
13    A.  At that time I remember that clearly because I was
14 thrilled. I was making I'm pretty sure $170,000.
15    Q.  Now was -- was your husband Bob helping in the
16 business at all at this point or was he just taking care of
17 the kids?
18    A.  He was a stay-at-home dad that would help when I
19 couldn't lift my head in the morning or at nights when I
20 would come home crying my eyes out frankly. So he'd help as
21 I needed him. But he was with three babies. We had three
22 kids that were very young at the time.
23    Q.  So just odds and ends here and there that he would
24 do when asked essentially? Is that a yes?
25    A.  Yes. Sorry.

Page 35

1    Q.  Was he paid any salary by Kids Count, LLC?
2    A.  I don't believe he ever was.
3    Q.  Whose idea was it to -- to end the relationship
4 with Alan Young's group?
5    A.  It was mutual.
6    Q.  And why did Alan Young want to end the
7 relationship?
8    A.  Because it wasn't working out. We needed somebody
9 to run the business.
10    Q.  And he wasn't willing --
11    A.  And I was --
12    Q.  -- to help you out, supply somebody to do that?
13    A.  They just kept thinking I could do it, and it just
14 got -- that was -- it was just hard. Rollin knows Alan
15 Young well, and he was very sympathetic about, you know,
16 he's a tough cookie. And I wasn't -- I didn't have the -- I
17 think they thought I was more than I was. I -- you know, I
18 -- you know, when people tell you stuff you should believe
19 them, and I kept saying I could make products, that's what I
20 know how to do. I don't know how to do the other things.
21 And everybody thought I could, and I couldn't.
22    Q.  And what were the terms on your split with Alan
23 Young?
24    A.  Oh, I don't recall.
25    Q.  Do you recall anything about the terms?

Page 36

1    A.  I remember that whatever was left in the bank I
2 gave them.
3    Q.  Do you have any idea what that amount was?
4    A.  No. I'm sure that it's written in paperwork or
5 something, but I don't recall. It was a long and very
6 painful time ago.
7    Q.  And you were represented by Jonathon Rothchild at
8 the --
9    A.  Yes.
10    Q.  -- termination?
11    A.  I didn't know him. His aunt liked my products and
12 sent me a letter and donated -- I guess I gave her like two
13 products to give to a church preschool in Wisconsin. And
14 she would just write me notes and -- I think this is frankly
15 in the beginning of email -- send me an email and just say
16 how she loved the products. And I didn't know who to reach
17 out to. And I asked her if she knew an attorney, and she
18 introduced me to her nephew. So I had no knowledge of him
19 before, I had no knowledge of him afterward.
20    Q.  Was he an attorney in the Chicago area?
21    A.  Yes.
22    Q.  Why did you not go back to Rollin Soskin when Wes
23 Neisen said he couldn't represent you at the split?
24    A.  I don't know actually. I really don't know. We
25 probably should have, but I don't know. I don't know if --

Page 37

1 I know there was some conflict with Alan Young's partner and
2 Rollin or something. I don't know. I don't know why we
3 didn't because I thought we kept in touch with Rollin. I
4 don't recall, Rollin may, if he was still doing our
5 accounting. I really don't remember.
6    Q.  Was Art Evans involved in any of your business
7 dealings at this point?
8    A.  I believe the Art Evans was Alan Young's attorney,
9 and I believe Art Evans was Rollin's law partner or -- yeah.
10    Q.  Did Jonathon Rothchild work for a firm?
11    A.  I don't recall.
12    Q.  After you split with Alan Young's group, what did
13 you have left as far as a business entity?
14    A.  I don't understand your question.
15    Q.  Did you still -- did you still own Kids Count,
16 LLC?
17    A.  Yes.
18    Q.  The products that you've talked about that the LLC
19 had, did the LLC still own those products?
20    A.  Yes.
21    Q.  Other than giving Alan Young's group whatever
22 money you had in the bank, did they get anything else?
23    A.  There was a note. I don't recall how much the
24 note was for. And I don't recall if there was anything
25 else. I'm sure it's written up in some document somewhere.

Case 04-03774   Doc 42-3   Filed 02/21/06   Entered 02/21/06 16:44:14   Desc Esralew
deposition excerpts   Page 12 of 29
TEXTNET Internet Court Reporters        888-TEXTNET Toll Free                     www.textnet.com

Page 38

1    Q.   The note was money that the LLC would owe Alan
2   Young?
3    A.   Yes, I recall that.
4    Q.   What's your best estimate as to the amount of that
5   note?
6    A.   50,000 or 75,000.
7    Q.   And how was that to be paid?
8    A.   I have no clue. I basically -- whatever they said
9   they wanted, I said you got it. I just wanted to sleep at
10  night frankly.
11   Q.   Well, how was that going to help you sleep at
12  night?
13   A.   Because it was a very stressful situation
14  working. I couldn't work any harder and I couldn't work any
15  smarter, and it wasn't working right because I needed
16  somebody to run the business, and it wasn't me.
17   Q.   But ending your relationship with Alan Young
18  wasn't going to give you somebody to run the business, was
19  it?
20   A.   It was going to provide me with an opportunity of
21  not getting sworn at and screamed at every single day
22  numerous times a day.
23   Q.   And who was doing that?
24   A.   Alan Young. It just got sad and hard at the end.
25  He's just a -- he's an emotional person and --

Page 39

1    Q.   Was he doing that face to face or over the
2   telephone?
3    A.   Both, when he'd stop by the office. It was just
4   -- it was a hard situation. I'm sure he wasn't happy
5   about. And I'm sure everybody thought I was more than I
6   was. And I -- I am what -- I mean I'm a mom with a dream
7   that just was a little nuts and wanted to do something, and
8   believed in doing it, and believed that we get the right
9   support behind us.
10   Q.   When he was yelling and screaming at you every day
11  --
12   A.   Well, maybe I shouldn't say every day. Whenever
13  it was. I don't recall. It was a long time ago. But when
14  you said how did that help alleviate it? I don't like
15  getting yelled and screamed at.
16   Q.   Right.
17   A.   It was not healthy.
18   Q.   That I understand. But when he was yelling and
19  screaming at you -- before you said every day, now --
20   A.   Mm-hmm.
21   Q.   -- is it not every day he was doing that?
22   A.   I don't recall. I guess I would say it's not
23  every day, but it was stressful and it was whenever -- it
24  was the opportunity.
25   Q.   It was at least several times a week he was

Page 40

1   yelling and screaming at you, is that fair?
2    A.   Let me rephrase that. I'm sure he was very upset
3   that the business didn't go anywhere. And I was upset
4   because I had nothing left to give. And to one person, I
5   interpreted it as yelling and screaming. He just could have
6   been talking in his way. You have to kind of know him.
7   He's not a bad person. He's just like a dramatic kind of
8   person.
9    Q.   Okay. Whether he was actually yelling and
10  screaming or you just perceived it as yelling and screaming,
11  and whether it happened every day or less frequently, what
12  was he yelling and screaming about?
13   A.   That it just didn't work. We should have -- I'm
14  sure -- I assume he thought we should have gotten somebody
15  to run it and that. I'm assuming that they should have
16  listened when I said I needed someone to run it because I am
17  what I am. And I don't think anybody likes bringing in his
18  buddies and it not going well. And there was only so much
19  milk you could milk from me. I mean I just -- I didn't
20  have, you know --
21   Q.   All right. What did you --
22   A.   I guess I didn't have the stuff they thought I
23  had.
24   Q.   What did you do with the LLC going forward then
25  after your relationship was done with Alan Young?

Page 41

1    A.   What did I do with the LL -- meaning the company?
2    Q.   Yeah.
3    A.   I -- I ended up meeting Michael Resnick because
4   somebody introduced me to him.
5    Q.   Okay. Who introduced you to Michael Resnick?
6    A.   Some neighbor in my old neighborhood. And if you
7   gave me $100, I couldn't tell you the person's name. I have
8   no clue. And it was somebody who just said I'd like you to
9   meet them, and I met Michael Resnick.
10   Q.   Were you at the time looking for new investors for
11  the company?
12   A.   It -- with the end of Alan Young, yes, because I
13  gave every dime I had I think. And -- yes.
14   Q.   Okay. And how were you going about looking for
15  new investors?
16   A.   I don't recall because I don't know people with
17  money. It would usually be through an attorney or -- well,
18  that was the case with Wes Neisen. Or somebody would
19  introduce me to somebody.
20   Q.   Was Jonathon Rothchild still doing legal work for
21  the LLC?
22   A.   I have no recollection.
23   Q.   Was he your attorney so to speak?
24   A.   I don't think he did anything other than helping
25  separate the case as I recall it.

Case 04-03774   Doc 42-3   Filed 02/21/06   Entered 02/21/06 16:44:14   Desc Esralew
deposition excerpts   Page 13 of 29
TEXTNET Internet Court Reporters          888-TEXTNET Toll Free                    www.textnet.com

Page 42

1 Q. Okay.
2 A. I don't think anything other than that.
3 Q. What happened with regard to Michael Resnick, did
4 you reach some kind of an agreement with him?
5 A. He wanted to come in and help, very nice person.
6 And they put money into the business. I don't think it was
7 an investment. I think it --
8 Q. You said they?
9 A. Michael Resnick. I'm calling it they. Michael
10 Resnick's company.
11 Q. What was his company's name?
12 A. I think it's Harris Associates. It's in the --
13 all the paperwork.
14 Q. And now you say you don't know whether he invested
15 in the company or --
16 A. I don't know if it was a -- I think he loaned the
17 company money and it was like a convertible loan with the
18 intention we were going to try to find somebody to raise
19 money because I'm not a money raiser.
20 Q. Do you remember how much money he loaned or
21 invested in the company?
22 A. I believe it was $300,000.
23 Q. And that was from Harris Associates, his company?
24 A. Yes.
25 Q. Right? Did he take on any management --

Page 43

1 A. No.
2 Q. -- responsibilities?
3 A. Hm-mm.
4 Q. Did you discuss with him the need for someone to
5 take on management responsibilities?
6 A. Yes.
7 Q. And what was the plan in that regard?
8 A. I really don't even remember. I was trying to
9 raise money and then hire somebody. There was no plan.
10 Q. By the way, Alan Young's group, did they ever get
11 any dividends or any money paid back as part of their
12 investment, other than whatever money came at the end of the
13 deal?
14 A. I don't know what you mean by dividends. Could
15 you rephrase that please?
16 Q. Did money in any way, shape or form get paid back
17 to Alan Young's group, other than whatever was paid at the
18 time you parted ways with them?
19 A. We gave them like every dime we had and then I
20 believe -- I'm sure it's written somewhere because I wasn't
21 -- I believe we paid them a check once for 25,000. We might
22 have paid them a check twice. It was like the end of the
23 year. But when we did the memorandum with Rollin and the
24 Terrys, it spelled out who we owed money to, and I remember
25 seeing Feels Good, Inc. Feels Good, Inc. is Alan Young;

