IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| | ) | Case No. 04-B-24393 |
| VICKI E. ESRALEW | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| ROLLIN J. SOSKIN, EUGENE TERRY, NICOLE TERRY and TERRY'S COMPANY, INC. Plaintiffs, | ) ) ) ) | |
| | ) | |
| vs. | ) ) | Adversary Proceeding No. 04 A 3774 |
| | ) | |
| VICKI E. ESRALEW, Defendant. | ) ) | Judge Goldgar |

Affidavit of Robert Blagman

Robert Blagman, after first being duly sworn on oath, deposes and states:

1. I have personal knowledge of the statements made in this affidavit and if called upon to testify could so testify in open court.

2. I was hired in the fall of 1998 to produce a television commercial for Kids Count Entertainment, L.L.C. I dealt directly with Vicki Esralew and her husband, Robert Aren.

3. Based upon conversations I had with Vicki Esralew during October and November of 1998 she knew that if we started filming the television commercial at Thanksgiving it would not give us enough time to complete the post production work and have the commercial on the air in time for an effective Christmas sales campaign.

4. In the fall of 1998 there were outstanding invoices to Kids Count based on work my company had done. After November 22, 1998 I was directed by Esralew to resubmit the bills and

they were then paid.

5.   In December of 1998 and early 1999 I traveled to Chicago three times in order to meet with potential investors in Kids Count that Esralew arranged for me to talk to. Esralew said that she was hoping to get financing from these people in order to buy out Soskin and the Terrys and move forward without them. Esralew told me she wanted to get financing through Peter Abruzzo or contacts made through a Dr. Leonard Makowka. Each time I traveled to Chicago to meet with the potential investors I was instructed by Esralew not to let Mr. Soskin or the Terrys know I was coming to town and not to tell them that I was working with Esralew and Aren to find other investors to replace them.

6.   During December of 1998 and January of 1999 I was constantly given direction by Esralew that contradicted what I was being told by Mr. Soskin. Esralew directed me to hold back information from Mr. Soskin on many occasions. I was told by Esralew during this time period to withhold information about Peter Abruzzo from Soskin and the Terrys.

7.   I met with Dr. Makowka at Esralew's home in January or February of 1999 to discuss a possible investment by people he knew. I was directed by Esralew to make up a story about what I was in town for and not to tell Soskin or the Terrys that I was meeting with Dr. Makowka about a possible investment.

8.   Based upon the dealings I had with Esralew the second half of 1998 and first half of 1999 and having had an opportunity to observe her engage not only with Soskin and the Terrys, but also a number of potential investors, I came to the conclusion that she has a problem with proper business procedures and loyalty to investors. She seemed to consistently drop initial investors for newer possible investors using interests in her business as "bait" for lack of a better term.

9. Attached to this affidavit is a true and correct copy of a letter dated May 23, 1999 which I sent to Mr. Soskin and the Terrys. On page 4 of that letter I fully explained to them for the first time the problems I was having months earlier when Esralew was directing me to withhold information from and even lie to Soskin and the Terrys.

Executed this 22nd 21st day of February, 2006.

*Robert Blagman*

SUBSCRIBED AND SWORN
To before me this 22nd day of February, 2006

*Notary Public*

OGDEN C. PAGE
Commission # 1420208
Notary Public - California
Los Angeles County
My Comm. Expires Jun 12, 2007

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| VICKI E. ESRALEW | ) | Case No. 04-B-24393 |
| Debtor | ) | Chapter 7 |
| ROLLIN J. SOSKIN, EUGENE TERRY, NICOLE TERRY and TERRY'S COMPANY, INC. Plaintiffs; | ) | |
| vs | ) | Adversary Proceeding No. 04 A 3774 |
| VICKI E. ESRALEW Defendant. | ) | Judge Goldgar |

Affidavit of Peter Abruzzo

Peter Abruzzo, after first being duly sworn on oath, deposes and states;

1. I have personal knowledge of the statements made in this affidavit and if called upon to testify could so testify in open court.

2. During and after October, 1998 I had personal conversations with Vicki Esralew and her husband Robert Aren, concerning the possible investment by me of both money and time in their company, Kids Count Entertainment, LLC.

3. During November, 1998 I became aware that they were also negotiating with Eugene Terry, Nicole Terry, and Rollin Soskin, but was asked by Vicki Esralew to keep our conversations confidential while she dealt with the Terrys, and Soskin. Our conversations continued through November and December, even though I have subsequently been made aware that Esralew and Aren signed an agreement with Soskin and the Terrys in November, 1998.

