IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

APR 2 4 2006

Judge A. Benjamin Goldgar
United States Bankruptcy Court

| | |
|---|---|
| In Re: ) | |
| ) | |
| ) | Case No. 04-B-24393 |
| VICKI E. ESRALEW ) | Chapter 7 |
| ) | |
| Debtor. ) | |
| | |
| ROLLIN J. SOSKIN, EUGENE ) | |
| TERRY, NICOLE TERRY and ) | |
| TERRY'S COMPANY, INC. ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Adversary Proceeding |
| ) | No. 04 A 3774 |
| ) | |
| VICKI E. ESRALEW, ) | Judge Goldgar |
| Defendant. ) | |

### Affidavit of Rollin J. Soskin

Rollin J. Soskin, after first being duly sworn on oath, deposes and states:

1. I have personal knowledge of the statements made in this affidavit and if called upon to testify could so testify in open court. I am one of the plaintiffs in the above captioned case.

2. I first met Vicki Esralew and her husband Robert Aren in 1988 when they were referred to me for estate planning. I prepared wills and trusts for them in 1988.

3. Shortly after the estate work I incorporated an advertising agency for Esralew, Capital Advertising, Inc. I also incorporated a business for Esralew named Enivar Woods. My recollection is that I had annual contact with Esralew when I prepared and sent the annual report for each entity to Esralew through 1993.

4. I also did a closing on Esralew and Aren's townhouse sometime in 1993. After that I was asked to forward my corporate files regarding Esralew and Aren's businesses to another lawyer who handled these matters for them going forward.

5. After I forwarded my corporate files I had no contact with Esralew or Aren until I ran into Esralew at my synagogue in the summer of 1998.

6. In the summer of 1998 Esralew told me that she and her husband wished to update their estate plans. I met with Esralew and Aren and during the late summer and early fall of 1998 I updated their estate plans.

7. When the estate planning work was completed in 1998 Esralew asked if I knew anyone who would be interested investing in her business which was now known as Kids Count Entertainment, L.L.C. Esralew said that she was looking for investors and also needed help in managing the company so that she could concentrate on the creative part of the business.

8. I believed that my long time friends Eugene and Nicole Terry might be interested in the investment. They had both owned and operated businesses in the past and were retired as of 1998.

9. During October and November of 1998 there were a series of meetings with Eugene and Nicole Terry, myself, Esralew and Aren in which information was exchanged about Esralew's business needs and the Terry's ability to invest and help. Esralew gave a prospectus to me and the Terrys providing information about Kids Count. The prospectus is attached hereto as Ex. A. The Terrys said they would invest in Esralew's company only under the condition that I become active in the management of the company.

10. As a result of the meetings, on November 16, 1998, Eugene Terry faxed a proposal to me which is attached hereto as Ex. B. Paragraph 7 of the proposal stated that "[w]e

recognize you as attorney for Vicki and KC..." Upon reading this provision it became clear to me that the parties had to have separate legal counsel. All parties met the night of November 16, 1998 to discuss Terry's proposal as well as the need for Esralew and Aren to have independent counsel.

11. The meeting on November 16, 1998 took place at Esralew's house. The Terry's Esralew, Aren and I were all present. During the meeting I told Esralew and Aren that they had to consult with independent counsel of their choosing before entering into the agreement. Esralew said that they had used two lawyers recently, one for the purchase of a new home in the summer of 1998 and one during in an anticipated deal that had fallen through in the fall of 1998. She said they would consult with one of these attorneys. Esralew also stated that her brother or brother-in-law was a sophisticated and experienced businessman and that she would also consult with him.

12. The Terrys, Esralew, Aren and I all had input into the document entitled Memorandum of Agreement. As a result of Terry's proposal and everyone's input during the meeting on November 16, 1998, I prepared the first draft of the agreement which was faxed to all parties on November 18, 1998. That first draft is attached hereto as Ex. C.

13. Esralew requested that certain changes be made to the agreement. She told me these changes were based upon the advice of the legal counsel and others with whom she had consulted.

