IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF ) | |
| ) | |
| VICKI ESRALEW ) | |
| ) | |
|    Debtor, ) | |
| _____) | |
| ) | |
| ROLLIN SOSKIN, et. al. ) | |
| ) | |
|    Plaintiffs ) | No. 04 A 3774 |
| ) | |
|    v. ) | Judge Goldgar |
| ) | |
| VICKI ESRALEW ) | |
| ) | |
|    Defendant ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

Defendant, VICKI ESRALEW ("Esralew") , by and through her attorneys, ASHMAN & STEIN, respectfully submits the following Memorandum of Law in Support of Defendant's Motion for Summary Judgment on Counts I through IV of Plaintiffs' Complaint

**BACKGROUND**

The Plaintiffs allege that, on November 22, 1998, they entered into a Memorandum of Agreement with Esralew ("Agreement") pursuant to which, *inter alia*, Eugene Terry, Nicole Terry and Terry Company, Inc. (the "Terry Plaintiffs") loaned money to an Illinois limited liability company known as Kids Count Entertainment, L.L.C. ("Kids Count" ) that Esralew had no intention of repaying and that, somehow, Esralew's purported breach of what the Plaintiffs

1

consider to be a restrictive employment covenant in the Agreement also constituted fraud [Count I]; that Esralew subsequently transferred substantially all of the assets of Kids Count to an entity known as Vickilew Inc., which subsequently sold such assets for "inadequate consideration" to a third party [Count II]; that Esralew breached some unspecified "fiduciary duties" she had to the Plaintiffs [Count III]; and that Esralew's aforesaid actions were willful and malicious [Count IV]. Based upon the foregoing, the Complaint seeks an Order that any liability of Esralew to the Plaintiffs arising out of the Agreement not be discharged pursuant to 11 U.S.C § 523(a)(2)(A), 11 U.S.C § 523(a)(4), and 11 U.S.C § 523(a)(6), respectively.

One of the most important benefits of the bankruptcy code is its ability to offer a debtor a fresh start. This concept of a fresh start demands courts construe exceptions to discharge narrowly. *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir. 1999) (citing *Century 21 Balfour Real Estate v. Menna (In re Menna)*, 16 F.3d 7, 9 (1st Cir. 1994)); *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1016 (Bankr.N.D.Ill.1996) (citing *Mayer v. Spanel Int'l., Ltd.*, 51 F.3d 670, 674 (7th Cir.1995)). Courts balance this belief with the principle that "perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *In re Biondo*, 180 F.3d at 130 (citing *Cohen v. de la Cruz*, 523 U.S. 213, 217, 118 S.Ct. 1212, 140 L. Ed.2d 341 (1998)). In the instant case, there exist no grounds upon which to deny Esralew the relief she has sought in her bankruptcy petition.

## THE FACTS

When Plaintiff Rollin Soskin ("Soskin"), who had formerly represented one or more companies that Esralew was involved in, ran into Esralew in June or July of 1998, she told him about Kids Count and invited him to come see her operation, an offer Soskin accepted in October

of 1998. [Fcts.¶ 12,13][1] Soskin believed Esralew's ideas had merit and that she just needed proper investors; and knowing that his former law partner, Eugene Terry ("Terry"), had been successful in business and had money to invest, he introduced Esralew to Terry and his wife, Nicole, in early November 1998. [Fcts.¶ 14]

During her meeting with the Terrys, Esralew told them that she believed that if Kids Count could get an infomercial on the air before Christmas, it would be a huge success, but that the company needed funding to produce the infomercial.[Fcts.¶ 19] According to Soskin, she impressed the Terrys as someone who was creative, but could not run a business. [Fcts.¶ 17, 18] The Terrys then did some field work to determine where Kids Count's products were sold and Terry asked for a six month cash flow statement, as the investment he was then considering making in Kids Count was to get the company through the next three to six months. [Fcts.¶ 20]

After Terry received Kids Count's six month cash flow statement, which he believes was prepared by Soskin, Terry requested further information about placement fees, informed Soskin that he would not accept the salaries projected for Soskin and Esralew (which he reduced) and prepared a memorandum for Soskin regarding the investment he was prepared to make in the business, detailing the amount of money he was willing to invest to get Kids Count through the production of an infomercial. [Fcts.¶ 21]

The Plaintiffs admit that Esralew told them that she wasn't good at management and that her inability to deal with cash flow issues and check authorizations had caused past failures in the history of the company. [Fcts.¶ 29, 30] Accordingly, Terry was only willing to invest in Kids

---

[1] References to facts stated in Defendant's Local Rule 7056-1Statement are captioned as "Fcts ¶ ."

