IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |  |
|---|---|---|
| VICKI ESRALEW | ) | |
| Debtor, | ) | |
| ROLLIN SOSKIN, et. al. | ) | |
| Plaintiffs | ) | No. 04 A 3774 |
| v. | ) | Judge Goldgar |
| VICKI ESRALEW | ) | |
| Defendant | ) | |

**DEFENDANT'S LOCAL RULE 7056-1 STATEMENT OF FACTS**

Vicki Esralew ("Esralew"), Defendant and Debtor herein, by and through her attorneys,

Ashman & Stein, respectfully submits the following Statement of Material Facts in support of her

Motion for Summary Judgment  pursuant to Local Rule 7056-1.

**I.      The Parties**

A.      Vicki Esralew

1.      Esralew obtained her bachelors in communications degree from the University of

Illinois in 1980, and was subsequently employed in various positions in radio. [Esralew Dep. pp

5 - 10]

2.      Esralew then began to write children's books and, in 1993, organized an Illinois

company called Enviar Roads, Inc., which eventually changed its name to Imagine Software

Corporation and, then, Kids Count Entertainment, Inc.[Esralew Dep. pp 14, 15; Group Exhibit A]

3.    Kids Count Entertainment LLC ("Kids Count")  is an Illinois limited liability company currently existing and in good standing in the State of Illinois. [Exhibit B]

4.    At all relevant times, the "managing member" of Kids Count was Kids Count Entertainment, Inc. [Exhibit C; Operating Agreement of Kids Count, amended and restated as of March 20, 1998]

5.    Kids Count Entertainment, Inc was involuntarily dissolved in 2006. [Exhibit D]

6.    Esralew filed her Chapter 7 bankruptcy petition on June 29, 2004. [Compl.¶ 1]

7.    On October 12, 2004, Plaintiffs filed their Adversary Complaint against Esralew, seeking judgment against Esralew, and seeking that such judgment be held nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A), 523 (a)(4), and 523 (a)(6). [Adversary Complaint]

8.    On November 16, 2004, Plaintiffs filed their First Amended Adversary Complaint against Esralew, seeking judgment and *a* finding that such judgment be held nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A), 523(a)(4), and 523(a)(6). [First Amended Adversary Complaint]

B.    Eugene Terry

9.    Plaintiff Eugene Terry ("Terry") is retired, after practicing law until he was about 55.  His JD is from University of Chicago; and he has also taken accounting courses over the years to understand the basics of financial statements. While practicing law, Plaintiff Rollin Soskin ("Soskin") was employed by Terry's firm and later became a partner in same. [Terry Dep. pp 5, 8, 11]

10.     Terry was also  responsible for making financial decisions while owning and

operating a company known as Precision Carbide and is familiar with financial statements. He

has reviewed in excess of 100 balance sheets during his career; and has inspected others. He also

has extensive familiarity with business plans, strategic plans and marketing plans.  [Terry Dep.

pp 9 - 11]

    C.     Rollin Soskin

11.     Soskin has been an attorney since 1979, a CPA since 1975, and is also the trustee

of several trusts. He is a general practitioner with a heavy emphasis on estate planning, tax and

business transactions. He does anything a businessman needs. [Soskin Dep. pp 5, 6, 8 ]

12.     Soskin  acted as a registered agent for Enivar Roads, Inc. and Kids Count

Entertainment, Inc. until 1993. Thereafter, he had very little personal contact with Esralew until

he ran into her in June or July of 1998, when she told him about a new business venture and

invited him to come see her operation. [Exhibit A; Soskin Dep. pp 9, 10, 12-14]

13.     Soskin met with Esralew in October 1998, and Esralew asked him if he knew of

any possible investors in Kids Count. [Soskin Dep. pp 20,  21]

II.     The Parties' Agreements

14.     When Soskin met with Esralew, she didn't have any financial statements for the

past 4 or 5 months, however, Soskin believed that Esralew's ideas had merit and that she just

needed proper investors. He thought about the Terrys, who were successful in business and had

money to invest. [Soskin Dep. pp 21, 25]

15.     Soskin knew that another corporate entity was the manager of Kids Count.

[Soskin Dep. p. 15]

3

16.     Soskin understood the purpose of Kids Count to be the creation and sale of child friendly, nonviolent/educational product. [Soskin Dep. pp 15, 16]

