IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |  |
|---|---|---|
| VICKI ESRALEW | ) | |
| Debtor, | ) | |
| | ) | |
| ROLLIN SOSKIN, et. al. | ) | |
| Plaintiffs | ) | No. 04 A 3774 |
| v. | ) | Judge Goldgar |
| VICKI ESRALEW | ) | |
| Defendant | ) | |

# EXHIBIT 1

Page 5

1    Q.  Were you ever licensed to practice law in the

2  state of Illinois?

3    A.  Yes.

4    Q.  And did you in fact practice law --

5    A.  Yes.

6    Q.  And from what period of time to what period of

7  time?

8    A.  I practice law from -- I don't know the date --

9  age of 21 to -- I believe I stopped practicing law when I

10  was about 50, 55.

11    Q.  And how old are you now, sir?

12    A.  71.

13    Q.  Are you licensed to practice law in any other

14  state?

15    A.  No.

16    Q.  And is it your testimony that you have not

17  practiced law since the age 55?  So that would be --

18    A.  No -- well, no.  I retired, yes, but there were --

19  occasionally I did a few things.  It was -- I think the last

20  three years.  Then I went on the retirement rolls with the

21  state of Illinois.

22    Q.  Okay.

23    A.  When you retire you can give notice that you're

24  retired and you pay less dues but you can't practice law.

25    Q.  And when was that approximately?

Page 8

1    A.  I sold that about -- about three or four years

2  ago.

3    Q.  Did you receive proceeds from the sale?

4    A.  Oh, yes.  That's why I sold it.

5    Q.  And how much did you receive then?

6    A.  A million and a half was the gross amount.

7    Q.  So you operated that company for between 25 and 30

8  years, is that correct?

9    A.  Yes.  I think 25 would be close.  Yes.

10   Q.  And what were your duties with the company?

11   A.  I was chairman of the board.  I participated as I

12  chose them, actual management.  However we did have a

13  president for the day to day details.

14   Q.  What is your educational background, Mr. Terry?

15   A.  Okay.  I have a doctor of law degree, University

16  of Chicago.  And then I've taken various refresher courses

17  or courses like in accounting and such over the years.

18   Q.  You've taken accounting courses?

19   A.  I've taken -- yes, when -- after I graduated I

20  took one accounting course to understand the basics of

21  financial statements.

22   Q.  Any other formal courses that you took after you

23  obtained your -- did you go from -- from your undergraduate

24  education to -- right to law school?

25   A.  Yes.

Page 9

1    Q.  And then did you have anything other than that,

2  other than the one or two accounting courses post-JD?

3    A.  I did take a course at the -- Trois Rivières in

4  Canada, the university there, in French.

5    Q.  When you were operating Precision Carbide at any

6  time during your 25 to 30 year tenure were you responsible

7  for the -- the financial condition of the company?  Did you

8  review the financial statements for the company, did you

9  make financial decisions for the company?

10    A.  Yes.

11    Q.  When you were looking to sell the company did you

12  prepare financial statements for the proposed sale of the

13  company?

14    A.  I had them prepared, yes.

15    Q.  Did you review them?

16    A.  Yes.

17    Q.  So you're familiar with a financial statement?

18    A.  Yes.

19    Q.  What -- what types of documents in your

20  estimation, based upon your experience as a businessman and

21  an attorney, what types of documents would be used to

22  compile a financial statement?

23    A.  You mean a balance sheet?  A --

24    Q.  A balance sheet.  If that -- let's talk about a

25  balance sheet.  What types of documents would be used to

Page 10

1  compile a balance sheet?

2  A. Well, you'd need your year end accounts payable,

3  your year end accounts receivable, things of that nature.

4  It's standard -- as far as I know it's standard operating

5  procedure.

6  Q. What about say a profit and loss statement?

7  A. Yes, that would be included. Yeah, profit and

8  loss. You have to know your sales and then you'd have to

9  know your costs that are involved and overhead, etcetera,

10  etcetera. And then you'd come up with your bottom line

11  figure.

12  Q. In your background how many balance sheets would

13  you say that you've reviewed? Both for your --

14  A. What --

15  Q. -- company --

16  A. Well, I've reviewed for my company or things that

17  I wanted many -- in excess of 100, okay? Other balance

18  sheets I've read but I wouldn't use the term reviewed. I

19  just inspected them.

20  Q. When you were considering retirement did you

21  market your company for sale?

22  A. Did I market my company? No, I was approached.

23  Q. And how did you go about evaluating the offer that

24  you received?

25  A. I was approached by a venture capital group which

Page 11

1 owned a competing company. I submitted to them documents

2 that they wanted to see, I told them what we planned to do.

3 They reviewed across our history. They interviewed my

4 people to see whether they were talented or not. And then

5 they made us an offer.

6    Q. What types of documents would you have prepared

7 for these venture capitalists?

8    A. They wanted five years financials. If I remember

9 correctly things like your ten biggest customers, how long

10 your employees were with you, what my opinion was about the

11 business, what plans we had for the business, what our

12 strategic plan -- we had a strategic plan. Most companies

13 do. What our marketing plan was, things of that nature.

14    Q. Based upon your experience in business would these

15 be typical things that you would supply --

16    A. Yes.

17    Q. -- to a potential purchaser?

18    A. Typical, yes.

19    Q. Now, Mr. Terry, how do you know Rollin Soskin?

20    A. Rollin Soskin, when I practiced law Rollin was

21 employed by my law firm.

22    Q. Were you a partner in that law firm?

23    A. Later on he -- yes, I was a partner and later on

24 Rollin became a partner.

25    Q. Okay. So at the time you were first introduced to

Page 14

1    Q.  When would this have happened?

2    A.  Oh, boy. I'd have to inspect the records but I

3  believe 15 years ago, something like that. It wasn't 30

4  years ago and it wasn't two years ago.

5    Q.  And why did you say you -- you left the practice

6  of law?  To spend more time with your business, is that

7  correct?

8    A.  That's correct.

9    Q.  Mr. Terry, you're a plaintiff in the adversary

10  proceeding that we have earlier referred to, is that

11  correct?

12    A.  Correct.

13    Q.  And Vicki Esralew is the defendant in that case,

14  correct?

15    A.  Correct.

16    Q.  When did you first meet Vicki Esralew?

17    A.  The first time I met her as I recall it was

18  November 4 or 5, early November, 1998.

19    Q.  And how were you introduced to her?

20    A.  I'd received a telephone call previous to that

21  meeting from Rollin Soskin. He stated that he had some

22  friends, knew them from the synagogue, done some legal work

23  for, people who needed money. And if I would be interested

24  it might be an economically feasible deal for me. And I

25  said okay, I'll talk to them.

Page 15

1   Q.   And then what happened?

2   A.   Then what happened was we had a meeting with -- I

3   believe the first meeting that we had was Vicki, Nicole

4   Terry, Eugene Terry.  I don't know if Aren -- if Robert Aren

5   was there.  And we had several meetings so this was either

6   at her house or at Rollin's house.  And when I say her house

7   I mean Vicki's house.

8   Q.   And that was the first meeting?

9   A.   That as I recall at this time was the first

10  meeting I -- you asked me when I met her.  That was the

11  first -- met her -- the first time I met her was at the

12  meeting.