Page 44

1 it's the same people. So whatever was listed in there.
2 Q. Alan Young is Feels Good, Inc.?
3 A. Yes.
4 Q. The -- the $25,000 or maybe two payments of
5 $25,000, was that at the end when you were terminating your
6 relationship or was that ongoing while the relationship was
7 -- was still, you know, active?
8 A. No. When the relationship was active we gave
9 every money -- dime we had to pay them and have a separation
10 deal. There was a -- we owed them money. I don't know if
11 it was 50,000 or 75,000. That was like some type of note.
12 And I remember we made one payment of 25,000. We might have
13 made two payments. I don't recall. But it was --
14 Q. Were those payments on the note?
15 A. Those payments -- I -- I don't -- I'm sorry. I
16 think I'm being clear. We had -- every dime we had we
17 gave. Then we had some type of note or some type of note
18 that we owed them money. It was either for $50,000 or
19 75,000. I do recall making one payment, possibly made two
20 payments. I don't remember.
21 Q. So --
22 A. And it would have been after the relationship. I
23 don't know if it was six months after --
24 Q. Okay.
25 A. -- or a year after. But I'm sure there's --

Page 45

1 Q. All right.
2 A. -- paperwork that says what it was --
3 Q. I just want to be --
4 A. -- supposed to be.
5 Q. -- sure that all those payments are either at the
6 time the relationship ended or afterwards, and I think
7 you've told me that that's correct. They were either at the
8 time you --
9 A. It would have been after the relationship ended,
10 and then I do remember though when we did the memorandum
11 Gene and Rollin went through everything, who we owed. And
12 we listed -- and I remember it saying Feels Good, Inc. I
13 don't remember if it said 50,000 or 25,000 dollars. But it
14 would be in that memorandum.
15 Q. Now Michael Resnick then was -- brought in
16 $300,000, correct?
17 A. Mm-hmm.
18 Q. Was there a written agreement with Michael
19 Resnick?
20 A. Yes. And actually I just remembered the name of
21 his business is Harris Associates, but I think they set it
22 up as Hudsucker.
23 Q. Okay.
24 A. Because it's the same -- same thing.
25 Q. Now was there a written agreement between you or

Page 46

1  between Kids Count and Michael Resnick or Hudsucker or
2  Harris & Associates?
3     A.  I believe there was an agreement between Hudsucker
4  and not me, but the business, the Kids Count.
5     Q.  And what was Michael Resnick to do and what were
6  you to do under this agreement?
7     A.  I have no clue what he was to do under the
8  agreement, and I don't know what I was to do under the
9  agreement.  But I was going to do was try to raise money and
10  some -- find someone to run the business and grow a
11  business.
12     Q.  Well, you're going to try to raise money.  What
13  was Michael Resnick going to do?
14     A.  He wasn't doing anything other than he put money
15  into the business as some type of loan.  I don't -- I'm
16  assuming it was a convertible loan.
17     Q.  Okay.
18     A.  Because I remember something with six percent.  I
19  don't know if it was six percent interest or if it was a six
20  million valuation.  I just remember a six.
21     Q.  Convertible -- a loan convertible to an ownership
22  interest in your company?
23     A.  I'm assuming, mm-hmm.
24     Q.  Are you assuming or is that your best
25  recollection?

Page 47

1     A.  I'm -- I'd have to look at the paperwork.  I
2  remember it was some type of loan that I'm assuming was a
3  convertible into the business.  I don't know if -- who
4  decides, how they decide.  I just remember there being a six
5  in something.
6     Q.  Now the $300,000 that was put into your business,
7  what was that money used for?
8     A.  I would assume it was used to keep -- we had some
9  employees to finish the game.  I don't know if they were
10  finishing Jack's Attic.  There was another game we were
11  working on called Spuzzled.  I don't know if it was
12  finishing one or finishing the next one.
13     Q.  Did you --
14     A.  And it would have been for operating money.
15     Q.  What were your expenses -- your operating
16  expenses?
17     A.  I don't recall what my operating expenses were in
18  1990 whatever it was, five or six or seven.
19     Q.  Were you drawing a salary at that time?
20     A.  I don't recall if I was then.  I was drawing one
21  with Alan Young.  I don't recall if I was drawing -- there
22  were many months that I didn't take anything.  I don't
23  recall when.
24     Q.  Did you eventually hire a president for your
25  company?

Page 48

1     A.  For Kids Count?
2     Q.  Yeah.
3     A.  I don't recall.
4     Q.  Who's Craig Carter?
5     A.  Craig Carter was -- somebody introduced me to
6  him.  I don't even remember who did.  And I -- to the best
7  of my recollection, I thought he was coming in to do
8  marketing.  I don't know if he -- I don't think he had the
9  title of a president.  I don't know.  I could probably look
10  through old paperwork, I don't recall.
11     Q.  Did he become an employee of Kids Count?
12     A.  Yes.
13     Q.  As best you recall, when?
14     A.  No clue when.
15     Q.  Was it before --
16     A.  I'd -- I'd say it's between 1996 and 1998.
17     Q.  And how long did he have a position with Kids
18  Count?
19     A.  A short period of time.
20     Q.  Is that a week or a month or a year?
21     A.  I'd say it was less than six months or around six
22  months.
23     Q.  And --
24     A.  I don't recall.
25     Q.  -- did he receive a salary?

Page 49

1     A.  Yes.
2     Q.  And what did he do for Kids Count?
3     A.  The intention was he was going to go raise money,
4  be like the person to go out there and raise money.  He
5  didn't.  It wasn't a fit.
6     Q.  Was anybody running the business at that point?
7     A.  No.  It was me, but I'm not one to run the
8  business.  I was wanting to find somebody desperately to run
9  the business, desperately.
10     Q.  Why not Craig Carter?
11     A.  When we interviewed Craig Carter, and I don't know
12  -- I don't -- I don't recall if Rollin interviewed him as
13  well, I don't think so -- but we had asked -- I was very --
14  I don't have the skill set to know how to interview somebody
15  to run the business.  I feel like I have a good sense of
16  judgment if someone's working with me and making products.
17  So I remember us asking other people to help us.  And I do
18  remember Michael Resnick had interviewed Craig Carter.
19     Q.  Why did you hire someone to raise money for the
20  company before hiring someone to run the business since
21  that's the need you said you'd had all these years?
22     A.  Because -- wait -- say that again.
23     Q.  You testified about what you always needed was
24  someone to run the company and do the business.  Why did you
25  hire Craig Carter as someone to raise money before --

Case 04-03774    Doc 42-3    Filed 02/21/06    Entered 02/21/06 16:44:14    Desc Esralew
deposition excerpts    Page 15 of 29
TEXTNET Internet Court Reporters          888-TEXTNET Toll Free                    www.textnet.com

Page 50

1    A.  How was I going to --
2    Q.  -- you hired somebody to -- to run the business?
3    A.  I needed to have money to pay someone to run the
4  business.
5    Q.  Well, you had $300,000 from Mr. Resnick.
6    A.  I don't remember how much we had in there when
7  Craig Carter came in.
8    Q.  But when the $300,000 came in from Mr. Resnick's
9  group you had $300,000.  Why was that money not used to hire
10  the person to fulfill the need you testified was your
11  greatest need, someone to run the business?
12    A.  That's what I was looking to do.  I don't recall
13  -- and it looks like Rollin recalls -- what Craig Carter's
14  title was.  So if you could maybe stop this and ask him
15  because this was a long time ago and I don't recall.  I know
16  he was a marketing person.  And I -- I -- I don't know if it
17  was the intention to have him run the business.  I don't
18  recall.
19    Q.  Was any of the --
20    A.  But I know that I was interested in him running --
21  you know, raising money and then -- you know, I don't know
22  if it was that everybody said let's test it and see how it
23  works.
24      The biggest concern, he was from a corporation and
25  we were a tiny little you've got to wear 15 hats at any

Page 51

1  given time type of business.
2    Q.  You've said several times that there's paperwork
3  regarding Mr. Resnick, and -- and I've looked at the
4  documents you've produced in this case and there wasn't any
5  paperwork regarding Mr. Resnick.  Do you have documents
6  regarding your relationship with Mr. Resnick?
7    A.  I remember there being a piece of paper that
8  Rollin and Michael Resnick and I went through in Rollin's
9  office because they had -- we had a meeting there because
10  Rollin thought he was in front of Michael and Michael said
11  he was in front of Rollin.  I don't recall.  But I would
12  assume that there's -- I mean it just -- it wasn't -- wasn't
13  my thing.  I don't know.
14    Q.  When was that meeting?
15    A.  I have no clue.
16    Q.  Do you know --
17    A.  It was after Rollin came in with Gene and we had a
18  meeting at the cafeteria or an office next to --
19    Q.  All right.
20    A.  -- Rollin's office.
21    Q.  But my question really was you've made many
22  references to this it's in the paperwork whatever the
23  numbers are with Mr. Resnick, and I've received no documents
24  regarding Mr. Resnick.  So why don't I just leave it this
25  way, I would like you to look for all your records on Mr.