4. During all of my conversations with Esralew and Aren, they were asking that I use my personal management skills and experience to run the company, leaving Esralew free to create new products. I was not aware at that time that Esralew and Aren had agreed to equal management control with Soskin and the Terrys.

5. It was not until sometime in January, 1999 that I was introduced to Soskin and the Terrys for discussions concerning my possible involvement in the company.

6. Although negotiations between Esralew and myself did not result in an agreement with Soskin and the Terrys, Soskin and the Terrys continued to welcome my involvement at Esralew's request.

7. In addition to my negotiations with Soskin and the Terrys, Esralew continued to request that I introduce her to others who might be interested in investing in the company, including Jim Robinson of Morgan Creek Productions. Throughout the negotiations, Esralew promised that if I would introduce her to someone who would invest in the company, she would sell me part of her own shares in the company. To my knowledge, this was not prohibited by her agreement with Soskin and the Terrys.

8. In or about April, 1999 I did in fact arrange a meeting for Esralew with Mr. Robinson. Upon return from that meeting, Esralew advised that Robinson was very interested and prepared to invest in the company, but that he was only interested in her as the "talent" and Esralew then indicated that she would not honor her agreement to sell me part of her interest in the company, despite the apparent willingness of my referral to invest.

Further affiant sayth naught:

Executed this 19 of February, 2006

_____
Peter Abruzzo

Subscribed and Sworn to before me
this 19 day of February, 2006.

_____
Notary Public

KIMBERLY L. AMBROSE
MY COMMISSION EXPIRES
SEPTEMBER 22, 2009
OFFICIAL SEAL
STATE OF ILLINOIS

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| | ) | Case No. 04-B-24393 |
| VICKI E. ESRALEW | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| ROLLIN J. SOSKIN, EUGENE TERRY, NICOLE TERRY and TERRY'S COMPANY, INC. Plaintiffs, | ) ) ) ) ) | |
| vs. | ) ) | Adversary Proceeding No. 04 A 3774 |
| | ) | |
| VICKI E. ESRALEW, Defendant. | ) ) | Judge Goldgar |

<u>Affidavit of Rollin J. Soskin</u>

Rollin J. Soskin, after first being duly sworn on oath, deposes and states:

1. I have personal knowledge of the statements made in this affidavit and if called upon to testify could so testify in open court. I am one of the plaintiffs in the above captioned case.

2. I first met Vicki Esralew and her husband Robert Aren in 1988 when they were referred to me for estate planning. I prepared wills and trusts for them in 1988.

3. Shortly after the estate work I incorporated an advertising agency for Esralew, Capital Advertising, Inc. I also incorporated a business for Esralew named Enivar Woods. My recollection is that I had annual contact with Esralew when I prepared and sent the annual report for each entity to Esralew through 1993.

4. I also did a closing on Esralew and Aren's townhouse sometime in 1993. After that I was asked to forward my corporate files regarding Esralew and Aren's businesses to another lawyer who handled these matters for them going forward.

5. After I forwarded my corporate files I had no contact with Esralew or Aren until I ran into Esralew at my synagogue in the summer of 1998.

6. In the summer of 1998 Esralew told me that she and her husband wished to update their estate plans. I met with Esralew and Aren and during the late summer and early fall of 1998 I updated their estate plans.

7. When the estate planning work was completed in 1998 Esralew asked if I knew anyone who would be interested investing in her business which was now known as Kids Count Entertainment, L.L.C. Esralew said that she was looking for investors and also needed help in managing the company so that she could concentrate on the creative part of the business.

8. I believed that my long time friends Eugene and Nicole Terry might be interested in the investment. They had both owned and operated businesses in the past and were retired as of 1998.

9. During October and November of 1998 there were a series of meetings with Eugene and Nicole Terry, myself, Esralew and Aren in which information was exchanged about Esralew's business needs and the Terry's ability to invest and help. Esralew gave a prospectus to me and the Terrys providing information about Kids Count. The prospectus is attached hereto as Ex. A. The Terrys said they would invest in Esralew's company only under the condition that I become active in the management of the company.

10. As a result of the meetings, on November 16, 1998, Eugene Terry faxed a proposal to me which is attached hereto as Ex. B. Paragraph 7 of the proposal stated that "[w]e

recognize you as attorney for Vicki and KC..." Upon reading this provision it became clear to me that the parties had to have separate legal counsel. All parties met the night of November 16, 1998 to discuss Terry's proposal as well as the need for Esralew and Aren to have independent counsel.