14. The original draft gave the Terry's the option to convert their $250,000.00 investment in Kids Count from a loan to a 10% ownership interest (Ex.C, ¶ 6). The original draft gave me an option to purchase an 8% interest in Kids Count for the price of $200,000.00 (Ex. C, ¶ 7). Esralew asked that there be a time limit placed on the exercise of these options. As

a result, the following language was added to paragraphs 6 and 7: "In the event of a refinancing in excess of two million dollars or recapitalization of Kids Count with a new value in excess of two million dollars Kids Count may demand that Soskin [or Terry] exercise or waive his option within one hundred twenty (120) days of notice." (Ex. D, ¶ 6,7).

15. The original draft contained a provision in ¶ 10 which gave the Terrys and me the right to "tag along" in the event that Esralew sold enough of her shares in the business such that she controlled less than 51%. Under these circumstances we would be able to sell our interest at the same price if we so chose. Esralew proposed that we give her the right to force us to sell when and if she sold. As a result, the second draft of the agreement also contained "bring along" rights for Esralew and Aren in ¶ 10.

16. The second draft of the Memorandum of Agreement was faxed by me to the Terrys, Esralew and Aren on November 19, 1998. The second draft, with the fax cover sheet, is attached as Ex. D. The second draft contains the changes to ¶¶ 6, 7 and 10 described above. The second draft also contained changes to ¶¶ 3, 8 and new ¶¶ 14 and 15. All of these changes were made as a result of input from Esralew, Aren, the Terrys and me.

17. After the second draft was circulated, Esralew requested that the time limit for the Terrys and I to exercise our options be further reduced to 90 days. I hand wrote these changes, and others suggested by the parties, on the second draft (Ex. D). All of the hand written changes were included in the final agreement which was executed by the parties and is attached as Ex. E.

18. Esralew and Aren pressured the parties to reach an agreement quickly purportedly so that the Terrys' funds would be available to produce a TV commercial to sell Kids Count's products for Christmas. The commercial did not make it to TV in time for the Christmas sale season and, as a result, did not result generate the sales which the parties had hoped for.

19. In the Spring of 1999 the Terrys and Soskin were still interested in moving forward and building the business, as had always been contemplated, despite the poor response to the Christmas commercials.

20. In April of 1999 Esralew repeatedly told me and the Terrys that she was not interested in building the business from the bottom up by firming up and expanding Kids Count's sales to retail stores. She wanted to seek out new investors who could invest enough money to buy out me and the Terrys. During this same time period Esralew and Aren stopped meeting with me and the Terrys in violation of the Memorandum of Agreement, ¶ 12.

21. In early May of 1999 I had a telephone conversation with Aren in which we discussed the deteriorating relationship between Aren and Esralew, on one side, and the Terrys and me, on the other. Aren said he and Esralew were looking for new investors to buy out the Terrys and me. During the conversation Aren asked if he and Esralew should get separate counsel for use during our anticipated break up and I said that they should. Aren said they would use an attorney named Peter Weil. When I asked, Aren confirmed that he and Esralew had used Weil when reviewing the proposed Memorandum of Agreement in November of 1998.

22. As a result of my conversation with Aren as described above, I wrote a letter dated May 5, 1999 putting in writing my statement to Aren that all parties should get separate counsel. My May 5, 1999 letter is attached to Esralew's Local Rule 7056-1 statement as exhibit H.

23. Although the Memorandum of Agreement called for me to receive compensation for my work in Kids Count at approximately one third of my hourly rate, I was never paid any money for my work.

Executed this 20th day of February, 2006.

_____
Rollin J. Soskin

SUBSCRIBED AND SWORN
To before me this 20th day of February, 2006

_____
Notary Public

KIMBERLY L. AMBROSE
NOTARY PUBLIC
OFFICIAL SEAL
STATE OF ILLINOIS
MY COMMISSION EXPIRES
SEPTEMBER 22, 2009