3

Count if Soskin managed the details, which was consistent with Soskin's opinion that Esralew was incapable of keeping records. [Fcts.¶ 29, 31]

On November 22, 1998, the parties entered into the Agreement, which was prepared by Soskin with input from all of the parties, each of whom represented that they had properly investigated the circumstances and condition of Kids Count. [Fcts.¶ 25, 28] Soskin understood that everyone agreed that he and Terry were to have equal control over the use of Kids Count's funds and that Terry was going to invest money in Kids Count as needed, over a limited period of time and for limited uses. [Fcts.¶ 27] Terry and Soskin were to be directors of Kids Count; and Esralew was to be responsible for designing new products, as she had represented herself to be only a creative type of person and Terry wanted her freed up to focus on the creative side of the business. [Fcts.¶ 29]

The documents Terry relied upon in deciding to make an "investment" in Kids Count indicated that the company would require between $200,000 and 250,000 from December 1998 through February 1999. [Fcts.¶ 33] Terry was not prepared to invest a lump sum, but was prepared to invest as much as $250,000 depending on what the company needed as far as cash flow; the purpose of these funds was to provide cash flow to produce the infomercials the parties had discussed. [Fcts.¶ 37]

In consideration for funding Kids Count's cash flow needs, the Terry Plaintiffs were to receive a note convertible into a 10% ownership interest in the company (based upon the $2.5 million value they believed the company then had). It was Terry's idea to treat the investment as a loan convertible into ownership so that he would be a secured creditor rather than a stockholder. [Fcts.¶ 34] Terry was also given a security interest and an assignment of Kids

Count's receivables to secure his loan. [Fcts.¶ 41]

The Terry Plaintiffs thereafter made receivable loans to Kids Count, including a $27,000 loan based upon receivables from Discovery Toys, which was repaid. [Fcts.¶ 40] At first, Terry watched the company's sales figures and deposited checks in the company's accounts on a day to day or week to week basis, as required based upon information from Soskin, however, Terry knew that sometimes there was not enough cash flow to cover Kids Count's payables and saw communications to Soskin from Joanne Livingston, one of Kids Count's employees, seeking immediate assistance with cash flow issues. [Fcts.¶ 38]

Soskin believes that the Terry Plaintiffs paid $50,000 for a media buy and another $100,000 to complete the infomercial. [Fcts.¶ 40] Terry was not asked to advance additional funds to Kids Count in January of 1999, although the company was still paying for infomercials during that time because they were to be on through February. [Fcts.¶ 42]

Robert Blagman ("Blagman") already had been hired by Kids Count to produce the infomercial and to choose the times it would air; and consistent with the intent of the Terry Plaintiffs' investment, Kids Count started shooting an infomercial right away, over the Thanksgiving weekend.[Fcts.¶ 43, 46] However, it took forever to get post-production work done; and Soskin believed that the script was so bad and confusing that he and Terry's wife finally rewrote it. [Fcts.¶ 45, 48]

Both Soskin and Terry think Blagman did a terrible job. [Fcts.¶ 47, 49] Terry also recalls that Blagman owed the company either time or money and it was decided that only Soskin would deal with him, resulting in Soskin's May 3, 1999 letter to Blagman stating that he had "been asked to file claims against you for breach of contract, breach of fiduciary duty and conversion of

5

funds". [Fcts.¶ 54, 55]  Significantly, however, Terry believes that Esralew gave her best effort to make the infomercial a success. [Fcts.¶ 52]

The infomercial aired from December 23 , 1998 through about January 20, 1999. Although it resulted in a lot of response, less than 50% of the calls were converted into purchases.[Fcts.¶ 51] By the time the infomercial started getting a better response, Kids Count was again out of  money and, by the end of February 1999,  its  prospects were back to about the same as they were before the Plaintiffs  got involved. [Fcts.¶ 51, 73]