17.     Soskin and introduced Esralew to Terry and Terry's wife, Nicole, during the first ten days of November; and she impressed them as someone who was creative but could not run a business. [Soskin Dep. pp 21, 22]

18.     The Terrys met with Esralew, either at Esralew's  house or Soskin's house, for at least 4 - 5 hours, during which Terry learned about the background and business of  Kids Count. Terry never requested documents regarding the creation of the company but knew it was an limited liability company.  [Terry Dep. pp. 14 - 17, 21, 22]

19.     Esralew told Soskin and the Terrys that she was convinced that if the company could get an infomercial on the air before Christmas, it would be a huge success, but that the company needed funding to produce an infomercial. [Soskin Dep. p. 24]

20.     After meeting with Esralew, the Terrys did some field work to determine where Kids Count's products were sold; and  Terry also asked for a six month cash flow statement, as the investment he was considering making in Kids Count was to get the company through 3 - 6 months. [Terry Dep. pp 19 - 20]

21.     After receiving a six month cash flow statement, which he believes was prepared by Soskin, Terry reduced the projected salaries for Soskin and Esralew,  requested further information about placement fees, and prepared a memorandum for Soskin regarding the investment he was prepared to make in the business and detailing the amount of money he was willing to invest in the company to get through the production of an infomercial. [Terry Dep. pp 20, 23, 24; Exhibit E]

22.     Esralew, Soskin and the Terrys thereafter had several meetings, including a 10 hour marathon meeting at Soskin's house during which Esralew gave sales projections, the parties looked at spreadsheets showing possible projected revenues and expense based upon certain assumptions, and Terry asked Soskin him to help Esralew develop proper documents for him to analyze as an investor. Terry insisted that Soskin be involved. [Soskin Dep. pp 22 - 24]

23.     Soskin  produced spreadsheets from the information Esralew  had given to Terry, and  he, Terry and Esralew all asked questions and provided input. They all agreed that the value of Kids Count in November 1998 was $2.5 million. [Soskin Dep. pp 27, 36]

24.     From the time the parties were first introduced, they were talking everyday and a substantial amount of time was spent meeting and discussing things before an agreement was reached.  [Soskin Dep. pp 24 - 26, 53]

25.     On November 22, 1998, the parties entered into a Memorandum of Agreement ("Agreement") which was prepared by Soskin after  2 or 3 drafts with input from all of its parties. Each party represented that they had properly investigated the circumstances and condition of Kids Count.  [Soskin Dep. pp 19, 52]

26.     At the time the Agreement was signed, 94% of Kids Count was owned by Kids Count Entertainment, Inc. and 6% was owned by unrelated parties; and the Plaintiffs agreed that Kids Count owed $809, 533 to outside creditors and $196, 445 to Esralew.[Exhibit F, Agreement ¶ 15, 16]

27.     At the time the Agreement was signed, Soskin understood that the parties also agreed that he and the Terrys were to have equal control over the use of Kids Count funds and that the Terrys were to invest money as needed over a limited period of time for limited uses.

5

[Soskin Dep. pp 46, 85]

28.     At the time Terry signed the Agreement,  he had Kids Count's financial statement,

had asked additional questions and had modified his initial proposal. All of the information he

had been given seemed sufficient to make a decision to make an investment in the company; and

he believes that all of the other questions he had were answered.  [Terry Dep. pp 36 - 38]

29.     Terry and Soskin were to be directors of Kids Count and Esralew was to be

responsible for designing new products, as she had represented herself to be only a creative type

of person who needed help with day to day management and claimed she wasn't good at

management. Terry was only willing to invest in Kids Count if Soskin was involved to manage

the details.  [Terry Dep. pp 50 - 54]

30.     Soskin was to help with cash flow issues and check authorization because Esralew

claimed those things had caused past failures in the history of the company.  [Terry Dep. pp 51,

52]

31.     Soskin believed that Esralew was incapable of keeping records without someone

else doing it; and  Terry wanted her freed up to focus on the creative side of the business.