13  Q.   And what was discussed at that meeting?

14  A.   We discussed lots of items that related to the

15  business such as what's the product, why do you need money,

16  things of that nature.  Who -- who are you?  She wanted to

17  know who we were, etcetera.

18  Q.   So what would you say the purpose of that meeting

19  was?  To get to know her?

20  A.   The purpose of the -- the purpose of the meeting

21  was to determine who they were, what they were looking for,

22  how much money was involved.  The basic things that anybody

23  would -- I believe that an investor would want to know.

24  Q.   And how did you conclude that meeting?

25  A.   I believe we had another meeting also and --

Page 16

1    Q.  All right.  Let's talk about --

2    A.  Okay, yeah.  That -- that --

3    Q.  -- that first meeting.

4    A.  -- meeting -- yeah.

5    Q.  How long did that meeting last, that first

6    meeting?

7    A.  I don't recall.  The meeting lasted a long time

8    but -- I mean it was in excess of four hours, five hours.

9    Q.  Who arranged the meeting?

10   A.  Rollin Soskin.

11   Q.  And what did you learn during that meeting?

12   A.  I learned what the background was to the company,

13   what they were representing.  They gave me various

14   documents.

15   Q.  Do you know -- I'm going to back you up.

16   A.  Okay.

17   Q.  What company are we talking about?

18   A.  Kids Count.  Kids Count and there was another

19   company that controlled it.  I don't remember exactly what

20   it was.  It was Kids Count Entertainment and an interest in

21   or visa versa Kids Count, Inc. or something like that.

22   Q.  And who gave you documents?  You said somebody

23   gave you --

24   A.  Vicki.

25   Q.  -- documents.  What documents did Vicki give you?

Page 17

1   This was at the first meeting?

2       A.   I believe it was the first meeting, yes.  I -- I

3   got a business plan which is a bound copy.  We discussed

4   some of the things in those. I got copies of the product,

5   okay? And then I -- I -- a copy of the product.  I got a

6   statement. What else?

7       Q.   What type of statement?

8       A.   A financial statement, a balance sheet. I'd have

9   to look and see if my notes are -- but those -- as I recall

10   at this time those are the documents that I got.

11      Q.   Did you ask for documents or did -- did she just

12   volunteer giving you these documents?

13      A.   Did I ask for these particular documents?  No,

14   these were the documents that were presented to me.  I

15   didn't give -- if you're saying did I say I need A, B, C, D,

16   no, I didn't say A, B, C, D. The purpose was -- was to find

17   out what I was going to get and what documents they had to

18   deliver.

19      Q.   So after this meeting, this first meeting for four

20   or five hours, did you come to any understanding or did you

21   come to any conclusion?

22      A.   Did I come to -- the conclusion we came to is we'd

23   like to continue it and hear more.  When you say we I'm

24   talking about myself and my wife.

25      Q.   So then what happened next?

Page 19

1  wife might have had -- got there -- she was to find out what

2  stores were carrying, things of that nature -- toy stores

3  were carrying competing products, things like that.

4      Q.  So she was going to do --

5      A.  But did I have --

6      Q.  -- some in --

7      A.  Field work --

8      Q.  -- field work?

9      A.  -- she was doing that, okay.

10     Q.  Mm-hmm.  Did you have any conversations with

11  Rollin Soskin in between the first and the second meeting?

12     A.  I believe I did talk to Rollin.  Somebody gave me

13  directions to her home, okay?  And it would have been

14  Rollin.  So I did have some -- but that could have been the

15  first meeting.  So did I have any conversations with Rollin?

16  I'd have to look at the records.  I don't -- at this point I

17  don't recall a conversation.

18     Q.  Did you -- did you or anyone on your behalf

19  request additional documents between the first meeting and

20  the second meeting?

21     A.  Between, no.  I believe, as best I can remember,

22  at the second meeting when we knew more about the items

23  involved, the personalities, the product, I asked for a six

24  month cash flow statement because the statements I had seen

25  and the investment I was considering was really only for --

Page 20

1  to get us through six months, four months, three months.

2  And the statements that I was given were, you know, over a

3  five year period. So I request a six month projected cash

4  flow.

5     Q.  And that was after the second meeting. Is that

6  correct?

7     A.  I believe it was after the second -- after the

8  second meeting? I cannot recall at this time whether it was

9  after the second meeting. But some were -- before we made

10  the investment we requested a cash flow.

11     Q.  Did you receive that cash flow projection?

12     A.  Yes, I did.

13     Q.  Who prepared that cash flow projection?

14     A.  I believe it was prepared by Rollin Soskin.

15     Q.  And that cash flow projection satisfied your

16  request?

17     A.  No.

18     Q.  Okay, why not?

19     A.  In the cash flow projection there was a -- a

20  salary for Rollin and there was a salary for Vicki which

21  were -- I reduced the amounts. I also asked some questions

22  such as there was a placement fee and all kinds of things.

23  I -- I'd -- I requested further information on it and -- but

24  the main thing was the -- the salaries.

25     Q.  So you didn't like the salaries that were

Page 21

1  projected in this cash flow projection and then there were

2  some other things in there that you wanted to change as

3  well?

4     A.  I wanted an explanation.

5     Q.  Explanation.  Did you get the explanation?

6     A.  I believe I did but I'd have to look at my -- my

7  notes.  But I --

8     Q.  Who would have provided the explanation?

9     A.  Vicki, her parents, that's Robert Aren or Rollin.

10    Q.  Now, you were aware that this company that you

11  were looking to invest in was Kids Count Entertainment in

12  some form -- Inc. or LLC or you knew that it -- there was

13  this formed entity --

14    A.  Correct.

15    Q.  -- correct?  Were you aware of the existing

16  members of the LLC?

17    A.  I don't understand.

18    Q.  Did you --

19    A.  Members?

20    Q.  Let's say that the operating entity was not a

21  corporation but an LLC.  Did you know who the members of the

22  LLC were before you made the investment?

23    A.  Yes, I was told I believe by Vicki and Aren that

24  they controlled both entities.

25    Q.  Did you ever request the creation documents for

Page 22

1 the entity?

2    A. Did I ever request the -- I don't recall ever

3 requesting at this time -- that particular document.

4    Q. So they -- you were told that -- that Vicki and

5 Mr. Aren is it that --

6    A. Right.

7    Q. -- controlled the entity? That's what you knew?

8    A. I don't remember exactly whether it was just Vicki

9 and Aren or Aren or Vicki. I just knew they acted together,

10 they talked together, they seemed to both be instrumental in

11 the company and I was told that they controlled the company.

12 The companies.

13    Q. So after the second meeting how many more meetings

14 were there before -- how many other meetings took place

15 before November of -- I want to say November 20th but let me

16 just verify my date.