Page 52

1  Resnick and turn them over to your lawyer.  And Gina, I
2  would like those documents produced.
3    A.  Yeah, I recall there being one piece of paper.  We
4  can look to see.  I --
5    Q.  And what was that piece of paperwork?
6    A.  I believe it was a piece of paper that was some
7  type of convertible note.  And I remember seeing the number
8  six in there.  I don't know if it was six percent interest
9  or if it was a six million valuation.  And it might not even
10  be six, I just -- so it might -- I don't know.
11    Q.  Was any of Mr. Resnick's $300,000 used to pay off
12  Alan Young's group?
13    A.  I don't know.
14    Q.  It's possible?
15    A.  I don't know.
16    Q.  So you're not denying it, it is possible.  Is that
17  -- is that fair to say?
18    A.  No, it's not fair to say because I don't know.
19  You're making an assumption that I'm saying it was, and I
20  don't know.
21    Q.  No, I'm not assuming you're saying it was.
22      MS. KROL:  She -- she's answered that she doesn't
23  know.
24    Q.  All right.  You don't know one way or another
25  whether any of the money that Michael Resnick brought in,

Page 53

1  the $300,000, went to pay Alan Young's group.  Is that fair?
2    A.  Yes, you're correct, I don't know.  I don't
3  recall.
4    Q.  Okay.  How long -- how -- did your -- your
5  relationship with Michael Resnick end at some point?
6    A.  No, I still talk to him.
7    Q.  Has he been repaid any of the $300,000?
8    A.  No, hm-mm.
9    Q.  Was that discharged in your bankruptcy?
10    A.  Yes.
11      MS. KROL:  Well, now I -- that calls for a legal
12  conclusion.  I'm not sure she even --
13    A.  Well, yeah.  I'm saying yes.  I don't know.  I
14  guess we wrote everything down.
15    Q.  What was the next partner, investor or person that
16  loaned money to you or your business after Mr. Resnick?
17    A.  To the best of my recollection I think that was
18  about the time that we had a meeting with Rollin, and he
19  knew all about -- we told him all about the Alan Young.  And
20  he had some -- there was some big run-in.  I don't remember
21  if it was drug-related.  There was some -- something weird,
22  I don't know what.  And it was he knew about Alan, and I
23  remember him saying -- it was nothing with drugs with Alan.
24  It was something -- I don't know.  It was something with
25  Alan's attorney or Rollin, and he just -- I remember him

Case 04-03774   Doc 42-3   Filed 02/21/06   Entered 02/21/06 16:44:14   Desc Esralew
deposition excerpts   Page 16 of 29
TEXTNET Internet Court Reporters          888-TEXTNET Toll Free          www.textnet.com

## Page 54

1 feeling very bad and said that he wanted to introduce me to
2 some nice people. And I needed nice people. And I think he
3 meant specifically Gene Terry.
4  Q.  What about Steve Santowski?
5  A.  Oh, yes. Steve Santowski's a neighbor of mine.
6  Q.  And what involvement has he had in Kids Count?
7  A.  He had no involvement. He was a neighbor of mine,
8 is a neighbor of mine, and had offered to put in a lot of
9 money. And --
10  Q.  When did this happen?
11  A.  I don't recall, but it was after Alan Young and --
12  Q.  Was it before Michael Resnick?
13  A.  I don't recall. My guess, if I could guess, would
14 be after Michael Resnick, but I'm not sure.
15  Q.  All right. That's fair.
16  A.  Okay.
17  Q.  And --
18  A.  But yes, he had offered to put in like a huge
19 amount, like 500 to 700 thousand or something and didn't.
20 He -- he put in $75,000. I remember that.
21  Q.  Now --
22  A.  And then just never put in more and --
23  Q.  Was that an investment or a loan?
24  A.  I don't recall. I know at some point Rollin met
25 with him a couple times. I don't recall if it was an

## Page 55

1 investment or a loan.
2  Q.  Did Rollin meet with him at the time he was
3 considering putting money into the business?
4  A.  No, I think he met with him afterward, after he
5 was already in. And the reason I'm thinking it's a loan, I
6 remember Rollin -- I don't know if there was paperwork or
7 there wasn't paperwork and Rollin drew up paperwork.
8 Because he was -- I think Rollin when he came in was tidying
9 everything up. I mean he was like dotting all the i's and
10 crossing all the t's. And so -- and you know what, I don't
11 even know if they met in person or on the phone. I'm
12 thinking they met in person that I went with to a meeting,
13 but I really don't recall. But that would be my guess. And
14 I do remember Rollin drawing up paperwork after Rollin --
15 after Gene came in.
16  Q.  Do you know was Mr. Santowski ever repaid if it
17 was a loan?
18  A.  He was not repaid. We had him on the books. We
19 had anybody who put money in on whatever note or books or
20 something.
21    I don't know if it was on the memorandum because I
22 don't -- if it was beforehand it would have been listed on
23 the memorandum. I probably should have looked at it, but I
24 haven't looked at it in a long time. But I can picture
25 Feels Good, Inc. And Rollin and Gene would know if it said

## Page 56

1 because they went through everything before they came in.
2 We -- you know, that when it was fresh. It wasn't six
3 years later. So we went through everybody who had any
4 involvement or who had put money in the business and it was
5 listed.
6  Q.  When you say -- you say memorandum, are you
7 referring to the memorandum of agreement you entered into
8 with --
9  A.  The one Rollin did.
10  Q.  -- the Terrys and Soskin?
11  A.  Mm-hmm. Yeah.
12  Q.  Okay. As you sit here today has Mr. Santowski
13 been repaid any of that money?
14  A.  No, hm-mm.
15  Q.  Any other investors or partners in the business
16 that you -- you had --
17  A.  In Kids Count?
18  Q.  -- up until the time before -- before Mr. Terry
19 and his wife and Mr. Soskin got involved in the business?
20  A.  I don't recall. I know -- I'm thinking Jim
21 Terra. I don't know if it was before or after.
22  Q.  How do you spell that name?
23  A.  T-e-r-r-a.
24  Q.  And what was he, an investor or did he loan money?
25  A.  No, he was a friend who I really wanted to do a

## Page 57

1 deal with, but our attorney was playing hardball. I don't
2 even remember who it was. I just remember him telling me I
3 need to have balls, and I'm like I just want to get this
4 funded and bring somebody in to run the business. And he
5 didn't like how the -- you know, the interaction. But I
6 couldn't even tell you who the attorney was. I know it
7 wasn't Rollin.
8  Q.  Was it one of the names you've already mentioned
9 or it was another attorney?
10  A.  I don't recall. And I recall it wasn't Jonathan
11 Rothchild. I think Jonathon Rothchild only did the Alan
12 Young separation. So I don't recall. And I don't know if
13 there was anybody else. I don't think so.
14  Q.  Wes Neisen?
15  A.  Well, I mean about putting money in.
16  Q.  No, I'm asking --
17  A.  But it would have been listed --
18  Q.  -- as far as --
19  A.  -- on that memorandum.
20  Q.  -- who the lawyer was.
21  A.  I don't recall. It wouldn't have been Wes Neisen
22 though. Maybe it was Rollin, but I don't think it was
23 Rollin.
24  Q.  Okay. And it wasn't Jonathon Rothchild. Was
25 there a venture capital deal that you -- that you had in

Case 04-03774   Doc 42-3   Filed 02/21/06   Entered 02/21/06 16:44:14   Desc Esralew
deposition excerpts   Page 17 of 29
TEXTNET Internet Court Reporters          888-TEXTNET Toll Free          www.textnet.com

## Page 58

1  order to try to raise funds before the Terrys and Mr. Soskin
2  got involved?
3      A.  There wasn't a -- well, I don't know if you'd call
4  it a deal.  Somebody introduced me to somebody named Bob --
5  Bob -- Bob -- what was his last name -- Bob Bernard, and
6  that could be what Rollin's writing you notes about.  He
7  owned a big company called Whittman-Hart.
8      Q.  Whittman --
9      A.  Hart.
10     Q.  Hart?
11     A.  I don't know if it's in business any longer; it
12  might be.
13     Q.  And how did you meet Mr. Bernard?
14     A.  Somebody, I can't even recall.  Somebody
15  introduced me.  I don't know if it was an associate or a
16  friend from high school.  I had bizarre -- I mean people
17  would just like bump into me at the grocery store and
18  introduce me to people.  But somebody introduced me to him.
19  And he -- I know he had a company called marchFIRST too that
20  Whittman-Hart I think turned into marchFIRST or marchFIRST
21  turned into Whittman-Hart or something.  And I had I believe
22  two meetings with him, and he was a big -- excuse me -- kind
23  of mover and shaker kind of person.
24     Q.  What was the purpose of the meetings?
25     A.  To invest money, to raise mon -- to put money in.

## Page 59

1      Q.  To Kids Count?
2      A.  Mm-hmm.  Yeah.  A lot of money, mm-hmm.
3      Q.  Was there an amount you were seeking from him?
4  Was there an amount that he was proposing he put in?  Tell
5  me what the discussions were between you and him.
6      A.  Well, I don't recall what the discussions were,
7  they were a long time ago.  But it was about him putting in
8  a significant amount of money, like -- like millions of
9  dollars.  And I was very excited and very taken at the
10  prospect of, you know, having -- it was never said, but I
11  guess I felt he could be a mentor, you know, help bring the
12  right people in.  He wanted to increase my salary, which I
13  was thrilled, because he said, you know, you can't be
14  working like you're working and not making enough to -- you
15  know.
16     Q.  What was your salary at the time?
17     A.  I don't recall.  I know with Feels Good it was 170
18  and there were many months I didn't take any salary.  And I
19  don't remember what he wanted to increase it to, but I just
20  remember it being more than 170.
21     Q.  All right.
22     A.  We never did a deal with him though.
23     Q.  I want to make sure I understand this.  You were
24  getting 170 when you were with Feels Good.
25     A.  It was an annual salary, one salary.

## Page 60

1      Q.  And after that, although there were months when
2  you didn't take anything --
3      A.  Mm-hmm.
4      Q.  -- your salary was still listed at 170?
5      A.  Don't recall.
6      Q.  But in any case when you were talking to Bob
7  Bernard about putting millions of dollars into the company,
8  he suggested that you increase your salary above 170?
9      A.  Yes, I recall that.
10     Q.  What was he to get in exchange for putting
11  millions of dollars into the company?
12     A.  A big chunk of the company.
13     Q.  How much?
14     A.  Don't recall.
15     Q.  Was it less than a majority of the stock?
16     A.  Yes.
17     Q.  So you still would have had ownership and control
18  of the company?
19     A.  I don't know if it's control, but more ownership.
20  I don't know.  There was never any documents.  I don't know
21  that if it was documents had said I didn't have control, I
22  don't know.  But I would have had more stock than he had if
23  that's what you're asking me.
24     Q.  You would have had more than 50 percent of the
25  ownership?

## Page 61

1      A.  I --
2      Q.  Is that right?
3      A.  -- believe so, yes.
4      Q.  Okay.  Why did that deal never come through?
5      A.  The person who introduced me -- and I wish -- I
6  can't even believe I'm like totally drawing a blank.  Who
7  introduced me; I am just drawing a blank.  But I remember
8  him turning it down, being at a meeting, this was a long
9  time ago, and saying I was ready to like throw up, that he
10  didn't want him having so much control.  I remember that.
11     Q.  He -- he --
12     A.  So that's why I'm saying --
13     Q.  You used he --
14     A.  -- I don't know if things were control.
15     Q.  -- and him in that sentence.  Who are he and him?
16  He --
17     A.  Bob Bernard and whoever introduced me to him.  I'm
18  just drawing a total blank.  If I remember or if I look at
19  documents I can let you know later.
20     Q.  So the person that introduced you to Bob Bernard
21  didn't want Bob Bernard to have so much control --
22     A.  Yes.
23     Q.  -- in the company?  Well, why did you care what
24  this person thought?  They had just introduced you to
25  somebody, they didn't -- am I right?