11. The meeting on November 16, 1998 took place at Esralew's house. The Terry's Esralew, Aren and I were all present. During the meeting I told Esralew and Aren that they had to consult with independent counsel of their choosing before entering into the agreement. Esralew said that they had used two lawyers recently, one for the purchase of a new home in the summer of 1998 and one during in an anticipated deal that had fallen through in the fall of 1998. She said they would consult with one of these attorneys. Esralew also stated that her brother or brother-in-law was a sophisticated and experienced businessman and that she would also consult with him.

12. The Terrys, Esralew, Aren and I all had input into the document entitled Memorandum of Agreement. As a result of Terry's proposal and everyone's input during the meeting on November 16, 1998, I prepared the first draft of the agreement which was faxed to all parties on November 18, 1998. That first draft is attached hereto as Ex. C.

13. Esralew requested that certain changes be made to the agreement. She told me these changes were based upon the advice of the legal counsel and others with whom she had consulted.

14. The original draft gave the Terry's the option to convert their $250,000.00 investment in Kids Count from a loan to a 10% ownership interest (Ex.C, ¶ 6). The original draft gave me an option to purchase an 8% interest in Kids Count for the price of $200,000.00 (Ex. C, ¶ 7). Esralew asked that there be a time limit placed on the exercise of these options. As

a result, the following language was added to paragraphs 6 and 7: "In the event of a refinancing in excess of two million dollars or recapitalization of Kids Count with a new value in excess of two million dollars Kids Count may demand that Soskin [or Terry] exercise or waive his option within one hundred twenty (120) days of notice." (Ex. D, ¶ 6,7).

15. The original draft contained a provision in ¶ 10 which gave the Terrys and me the right to "tag along" in the event that Esralew sold enough of her shares in the business such that she controlled less than 51%. Under these circumstances we would be able to sell our interest at the same price if we so chose. Esralew proposed that we give her the right to force us to sell when and if she sold. As a result, the second draft of the agreement also contained "bring along" rights for Esralew and Aren in ¶ 10.

16. The second draft of the Memorandum of Agreement was faxed by me to the Terrys, Esralew and Aren on November 19, 1998. The second draft, with the fax cover sheet, is attached as Ex. D. The second draft contains the changes to ¶¶ 6, 7 and 10 described above. The second draft also contained changes to ¶¶ 3, 8 and new ¶¶ 14 and 15. All of these changes were made as a result of input from Esralew, Aren, the Terrys and me.

17. After the second draft was circulated, Esralew requested that the time limit for the Terrys and I to exercise our options be further reduced to 90 days. I hand wrote these changes, and others suggested by the parties, on the second draft (Ex. D). All of the hand written changes were included in the final agreement which was executed by the parties and is attached as Ex. E.

18. Esralew and Aren pressured the parties to reach an agreement quickly purportedly so that the Terrys' funds would be available to produce a TV commercial to sell Kids Count's products for Christmas. The commercial did not make it to TV in time for the Christmas sale season and, as a result, did not result generate the sales which the parties had hoped for.

19. In the Spring of 1999 the Terrys and Soskin were still interested in moving forward and building the business, as had always been contemplated, despite the poor response to the Christmas commercials.

20. In April of 1999 Esralew repeatedly told me and the Terrys that she was not interested in building the business from the bottom up by firming up and expanding Kids Count's sales to retail stores. She wanted to seek out new investors who could invest enough money to buy out me and the Terrys. During this same time period Esralew and Aren stopped meeting with me and the Terrys in violation of the Memorandum of Agreement, ¶ 12.

21. In early May of 1999 I had a telephone conversation with Aren in which we discussed the deteriorating relationship between Aren and Esralew, on one side, and the Terrys and me, on the other. Aren said he and Esralew were looking for new investors to buy out the Terrys and me. During the conversation Aren asked if he and Esralew should get separate counsel for use during our anticipated break up and I said that they should. Aren said they would use an attorney named Peter Weil. When I asked, Aren confirmed that he and Esralew had used Weil when reviewing the proposed Memorandum of Agreement in November of 1998.

22. As a result of my conversation with Aren as described above, I wrote a letter dated May 5, 1999 putting in writing my statement to Aren that all parties should get separate counsel. My May 5, 1999 letter is attached to Esralew's Local Rule 7056-1 statement as exhibit H.

23. Although the Memorandum of Agreement called for me to receive compensation for my work in Kids Count at approximately one third of my hourly rate, I was never paid any money for my work.

Executed this 20th day of February, 2006.

_____
Rollin J. Soskin

SUBSCRIBED AND SWORN
To before me this 20th day of February, 2006

_____
Notary Public

KIMBERLY L. AMBROSE
MY COMMISSION EXPIRES
SEPTEMBER 22, 2009
OFFICIAL SEAL
NOTARY PUBLIC STATE OF ILLINOIS