By May of 1999, Kids Count was unable to pay its bills and Soskin was advising the parties to consider bankruptcy and/or an assignment for the benefit of creditors, neither of which Esralew was in favor of doing.[Fcts.¶ 65, 66] However,  no plan of any kind was put into operation and Soskin has no idea of what happened at, or to, Kids Count after May 1999.  [Fcts.¶ 66, 67]

On November 15, 2000, Esralew wrote to the Terrys with a plan to pay Kids Count's creditors, including the Terrys,  by licensing Kids Count's products to a new company to be formed; and sought the Terry's consent to this arrangement. [Fcts.¶ 68] Thereafter, Esralew caused Kids Count to enter into distribution and licensing agreements with  Vickilew, LLC., a Delaware limited liability company, and with Good Sector LLC, an Illinois limited liability corporation, in each case for the purpose of continuing to sell Kids Count products. All of these agreements recited that Kids Count was the owner of the products and copyrights for the products to be sold and provided that  Kids Count was to be paid marketing fees and/or minimum and percentage royalty payments  in connection with such sales.[Fcts.¶ 69]

**THE LAW**

Summary judgment is appropriate where the submissions of the parties indicate that no genuine issue of material fact stands in the way of the judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Unsubstantiated allegations carry no probative weight in summary judgment proceedings. *Bone v. Honeywell International, Inc.* 366 F. 3d 869, 875 (10th Cir. 2004), citing *Phillips v. Calhoun*, 956 F.2d 949, 951 (10th Cir. 1992). To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise. *Id.* citing: *Rice v United States*, 166F.3d 1088, 1092 (10th Cir. 1999) and *Allen v. Muskogee*, 119 F.3d 837, 846 (10th Cir. 1997). Under Bankruptcy Rule 4005, the Plaintiffs have the burden of proving non-dischargeability by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir.1994); *Combs v. Richardson*, 838 F.2d 112 (4th Cir.1988); *Whitson v. Middleton (In re Middleton)*, 100 B.R. 814, 818 Bankr.E.D.Va.1988). Only factual disputes that could have an effect on the outcome of the suit should prevent the entry of summary judgment. *Scholes v. Stone, McGuire & Benjamin*, 821 F.Supp. 533, 535 (N.D. Ill. 1993).

**I.**      **Esralew is Entitled To Summary Judgment on Counts I and II of the Complaint**

In order for the Plaintiffs to prevail on their claim that Esralew has any liability to them which is nondischargable pursuant to 11 U.S.C. § 523(a)(2)(A), Plaintiffs must both allege and prove that (a) Esralew made a representation; (b) Esralew knew the representation was false at the time the representation was made; (c) Esralew made the false representation with the intention of deceiving the Plaintiffs; (d) the Plaintiffs relied on such representation; and (e) the Plaintiffs sustained the alleged loss and damage as the proximate result of the false

representation. *Parker v. Grant (In re Grant)*, 237 B.R. 97, 112 (Bankr.E.D.Va.1999); *Fowler v. Garey (In re Garey)*, 258 B.R. 356, 361 (Bankr.E.D.Va.2000); *In re Heilman*, 241 B.R. 137 (Bankr.D.Md.1999); *Hecht's v. Valdes (In re Valdes)*, 188 B.R. 533, 535 (Bankr.D.Md.1995); *Clarkson v. Elibuyuk (In re Elibuyuk)*, 163 B.R. 75, 76 (Bankr.E.D.Va.1993). Plaintiffs do neither.[2]

Representations are either express or implied. "A false representation is an express misrepresentation, while a false pretense refers to an implied misrepresentation of 'conduct intended to create and foster a false impression.' " *National Bank of North America v. Newmark (In re Newmark)*, 20 B.R. 842, 854 (Bankr.E.D.N.Y.1982) (quoting *H.C. Prange Co. v. Schnore (In re Schnore)*, 13 B.R. 249, 251 (Bankr.W.D.Wis.1981)). Fraud and misrepresentation also may be established by a failure to disclose on the part of the debtor where such failure creates a false impression which is known by the debtor." *Caldwell v. Hanes (In re Hanes)*, 214 B.R. 786, 809 (Bankr.E.D.Va.619 (1997) (citing *O'Connor, CPO v. Booker (In re Booker)*, 165 B.R. 164 (Bankr.M.D.N.C.1994)). If funds are deemed to have been entrusted to a debtor for a specific purpose, the debtor is regarded as impliedly representing his intention to use the funds accordingly." *Fensick v. Segala (In re Segala)*, 133 B.R. 261, 264 (Bankr.D.Mass.1991)