[Soskin Dep. pp 28 - 30]

32.     Shortly after the Agreement was signed, Terry advised Esralew and Soskin that he

wanted to meet twice a month with them to discuss the status of the company. [Exhibit G]

33.     The documents Terry relied upon to loan money to Kids Count indicated that Kids

Count would require between $200,000 and 250,000 from December 1998 through February

1999.  [Terry Dep. p 42]

34.     The Terrys were to receive a note convertible into a 10% ownership interest,

based upon the $2.5 million valuation they had placed on the company. It was Terry's idea to

treat the investment as a loan convertible into ownership so that he would be a secured creditor

rather than a stockholder.  [Soskin Dep. pp 38, 39]

35.     Harris Bank already had a lien on the assets of Kids Count Entertainment, Inc.,

but Soskin and Terry felt that Terry was first in line on the assets of Kids Count.  [Soskin Dep.

pp 41, 42; Exhibit H]

36.     Kids Count's products were Jack's Attic, Jack's House, an exercise video, Music

called Home, and a partially completed game called Spuzzled.[Esalew Dep. pp. 123, 124]

37.     The purpose of Terry's investment was to provide cash flow to produce

infomercials for which Terry and his wife submitted suggestions. Terry was not prepared to

invest  a lump sum, but was prepared to invest as much as $250,000, depending on what the

company needed as far as cash flow.  [Terry Dep. pp 40, 41]

38.     In the beginning, Terry watched the company's sales figures and deposited checks

day to day or week to week for the cash flow required, based upon information Soskin presented

to him. However, Terry knew that sometimes there was not enough cash flow to cover payables

during the first four months of 1999, and saw communications to Soskin from Joanne

Livingston, one of Kids Count's employees, seeking immediate assistance with cash flow issues.

[Terry Dep. pp 39, 44 - 46; Exhibit I]

39.     Soskin was in charge of accounts payables and accounts receivables; nothing

could go out of the company without his approval.[Esralew Dep. P. 127; Exhibit J]

40.     The Terrys made receivable loans by writing check to Kids Count and Soskin

believes they also paid  $50,000 for a media buy to Blagman and another $100,000 to complete

the infomercial. A $27,000 loan to the company by the Terrys, based upon receivables from Discovery Toys, was repaid. [Soskin Dep. pp 43 - 45]

41.    Terry believes that the money he advanced to Kids Count was a loan and that he had the right to convert his loan into stock of the company or just get paid back with interest. He was also given a security interest and an assignments of Kids Count's receivables and, in fact, part of his advances were repaid from the receivables.  [Terry Dep. pp 49, 50]

42.    Terry states that he was not asked to advance additional funds to the company in January 1999; but thinks the company was still paying for the infomercials during that time because they were to be on through February.  [Terry Dep. pp 47, 48]

III.    The Infomercial

43.    Kids Count had contracted with Robert Blagman ("Blagman") to produce an infomercial before meeting the Terrys. [Exhibit K]

44.    Esralew was concerned that there wasn't enough time to complete an infomercial for Christmas advertising, however, Blagman assured her that the infomercial could be ready by that time. [Esralew Dep. pp. 103, 104]

45.    Blagman was to produce the infomercial and choose air times because Kids Count was not an expert at picking times. [Terry Dep. pp 57 - 59]

46.    The company started shooting the infomercial right after the Agreement was signed, over Thanksgiving weekend. [Soskin Dep. pp 71, 72; Esralew Dep. p. 108]

47.    Blagman, who Soskin thinks was terrible, purchased the media  and introduced Esralew to the people who shot the commercial. [Soskin Dep. p 74]

48.    It took forever to get post-production work done on the infomercial and Soskin

believed that the script was so bad and confusing that he and Terry's wife finally rewrote it.

[Soskin Dep. pp 72, 75 ]

49.     Terry doesn't believe Blagman succeeded in what was represented to him and

doesn't believe Blagman did a good job with buying media time. [Terry Dep. pp 57 - 61]

50.     The company ended up with airtime at 3:00 am and 6:00 am. [Esralew Dep. p.

109]

51.     The infomercial aired from December 23 , 1998 through about January 20, 1999.

It resulted in a lot of response, but less than 50% of the calls were converted into purchases. By

the time the company started getting a better response, the company was out of media money.

[Soskin Dep. pp 74, 75; Exhibit L]

52.     Terry believes that Esralew gave her best effort to make the infomercial a success.

[Terry Dep. p 56]

53.     In late January of 1999, Terry expressed his belief that the infomercial would

 "not produce a positive cash flow" but that Esralew "has done a fantastic job getting us this far".

He also believed that one of the reasons the infomercial was not successful was that Esralew was

not being perceived by consumers as an "expert" and that an alternative would be "to hire an

educational expert or organization to endorse the product and then redo the ad." However, he

recognized that this would require more funds than Kids Count had or to which it had access.