17    A. A Friday.

18    Q. November 22nd.

19    A. How many more meetings?

20    Q. Right.

21    A. There was a meeting where we all met -- I think it

22 was the 16th -- around that date, okay? A week before --

23 some period before the 22nd when we signed the letter.

24    Q. So there was one more meeting?

25    A. That's all I can recall at this time. I'd have to

Page 23

1  go through all my notes.

2      Q.  And what happened at that meeting?

3      A.  I had -- before that meeting I had sent --

4  returned the cash flow to Rollin saying that I don't -- will

5  not go for those salaries, okay? And I think I suggested

6  what I would go for, okay? In addition I prepared a

7  memorandum because there was nothing legal or -- involved

8  here. We had -- I obviously wanted something legal so I

9  prepared a memorandum which I sent to Rollin, okay, which

10  outlined what I was prepared to do. When I say prepared to

11  do I mean the investment I was prepared to make.

12      Q.  Has that memorandum been produced in discovery?

13      A.  I believe so.

14      Q.  Well, I know there was a recently -- this found

15  box of records that I was apprised of --

16      A.  You asked me about it at my deposition.

17      Q.  I don't if there was more than one. We're talking

18  about a specific one that pre-dates the memorandum.

19      A.  You mean my -- the memorandum I sent --

20      Q.  That you drafted?

21      A.  Is there a memorandum before that date? I cannot

22  at this time recall it but I'd have to look at all the

23  discovery.

24      Q.  So this memorandum set out -- it was sent to

25  Rollin Soskin, is that your testimony?

Case 04-03774  Doc 68-2  Filed 11/14/06  Entered 11/14/06 12:41:21  Desc Exhibit
1  Page 16 of 51

Page 24

1    A.  That's correct.

2    Q.  And it set out what you were prepared to do with

3  respect to your investment?

4    A.  Economics, yeah.

5    Q.  And what was -- what was it that you were prepared

6  to do?

7    A.  Can I have a copy of it?

8    Q.  I -- I didn't bring it.  Do you recall?

9        MR. CROOKS:  Just give your best recollection.

10   A.  My best recollection is that I was to invest a --

11  I was willing to invest a certain sum of money that the

12  purpose was for -- to get us through the production of the

13  informational that --

14   Q.  The infomercial?

15   A.  Infomercial.  Excuse me.

16   Q.  Mm-hmm.

17   A.  The infomercial.  Okay.  That -- what else was in

18  that memorandum?  That -- I'd have to look at that to recall

19  exactly all the details.  If I had it I would look at it.  I

20  have seen it.

21   Q.  Now you sent this memorandum to Rollin?

22   A.  Correct.

23   Q.  Why?  Why did you send it to Rollin?

24   A.  Rollin was facilitating the relationship between

25  the parties that were involved.

Page 36

1    A.  When we would draft the legal documents, okay, the

2  documents that were involved, okay, there should be a lawyer

3  and I was recommending Rollin.  Up to that time we -- it was

4  financial --

5    Q.  You --

6    A.  -- financial and reviewed the product, things of

7  that nature.

8    Q.  But via this document you recognized him as her

9  attorney and the attorney for the company, is that correct?

10    A.  At this point in time, yes.

11    Q.  Okay.  Now, this document raises other questions

12  that you had, correct?  If you look --

13    A.  Well --

14    Q.  It says, "These are the questions we have."

15    A.  Right.

16    Q.  Were those questions answered?

17    A.  I believe they were.

18    Q.  Were they answered for you before you entered into

19  the memorandum agreement?  Not that agreement but the later

20  agreement subsequent --

21    A.  The memorandum --

22    Q.  Yes, that's right.

23    A.  And your request -- would you repeat it -- did I

24  --

25    Q.  Were you -- you had some questions --

Page 37

1     A.  Right.

2     Q.  After you looked at the books and records it

3  raised some questions for you?

4     A.  I believe there were, yes.

5     Q.  So when you signed that memorandum of agreement on

6  March -- I'm sorry, November 22nd, 1998 --

7     A.  Right.

8     Q.  -- you had reviewed financial information,

9  correct?

10    A.  Correct.

11    Q.  You had asked some questions, correct?  Is that

12 correct?

13    A.  That's correct.

14    Q.  You had modified the initial proposal, is that

15 correct?  You had gotten some cash flow projections and you

16 modified them, you made some changes to them, is that

17 correct?

18    A.  Right.

19    Q.  And you then --

20    A.  Did I modify them?

21    Q.  Well, you had indicated that you had made some

22 changes regarding salaries and --

23    A.  Well, that's -- yeah, that's on the cash flow.

24 Yes.

25    Q.  Okay.  So you made some changes to some of the

Page 38

1  projected cash flow --

2     A.  Right.

3     Q.  -- statements and then you came to an

4  understanding and an agreement and you signed --

5     A.  We met on this. I mean, in fact I think it was

6  either that evening or the next day. We met -- I don't

7  remember the exact place we met. That might have been at

8  Rollin's house again. It might have been at her house. We

9  met to discuss these particular things and that's when the

10  discussion came up in regard to an attorney, when the

11  discussion came up in regard to who's going to get salaries,

12  when -- those particular points. Whether I could do this or

13  not. And some of these questions were answered like

14  insurance and so forth. And that was the sum and substance

15  of the -- of the meeting.

16     Q.  And you were satisfied at that point with the

17  information you were given?

18     A.  Well, I had had -- all the information I had been

19  given up to this period seemed to me to be sufficient for me

20  to make a decision to make this investment.

21     Q.  And then you entered into that memorandum of

22  agreement on November 22nd?

23     A.  Correct.

24     Q.  Now, if you look at the memorandum agreement --

25  and I'm going to ask -- it indicates -- paragraph number one

Page 39

1  indicates that you would invest 200 to 250 thousand dollars

2  as December 1998 through February 1999. Is that correct?

3      A.  Correct.

4      Q.  And did you in fact invest that amount of money?

5      A.  The amount -- the total amount of money invested

6  was around 200,000.

7      Q.  Were you reviewing financial documentation -- it

8  indicates as cash flow shall require, is that right?

9      A.  Right, that's correct.

10      Q.  So you were periodically reviewing cash flow

11  statements to determine how much to invest, how much money

12  to put in?

13      A.  We -- we would get -- are you saying were there

14  formal, written cash flows produced by computer or an

15  accountant?  No.  What we had was almost day to day how much

16  sales we had made, how much -- how much more money was

17  needed, put in more money, etcetera, etcetera, write a check

18  to deposit.  So it was almost like day to day, week to week

19  we were reviewing what was -- what cash flow required.

20      Q.  And would you make a request for that information

21  to somebody or would somebody just --

22      A.  A request for somebody -- yeah, generally I --

23  Rollin -- or he'd present it to me, yes.

24      Q.  Why did you -- what was -- what was your

25  understanding that your -- in -- of your investment?  What

TEXTNET Internet Court Reporters

Case 04-00774   Doc 66-2   Filed 11/14/06   Entered 11/14/06 12:41:21   Desc Exhibit
1   Page 21 of 51
888-TEXTNET Toll Free                                    www.textnet.com

Page 40

1   was it going to go to?