Case 04-03774   Doc 42-3   Filed 02/21/06   Entered 02/21/06 16:44:14   Desc Esralew
deposition excerpts   Page 18 of 29
TEXTNET Internet Court Reporters     888-TEXTNET Toll Free     www.textnet.com

Page 62

1   A.   Yes.
2   Q.   They didn't own part of your company, did they?
3   A.   You are right.
4   Q.   They -- they weren't your -- your lawyer or your
5   financial adviser, were they?
6   A.   They were advising me.  This guy was advising me
7   and I --
8   Q.   And this guy who -- who --
9   A.   -- for better or for worse, and it's been much for
10  worse, I'm -- I'm not equipped to be doing the business kind
11  of things, and I was -- I would unfortunately lean on --
12  rely on people for advice.  And --
13  Q.   Well, why didn't you lean on Bob Bernard for
14  advice --
15  A.   Well --
16  Q.   -- in this case?
17  A.   I don't know if you know him, but he's not the
18  kind of guy you lean on for advice.  He's a big, busy guy,
19  and I had I believe two meetings with him.  And I -- you
20  know, I took it to heart.  Maybe it would never have come to
21  fruition, and it ended up not coming to fruition.  But he
22  wanted to put a significant amount of money in.
23       I do remember him sending me an email.  This was
24  in the pre-email days so I didn't respond to it because I
25  was not email savvy.  I just thought, oh, he's emailing me.

Page 63

1   And I -- my guess -- my guess is because I didn't respond it
2   was more of the chase.  Maybe he thought I was, you know,
3   being hounded by a bunch of people to put money in.  I have
4   no clue.  I just kind of didn't know better.
5   Q.   What did his email say?
6   A.   I think it was we had a nice meeting, and I'm
7   interested, and you know, something to that effect.  I don't
8   recall exactly.  It was probably eight or nine year ago.
9   Q.   Was it Peter Abruzzo that introduced you to --
10  A.   No, he didn't.
11  Q.   -- Bob Bernard?
12  A.   No.
13  Q.   Do I understand from what you're telling us that
14  you decided, based on this person who you don't recall
15  saying they didn't think that Bob Bernard should have so
16  much control in the company, that was the reason that you
17  backed away from this deal?
18  A.   It was not that I decided.  The person did that
19  who knew him.  They had a history together.  And I do
20  remember me telling Michael Resnick because I was thrilled.
21  And he was also saying, you know, you don't know this person
22  and take it easy.  I do remember that.  So it must have been
23  all around the same time.
24  Q.   Am I correct that the reason the deal did not go
25  forward is because you backed away from the deal because of

Page 64

1   the advice you were getting from Mr. Resnick and this other
2   person?
3   A.   I remember being at a meeting with the person and
4   the person saying while I was there, she doesn't want to do
5   the deal, she wants you to be part of it, not the whole
6   thing.
7   Q.   Who was at that meeting?
8   A.   I remember it being Bob Bernard, myself and
9   somebody who I cannot even place.  But it was not Peter
10  Abruzzo.
11  Q.   But it was the person that introduced you to Bob
12  Bernard?
13  A.   Yeah.
14  Q.   And --
15  A.   And I'm drawing a -- yeah.
16  Q.   And while you were present this person who you
17  don't recall told Bob Bernard that she wasn't -- that you
18  weren't comfortable doing the deal.
19  A.   I mean I know what he looks like, if that helps.
20  I can say for the record what he looks like, but I just am
21  totally drawing a blank with his name.
22  Q.   All right.
23  A.   I think he was a hedge fund guy who knew Bob and
24  somebody introduced me to -- I mean I would meet people.  I
25  just don't recall his name.  I don't even --

Page 65

1   Q.   But going back to the question I asked, it was
2   this person whose name you can't recall and Bob Bernard and
3   yourself in a meeting.  And this person told Bob Bernard
4   that you did not want to go forward with this deal?
5   A.   Yes.
6   Q.   And what did Bob Bernard say to that?
7   A.   I don't recall.
8   Q.   Did this happen -- and by this I mean you turning
9   down this deal.  Was this sometime in 1998?
10  A.   I know it was right before I moved in my house
11  because I wanted to take the deal because I thought it
12  would afford me to move in my house.  I really wanted the
13  deal for lots of reasons.  So --
14  Q.   Did you  in fact buy the house because you saw
15  this deal coming and you knew that this meant an inflow of
16  cash?
17  m   Well, I believed the deal would be coming.  The guy --
18  I remember after we walked out of that meeting I was like
19  crying I was so upset.  And he walked me over to LaSalle
20  Bank, and he had a relationship there because I didn't have
21  bankers, and said that he wanted me to turn down this deal
22  but I wanted to buy this house because I -- we just -- we
23  needed to get out of our other house.  There was just a lot
24  of environmental issues with the house.
25  Q.   Why -- why were you crying when you came out of

Case 04-03774    Doc 42-3    Filed 02/21/06    Entered 02/21/06 16:44:14    Desc  Esralew
deposition excerpts    Page 19 of 29
TEXTNET Internet Court Reporters                888-TEXTNET Toll Free                www.textnet.com

Page 98

1 see the memorandum of agreement --
2    A.   Mm-hmm.
3    Q.   -- that was signed November 22nd, 1998, if that
4 helps orient you in time.
5    A.   It would be before that agreement.
6    Q.   I assumed so.  What is your recollection as to how
7 far before you signed an actual written agreement were these
8 conversations?
9    A.   It seemed like it happened pretty quick.  I just
10 remembered having four meetings, it could have been six
11 meetings, it could have been five meetings, I remember four
12 -- I could be wrong -- that were long -- you know, long,
13 long, long four-hour meetings.  I remember it being over a
14 week, maybe it was two weeks.
15    Q.   Who attended these meetings?
16    A.   To the best of my recollection, it was myself,
17 Gene, Nicole and Rollin.  I don't know if my husband was
18 ever at one of the meetings.  He could have been, I don't
19 remember.  I don't think so because then we would have had
20 the kids because he was with -- we had three little ones at
21 the time.  And I don't remember them being at a meeting.
22    Q.   Did --
23    A.   At that time.
24    Q.   Was there any reason that you had an immediate
25 need for money for the business at that point during these

Page 99

1 discussions?
2    A.   We -- yes.  The only -- what we wanted to do -- my
3 whole concept was testing out the model and -- meaning the
4 viability of the business.  And we had success with Sears
5 years before.  And when Alan Young came in it was kind of
6 like everything just shut down.  It was just -- it was just
7 -- it was just -- it was like everything -- everything was
8 really kind of managing a lot of stress --
9    Q.   You were --
10    A.   -- and working on the software game, that big
11 software game.
12    Q.   You had product in Sears at one point --
13    A.   Yes.
14    Q.   -- sometime earlier.  Why did that end?
15    A.   Well, when you bring product in it kind of cycles
16 in and cycles out.  It just goes in and goes out.  So we had
17 a displayer -- display thing box.  And they said it would be
18 in there for four weeks.  It was there for months and it was
19 just there until the displayers broke and that was it.  I
20 didn't have -- I was in Sears, which is not a video store.
21 So it's not like I was in a video rack at a store, if that
22 makes sense.  You know when you go into Wal-Mart and you see
23 a video section?  The video section is not a corrugated
24 displayer typically unless it's a in and out display.  I was
25 an in and out display.

Page 100

1    Q.   Were you successful at Sears?
2    A.   I made the products very quickly, they were good
3 quickly.  We didn't get into -- the buyer said don't come in
4 after Easter and we came in after Easter.  We had somebody
5 doing the packaging and it took a lot longer than they said
6 it would.  So we kind of missed the Christmas window and we
7 went in after Easter.  So the products sold through, as I
8 understand, and I thought it was successful just being in
9 Sears.  But it was not like I had a follow in product.  To
10 be successful you really need to have an ad campaign, you
11 have to have all the different functions of the business.
12 Advertising, marketing, P.R., they're timed together, you go
13 in stores.
14    Q.   Okay.  I got into that because you said you had
15 tested --
16 m   I called it test.  That was I even think with Rollin,
17 Gene and Nicole, we were looking at -- we had this trying in
18 Sears, we had a -- you know, the trying it and testing it in
19 Zany Brainy, which is a small retailer.  The only thing that
20 we hadn't done, which everybody felt, everybody is a loose
21 term, people we were talking to, that we should do is test
22 direct response.  And what we kept hearing from people is if
23 I could be doing a commercial at the retailer, that would
24 really help.  But I can't be at retailers standing there and
25 talking, that's not -- doesn't happen.  So we were extremely

Page 101

1 excited to do this direct response commercial.
2    Q.   What's a direct response commercial?
3    A.   It's a commercial that's aired on television
4 that's called direct response.  It could be a 30-second
5 commercial, it can be an hour infomercial.
6    Q.   Is this -- is this where you're asking people to
7 buy it directly from you, whatever product you --
8    A.   Yeah, you're doing a commercial and you're having
9 a 1-800 number up at the bottom.  And we felt that that
10 would be -- when you don't have money to go into retail,
11 because most retailers will charge you shelfing fees, we
12 thought that would be a very good way and were very excited
13 about it.
14    Q.   Were you charged shelfing fees at Zany Brainy?
15    A.   No.
16    Q.   Did you have also your product at Noodle Cadoodle?
17    A.   For a short time because --
18    Q.   When was --
19    A.   -- they didn't --
20    Q.   -- that?
21    A.   -- pay their bills.  No clue.  '90 -- I don't --
22 6, '96 probably.
23    Q.   Did you -- were you successful in selling product
24 through Zany Brainy and Noodle Cadoodle?
25    A.   We were successful in selling it through Zany

Case 04-03774   Doc 42-3   Filed 02/21/06   Entered 02/21/06 16:44:14   Desc Esralew
deposition excerpts   Page 20 of 29
TEXTNET Internet Court Reporters          888-TEXTNET Toll Free          www.textnet.com

Page 102

1  Brainy. I used to deliver it out of my Jeep. I mean it was
2  a great product, but you had to -- you had to -- you had to
3  do advertising and marketing, they call it MDF funds, market
4  development funds. So when you go in the store you're in
5  their ads. You don't just go in there because -- you know,
6  you have to pay for space. They -- they give you these
7  things. And because I didn't have the money to do it -- the
8  buyers loved the product, the buyer at Sears, the buyer at
9  Zany Brainy. I don't recall meeting a buyer at Noodle
10 Cadoodle, I think I just called up and got it in. But
11 again, they were very difficult to pay their bills. So it
12 was not a -- it was not someone we were interested in doing
13 business with. And I think they went out of business at
14 some point. I -- you know, I don't think they're around
15 that much.
16      So the buyers liked it and kind of bent the rules,
17 meaning we didn't have to pay for those things, but you
18 actually need to do those things for people to -- consumer
19 to know who you are, otherwise you're sitting on a shelf.
20 And depending on the store, you're in the shelf, you're in
21 the backroom. You know, I didn't have a national
22 merchandising firm to go and make -- you know, pull my
23 product off the shelf. That's what firms did back then, you
24 know, put your product on or put yours in the back and put
25 yours front.