The "liability" the Plaintiffs want this Court to find nondischargable arose out of the

---

[2] FRCP Rule 9(b) requires that the circumstances of all allegations of fraud be stated with particularity. *Goren v New Vision Int'l, Inc.*, 156 F 3d 721, 726 (7th Cir. (1998) Stating such allegations with particularity means stating "the time, place and content of the misrepresentation, and the method by which the misrepresentation, and the method by which the misrepresentation was communicated to the [defrauded party]" *Uniquality, Inc. v Infotronix, Inc.*, 976 F 2d 918, 923 (7th Cir. 1992); accord: *Ackerman v Northwestern Mutual Life Insurance Co.*, 172 F 3d 467, 469 (7th Cir. 1999); *Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F3d 580, 597 (7th Cir.2001)

8

Terry Plaintiffs' "investment" in Kids Count for the purpose of funding the production and airing of an infomercial. However, it is uncontested that none of the Terry Plaintiffs' funds were ever "entrusted" to Esralew. Rather, the facts show that all funds flowing into Kids Count, by whatever means, was being carefully monitored and controlled by Terry and/or Soskin, that no substantial sums of money could be removed from Kids Count without at least one of the signatures of the Plaintiffs, that status meetings were required to be held twice a month with the Plaintiffs, and that it was Soskin's specific duty to watch over the Terry Plaintiffs' investment. [Fcts.¶ 29, 30, 32, 39] Moreover, it is also uncontested that the Terry Plaintiffs' funds were, in fact, used for their intended purpose, to pay for the cost of an infomercial - which, unfortunately, was a bust. [Fcts.¶ 40, 51]

There is no evidence that Esralew made a single misrepresentation regarding the intended use of the money the Terry Plaintiffs loaned to Kid's Count (or failed to disclose something that created a false impression on the part of any of the Plaintiffs), either at the time the Plaintiffs entered into the Agreement, or at any other time. Nor can the Plaintiffs show that Esralew knew, or should have known, that any representation she has ever made was false when made. *Koma v. Brooks (In re Brooks)*, 4 B.R. 237, 238 (Bankr.S.D.Fla.1980); *Berk v. Stewart (In re Stewart)*, 10 B.R. 214, 217 (Bankr.C.D.Cal.1981)**.** Accordingly, Plaintiffs cannot satisfy the first two elements of § 523(a)(2)(A).

In addition, the Plaintiffs could not possibly have justifiably relied on any of Esralew's representations. "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Field v. Mans*, 516 U.S. 59, 70 (1995). A creditor

9

"cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id*. (quoting Restatement (Second) of Torts § 541)

In this case, the Plaintiffs are all attorneys and experienced businessmen (or related to attorneys and experienced businessmen). Terry practiced law until he was about 55, after obtaining his JD is from University of Chicago. In addition to taking accounting courses over the years to understand the basics of financial statements, he was responsible for making financial decisions while owning and operating a company known as Precision Carbide and admits his familiarity with business plans, strategic plans, marketing plans and financial statements, having reviewed in excess of 100 balance sheets during his career. [Fcts.¶ 9, 10] Soskin was employed by Terry's law firm and later became Terry's law partner. He has been an attorney since 1979, a CPA since 1975, and is also the trustee of several trusts. He is a general practitioner with a heavy emphasis in business transactions and claims to be able to do "anything a businessman needs". [Fcts.¶ 9, 11]

Moreover, it is undisputed that the Plaintiffs were given full access to all of the business and financial records of Kids Count and knew the risks of making an investment of the kind they made. Their first meeting with Esralew lasted from 4 - 5 hours to 10 hours, during which Terry learned about the background and business of Kids Count and, thereafter, Terry and Soskin had several additional meetings with Esralew, including a 10 hour marathon meeting during which the parties looked at Soskin's spreadsheets showing possible projected revenues and expense based upon varying assumptions; and Terry asked Soskin to help Esralew develop proper documents for him to analyze as an investor. [Fcts.¶ 18, 22] From the time the parties were first