Terry further suggested that Kids Count seek out new investors to  "drive the program",

preferably in the entertainment business, that have "several millions" necessary to promote

Esralew, or hire a known expert to promote Kids Count's products.[Exhibit M]

54.     Terry  recalls that Blagman owed the company either time or money and it was

decided that only Soskin would deal with Blagman.  [Terry Dep. pp 60, 61]

55.      On May 3, 1999, Soskin informed Blagman by letter that he had "been asked to

file claims against you for breach of contract, breach of fiduciary duty and conversion of funds"

and Blagman responded that he "would no longer communicate with (Esralew)". Group Exhibit

N]

IV.      The Parties' Search For New Investors

56.      Terry knew Kids Count was in financial trouble and that his investment was at

risk, but he did not independently seek any investors.  [Terry Dep. p 65]

57.      According to Terry, Esralew indicated that she had several resources, including

Peter Abruzzo ("Abruzzo") and three or four others, who were very interested in investing in

Kids Count and that, perhaps, the company could get additional  financing within 60 days.

[Terry Dep. pp 64, 65]

58.      None of the Plaintiffs disagreed with Esralew's desire to bring in new investors.

[Soskin Dep. p 110]

59.      Terry met  with Abruzzo to discuss investing capital into the company,  but

Abruzzo did not bring any new investors into the company. He also recalls Blagman being at this

meeting and discussing a physician friend who might be a potential investor.  [Terry Dep. pp 65 -

67; Exhibit O]

60.      Soskin also met with Abruzzo in February 1999, to discuss  a potential

investment, however, he didn't negotiate with Abruzzo. Instead, the Plaintiffs were willing to let

Esralew "drive the bus". They knew Abruzzo had a bunch of contacts in the entertainment

business and had set up some meetings for Esralew.  [Soskin Dep. pp 118, 119]

61.     Blagman also wanted Soskin and the Terrys to meet a potential new investor

named Dr. Leonard Makawka. [ Soskin Dep. pp 109]

62.     Esralew also asked Terry to meet with a Joanne Marlowe regarding a potential

investment that he didn't understand, so he asked Soskin to meet with Marlowe instead. [Terry

Dep. pp 66 - 67; Group Exhibit P]

63.     Terry is not aware of any additional investors actually investing money in Kids

Count, despite Esralew's, Soskin's and his efforts. [Terry Dep. p 67]

V.      The Parties' Relationship Deteriorates

64.     By February 1999, the company's business was about the same as it was before

Soskin and the Terrys got involved. [Soskin Dep. p 60]

65.     On April 28, 1999, Terry, Soskin and Esralew met to discuss the status of the

company, raising money, a possible bankruptcy and calling a creditors meeting. During this

meeting, Soskin said that some of the options to consider were bankruptcy and assignment for

the benefit of creditors. The participants in this meeting also discussed cutting back all overhead

costs to a minimum as well as having Esralew travel around the country to promote the

company's products, but no discussion as to how this travel would be funded; and no plan of any

kind was put into operation. [Terry Dep. pp 69, 70, 81-85; Exhibits Q and R]

66.     By May of 1999, Kids Count was unable to pay its bills. [Esralew Dep. p. 133]

67.     Soskin has no idea what business Kids Count did after May 1999. [Soskin Dep.

pp 95]

68.     On November 15, 2000, Esralew wrote to the Terrys with a plan to pay Kids

Count's creditors, including the Terrys, by licensing Kids Count's products to a new company to

be formed; and sought the Terry's consent to this arrangement. [Exhibit S]

69.     On January 1, 2000, and thereafter, Kids Count entered into distribution and

licensing agreements for the purpose of continuing to sell Kids Count products, including

agreements with Vickilew, LLC., a Delaware limited liability company, and Good Sector LLC,

another Illinois limited liability corporation. All of said agreements recite that Kids Count is the

owner of the products and copyrights for the products to be sold and provide that  Kids Count

was to be paid marketing fees and/or minimum and percentage royalty payments  in connection

with such sales. [Group Exhibit T]


                                              Respectfully submitted,
                                              Vicki Esralew

                                              BY:/s/ Carey M. Stein
                                              One of her attorneys



Carey M. Stein
ASHMAN & STEIN
Attorneys for Defendant
150 North Wacker Drive
Suite 3000
Chicago, Illinois 60606
(312) 782-3484