2       A.   To produce -- the purpose of the investment was to

3   produce the intro commercials that were in the hopper so to

4   speak, that were going to produce the cash flow that was

5   going to provide the company, etcetera, etcetera.

6       Q.   And were those infomercials produced?

7       A.   Were they produced?  Yes.

8       Q.   Did you see them?

9       A.   Yes.

10      Q.   Did you see them on television?

11      A.   I think we saw one in Chicago.  Okay.

12      Q.   What did you think?

13      A.   What did I think?  I think -- I think it -- you

14  want to know what I think?

15      Q.   Did it look professional?

16      A.   Yes.  We had some suggestions.  When I say we I'm

17  usually referring to my wife.  We had some suggestions to

18  make which we submitted.

19      Q.   When you look at paragraph one of that memorandum

20  agreement and it says that you will invest 200 to 250

21  thousand dollars between December of '98 and February of '99

22  as cash flow requires.  Who would determine what the cash

23  flow required?  Did you determine that?

24      A.   Who would determine that?  It was my understanding

25  when I submitted this, and I believe it was the

Page 41

1   understanding of everybody, that we did not know at that

2   particular time whether the first week we produced $200,000

3   worth of profit, two million dollars worth of profit.  Do

4   you understand?  We didn't think it would produce five

5   dollars worth of profit, okay?  We had projections and I --

6   I'd say prospectuses and all kinds of things.

7       Q.  But anything was possible?

8       A.  Anything was possible?  Well, sure, anything is

9   possible.  I mean --

10      Q.  But I mean with respect to the cash flow needs of

11  the company you didn't know?  It could --

12      A.  Yeah, but I was what --

13      Q.  Go ahead.

14      A.  I was not prepared to put in 200 or 250 thousand

15  dollars and now you do with it what you want.  How much is

16  required now for the first week?  What does Blagman want,

17  what does this one want, what does that one want?  And we

18  need -- it's 40 -- I'm making up figures.  It's $42,000 and

19  our revenues are only 40,000 so we're short $2,000.  We may

20  be short the -- the money doesn't come in -- it was on

21  credit cards -- for a week so we may be short for a week and

22  therefore I was prepared -- I wasn't prepared to put in a

23  million dollars but I was prepared to put in, depending on

24  what the cash flow showed from the informationals up to 200

25  to 250 thousand dollars.  And it showed about 200,000 as I

Page 42

1  recall.

2  Q. Did -- so -- so your recollection is that the cash

3  flow between that period of time, December '98 to February

4  of '99, required about $200,000? Is that correct?

5  A. Based upon this document it required about

6  200,000, 250, yeah.

7  Q. Did it in fact -- after you signed that agreement

8  did it in fact require more than $200,000?

9  A. No.

10  Q. It never required more than $200,000 cash flow of

11  the company?

12  A. The informationals that we produced we paid for.

13  That was the purpose of this. They were 100 percent -- as

14  far as I know they were 100 percent paid for. Many of the

15  parties we dealt with wouldn't deal with us without, okay,

16  pre-payment.

17  Q. Well --

18  A. We needed cartons and things of that nature.

19  Bills were submitted in regard -- in fact, at one time I did

20  go with her and bills were submitted because you need

21  packaging and you need fulfillment companies and so forth,

22  and we paid those. Those as far as I know are paid. From

23  the amount of money I put in, which is my opinion and which

24  is -- was the purpose of my putting in the money.

25  Q. How did the infomercials do? Did they --

Page 44

1    A. Right. Let me answer your question. No, no. The

2 purpose of the -- of the -- was to support the commercials.

3 I believe I said that before. As for operational expenses

4 and such I don't believe that was the purpose of the -- the

5 purpose -- the information would -- was sought to produce

6 sufficient amount of income to just about cover operational

7 expenses.

8    Q. Were -- are you familiar with a woman named Joanne

9 Livingston?

10    A. Yes.

11    Q. And how do you know Joanne Livingston?

12    A. As I recall at this time Joanne Livingston worked

13 for Kids Count -- Kids Count Entertainment -- I mean, it's

14 the same thing --

15    Q. Did you ever have any --

16    A. -- in the office where -- where Vicki operated.

17    Q. Did you ever have any communication with her?

18    A. Yes.

19    Q. What type of communication did you have?

20    A. I had both phone conversations and I would get a

21 memo from her, some of which just she left a message.

22    Q. And what time period are we talking about if you

23 could recall?

24    A. That I had -- from January '98 --

25    Q. '99 you mean?

1     A. No, '99. Excuse me. January of '99, I figure the

2 next four months, five months, something like that.

3     Q. And what were the nature of the messages and the

4 memos and the phone calls?

5     A. Some were in response to requests that I had made,

6 that my wife had made such as who should sign our checks and

7 how you deposit the checks. We had a lien and then an

8 assignment on the receivables. They had to be endorsed

9 properly. Most of them were operational things. She wanted

10 to know who -- who she could contact for different things,

11 whether it should be me or Vicki was handling it or Rollin

12 or who's handling those particular things. Those were the

13 type of things.

14     Q. Do you recall ever seeing communication from her

15 indicating that there were company payables that remained

16 past due and asking for some direction on --

17     A. Oh, yes --

18     Q. -- how to handle --

19     A. Yes, yes.

20     Q. -- those?

21     A. Those were one of the things -- yes, those were

22 one of the things that either we discussed or we -- yes,

23 what's payable, what should be paid sometimes. Who should

24 she ask about it? Things like that which would relate to

25 cash flow.

Page 46

1    Q.   Were there -- to your knowledge was there

2  sufficient funds in the company's accounts to cover the

3  payables that were being generated?  Or was she looking for

4  direction on --

5    A.   No, there -- at particular times there was,

6  particular times there wasn't.  This was a period of time

7  we're talking about --

8    Q.   Four months.

9    A.   -- at least 90 days.

10   Q.   Right.

11   A.   Four months, yeah.  Sometimes there were,

12 sometimes there weren't.  Sometimes your receivable was

13 delayed, things of that nature.

14   Q.   Do you recall seeing communication between Joanne

15 Livingston and Rollin Soskin asking for assistance on

16 various matters of that nature, payables and operational

17 type questions?

18   A.   Repeat it?  Do I recall what?

19   Q.   Seeing any kind of communication between Joanne

20 Livingston and Rollin Soskin where Ms. Livingston was

21 looking to Mr. Soskin for --

22   A.   Yes.

23   Q.   -- assistance?

24   A.   I -- I don't remember specifics but yes, should I

25 do this, should I do that and so forth.

Page 47

1      Q.  Do you recall the tone of those communications.

2   Was she --

3      A.  Tone?

4      Q.  Were they friendly?  Was she --

5      A.  No, she --

6      Q.  -- desperate?

7      A.  It seemed like she wanted immediate answers.

8      Q.  Were you aware of the company's financial stress

9   at this time after you had invested the money --

10         MR. CROOKS:  What time?

11     Q.  After you had invested --

12         MS. KROL:  If you let me finish I'm getting there.

13  Okay?

14         MR. CROOKS:  Sorry.  I thought you were done.

15         MS. KROL:  I was not done.  And I can provide a

16  more specific time if you want.