Page 103

1   Q.  Were you successful at Zany Brainy in terms of
2  sales?
3   A.  I think successful's relative. I thought we were
4  because we sold through, primarily in the Northbrook stores
5  I thought it was very successful. But we were selling at
6  their other stores too. The software was the most
7  successful, Jack's Attic and Jack's House.
8   Q.  Okay. What was the next thing that happened? You
9  had four to six meetings with the Terrys and Rollin Soskin
10 regarding an agreement. What was the next step?
11  A.  We were talking to somebody about the direct
12 response commercial that I just told you what direct
13 response was.
14  Q.  Right.
15  A.  And the timing was getting very close.
16  Q.  Who was the person you were talking to?
17  A.  Robert Blagman.
18  Q.  Okay.
19  A.  He was recommended from somebody at Eikhoff (ph.)
20 because we talked to Eikhoff, and I believe Eikhoff thought
21 we were too small, thought Robert Blagman would be better.
22 And he was in Los Angeles.
23      So I don't recall when I started talking to
24 Robert. It could have September, it could have been
25 earlier, I don't recall. And he's a tremendous sales guy,

Page 104

1  and felt that we would do extremely well in direct
2  response. My concern was we didn't have enough time. And
3  because --
4   Q.  Why -- why did you have that concern?
5   A.  Because for us to do advertising Christmas,
6  there's certain periods of time -- because of my background
7  I knew media buy. There's certain periods of time that are
8  very slow periods, like the week after Christmas and New
9  Year's Eve is actually a very good time to be in media
10 because you can get rates for like 40 percent costs, things
11 like that that a lot of people don't sell. But in our case,
12 kids could get TVs or families could get TVs or kids can get
13 computers and then they want the software or they want the
14 video machines for it. So there's a lot of those sales that
15 go on right after Christmas in January.
16      Robert came in to shoot the commercial, and again
17 he's -- you know, he's a very -- he'd give me speeches about
18 it's like you're standing up for the academy award and
19 you're not grabbing the academy award. You've got to do
20 this, you've got to do this for Christmas and assured me
21 that we would be on for Christmas.
22  Q.  When you say on for Christmas, are you talking
23 about this period after people have gotten their computers
24 and TVs --
25  A.  No, before.

Page 105

1   Q.  -- for Christmas?
2   A.  It should have been -- being on for --
3   Q.  Before --
4   A.  -- Christmas means probably beginning of December,
5  preferably right around Thanksgiving through I'd say a four-
6  weeks -- four-week time period.
7   Q.  Now do you recall when Mr. Blagman was telling you
8  that, that he would have you on by Christmas -- have you on
9  for Christmas?
10  A.  My guess would be September-October because
11 October would be close. He -- he said things that he bought
12 blocks of media time, which is very normal for firms to do
13 when you're a media buying firm that you kind of buy that
14 time. I don't know if you technically buy that time or you
15 have good relationships that they call you to say, hey, we
16 have time at seven in the morning or two in the afternoon or
17 two in the morning. But assured me, because I remember
18 having numerous -- I mean I talked to him numerous times
19 because I'm really picky with things.
20      I mean I put my heart into it and get very -- you
21 know, and I was -- you know, I was -- I was upset that the
22 spots weren't a where they were supposed to be. I was upset
23 -- you know, we -- I -- I -- to absorb a lot of the costs, I
24 did the casting, we did it at my house. He made a big
25 production, and we actually -- we had a friend in the

Page 106

1 business that we -- that we wanted him and should have had
2 him done the commercial, we felt it could have saved money.
3 But Robert said we had to have people who do direct
4 response.
5 And I didn't know direct response. My TV days
6 were limited to I believe one schedule for Nevada Bob's I
7 think it was. It could have been Fannie May, but I'm pretty
8 sure it was Nevada Bob's. But mine was really radio, 99
9 percent of everything I did.
10 I know with radio when there's open time, that's
11 where you get good rates because everybody's pitching and
12 pitching. And then there's -- there's time that no one's
13 selling. And there's -- there's just like windows of
14 opportunity that you can be very efficient with your media
15 buying.
16 So Robert kept assuring me that we would be on in
17 time, so that's why we started working on everything
18 immediately, working on writing the commercial, coming in to
19 produce the commercial. I believe they edited it right
20 away. It was actually a very nice commercial I thought, I
21 think we all thought. And then getting it on with -- his
22 plan was -- I believe he was either going to do key markets,
23 it's a little fuzzy now, because he -- he was handling that
24 whole -- that's what he did, he did the media buying. But I
25 remember certain shows that would be good that kids were

Page 107

1 watching.
2 RECORDER: Can I take just a minute?
3 MR. CROOKS: Sure.
4 RECORDER: Thank you.
5 (Off the record)
6 RECORDER: We're back on the record.
7 Q. When -- when Mr. Blagman told you that he believed
8 he could get your commercial on television in time for
9 Christmas, do I understand that you understood him to mean
10 get your commercial on in order to make sales for people
11 buying for the Christmas season?
12 A. Yes.
13 Q. And as best you recall, when was it he told you
14 that we can get you on in time for Christmas?
15 A. I remember him saying something like they would
16 edit for a couple days and right after Thanksgiving.
17 Because that was -- I kept pushing about that because --
18 Q. It was right after Thanksgiving he told you that?
19 A. No, it was before Thanksgiving. It was all during
20 the time we talked that he wanted to get us on right after
21 Thanksgiving.
22 Q. All right.
23 A. That's what I kept -- it was always right after
24 Thanksgiving.
25 Q. But my question is when he was giving you these

Page 108

1 assurances that he could get you on --
2 A. Mm-hmm.
3 Q. -- you hadn't made the TV commercial yet?
4 A. We had already started writing the commercial,
5 finished writing the commercial. They came in I remember
6 Thanksgiving break and we shot the commercial. They flew
7 out immediately and edited the commercial during their
8 Thanksgiving break and it would be on right after because he
9 said how quickly they could do everything, which they did.
10 Q. When did the commercial go on TV?
11 A. I don't recall when it went on TV. I would say
12 right at the beginning of December. Maybe it was the end of
13 November, but I don't recall. I could look. I have all the
14 -- I forget what you call it -- the invoices is not the
15 right name, but the affidavits of when they went on.
16 Q. So you were successful in getting the commercial
17 on in time to make sales for Christmas?
18 A. We didn't make sales, but the commercial was on.
19 They -- it wasn't -- it wasn't on where I was told it would
20 be on because I remember we had -- that's when a lot of
21 issues started with him because we kept pressing.
22 Rollin was -- we had trouble getting affidavits,
23 trouble getting any information from Blagman after he kind
24 of sold us. We had trouble getting the airtimes because you
25 -- you -- you can get them, like they post them and you can

Page 109

1 get them before the affidavits. You can have the station
2 email or fax you -- I guess email now, fax then -- when the
3 anticipated airtimes were. I had nothing to do with the
4 media buying, but I was aware of where we were promised it
5 would be on and when -- where it ran.
6 Q. What was the difference between those two?
7 A. Well, we were supposed to be on certain shows that
8 kids watch. And I just recall us being on at goofy times,
9 like three in the morning and six in the morning when kids
10 are not watching shows or shouldn't be watching shows.
11 Q. So it was the time of day that was different as
12 opposed to the time of the season?
13 A. Right, mm-hmm.
14 Q. All right. So you did have a need to raise funds
15 to pay for the commercial?
16 A. That was the whole point. It was to test out this
17 commercial, and we really thought the commercial would be
18 our savior because whenever I had been on TV or the product
19 was promoted, that's when -- you know, if it was in a local
20 newspaper, that's when we sold through Zany Brainy. It was
21 -- I was on the local Channel 5 news, it sold through Zany
22 Brainy. So -- and just in our travels, even some of the
23 retailers said you should do direct response. It was just
24 because we can be there and talk about the message and have
25 it -- you know, people respond, you have your 1-800 number

Case 04-03774    Doc 42-3    Filed 02/21/06    Entered 02/21/06 16:44:14    Desc Esralew
deposition excerpts    Page 22 of 29
TEXTNET Internet Court Reporters          888-TEXTNET Toll Free                    www.textnet.com

## Page 231

1 an Academy Award and not showing up, assured me that we
2 would be on for Christmas. He buys blocks of time and
3 there's unused spots. There may or may not have been a
4 target date. I don't recall but we know it was on -- it was
5 very close to Christmas, the thing on -- right after the
6 editing of the commercial and we shot the commercial
7 Thanksgiving.
8    Q.  Okay.
9    A.  So I don't remember if there was a target date --
10    Q.  Whether you --
11    A.  -- or not. I don't recall.
12    Q.  Whether you had a specific date in mind am I
13 correct that your -- your testimony is that you wanted to
14 get it on in time for Christmas so that sales could be made
15 to people buying Christmas presents?
16    A.  Mm-hmm.
17    Q.  And there's -- in bullet point three there's a
18 reference to upon receipt of the masters. Do you see that?
19 It's the third line from the bottom of bullet point three.
20    A.  Where it's underlined?
21    Q.  Yes.
22    A.  Mm-hmm.
23    Q.  Did that relate -- when you got the masters did
24 that relate in anyway to when the commercial could get on
25 TV?