10

introduced, they were talking everyday, spending substantial amounts of time meeting and discussing Kids Count's business, all of them asking questions and providing input. [Fcts.¶ 23,24] Terry has also testified that he deemed all of the information that he had been given sufficient to make a decision to make an investment in the company; and believes that all of the other questions he had asked were answered. [Fcts.¶ 28] In addition, although there are very few investors who are able to protect their investments by requiring the companies they invest in to hire their law partners, have bi-monthly meetings and give them security interests and seats on the Board, that is precisely what these Plaintiff insisted upon and received. [Fcts.¶ 27, 29, 32, 41] There is not a shred of evidence that any information to which the Plaintiffs were entitled was withheld from, or inaccessible to, them.

Finally, it is uncontested that all of the advances made to Kids Count by the Terry Plaintiffs were made after November of 1998. Accordingly, it is not even remotely conceivable that the Plaintiffs would have been unable to uncover any misrepresentations or undisclosed material facts regarding the infomercial before the Terry Plaintiffs made their investment in the company; or that they could have possibly relied (justifiably or not) on anyone's representation that the infomercial could be aired before Christmas. They were still writing it in December! [Fcts.¶ 48]

There is also no evidence that anything Esralew did (or didn't do) caused the Plaintiffs any harm. Proximate cause is both causation in fact, that is: "loss suffered by one who justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss;" and legal causation, that is "if the loss might reasonably be expected to occur from the reliance." Restatement (Second) of Torts §§ 546,

11

548A; See also *Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir.1991); *In re Grant*, 237 B.R. at 117; *Shannon v. Russell (In re Russell)*, 203 B.R. 303, 313 (Bankr.S.D. Cal. 1996).

In the instant case, the undisputed facts demonstrate that the only "cause" of the Plaintiffs' damage was the ineffectiveness of the infomercial, which they were heavily involved in producing and writing, and their subsequent abandonment of Kids Count when the infomercial failed to produce the results they were hoping for and they couldn't attract any other investors in the business. [Fcts.¶ 51, 63]

### III. Esralew is Entitled To Summary Judgment on Count III of the Complaint

In order for Plaintiffs to prevail under 11 U.S.C. § 523(a)(4), they must prove both that the debt in issue arose (a) while Esralew acted in a fiduciary capacity and (b) from Esralew's fraud or defalcation. *Global Express Money Orders, Inc. v. Davis (In re Davis)*, 262 B.R. 673, 682 (Bankr.E.D.Va.2001). The term "fiduciary" is narrowly construed and the term "fiduciary capacity" is limited to actions by individuals under express or technical trusts that existed before the defalcation claim arose. *Id*. Accordingly, the exception from discharge applies "... only to a debt created by a person who was already a fiduciary when the debt was created." *Id*. (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934).

Although this Court has already correctly pointed out that a member/manager of a limited liability corporation owes a duty of loyalty to the other members, citing 805 ILCS 180/15-3(b), (g)(2). [Tr. 8/23/06 p. 19], Kids Count's managing member was Kids Count Entertainment, Inc. [Fcts.¶ 4] The Agreement is also signed by Kids Count Entertainment, Inc., which owned 94% of Kids Count (and, thereafter, owned 92% of Kids Count - the 2% difference going to Soskin). [Fcts.¶ 26 ] Esralew did not directly own any interest in Kids Count and was not a member of

12

Kids Count; and there is no evidence that Kids Count Entertainment, Inc. was operated by Esralew without regard to corporate formalities or otherwise in a manner that would permit a finder of fact to "pierce its corporate veil".

In addition, while it is true that many courts have also concluded that corporate officers or directors occupy a fiduciary relationship for purposes of § 523(a)(4), the Seventh Circuit has held that only those fiduciary obligations in which there is a substantial inequality in power or knowledge in favor of the debtor seeking the discharge and against the creditor resisting discharge are included under § 523(a)(4). See: *In re Marchiando*, 13 F.3d 1111 (7th Cir.1994); and *In re Woldman*, 92 F.3d 546 (7th Cir.1996). The test is whether there is "a difference in knowledge or power between fiduciary and principal which ... gives the former a position of ascendency over the latter.". *In re Frain*, 230 F.3d 1014, 1017 (7th Cir.2000).