17     Q.  After November 22nd, let's say January 1999, were

18  you aware of the company's financial stress at that time?

19     A.  Financial stress?  You mean that we're having

20  financial problems, yes.

21     Q.  Did -- were you asked to put in additional funds

22  --

23     A.  No.

24     Q.  -- for operations?

25     A.  For operations?  No, I was -- we -- if I recall

Page 48

1 correctly -- well, I have to check the notes -- we were

2 still paying for informationals, for time and so forth. I

3 believe that they were on through February actually,

4 something like that. We were still paying for them so I

5 would get requests for the bill is due for such for -- the

6 week of such and such, okay. Usually that went through

7 Rollin. Rollin was keeping -- letting us know what the --

8 what the cash flow, what the problems were. He was trying

9 solve them. The balance on accounts, doing that particular

10 kind of management work.

11      Q.  And you were -- is it -- is it your testimony that

12 you were never asked to put additional money into the

13 company?

14      A.  That's correct. Let me rephrase it. At periods

15 of time after November -- in fact, the first check went out

16 I believe November 22 to them. At different periods of time

17 I was asked to produce funds pursuant to the agreement for

18 the infocommercials and things relating to that. Yes. If

19 you asked me on September the 2nd -- I mean, on February the

20 2nd, I don't know. But I was -- but was I asked to put up

21 money to meet a payroll, was I asked to do that? No.

22      Q.  In -- you made an investment, we acknowledged

23 that, something between -- well, I've seen numbers anywhere

24 from 160 to $200,000. What were you to receive in return

25 for your investment? What do you understand --

Page 49

1    A.  It states in the memo -- the memo --

2    Q.  What is your understanding of what you were

3  getting in return?

4    A.  Okay, I was supposed to get interest on my -- the

5  first paragraph provides for interest I was supposed to get

6  and how my -- would be protected -- my loan would be

7  protected.  And the second paragraph provides for --

8    Q.  Well, I'm going to back you up --

9    A.  -- if --

10    Q.  You -- you just now called it a loan and you've

11  been calling it an investment.

12    A.  Well, I had -- I had the right to -- it was a loan

13  but I had the right to convert it.  As I understand it -- if

14  you want me to read it I'll read it.  It says, "Terry will

15  invest" --

16    Q.  I don't want you to read it, Mr. Terry.

17    A.  Oh.

18    Q.  I want you to tell me what your understanding of

19  it --

20    A.  My understanding of it was I was to make a loan

21  when -- and then I would have the option at some period of

22  time -- I've forgotten the exact amount -- to convert my

23  loan into stock in the company or just get paid back my --

24  my principal and interest.  That was my understanding.

25  That's the basic understanding.  And that it would be

Page 50

1  secured in certain ways.

2      Q.  Now, was this loan, was there collateral for this

3  loan?

4      A.  Was there collateral?  Yes, I had security

5  interest in certain things and I had assignments -- the

6  loans I made for receivables, I had assignments of the

7  receivables.  The company had assets, some assets and it was

8  making some sales.

9      Q.  And did you -- get repaid anything on your loan?

10     A.  I did get repaid something on -- on receivables,

11  yes.

12     Q.  So these were existing receivables prior to you

13  making the investment, is that correct?

14     A.  Plus ones we were generating.

15     Q.  After you entered into that agreement what was

16  your role with the company going to be?

17     A.  My role was to be, for a period of time it was, as

18  director -- you know, how a director -- policy, things of

19  that nature.  I was not to be involved in the day to day

20  details of the company.  It was made clear at all times.

21     Q.  What -- what did you understand Vicki Esralew's

22  role with the company to be?

23     A.  Vicki Esralew's role, she would be the manager of

24  the company.  She would review -- she was an expert as I

25  understood it.  She would review the infocommercials, are

Page 51

1  they good or bad, what we should do with them.  She would

2  makes sales to existing customers.  Okay?  She would

3  generally be the -- the CEO in a sense, okay?  She would

4  handle those particular things which she had expertise.

5  Design the new equipment, finish the new equipment, things

6  of that nature.

7      Q.  What about Nicole Terry --

8      A.  When I say -- I mean new products, not new

9  equipment.

10     Q.  That's okay.  Did -- was Nicole Terry going to

11 have a role with the company?

12     A.  When we signed the contract, no, it was really me.

13     Q.  What about Rollin Soskin?  What did you understand

14 his role to be?

15     A.  Rollin Soskin was supposed to -- Vicki at many of

16 the meetings had said the main problem she had, the reason

17 why this hadn't been successful is she's really not a

18 manager and this thing had taken away from her talents,

19 etcetera, etcetera, and she needed a manager.  I wasn't

20 going to go into the deal for two reasons unless Rollin was

21 involved.  Number one, I was putting a lot of money in.

22 I've only know them for a few weeks.  I want somebody in

23 there that I know.  Number two, okay, Rollin had had some

24 experience with management, okay?  And therefore his job was

25 to -- to handle a lot of the details.  Cash flow I told you

Page 52

1 about. What checks would be authorized. Things of that

2 particular nature that Vicki had claimed had caused in the

3 past failure of the other -- of the history of this company

4 --

5    Q. You --

6    A. -- or one of the things.

7    Q. You were here when Mr. Crooks took Vicki Esralew's

8 deposition, weren't you?

9    A. Yes.

10    Q. Do you recall Ms. Esralew at that point testifying

11 that she was in desperate need of someone to run the

12 business, that she didn't have the business --

13    A. Yeah, she was desperate. I remember those are the

14 words she used.

15    Q. And who was going to come in to run the business

16 as you understood it? With this agreement --

17    A. She was going to run the business with the help of

18 me in regard -- acting as a -- as a -- not acting as,

19 performing the same services as a director would perform

20 which is policy, reviews, things like that. And Rollin

21 would assist. In fact, we'd agreed that a certain number of

22 hours -- Rollin had agreed -- oh, I remember. Okay? Rollin

23 -- I -- I came up with a figure of, I don't know, X number

24 of hours it looked like it was going to be necessary, at

25 least initially, okay, for six months, something like that.

Page 53

1  That's why I've got a six month cash flow. And Rollin had

2  agreed to that but he wanted a lot of money for it. Okay?

3  That's one of the reasons why on the cash flow I reduced

4  that. So he was to devote a certain number of hours as

5  needed, which we thought there -- that would be needed.

6    Q. So was Vicki Esralew's responsibility going

7  forward after this agreement more toward the creativity of

8  the products and the sales of the products and the

9  infomercial? Or was it more toward running the business,

10  the day to day business affairs as you understood it?