## Page 232

1    A.  I don't know. Let me looking at the line. It
2 looks like the line refers to -- The Film Syndicate does not
3 put the commercial on TV. The Film Syndicate would be
4 Robert Blagman's company or people that he brings together
5 to shoot the commercial. They don't book the TV time.
6 Robert Blagman does. But Robert Blagman would need to have
7 a master to make duplicates to put -- to put it on TV. Is
8 that what you're asking?
9    Q.  Yeah. Okay. So receiving the masters does effect
10 when you can put it on TV, correct?
11    A.  You need a commercial to put on TV.
12    Q.  You testified a few minutes ago that Mr. Soskin
13 looked over Exhibit 5 and Exhibit 6 for you, these two
14 agreements you signed, correct?
15    A.  I don't know -- I don't recall if he looked over
16 Exhibit 5. I would have thought he would have looked over
17 Exhibit 6 and I recall talking with him about it because I
18 was concerned and I thought The Film Syndicate was
19 expensive. And that --
20    Q.  Do you recall anybody looking over Exhibit 5 and
21 advising you on it?
22    A.  I don't recall. I mean, maybe it was Rollin,
23 maybe it wasn't. I just -- I just don't recall.
24    Q.  If it wasn't Rollin was it somebody else?
25    A.  I don't recall.

## Page 233

1    Q.  Okay. As to The Film Syndicate agreement, Exhibit
2 6, tell me everything you recall about discussing this
3 agreement with Mr. Soskin?
4    A.  I remember Rollin going to Florida and talking
5 about getting back in time to be in the commercial because I
6 remember him wearing a Hawaiian shirt and showing up right
7 from the airport and there were scads of kids waiting in
8 line. And he got to the front and was in the spot. I
9 recall -- I thought this was expensive but I had never
10 produced TV commercials. I was -- my background was radio.
11 And a friend of mind worked in the industry.
12    Q.  Who is that?
13    A.  Alan Rubens. And I just recall him saying I could
14 try to find people and help. It seemed expensive. It was
15 just a very casual conversation. My guess would have been
16 Rollin and I and Gene would have looked through this
17 carefully. I remember Gene and Nicole, because we went
18 through everything and they were funding the commercial, so
19 we would have looked through this in detail because this is
20 -- this was news to me working with a firm out of L.A. who I
21 don't know. We tried to -- you know, we had the casting
22 call at my house. I did the kids. I remember being over
23 the top upset because they charged us for cell phone bills
24 that were expensive. I don't recall what they were and they
25 didn't have their cell phones with them. They were using my

## Page 234

1 home phone. You know, I just remember I was trying to watch
2 over every penny and just being pissed because it felt like
3 they treated it like we were a big company.
4    Q.  Other than the Terrys and Mr. Soskin, before
5 signing Exhibit 6, did you review it with or have anyone
6 else review it?
7    A.  This I would have -- think it would just have been
8 Rollin. I don't think I would have had anybody else review
9 it.
10    Q.  Okay, I thought this --
11    A.  My husband wouldn't have. And Alan Rubens is not
12 a lawyer. He just would have said I know people with direct
13 response. He would have asked them. But he doesn't -- he
14 works at an ad agency. He comes up with ideas. He doesn't
15 produce commercials.
16    Q.  I thought you said a few minutes ago that Exhibit
17 6, you looked over it with Soskin and the Terrys?
18    A.  That's what I just said.
19    Q.  Okay.
20    A.  I'm --
21    Q.  Where did that take place?
22    A.  We had met -- Rollin and I met at my house. I
23 believe most of the meetings with Gene and Nicole was at
24 Rollin's house. So it was Rollin's house. I remember
25 having a meeting with Gene and Nicole in their office right

Page 235

1 by the corner -- I forgot the name of the restaurant -- in
2 Highland Park. I don't recall where the meeting were going
3 to --
4    Q. Did you -- did you sign this at the meeting with
5 Mr. Soskin and the Terrys where it was discussed?
6    A. I have no idea.
7    Q. Do you have any other copies of Exhibit 6 for
8 example that don't contain the fax markings on them or
9 contain different fax markings?
10   A. I would have no idea. If they were in our box we
11 would. If they weren't we wouldn't. I don't know.
12   Q. If for example you have another copy of Exhibit 6
13 where either the fax markings are different or maybe the
14 handwritten portions and changes are different, if you
15 possessed such a document you would have turned this over
16 through your attorney, correct?
17   A. If I had a copy of a document I assume it would
18 have -- yeah, it would have been turned over. I don't know
19 if there was another. I don't recall.
20   Q. What's -- who did if anyone international work for
21 Kids Count? And I want to direct a couple of questions here
22 to the fall of 1998 leading up to the time you entered into
23 the memorandum agreement. Was anybody doing international
24 sales or marketing for Kids Count products?
25   A. I mean, other than one of my dogs? It was me.

Page 236

1 There was nobody doing sales except me calling Zany Brainy
2 and calling Sears.
3    Q. Okay. Tell me about what you did internationally
4 to promote the products, if anything?
5    A. It was always our goal to have this company grow
6 to be a global international company. But first we had to
7 get it off the ground, get funding, develop a following,
8 make products, make money.
9    Q. So --
10   A. I don't recall if there was -- if any people wrote
11 us internationally that heard about the product and bought
12 the product.
13   Q. Okay.
14   A. But it would have been in -- I mean, in my dreams
15 to do something internationally.
16   Q. Okay. Do I understand then that you were focusing
17 on getting it off the ground and getting the products sold
18 domestically and as you grew you were going to expand to the
19 international markets? That was your hope some day?
20   A. Yeah, I just have no clue how much I would have
21 thought about that back in 1998.
22   Q. Okay, that was a distant thought back in '98?
23   A. I don't recall but I can't imagine. I think I was
24 more focused on let's see if the direct response works.
25   Q. Okay.

Page 237

1    A. Because something needs to work and we had no
2 funds to go in retail.
3    Q. If I -- if I use the phrase Frankie Avalon's
4 Marketing Company does that mean anything to you?
5    A. No.
6    Q. Do you know who they are?
7    A. Frankie Avalon's --
8    Q. Frankie Avalon's Marketing Company?
9    A. No.
10   Q. At the time that you were negotiating with the
11 Terrys and Mr. Soskin, the negotiations, the meetings that
12 led to the memorandum of agreement, Exhibit 1, what was the
13 status of Kids Count sales through Zany Brainy?
14   A. I do not recall.
15   Q. Were you selling through -- do you recall if you
16 were selling through Zany Brainy at the time?
17   A. We were selling through Zany Brainy -- I recall us
18 selling through Noodle Kadoodle but they didn't pay their
19 bills and we didn't go back into Noodle Kadoodle. I don't
20 remember when that was. I remember selling the software
21 Jack's House or Jack's Attic or both through Zany Brainy.
22   Q. At the time you were negotiating the agreement
23 with the --
24   A. That was --
25   Q. -- Soskins and the Terrys?

Page 238

1    A. I would think that we were because that's where we
2 were selling. I don't recall what month. I don't recall
3 what year but our -- that's where we started off. I recall
4 trying to get the video in and I -- we may have had the
5 video in for a short period of time. I -- maybe not. I
6 don't recall. But I recall trying to call the buyer and not
7 getting a return phone call.
8    Q. You testified before about there was a period of
9 time when you sold through Sears?
10   A. Mm-hmm.
11   Q. When did that end?
12   A. I went into Sears I believe in '96. I believe.
13 And it was supposed to be a displayer up for a short period
14 of time and it was up until it basically broke. So it was
15 up for a period of months.
16   Q. Oh, just several months in you believe '96?
17   A. Mm-hmm.
18   Q. And then you were no longer selling through Sears?
19   A. Yeah, it wasn't that Sears had a software
20 department.
21   Q. Yeah.
22   A. So it was a corrugated displayer that they said
23 give it four weeks. But in some stores it was up for months
24 and then it would get hit with the vacuum cleaner so I heard
25 and fall apart.

Page 239

1   Q.   Okay.  So that ended your marketing through Sears?
2   A.   Yeah.  It was like an in and out program they'd
3   call it.
4   Q.   How about Discovery Toys?  There was a time period
5   when you sold your products through Discovery Toys --
6   A.   Yes.
7   Q.   -- correct?
8   A.   Mm-hmm.
9   Q.   What time period was that?
10   A.   To the best of my recollection I don't know if it
11   was '97, '96, '98.  I don't recall.  I do recall that it was
12   -- the game was broken a lot.  With software you have to
13   keep updating it and we didn't have the money or the
14   resources to keep updating it.  So it was very challenging.
15   Soft -- video you can pop in a machine and it's okay.
16   Software, if you don't -- even if you do update it, someone
17   can put together a computer, it's a different configuration.
18   There were tech problems like crazy, over the top.  And we
19   didn't have the money or the resources to update the game.
20   So there were more tech problems than one would want.
21   Q.   So did that end your sales at Discovery Toys
22   because you had to upgrade --
23   A.   No, but it was -- well, we eventually upgraded.
24   When we had a licensing agreement we took money and upgraded
25   it.

Page 240

1   Q.   When was that?
2   A.   With Vicki Lou.
3   Q.   All right.
4   A.   That was the first thing we did was upgrade
5   because you can't -- you just -- it wasn't working.
6   Q.   As best you recall when did your sales through
7   Discovery Toys end?  When did you stop making sales through
8   that entity?
9   A.   I don't recall but it's been several years.
10   Q.   So, sometime in 2002 approximately?  I mean --
11   A.   I don't recall but it's been several years.
12   Q.   From now?  I mean, several years going back from
13   today as we sit here today?
14   A.   Yes.  I don't recall when we were last with
15   Discovery Toys.
16   Q.   Okay.
17   A.   I know that they were not happy about the games
18   not working.
19   Q.   Have you ever had any experience with supply chain
20   analysis or activity based costing?  Do you know what those
21   phrases mean?
22   A.   Supply chain analysis?
23   Q.   Right.
24   A.   Or activity based costing?
25   Q.   Right.