Here, the undisputed facts show that the Plaintiffs had a position of ascendancy over Esralew! No substantive financial decisions could be made without Plaintiffs' input and acquiescence and, without funding, Esralew had absolutely no power over the direction of Kids Count.[Fcts.¶ 25, 30, 31, 32, 38, 39; Exhibit F ¶ 3, 4, 9]

**IV.    Esralew is Entitled To Summary Judgment on Count IV of the Complaint**

In *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), the Supreme Court concluded that the language of 11 U.S.C. § 523(a)(6) encompassed only acts done with the actual intent to cause injury, and not merely intentional acts that happen to cause injury. Under *Geiger* and its progeny, the willful injury requirement of § 523(a)(6) is met only when it is shown either that the debtor had a subjective motive to inflict the injury or that the debtor believed that injury was substantially certain to occur as a result of his conduct. See :*Branch Banking & Trust Co. of Va.*

13

*v. Powers (In re Powers)*, 227 B.R. 73 (Bankr.E.D.Va.1998).

Here, there is no evidence that Esralew did, or failed to do, a single thing for the purpose of injuring the Plaintiffs, or with the belief that injury was certain to occur; or that she had any motive to injure the Plaintiffs. Moreover, although none of Esralew's acknowledged efforts to raise additional capital from new investors panned out, the undisputed evidence shows that the Plaintiffs were perfectly willing to let her "drive the bus" in this regard. [Fcts.¶ 60] They had "tag-along rights" under the Agreement! [Fcts. ¶ 25, Exhibit F ¶ 10] In fact, knowing that Kids Count was in financial trouble and that his investment was at risk, Terry admits that he and Soskin actually relied on Esralew to seek new investors in the company. [Fcts.¶ 56, 57, 58, 59, 60, 62]

Finally, Plaintiffs' contention that Esralew sold Kids Count's assets for less than fair value, or otherwise, is belied by the distribution and licensing agreements subsequently entered into by Kids Count, after notice to the Terrys! [Fcts.¶ 68, 69] Indeed, the undisputed evidence shows that after the Plaintiffs abandoned Kids Count, Esralew caused the company - which continues to exist in good standing in the State of Illinois - to enter into a series of distribution and licensing agreements, each of which provides that Kids Count remained the owner of its copyrights and products and was to receive either or both marketing fees and/or minimum and percentage royalties on sales of such products. [Fcts.¶ 3, 69] See: *Fla. Outdoor Equip., Inc. v. Tomlinson (In re Tomlinson)*, 220 B.R. 134, 137 (Bankr. M.D. Fla. 1998) (holding that the debtor's failure to turn over inventory proceeds pledged to a creditor to keep the business operative was not an intentional act to cause injury under § 523(a)(6)).

The simple fact that Esralew may have become employed by the other parties to these

14

agreements after the Plaintiffs abandoned Kids Count and left her with no other means of financial support does not adversely affect dischargeability. There is not a shred of evidence that Esralew performed a single act with the actual intent to cause injury to anyone; that she had any motive to inflict injury to anyone; or that she believed that anything she did, or didn't do, was substantially certain to cause any injury to anyone.

Likewise, there is no evidence that Esralew has disposed of any of Kids Count's intellectual, or other, property other than in the normal course and for the exclusive benefit of Kids Count. The Terry Plaintiffs continue to have the right to seek to enforce their security interests, if any, in such property; and Soskin continues to have the right to seek to enforce all of his rights as "members" of Kids Count under the Illinois Limited Liability Company Act. That is where the Plaintiffs should be litigating their claims, if any. Not here.

For all of the foregoing reasons, Esralew is entitled to summary judgment in her favor on Counts I through IV of the Complaint.

WHEREFORE, Defendant and Debtor, Vicki Esralew, respectfully prays this Honorable Court for the entry of an Order granting summary judgment in her favor and against Plaintiffs.

                                                    Respectfully submitted,
                                                    Vicki Esralew

                                                    BY:/s/ Carey M. Stein
                                                    One of her attorneys

Carey M. Stein
ASHMAN & STEIN
Attorneys for Defendant
150 North Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 782-3484