11    A. I don't understand the question for this reason.

12  Some of the items that are involved in management are also

13  involved in day to day management. Some of the things in

14  day to day management are also involved in creative. For

15  example, I heard Vicki testify when her deposition -- that\

16  that's one of the things that she was good at was -- one of

17  the things that she thought were certain bills were too

18  high. So it was her duty at that particular -- well, my

19  assumption it's her duty to check the bills and see what it

20  is and so forth. It wouldn't be Rollins duty. But if a

21  check had to be issued to pay this particular thing she

22  probably should have gone to Rollin and said, Rollin, do we

23  have the money to issue the check? Who should the check be

24  made? So, there's an overlap in there. But the -- Vicki

25  had represented herself, okay, at all the meetings we had

Page 54

1  that she was a creative kind of person, that she would

2  develop the products, okay?  That whatever was involved in

3  regard to management she would perform, that it was really

4  -- what she needed was direction, okay, help on -- on

5  certain things which she was in my opinion frightened of,

6  okay?

7     Q.  You were aware that she was desperate for a --

8  someone to come in to run the company, the day to day

9  running of the company, is that correct?

10    A.  Yeah, she wanted somebody to -- yes.  She was

11 desperate for money more than she was desperate for somebody

12 to run the company.

13    Q.  Why did you wink at me?

14    A.  Wink at you?

15    Q.  We are taking a video dep --

16    A.  Because -- yes, I winked because I assumed that

17 you knew that -- that --

18    Q.  I don't assume anything, Mr. Terry.

19    A.  Okay, then I won't wink anymore.

20    Q.  I think that's probably something your attorney

21 would tell you not to do.

22    A.  But no, I could have changed my -- because you're

23 such an attractive -- so I could have done that.

24    Q.  Okay.  You practiced law for a considerable period

25 of time, didn't you, Mr. Terry?

Page 56

1    Q.  Do you think he put in 60 hours a month?

2    A.  I do.

3    Q.  Did you ever see billing from him indicating that

4  he had put in 60 hours a month?

5    A.  No.

6    Q.  Now, let me ask you a question about the

7  infomercials.  Did Vicki Esralew work on that infomercial?

8    A.  Yes.  To the best of my knowledge, yes.

9    Q.  Do you think she gave her best effort to make that

10  infomercial a success?

11    A.  Yes.

12    Q.  Why do you think the infomercial didn't work,

13  didn't generate the sales that you had hoped or that

14  everyone I guess had hoped?

15    A.  Okay.  There were several reasons.  Number one, I

16  was told that we were going to be on before Christmas --

17  Christmas season was the -- and I think in one of the memo

18  you'll find the term Christmas season which would be before

19  Christmas, because that was the big period when -- as we all

20  know that's when people are out shopping and buying things.

21  That was the most important thing.  We never succeeded in

22  that, okay?  As I recall the first commercial was the 28th,

23  I believe, of December.  It might even have gone to January.

24  I'm not certain.  That was the first one that we had.

25  Number two, the -- the -- the times that we had, okay, might

Page 57

1   have been better used, the time that was involved was better

2   used, okay? And she was checking the times that were being

3   used, okay, and the various reasons why --

4       Q. Let me -- let me back you up --

5       A. -- we were on at 3:00 in the morning instead of

6   2:00 in the morning.

7       Q. Let me back you up. You say she. You mean Vicki

8   Esralew --

9       A. Vicki, yes.

10      Q. -- was checking the times?

11      A. Yes, we would get the --

12      Q. Let me -- let me ask you a question. Do you know

13  Robert Blagman?

14      A. Do I know -- yes.

15      Q. And who is Robert Blagman?

16      A. Robert Blagman is the person that the company

17  hired to produce -- to be involved in producing the

18  infomercial and putting on the -- choosing the times -- a

19  medium (sic) buyer I think the term used.

20      Q. Media buyer?

21      A. I think he's -- he was -- would be involved in the

22  medium buying, advice in regard to the infocommercials,

23  generally things of that nature because as I understood it

24  that particular thing we weren't experts on.

25      Q. When you say we weren't experts?

Page 58

1  A.  Kids Count and Kids Entertainment Count.

2  Q.  Did you ever meet Mr. Blagman?

3  A.  Yes, I met him I believe once.

4  Q.  When?

5  A.  Oh, boy, I can't remember the date. I don't

6  remember -- I believe it was in January of '99. But I don't

7  -- I'm not sure of that. I have to look at -- through the

8  files which are --

9  Q.  Who else was there at that meeting?

10  A.  At that meeting present as I recall was my wife --

11  it was at my house. It was my wife, I was present. I can't

12  recall who else was present. Who else was present? Unless

13  I go to find a memo or something I really don't know exactly

14  who was present at that -- it was at my house though. I --

15  I know my wife was present. I believe Rollin but I cannot

16  -- unless I look at the records.

17  Q.  And you'd indicated that he was hired to be

18  involved in producing the commercial and choosing the times

19  and media buying, is that correct?

20  A.  He was hired -- and advising us what should sell

21  and what should not, that type of thing, yes.

22  Q.  And did he do his job?

23  A.  Did he do his job? Okay? It's difficult for me

24  to tell you that because I wasn't there with the day to day.

25  Did he succeed in what we -- what we -- what was represented

Page 59

1   to me?  No.  Why he didn't --

2       Q.  Well, let me ask you --

3       A.  Yeah --

4       Q.  -- did you think he did -- if he did his job do

5   you think he did a good job?

6       A.  Do I think he did a good job?  It's very difficult

7   for me to answer that question because the fact that we

8   weren't successful means that the thing failed.  Under the

9   circumstances did he do a good job, under the circumstances

10  being what we approved to him, okay, the infocommercial,

11  okay, whether -- that type of thing?  It could be he did a

12  bad job.  He should have advised us to do this and he should

13  have advised us to do that.  So it's difficult to say.  If

14  you ask me a specific thing, did he buy good media time?

15  The answer is no.  Did he do this?  The answer might be yes.

16      Q.  Was he paid for his job?

17      A.  Yes.  As far as I know, yes.

18      Q.  And how often did you communicate with Mr.

19  Blagman?

20      A.  Did I personally communicate with Mr. Blagman?  It

21  was not on a weekly basis.  It was two times that I directly

22  spoke to him.  With regard to Mr. Blagman I either spoke

23  about him, what was happening, with either Vicki or Rollin.

24      Q.  So you would primarily communicate about him with

25  Vicki and Rollin, is that right?

Page 60

1    A. Yes.

2    Q. And was there ever a decision -- do you recall a

3 decision being made between the parties, you and your wife

4 and Rollin and Vicki and maybe Mr. Aren, that Mr. Soskin

5 would primarily deal with Mr. Blagman?

6    A. There was -- there was one time, okay, when there

7 was a meeting and -- and there was -- Vicki and Rollin, they

8 believed that -- well, Blagman owed us time but -- I don't

9 know what it was, the billing or something, but he owed us

10 either time or money, and that Rollin should send out a -- a

11 strong letter to him, that type of thing. So there was that

12 incident, okay? And I recall at this time -- repeat the

13 question again? Did I deal directly with him or --

14    Q. No, do you recall a meeting -- and I -- my

15 recollection of the documents indicates that it might have

16 taken place sometime in late April or early May where the

17 parties, yourself --

18    A. Yes.

19    Q. -- and your wife and Ms. Esralew, Mr. Aren and Mr.

20 Soskin met and discussed Mr. Blagman?

21    A. Yes.

22    Q. Do you recall that meeting -- at that meeting a

23 decision being made that only Mr. Soskin would deal with Mr.