Page 241

1   A.   Conceptually I can have an idea.
2   Q.   Yeah.
3   A.   But I don't -- I mean I would have done it more
4   from my gut instinct meaning the buyer returned my phone
5   call and I was able to speak to them and I'd try to get the
6   product in.
7   Q.   That -- that meaning -- how is that answering my
8   question.  I don't know if I understand your answer.
9   A.   Well, I --
10   Q.   Let me break it down one at a time --
11   A.   Ask me your question --
12   Q.   The phrase supply chain analysis, do you know what
13   that means?
14   A.   It sounds like something that somebody would have
15   written in a business plan of mine or in a business plan to
16   tell you the truth.
17   Q.   Do you know what it means?
18   A.   I would assume it's analyzing the different
19   markets that your product's in.
20   Q.   And why would you assume that?
21   A.   Because that's what it sounds like, supply chain
22   analysis.
23   Q.   Okay.  Do you know what the phrase activity based
24   costing is?  Means -- what it means?
25   A.   Not really.  I would assume it means doing an

Page 242

1   analysis on where your activities are.  Again, it sounds
2   like something that somebody would write in a business plan.
3   Q.   You had a variety of business plans over the
4   years?
5   A.   Yes.
6   Q.   Who wrote them?
7   A.   A variety of people.
8   Q.   Can you name any of them?
9   A.   People who worked with the companies at different
10   times helped writing business plans.  Barry Moltz helped
11   with parts of them with Vicki Lou.
12   Q.   How about 1998 and prior thereto?  Can you
13   identify anyone that wrote any of your business plans during
14   that time period?
15   A.   I don't recall.
16   Q.   Would you write any --
17   A.   We'd have an employee --
18   Q.   -- of them?
19   A.   I wrote parts of them.  Anything like that I would
20   not have written.  We would have an employee -- because I
21   don't speak that same language.  We had an employee for a
22   short time named Craig Carter from Sprint.  Sounds like
23   something he would -- that would be his marketing language
24   but I can't verify that.
25   Q.   When did he stop working for you?

Case 04-03774   Doc 42-3   Filed 02/21/06   Entered 02/21/06 16:44:14   Desc Esralew
deposition excerpts   Page 25 of 29
TEXTNET Internet Court Reporters        888-TEXTNET Toll Free              www.textnet.com

Page 243

1    A.  A very short time.  I don't recall.
2    Q.  Do you recall the year?
3    A.  I know it was before -- was when I had an office.
4  So it would have been probably '98, '97.  It was before I
5  moved everything back in my house.
6    Q.  All right.  You sort of calculated it out loud but
7  I'm not sure what you're answer is.
8    A.  I don't recall exactly.  It was before I moved in
9  my house.  It could have been '98, it could have been '97.
10  I don't recall.
11   Q.  When did you move back into your house?
12   A.  Back into my house or into my house?
13   Q.  Move in -- move into your house?  When you say
14  move into your house you're talking about moving your
15  business into your house --
16   A.  I moved my business into my house.
17   Q.  When did you do that?
18   A.  I don't exactly recall but I believe it was
19  sometime in '98.  I moved into my house in '98, June.  So it
20  would have been sometime in '98 that I was in my house --
21  for years in my old house so --
22   Q.  Prior to your entering into the memorandum of
23  agreement did you have an offers from any persons or
24  entities to purchase Kids Count Entertainment?
25   A.  We spent probably an hour last time talking about

Page 244

1  Bob Bernard and talking about a meeting that was no more
2  than a meeting that you kept asking if there was an offer.
3  And I said it was a meeting.
4    Q.  My understanding was they were going to purchase a
5  small -- there was a question of whether they would be
6  interested in purchasing a small -- purchasing a small
7  percentage.  My question to you is whether anybody said,
8  hey, we'll buy the whole company from you?
9    A.  No.
10   Q.  That never happened?
11   A.  No, not to my knowledge.
12   Q.  Okay.  Well, you were the president of the
13  company.  Is it fair to say --
14   A.  Stranger things have happened.  Someone could have
15  told someone else that never told me.
16   Q.  Well --
17   A.  Not to my knowledge.
18   Q.  Well, so there may have been offers to buy the
19  company but if there were you were not aware of them?
20   A.  Not to my knowledge.
21   Q.  Okay.  Can you tell me about an organization
22  called Interactive Kids?
23   A.  Interactive Kids?
24   Q.  Yeah.
25   A.  I don't recall what Interactive Kids is.

Page 245

1    Q.  Do you recall that as an organization that
2  marketed some of your products -- Jack's Attic, Jack's House
3  --
4    A.  I don't recall --
5    Q.  -- at some point?
6    A.  -- the name.  Is there another name that they go
7  by maybe?
8    Q.  Not that --
9    A.  I don't --
10   Q.  Not that I'm aware of.
11   A.  I don't recall the name Interactive Kids.
12   Q.  If I suggested that perhaps Jack's Attic was a
13  featured item being promoted by Interactive Kids does that
14  ring a bell?
15   A.  I don't recall the name Interactive Kids.  There
16  could be another name that they're operating under that I
17  could recall.  But I don't recall the name Interactive Kids.
18   Q.  Do you recall an entity named Advanced Master Card
19  and any involvement they had in marketing any of your
20  products?
21   A.  This may not be the same company but I recall
22  Rollin negotiating with somebody that had to do with swiping
23  credit cards.  I don't know if that's Advanced Master Card
24  or not.  I don't recall.
25   Q.  Let me ask you this:  did you ever have an

Page 246

1  agreement with a credit card company?  Forget Master Card.
2  Any credit card company whereby when they sent their bills
3  out you would have a little flier enclosed to try to get
4  people to buy some of Kids Count's products?  Did you ever
5  do that?
6    A.  I know we wanted to do that, talked about doing
7  that.
8    Q.  Who did you talk to about that?
9    A.  I don't recall who we talked about doing that
10  with.  I remember years ago but I don't think it was a
11  flyer.  It was something with Triaminic cough syrup or
12  something.  I don't know if that's Advantage --
13   Q.  Is that -- is that Triaminic Parents Club?
14   A.  That could be it, Triaminic Parents Club.  That --
15  I don't remember how it came about.  I have no clue who I
16  talked to.  I think they were out of New York.  I don't
17  recall.
18   Q.  Did you ever reach an agreement with them?
19   A.  I feel like we did something once but I don't
20  recall what it was.  I vaguely recall trying to see if they
21  would do something again and nothing ever happened.  That's
22  the best that I can recall.
23   Q.  Can you recall through any entity using that --
24  that marketing approach I just described about having your
25  advertisement inside a credit card bill when it went home to

Case 04-03774   Doc 42-3   Filed 02/21/06   Entered 02/21/06 16:44:14   Desc Esralew
deposition excerpts   Page 26 of 29
TEXTNET Internet Court Reporters        888-TEXTNET Toll Free                    www.textnet.com

Page 247

1 someone?
2    A. No. I know that I wanted to do that. I don't
3 recall us doing that.
4    Q. Okay.
5    A. If someone did something I just don't recall. But
6 I wanted to.
7    Q. Did you ever work with a company called NAC
8 Marketing to -- do any marketing of Kids Count products?
9    A. I remember the name NAC but I don't recall if that
10 someone with radio, because I was doing a radio interview
11 once. And I'm thinking that was NAC. But then I also
12 thought there was a religious organization. I don't recall
13 which was which. But I'm thinking NAC may have been when I
14 had -- they had me on the radio for something.
15    Q. Okay. Just -- it was just a one time appearance
16 on the radio to try to sell some product?
17    A. I'm pretty sure that's what it was.
18    Q. All right.
19    A. But I'm not sure. But if that was -- I know there
20 was also religious but I'm thinking NAC was maybe the radio.
21    Q. Did you ever do any marketing through a website
22 with the name Kids Count in America, Voices of our Future?
23    A. I don't think we ever had a website but I don't
24 recall. But it was a program idea that I had a concept for.
25    Q. When I said Kids Count in America, Voices of our

Page 248

1 Future, that was the program you had a concept for?
2    A. Yes.
3    Q. Describe that concept for me?
4    A. It was a concept that I had to have kids around
5 the country write in how they'd like to make it a better
6 world. And then ultimately do something with it, get a
7 retailer to sponsor it and sell -- build -- you know, make
8 products and sell products.
9    Q. How would -- would the kids write in relate to the
10 products?
11    A. Don't know. It was a concept to do a promotion.
12    Q. Did it ever get behind the -- beyond the concept
13 stage?
14    A. No.
15    Q. At the time you entered into the memorandum of
16 agreement was there any software that you were at that point
17 in the process of developing but not yet developed?
18    A. There was one game called Spuzzle. I wasn't in
19 the process of developing but we spent the old -- the
20 company spent I don't know how much time. It was a long
21 time. I don't know if it was six months or nine months. I
22 was developing it then because I'm not a programer and I had
23 no money to develop it. But we had a game that we were told
24 was almost done. It wasn't that easy that it was almost
25 done. But we had graphics for it. And it looked -- I

Page 249

1 thought it was almost done. But when you don't touch a game
2 for months everything changes. With games you have to
3 constantly update it. So they --
4    Q. That game, is that Spuzzle or was that something
5 addition -- in addition --
6    A. It was --
7    Q. -- to Spuzzle?
8    A. -- Spuzzle.
9    Q. That was Spuzzle?
10    A. Mm-hmm.
11    Q. So by the time you entered into the memorandum of
12 agreement had -- had the work on Spuzzle, had that fallen to
13 the side or were you still developing that into a game to
14 market?
15    A. Well, I'm not a programer. I had no employees.
16 Joanne came on. Joanne was an office person. So she's not
17 a programer. So nobody was working on Spuzzle. It was a
18 game that before the office closed up and I moved back to my
19 house we had people working on it. When the office closed
20 up and moved back to my house nobody was working on it. We
21 were told by people working on it that it was almost done.
22 So from that period of time to now, I mean, you know, no
23 one's touched the game. But it seemed like a good concept
24 and there was a lot of work done it, maybe six or nine
25 months. I don't recall. Maybe longer.

Page 250

1    Q. So is it -- is it fair to say that as far as
2 Spuzzle goes that wasn't a product that at the time you
3 entered into the memorandum of agreement you expected to
4 have on the market in the let's say the first quarter of
5 1999?
6    A. That was a product that was partially done and
7 with funding we could have opened it back up and hired
8 programers and finish it. Without it you couldn't.
9    Q. And the funding you were seeking from the Terry's
10 was not intended to develop Spuzzle. It was intended for
11 the television commercials?
12    A. It was to promote the -- to do the TV commercials.
13    Q. Okay. So then am I correct that -- understanding
14 that maybe sometime down the road Spuzzle might have been
15 picked up again and finished. At the time you entered into
16 the memorandum of agreement you did not have a thought that
17 that was going to be something you'd have on the market the
18 first quarter of 1999?
19    A. Well, I thought it could have been. It had to be
20 finished. It was a matter of it being finished. We were
21 told it was pretty much done. It was only till -- you open
22 something -- if there's a software game that's pretty much
23 done and you open it up in a week pretty much done, if it
24 is. If you open it up in nine months there's probably two
25 new programs of director or whatever it was made in and you

### Page 251

1 kind of got to start from scratch. For each day, each
2 month, that becomes very dated unlike music that when you
3 have a master it's a master. Unlike a commercial, when
4 there's a master it's a master. Or a videotape. Software's
5 a different story.
6    Q.  All right.
7    A.  So with the time I would have probably hoped we
8 could get it on and sell it but we'd have to go back in.
9 Whether it was $200 or 2,000 I wouldn't have known. But my
10 guess is my intention would have been thinking the game was
11 almost done, because that's -- it was at that point. I just
12 -- I'm not a programer so I can't swear on a stack of bibles
13 what's left to be done because I wouldn't know. I would
14 rely on a programer saying it's almost done.
15    Q.  Was Spuzzle -- were characters in the Spuzzle game
16 intended at some point to be used potentially in a TV show?
17    A.  Characters in a Spuzzle game?
18    Q.  Yeah.
19    A.  There was one character that was a screw who's --
20 not characters. I don't know if that character was intended
21 to be used in a TV show. There was animation done that was
22 software.
23    Q.  Were there -- were there ever characters that you
24 developed? Was there ever a plan or talk or negotiations
25 about turning those characters into a television show?