24 Blagman?

25    A. Not that only Mr. -- no. It is only Mr. Soskin

Page 61

1   that would deal with Mr. Blagman?  No.

2      Q.  Should communicate with Mr. Blagman about --

3      A.  Only he should do it?  On this particular subject,

4   what was owed to us?  Yes.

5      Q.  And do you know if Mr. Soskin had communication

6   with Mr. Blagman after that point?

7      A.  To the best of my knowledge he did.

8      Q.  And what type of communication would that have

9   been?

10     A.  I believe he sent him a letter.

11     Q.  Do you know if he spoke with him?

12     A.  I don't not recall whether he spoke to him or not.

13     Q.  Did you ever give Mr. Blagman cigars?

14     A.  Yes.

15     Q.  When was that?

16     A.  Okay.  At the meeting that I related at my home

17  when I met him, one of the things I did was give him two

18  very good cigars, which he thanked me very much for.

19     Q.  And that was a meeting in January about '99 at

20  your house?

21     A.  Well, I cannot remember the exact -- it might have

22  been January or February but I cannot remember the exact --

23  the date.  I'd have to refresh my memory going through the

24  files and so forth.  But I don't remember exactly.  But I

25  remember the meeting, I mean, where it was and who was --

Page 64

1  ever arrange meetings with potential investors or contact

2  anyone that might be interested in bringing --

3      A.  I believe I spoke --

4      Q.  -- capital into the --

5      A.  -- with --

6      Q.  -- company?

7      A.  -- Abruzzo.  I believe we had a meeting with him.

8  He was one of the parties that was involved.

9      Q.  Was Mr. Abruzzo someone that you brought?

10     A.  No.

11     Q.  No.  Did you independently of -- of Vicki Esralew

12  or Bob Aren -- did you --

13     A.  Okay.

14     Q.  -- did you bring any potential investors to the --

15  the business?

16     A.  Not that I can recall.

17     Q.  If not, why not?  You knew the company was in

18  financial distress, correct?

19     A.  Correct.

20     Q.  And they were looking for people to put some money

21  in to keep the business going.  Why wouldn't you have

22  brought people that might be interested to look at the

23  business?

24     A.  Because Vicki had indicated to us that she had

25  several resources, Abruzzo and three or four others, that

Page 65

1  she was going to take care of. They were very interested.

2  That perhaps we were going to get financing in 60 days.

3  These guys know how to do it, etcetera, etcetera. And we

4  relied on that.

5      Q.  So you knew the company was in financial distress.

6  You had approximately $200,000 invested in this company,

7  whether an investment or a loan, and you didn't go out to

8  help seek investors, is that correct?

9      A.  Independently go out and seek investors?

10     Q.  Yes.

11     A.  No.

12     Q.  But you are aware of investors that Ms. Esralew --

13  potential investors that she brought to the business --

14     A.  Yes.

15     Q.  -- to try to raise money? And did you ever attend

16  any of the meetings that she had arranged with potential

17  investors?

18     A.  Yes.

19     Q.  And how many of those meetings would you say you

20  attended?

21     A.  I attended the meeting with Abruzzo. I believe to

22  the best of my recollection that the meeting that I had with

23  Blagman at our house, he had somebody -- a doctor somebody

24  -- I forgot the name. In fact, I -- I believe that Vicki

25  had produced the -- a resume, a four or five page resume.

Page 66

1  This fellow was a doctor and his business -- very well to do

2  and invested in these kind of things.  It was a friend I

3  believe of Blagman and -- a friend -- some friend anyhow.

4  We did discuss that with Blagman and he was going to bring

5  them here and come here and the guy's going to -- you know,

6  we were happily inspired, okay?

7      Q.  Did any -- anyone --

8      A.  The only other -- any other ones I don't -- at

9  this time I can't recall.

10     Q.  Do you remember a woman by the name of Joanne

11 Marlowe?

12     A.  Yes, I take it back.  I do remember.  If I'm

13 correct Joanne Marlowe -- oh, boy, yes.  If I'm correct

14 Joanne Marlowe was a woman that Vicki had met and had said

15 to her -- I forgot an exact place -- that she was very

16 interested and she raises money and it's millions and

17 millions, and you ought to go out and talk with her.  I did.

18 I went out.  She had an office, I remember, and she

19 presented a -- a deal.  I guess she had talked to Vicki

20 before about it.  Presented a deal that I felt was

21 completely insane, in addition to the fact that I couldn't

22 understand half of it.  And I did ask, I said, Rollin -- I

23 remember talking to Rollin.  She started telling me about

24 this and that and overseas and -- and investors and I don't

25 know what it was.  Rollin, you talk to her, please, 'cause I

Page 67

1  really don't know what -- half the terminology. And I

2  believe Rollin did talk to her. Rollin reported back to me

3  that my -- the -- my interpretation was correct. If I gave

4  you the details as I remember them, but she wanted -- you

5  would -- I think it would have been -- is this a deal.

6      Q.  And so what was the outcome of all of these

7  investor meetings? Did anyone put any additional money into

8  the company?

9      A.  Not that I know of.

10     Q.  Now, you had indicated earlier that you practiced

11 law for a period of years, is that correct?

12     A.  Yes.

13     Q.  And you understand -- do you understand within the

14 context of being an attorney what the meaning of a conflict

15 of interest is?

16     A.  In certain situations, yes.

17     Q.  Within the context of being an attorney?

18     A.  An attorney, yes.

19     Q.  When you look at that memorandum agreement today

20 and you apply your understanding of the professional code of

21 ethics do you see a conflict of interest in that agreement?

22     A.  Do I see it? Okay, in my opinion, no.

23     Q.  Now, if you understand Rollin Soskin to represent

24 Vicki Esralew and Kids Count as purported in your memorandum

25 agreement of November 16th, do you see a potential conflict

Page 69

1      MR. CROOKS: Wait for the next question.

2      Q.  Do you recall having a conversation between the

3   parties about how to proceed sometime in late April, early

4   May after you realized that the infomercial didn't produce

5   the sales that you had hoped to?

6      A.  Yes.

7      Q.  Okay. And then what did you determine should be

8   the next step with the company?

9      A.  There were very -- I -- I believe there's a memo

10  on that. I -- we had a meeting. Well, I need to -- it was

11  -- a memo or something. Oh, here. Okay. I -- could I ask

12  for the question?

13     Q.  I was going -- I was asking you the question late

14  April, early May the infomercials had aired and they had not

15  generated the sales that you'd hoped.

16     A.  Correct.

17     Q.  Did the parties meet to determine what should

18  happen next --

19     A.  Yes.

20     Q.  -- to the company? And what was determined at

21  that meeting?

22     A.  At that meeting various things were determined.

23  Okay?

24     Q.  Where -- where did that meeting take place if you

25  can recall?