### Page 252

1    A.  There were characters that I didn't develop but
2 Alex Paige, who owns those characters, developed. And
3 because he drew them and that was for -- to go into a TV
4 show.
5    Q.  And who did Alex Paige work for?
6    A.  DDB Needham.
7    Q.  And what's his relationship with Kids Count?
8    A.  He was a friend of a friend of mine at DDB Needham
9 and it was all of our dream to do a TV show. And with
10 funding we'd have a new company and with all the things you
11 need to do that would be ultimately a way to grow the
12 company and a way to survive and build a company.
13    Q.  How far did that dream get?
14    A.  It didn't -- it didn't get far.
15    Q.  Was -- were there any other characters in -- that
16 were ever considered for use in a television show connected
17 with Kids Count in anyway?
18    A.  Characters? Not to my knowledge.
19    Q.  When you said to me that it didn't get very far in
20 reference to these characters as a friend of a friend had
21 created. How far did it get?
22    A.  It got -- while I was meeting with Rollin and the
23 Terry's I was talking to PBS. And after that horrible
24 meeting in May, which we don't have to get back into again,
25 at the Marriott Hotel, you know, being told I could be a

### Page 253

1 fucking waitress and could never work another day in this
2 business. And then Rollin sent a letter shortly after I
3 don't know how long saying that it seems that our interests
4 are not aligned and we better get another attorney. I
5 continued to -- my allegiance was with saving the business
6 and raising money and having creditors -- taking care of the
7 creditors of which Gene was one and Nicole were one. And so
8 I tried to do everything I could do to turn over any
9 business opportunity to make that business develop. And
10 that was actually going on probably from January through May
11 as well where the Terrys and Rollin were very aware of it
12 because we had a meeting with somebody named Joanne Marlowe
13 who wanted to put money in the -- and Rollin went to the
14 meeting and she sent a horrible letter afterward that Rollin
15 was too pushy and I don't recall the letter. It's probably
16 in discovery. And Gene and Nicole and Rollin and I all
17 decided I'd be the front person to go meet with anybody who
18 -- who would meet with me to bring money into the company.
19 And then once they were interested, you know, they would ask
20 -- they would ask the tough questions. But they wanted me
21 to be the front person. So when trying to turn every
22 possibility we -- I met with a lot of people. I don't know
23 if that answers your question.
24    Q.  I forgot what it was.
25    A.  The -- how far we went with the TV commercial --

### Page 254

1 we were talking about the -- what, PBS?
2      MS. KROL:  PBS.
3    A.  I had gotten an agreement to host a show which we
4 would have had a sponsor. So that didn't go anywhere. And
5 I was also talking to somebody named Mark Robbins from
6 Warner Brothers. And --
7    Q.  How did you meet him?
8    A.  I met him in 1980, '81 when I worked as a
9 secretary at Blair Television. He worked there.
10    Q.  And when was it you were negotiating with him?
11    A.  Well, it was really negotiating with him. He
12 bumped into me -- I bumped into him on a plane. I don't
13 remember when, '96, '97 -- Gateway Computers, when I was out
14 there. And he said I could build this into the Martha
15 Stewart, blah, blah, blah, blah. So for about a year and a
16 half he'd call me and say you want to go to L.A. to meet
17 with Warner Brothers and I'd say yes. And then he wouldn't
18 follow up with the meeting. I believe I had told -- I'd
19 have to -- I'm sure it's in documents because I used to
20 tell, you know, Rollin and Gene and Nicole everything and
21 fortunately wrote stuff down. But that was a possibility.
22 It was Alan Rubens' dream -- Alan Rubens is my friend DDB
23 Needham to do a TV show. I won't get into it but he almost
24 died years ago from a brain tumor. And he's very talented
25 and very priority driven. He doesn't like people who are

### Page 255

1 full of baloney. And Alex Paige is an associate and friend
2 of Alan's who's an artist. So the three of us had meetings
3 with Mark Robbins and Mark didn't -- he didn't say what he
4 did and did what he said a lot.
5    Q.   Are you done?
6    A.   So ultimately there was no deal with Warner
7 Brothers and they were not going to be part of it if Mark
8 Robbins was part of it, Alan Rubens and Alex Paige.
9    Q.   Was it -- it was Alan Rubens that didn't want
10 anything to do with it if Mark Robbins was involved or
11 Warner Brothers?
12    A.   Alan Rubens didn't want anything to do with the
13 project and he was the one writing it because I'm not a TV
14 show writer and it was his thing, not me. I don't come up
15 with those kind of -- and Alex was the one drawing it. I'm
16 not an artist. But they both would not be part of it if
17 Mark Robbins was part of it. Because we spent a lot of time
18 and a lot of effort and a lot of --
19    Q.   Why did they not want --
20    A.   -- energy --
21    Q.   -- Mark Robbins involved?
22    A.   Because they thought he was full of baloney and
23 not using him. I think we put all this stuff in discovery.
24    Q.   And did Mr. Robbins ever introduce you to people
25 at Warner Brothers?

### Page 256

1    A.   Sure.
2    Q.   Did you have a meeting with Warner Brothers?
3    A.   Sure.
4    Q.   Was Mr. Robbins present?
5    A.   Sure.
6    Q.   Who else was present?
7    A.   The first meeting was with Mark Robbins and
8 myself. The second meeting was Mark Robbins, Alex Paige and
9 I remember Mark Robbins brought Buddy Meyers, his friend and
10 attorney, but I don't -- I assume he was at the meeting.
11    RECORDER: Hang on now. I've let the tape run
12 out. Let me -- this is the end of the first tape and we've
13 got two hours and two minutes on that. And we've
14 got two hours and four minutes on this thing. Off the
15 record to change a tape.
16    (End tape 1 -- Begin tape 2)
17    RECORDER: We're back on the record. It's the
18 beginning of the second tape. It's 12:19. Go ahead.
19    MR. CROOKS: Would you mark this as Exhibit 7,
20 please.
21    (Document marked as Exhibit 7 for identification)
22    Q.   I'm going to hand you what's been marked
23 deposition Exhibit 7 for identification, a document entitled
24 Executive Summary. Do you recognize what this document is?
25    A.   Yes, it was something a person Craig Carter I

### Page 257

1 mentioned wrote.
2    Q.   Is this part of a business plan for Kids Count?
3    A.   I don't know if it ever made it into a business
4 plan but this is something that -- I don't recall how long
5 Craig Carter was there for. I think it was a few months.
6 But it was something that he put together. It may or may
7 not have been cut and pasted into a business plan. I don't
8 recall.
9    Q.   Is this document as well as additional materials
10 as part of a business plan on a computer that you had in
11 1998? And let me tell you why I ask this. If you look down
12 in the right hand corner there's a date, November 4, 1998.
13 Do you see that?
14    A.   Mm-hmm.
15    Q.   No, I also have a business plan here, and I'll
16 turn to -- I'll mark this eventually but I haven't marked it
17 yet. And it has a page just like that, Executive Summary --
18    A.   It might have been cut and pasted into that.
19    Q.   And it has the date November 5th, 1998 on it. And
20 the -- what I'm leading up to is it looks to me like it's
21 the kind of document that maybe every time you print it off
22 the computer it puts the date that you printed it off the
23 computer?
24    A.   I would think so --
25    Q.   Do you see what --

### Page 258

1    A.   I'm not that good --
2    Q.   -- I'm saying?
3    A.   -- with doing that -- and it's probably set up
4 that way.
5    Q.   Okay. All right. I mean, that's what it looks
6 like to me. But at least you're not -- you don't have any
7 recollection which disputes what I just said as far as the
8 date? I'm just trying to understand that date. Do you have
9 any other explanation for what that date is?
10    A.   No.
11    Q.   Okay. If you go to page four of six there's a
12 paragraph titled The Company. And the last -- oh, last
13 sentence, maybe two sentences of that -- the last two
14 sentences of that says, "Her unique talent for populating
15 imaginative situations with captivating characters, adding
16 creative learning experiences and envisioning products that
17 appeal to both children and parents is the driving force
18 behind Kids Count. Additionally, Vicki's advertising
19 expertise and ability to express her personal mission is a
20 distinct competency that plays a vital role in gaining
21 business and promoting media attention." Would you agree
22 with that statement?
23    A.   Yes. Well, I don't know about populating
24 imaginative -- it's very well written. I'd love to take
25 credit for writing it. I'm sure Craig Carter wrote it

Page 327

1    A.  I would assume it was a recap.  I just don't know
2  if it was mine or one of the people in their office.  But
3  this was all from draft and I think it's -- yeah, it says
4  draft on there on the fax from them.  Some things look like
5  my handwriting, other things don't look the way I wrote.
6  So, I don't know.
7          MR. CROOKS:  Okay.  All right, that's all the
8  questions I have.
9          WITNESS:  Can I keep this?  Or she gets one --
10         MR. CROOKS:  That's an exhibit but your counsel
11  has --
12         WITNESS:  Thanks.
13         MR. CROOKS:  -- another copy.
14         RECORDER:  Anything further?
15         MR. CROOKS:  That's all the questions I have.
16         RECORDER:  We're going off the record on this one.
17  It's 1:56 and the elapsed time on this second tape here is
18  an hour and 27 minutes.
19
20
21
22
23
24
25

Page 328

1              CERTIFICATION

2      I certify that the foregoing is a correct

3   transcript from the record of proceedings

4        in the above-entitled matter.

5

6          Mark Douglas Lokken

7          December 28, 2005