Page 70

1    A.  Marriott.  Marriott -- I don't know if it was the

2   lobby or restaurant.  It was a Marriott.  It was in

3   Lincolnwood or wherever around here.

4    Q.  And who was there?  Do you remember?

5    A.  Who was there?  Yes.  I was there, my wife Nicole

6   was there, Rollin Soskin was there, Vicki was there and

7   Robert was there.  Yeah.

8    Q.  Okay.  And what was discussed at that meeting?

9    A.  Can I read my memo?  In my -- I produced after

10   that a letter and I summed up what it was -- the various

11   things we discussed and what I suggested.  Okay?  We

12   discussed for example -- I'm not going to read my memo --

13   it's -- it's all in there.  But we discussed things like are

14   we going to continue to try to raise money for the company?

15   Because I understood at that time Vicki already had

16   contacted several people, I don't remember exactly who, who

17   were going to come in within 60 days.  We discussed whether

18   the company would be able to make it based upon what we were

19   doing and maybe we had to file a bankruptcy.  Rollin had

20   suggested that he talk with all the creditors, call -- one

21   of the issues was well what if the creditors call in, you

22   know, their loans?  We're in trouble here -- and the

23   investors.  Rollin suggested well, why don't I get a

24   meeting.  You know, that happens all the time.  Get a

25   meeting and talk to the creditors and see what we can do.

Page 81

1  suggested an assignment for the benefit of the creditors?

2    A.  No.  We -- we discussed various things.  What are

3  -- the purpose of it was to discuss what's our future.  We

4  discussed carious options that we could have.  We asked

5  Rollin at that time what do you think some of the options

6  are because he had been involved in the management of the

7  business.  He knew some of these personalities, etcetera,

8  etcetera.  He said some of the options that you have, we

9  could consider a bankruptcy.  We could consider assignment.

10  We could consider those particular things, okay?

11    Q.  And that didn't -- those suggestions weren't

12  accepted?  Bankruptcy --

13    A.  No, Vicki --

14    Q.  -- or assignment?

15    A.  Look, everybody really has to agree that.  Vicki

16  said no.  And --

17    Q.  Did you want to go through a bankruptcy, put the

18  company through a bankruptcy?

19    A.  No, I did not.

20    Q.  Did you want to put the company through an

21  assignment for the benefit of creditors?

22    A.  No, I did not want to.

23    Q.  Do you understand what -- let's -- let's say the

24  company had annual sales of $200,000.  What were the

25  company's annual cash flow requirements?

Page 82

1    A. I would hope that they would be less than

2  $200,000.

3    Q. Do you know that they were less than what the

4  annual projected sales were?

5    A. No. At that particular time we said we have to go

6  over -- we have to cut back down to a minimum. I think I

7  used the phrase a boiler operation which means that you're

8  down to the minimum. You operate out of your house. You

9  don't have four secretaries, etcetera, etcetera. We

10  discussed it, maybe that's how -- what we're going to have

11  to do. At that particular point in time the phrase that

12  Vicki used was you don't see the big picture. And the big

13  picture meaning that you have to raise millions and she's

14  going out now to somebody to raise millions on her own,

15  etcetera, etcetera, and that -- c'est la vie. That was her

16  -- what she was going -- going to do.

17    Q. Were you aware that Vicki Esralew was the sole

18  support of her family at this time?

19    A. Was I aware she was the sole support of her

20  family? I believe at that particular time her husband was

21  studying something in real estate or something. But I don't

22  think he was working. I believe I thought that she was the

23  sole support of her family.

24    Q. Do you know how many children she has?

25    A. Yeah, three.

Page 83

1    Q. Was there in this scaled back business -- did --

2  did you discuss salary requirements?

3    A. Did we discuss salary requirements? No.

4    Q. Do you remember saying to Vicki at the meeting of

5  the creditors in this bankruptcy in Waukegan -- that took

6  place in Waukegan that you acknowledged that the paragraph

7  18 of that agreement is invalid? Do you recall that?

8    A. Do I recall the -- no, I don't.

9    Q. Now, at Mr. Soskin's deposition -- and I don't

10  think you were there -- he testified that a suggestion had

11  been made that Vicki and your wife Nicole, after this

12  meeting in -- at the Marriott, they should travel around the

13  country meeting buyers to promote Kids Count products. Do

14  you recall that suggestion being made?

15    A. Yes, that and others. Yes.

16    Q. Who made that suggestion?

17    A. Boy, I don't know. I don't remember exactly who

18  made it but it was discussed.

19    Q. Were you going to put in money to fund that

20  travel?

21    A. We might have. We should have discussed how we

22  were going to raise funds to do that. But the travel that

23  was contemplated was not millions. If you recall we had

24  sold to various entities and we were actually pushing the

25  information -- pushing the television sales. We had really

Page 84

1  not pushed the other sales, okay? And we had sold Sears as

2  I understand it and we had sold to Zany Brainy. We were in

3  a catalogue. We were going to be in all kinds of things,

4  okay? That was the representation. And we really hadn't

5  pushed those because the -- we thought the informational

6  would produce sufficient cash flow that we could go out to

7  the other programs. Okay? So we'd said we're going to have

8  to -- we should consider re-instituting those and going to

9  them and talking to them and who knows? She had related at

10  one of the previous meetings that -- even previous to the

11  signing that she'd been a booming success at -- when I say a

12  booming success I think she had sold in the millions of

13  dollars. Sears. So the possibility was out there, okay,

14  that the -- we should have tried it. Let me put it -- and

15  who would go around with her. We suggested, well, maybe my

16  wife would go because my wife had some experience of that.

17  She was a teacher also. So that type of thing. Because I

18  was fearful that she wouldn't want to go by herself. Okay?

19  She was upset. If somebody went with her who she respected

20  maybe it would be more successful.

21     Q.  Well, who was going to pay for that? I mean, how

22  were they going to travel?

23     A.  The answer is I don't know. We -- that's part of

24  what we should have discussed.

25     Q.  Was --

Page 85

1      A.  We should have sat down --

2      Q.  Did you ever --

3      A.  We should have sat down at that time.  That's what

4   we suggested.  Let's have a meeting on this.  Let's do it.

5   But we're supposed to see the big picture, okay?  And that

6   was, I believe, what created the problem.  We never

7   discussed doing those things.  I mean, we discussed it but

8   we never put it to -- into operation, any plan.

9      Q.  Do you remember telling Vicki Esralew that if you

10  put in anymore money into this business Rollin Soskin would

11  kill you?

12     A.  Do I remember telling -- no, that I don't

13  remember.

14     Q.  You don't remember that?

15     A.  No.  That I don't remember.

16     Q.  Let me ask you a question.  If you take a look at

17  that memorandum of agreement dated November 22nd, 1998 did

18  the -- look at the signature page for me, Mr. Terry.  Is

19  that executed by the Terry's company or by Terry's Company?

20     A.  No.

21     Q.  If I can have that back.  If you take a look at

22  paragraph one it does indicate that Terry's Company which is

23  party to that agreement, correct?

24        MR. CROOKS:  Paragraph one.

25     A.  Oh, here.  Okay.