IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| VICKI ESRALEW | ) |
| | ) |
| Debtor, | ) |
| | ) |
| ROLLIN SOSKIN, et. al. | ) |
| | ) |
| Plaintiffs | )   No. 04 A 3774 |
| | ) |
| v. | )   Judge Goldgar |
| | ) |
| VICKI ESRALEW | ) |
| | ) |
| Defendant | ) |

# EXHIBIT 2

```
 1        A.   I am an attorney is my primary

 2   occupation?

 3        Q.   Do you have a secondary occupation?

 4        A.   Yes.  I am trustee of many trusts.

 5        Q.   Are you also a licensed accountant?        01:10PM

 6        A.   Licensed, no.  I am a Certified Public

 7   Accountant, however, by virtue of having passed

 8   the CPA exam.

 9        Q.   Do you practice accounting?

10        A.   I do not hold myself out as a Certified    01:10PM

11   Public Accountant for purposes of doing any kind

12   of a certified audit, which is the only thing I

13   would be required to have a license for.

14        Q.   Do you do tax preparation?

15        A.   Yes.                                        01:10PM

16        Q.   So you do render some accounting

17   services?

18        A.   I render services, even tax services, as

19   a tax attorney.

20        Q.   When did you become licensed to practice   01:10PM

21   law?

22        A.   (Brief pause.)

23        Q.   I always have to count backwards, I

24   know.
```

1        A.   May -- I believe 1979.

2        Q.   And when did you become a CPA?

3        A.   I sat for the exam in May 1975 and

4   passed it.

5        Q.   And what states are you licensed to                01:11PM

6   practice law in?

7        A.   Currently just Illinois.

8        Q.   Do you practice accounting in any other

9   state?

10       A.   I have clients for whom I do tax work as           01:11PM

11   a tax attorney in many states.

12       Q.   Have you sat for the CPA exam in any

13   other state?

14       A.   That's not required.

15            So the answer is no.  The answer is no.           01:11PM

16       Q.   So once you pass it, you're good to go?

17       A.   You're a CPA by virtue of passing the

18   test.  If you want to be licensed to do certified

19   audits or do other accounting functions when

20   you're not an attorney, then you would be               01:11PM

21   licensed in every state that requires you to have

22   a license to practice there.  But I'm not

23   licensed in any state as a CPA.

24       Q.   You are a plaintiff in the adversary

1   which Vicki used to operate, sort of like an

2   advertising agency.

3        Q.   Do you have a specific area of law that

4   you practice in primarily?

5        A.   I would say I'm a general practitioner          01:13PM

6   with a heavy emphasis currently on estate

7   planning, tax, and business transactions.   It's

8   always been pretty much that emphasis, although

9   the estate planning has become bigger and bigger

10  to where it's dwarfing anything else.   Anything a    01:14PM

11  businessman needs we can do.   If he needs a

12  divorce or has a criminal matter or a labor law

13  problem, we refer him to somebody who specializes

14  or concentrates their practice in that area.

15       But for most things, we can do anything          01:14PM

16  that a businessman needs.

17       Q.   After your initial representation of

18  Vicki, did you continue to represent her in other

19  matters?

20       A.   Well, if you are asking if there is a       01:14PM

21  time when that representation ceased, the answer

22  is yes.

23       Q.   Okay.

24       A.   There were -- from the time she first

CAROL RABER & ASSOCIATES (312) 446-6926

1    came to my office, she made me the registered

2    agent -- or shortly after the first time, she

3    made me the registered agent of Capital

4    Advertising.

5              That meant that every year I would get          01:14PM

6    the annual report form from the Secretary of

7    State, through my law firm that I was practicing

8    with at that time, and I prepare the annual

9    reports and the annual minutes of the

10   corporation.                                               01:15PM

11             Shortly -- sometime shortly thereafter,

12   she had an idea for another business. So we set

13   up a corporation which was called Enivar Roads,

14   E-n-i-v-a-r, which is "ravine" backwards. She

15   was going to sell some sort of discount coupons           01:15PM

16   and get a piece of the action from retailers in

17   Hubbard Woods, or something like that. But I

18   don't think she ever went forward with it,

19   although I believe she later changed that

20   corporation -- not with me -- to become Kids             01:15PM

21   Count Entertainment, LLC. Or maybe it was with

22   me, but I don't think so though.

23             So when I created that corporation for

24   them, I acted as registered agent of that

```
1    corporation and I, of course, then prepared the

2    annual reports and annual minutes for that

3    corporation.

4           The only other representation that I had

5    of them that I recall prior to 1994 when I left          01:15PM

6    -- our contact and association ceased for an

7    extended period of time -- was involving purchase

8    or sale -- it must have been the purchase of

9    their town home in Northbrook.  And some later

10   time they looked at a property, a lot, in                01:16PM

11   Northbrook to build a home on, but ended up not

12   buying it.  I think that pretty thoroughly covers

13   everything that I ever did for them during that

14   first period of acquaintance.

15      Q.    That would be from approximately either          01:16PM

16   '86 or '88?

17      A.    I'd say '88.

18      Q.    '88 to 1994?

19      A.    Actually it would be sometime in mid-'93

20   is my best recollection.  I think sometime after         01:16PM

21   that I was asked -- the only contact that I had

22   was to send all of the records to some other

23   lawyer.

24      Q.    Do you know who that other lawyer was?
```

1        So we probably had very little personal

2    contact from 1991 or '92 on, that I can think of,

3    unless it was the time they were looking at that

4    lot.  And from '93 or so, after they requested

5    the records be sent somewhere else, I didn't hear          01:18PM

6    from them, to my recollection, until I ran into

7    them in June or July of 1998.

8        Q.  During that initial period, say '88 to

9    '93, did you have a written retainer agreement

10   with Vicki Esralew?                                         01:18PM

11       A.  I personally didn't.  If one existed, it

12   was with the firm I was with at that time which

13   was -- let's see, it had several different name

14   changes over the years.  But essentially it was

15   Evans, Soskin & Lowenstein.                                 01:18PM

16       And I don't recall if we had a retainer

17   agreement or not.  It would have been our

18   practice to have one, though, but I wouldn't have

19   it unless it was among what I sent.

20       But I think those records -- if there         01:18PM

21   are any other records pertaining to -- I think I

22   took all of my records that I had, all my files

23   when I left Evans' office downtown.  So -- and I

24   don't recall seeing a retainer agreement.

1          Q.   And just for the record, I don't recall

2     seeing it in the documents that you have

3     produced.

4          A.   I don't think so.  Although, again,

5     there may have been a master retainer file in          01:19PM

6     Evans' office.

7          Q.   From mid-'93 to June or thereabouts of

8     '98, did you represent any business entities

9     owned, controlled or operated by Vicki Esralew?

10         A.   No.                                            01:19PM

11         Q.   After 1998, did -- at some point after

12    that, you were re-engaged by Ms. Esralew?

13         A.   Well, we ran into each other at our

14    synagogue.  They joined, and the children were of

15    age to go to religious school.  And she said, Oh,     01:20PM

16    it's fate that we met again.  We're about to do

17    this whole big deal to sell 25 percent of our

18    company to some venture capitalists for 7 or

19    $8 million; but we need to some estate planning

20    and put some of the kids' -- some of the company     01:20PM

21    into the kids' names; and we need to update and

22    revise our estate planning.

23              And during that time she invited me to

24    come see her operation and everything else, and

CAROL RABER & ASSOCIATES (312) 446-6926

1   she instructed me to bill her company for the

2   time for everything, I think, including the

3   estate planning.  And so we became re-acquainted.

4         And I guess your question was were we

5   engaged to provide additional services.  At some      01:20PM

6   point during that summer or fall, they asked me

7   to analyze their situation, propose an

8   appropriate estate plan, to consult with another

9   lawyer they knew who had already made some

10  recommendations to them.  And, ultimately, we         01:21PM

11  drew up amended trusts and updated powers of

12  attorneys and all the wills.

13        Q.   Was there a written retention agreement

14  entered into between you and she about that time?

15        A.   Not that I recall.  If there was, it        01:21PM

16  would be among the documents that I produced.  I

17  would have to go look through it to know that.

18        Q.   When did you first become aware of Kids

19  Count Entertainment?

20        A.   You need to be more specific.  There are    01:21PM

21  two Kids Count Entertainments.

22        Q.   I know.  Either.  Let's say LLC.

23        A.   Well, it's a difficult question to

24  answer.  The first part of the answer is Kids

1    Count -- I knew Kids Count was -- when I ran into

2    her in the summer of 1998 and she brought me to

3    her office, I might have -- I might, or might

4    not, have noticed that now Kids Count

5    Entertainment now had a LLC at the end.  I don't          01:22PM

6    recall.

7         I don't know if I actually knew it was a

8    LLC or that the form had changed until after --

9    until November of 1998, although it's possible

10   that I saw the LLC --                                     01:22PM

11        No, I take that back.  I would have had

12   to know because in order to -- no, I'm thinking

13   for a second.

14        They kept both companies going.  The

15   corporation became the manager of the LLC.  And I        01:22PM

16   had to know something about that once they

17   started talking about the estate planning.

18        So I would say I became aware of the

19   existence of the LLC probably in July or August

20   of 1998.                                                  01:23PM

21   Q.   And what did you understand the purpose

22   of this company to be?

23   A.   Well, I understood it to be the same

24   purpose that Kids Count Entertainment had been --

1    the creation and sale of child friendly

2    nonviolent/educational product.

3         Q.   Did you have anything to do with the

4    organization of this LLC?

5         A.   None, no.                                        01:23PM

6         Q.   Do you know who the members of the LLC

7    were at its inception.

8         A.   At its inception, no.  I think I know

9    who some of them are.  I don't know how they took

10   their ownership interest.  I'm pretty sure Alan       01:24PM

11   Young was involved, either personally or through

12   something calls Feels Good, LLC.  I suspect --

13   well, Kids Count Entertainment, Inc., was the

14   manager and probably a member.  I later learned

15   of someone named Robert Lieper, L-i-e-p-e-r, who     01:24PM

16   had owned and probably sold Nevada Bob's golf

17   company.  I believe he was -- at some point was a

18   member of that company.

19        Again, I don't know at the inception who

20   was involved, but I suspect it was created when      01:24PM

21   Alan Young and his group invested over a million

22   dollars into the company.

23        Q.   When did you first become aware of Kids

24   Count Entertainment, Inc., the corporation?

1    Do you recognize that document?

2       A.   I recognize it as a copy of a document

3    that is called the Memorandum of Agreement

4    between Vicki Esralew, Robert Aren, Eugene Terry,

5    Nicole Terry, Terry's Company, Inc., and myself      01:27PM

6    and Kids Count Entertainment, Inc., and Kids

7    Count Entertainment, LLC, which we executed on/or

8    about November 22nd, 1998.

9       So the answer is, yes, I do.

10      Q.   Who drafted that document?                    01:27PM

11      A.   It was a joint effort.

12      If you're asking who typed it, I did.

13   If you're asking who participated in the language

14   and in the negotiation of it, I would say Vicki

15   Esralew, Robert Aren, Eugene Terry and myself.       01:27PM

16      Q.   Were there drafts that preceded that

17   agreement?

18      A.   Yes.

19      Q.   How many drafts?

20      A.   At least two, possibly three, to the         01:28PM

21   best of my recollection.

22      Q.   Where was that document signed?

23      A.   Where?  I don't recall for sure.  I'm

24   pretty confident it was at the Arens' house.  But

CAROL RABER & ASSOCIATES (312) 446-6926

1    I'm not sure.  It could have been at the Terrys

2    house, it could have been at my office.  I think

3    it was at the Arens house though.  You know,

4    you're talking about seven years ago to the

5    month.                                                    01:28PM

6         Q.   Who created the initial draft of the

7    document?

8         A.   I did.  I typed it.  I mean, creation

9    contemplates more than just typing something

10   up in legal language though.                              01:29PM

11            In terms of who sat and discussed the

12   terms, it would be Vicki Esralew, Bob Aren,

13   Eugene Terry, Nicole Terry and myself.

14        Q.   When did that meeting take place?

15        A.   There was actually a number of meetings      01:29PM

16   that led to -- it was a process.

17        Q.   Can you take me through that process?

18        A.   Sure.  I had my final meeting with Vicki

19   and Bob to sign the last of their estate

20   documents in October.                                     01:29PM

21        Q.   October.  Could you give me the year,

22   please?

23        A.   1998.  They signed the last document.

24   They started me asking me if there was anybody I

CAROL RABER & ASSOCIATES (312) 446-6926

1    knew that might be interested in investing in

2    their company.  They asked me about people that I

3    -- that were clients of mine, people that weren't

4    clients of mine but who we both knew to be from

5    wealthy families.                                              01:29PM

6              Of course, I told her that I would have

7    to ask them.  But I told her I would give it

8    thought.  Because I liked her concept, I liked

9    her, I thought of her as an honest person at the

10   time, and I thought her idea had merit and that   01:30PM

11   she just needed some -- you know, she needed

12   proper investment and somebody to help her.

13             So as I left there, I actually thought

14   about the Terrys, who had sold their business,

15   who were relatively young, had money -- when I    01:30PM

16   say "relatively young," I guess they were in

17   their sixties -- but they were brilliant people,

18   successful in business, with money to invest and

19   would love the idea of nonviolent educational

20   children's products.                                           01:30PM

21             So I -- and this is after we finished

22   the estate planning project -- I had mentioned it

23   to the Terrys, I asked them if they would be

24   interested, and I then ultimately introduced

CAROL RABER & ASSOCIATES (312) 446-6926

1     them.

2         Q.   When did you introduce the Terrys to

3     Vicki Esralew?

4         A.   I can't give you the exact date offhand,

5     but I'm sure it was during the first 10 days of          01:30PM

6     November 1998.

7              So continuing the process.  They met,

8     they liked each other.

9              Vicki is very charismatic and was very

10    enthusiastic about her products and also had            01:31PM

11    impressed the Terrys as somebody who was creative

12    but couldn't run a business.  So the Terrys said

13    they were interested enough to spend some time

14    seeing how such a deal could be successful.

15             And so we met on several occasions at          01:31PM

16    the Arens' house.  I think we met once at the

17    Terrys' house.  We once had a marathon meeting at

18    my house that must have gone 10 hours.  I

19    remember Gene Terry was so happy I brought in

20    corned beef and roast beef from a good deli that        01:32PM

21    he said -- he commented about it.

22             So during that meeting at my house we

23    already had some projections from Vicki about

24    various products and what she thought the sales

1   unless you are going to be there, meaning me.

2        So we came up with all kinds orf

3   projections.  And at that point there was a

4   projection Vicki wanted $12,000 a month, I think;

5   and I forget what my initial projection of the        01:33PM

6   amount was that was budgeted for me.  But I can

7   tell you it was ultimately substantially reduced

8   and that I never got paid a penny by this company

9   for all the time and work I spent on it.

10       Q.  So it was Mr. Terry that insisted that       01:33PM

11  you become involved in the project?

12       A.  Absolutely.

13       Q.  And back in October of '98 when you were

14  finishing up the estate planning and Vicki

15  approached you about investors, did she tell you     01:34PM

16  why she was interested in finding investors?

17       A.  Why she was interested in finding

18  investors?  She was convinced that if she made an

19  infomercial and got it on the air by Christmas,

20  she would be able to sell -- well, I should say       01:34PM

21  she convinced us that she was convinced that if

22  she got her infomercial on the air, it would be a

23  huge success and that we would all make a fortune

24  between then and Christmas or we would recognize

CAROL RABER & ASSOCIATES (312) 446-6926

1    huge success between then and Christmas.

2         Q.   Can you tie in for me the need for the

3    investors to this infomercial?  She had an

4    existing operating company, didn't she?

5         A.   Well, I'm not sure to what extent it was          01:35PM

6    operating.  I know she had some sales to Zany

7    Brainy and some other educational children's

8    stores.  I don't know -- all I know is when we

9    met up with her, she didn't have any financial

10   statements for the last four or five months.  But          01:35PM

11   they had just brought a brand new big house and

12   seemed to be optimistic about their likelihood

13   for success.  But they obviously -- but they at

14   some point during this process told me they had

15   borrowed some money from the guy across the                01:35PM

16   street, $75,000, Steve Santowski (phonetic), and

17   they had a payment to Alan Young to finish the

18   buyout of his interest.

19            So, you know, they gave us the

20   impression they were replacing investors that             01:35PM

21   wanted out.  And, of course, they also told us

22   that they needed money to do this commercial over

23   and above the money to buy people out or pay

24   people off.

CAROL RABER & ASSOCIATES (312) 446-6926

1       Q.   Now this was in about the beginning of

2    November you said of '98?

3       A.   This whole "do you know anybody" -- from

4    the time they asked me if I knew anybody that

5    might be interested in investing until the time          01:36PM

6    we signed the agreement was about three weeks.

7       Q.   And that agreement was signed

8    November 22nd?

9       A.   Correct.  It was all within a three-week

10   period.  It was pretty intense.  I mean they were       01:36PM

11   talking every day without me and with me.  I mean

12   they involved me when they wanted me.

13           But they were in contact.  From the time

14   that I introduced them, they were talking every

15   day and she was giving him information and he was       01:36PM

16   asking more questions.  And finally, it wasn't

17   coming into an order or format that he could put

18   together.

19       Q.   And that's when he asked you to get

20   involved?                                               01:36PM

21       A.   That's when they asked if I could assist

22   them in putting together an organized projection,

23   if I would join them to do that.

24       Q.   And did you do that?

CAROL RABER & ASSOCIATES (312) 446-6926

1       A.   Yes.   That's the meeting that took place

2   -- the marathon meeting that took place in my

3   house.   And I'm sure among the documents I gave

4   are big spreadsheets, however they were copied.

5   But they were big spreadsheets when they left my          01:37PM

6   house.

7       Q.   So, in addition, how did you collect the

8   information to create these spreadsheets?

9       A.   From what Vicki had given Gene.

10          And then the three of us sat there, and         01:37PM

11   I said, What about this?  And Gene and Vicki

12   would give an answer.  And Gene would say, What

13   about that?  And Vicki would give an answer.  And

14   Gene would say, That's not reasonable, let's use

15   this number because it's more conservative.              01:37PM

16          And we actually sat and developed

17   projections that gave Gene and Terry an idea of

18   how much money would be needed and what the

19   likelihood of -- you know, what his likely

20   expenditure would be to determine if this thing          01:37PM

21   would make it or not and what his likely reward

22   was if it worked out.  Like any other investor

23   it's a risk/reward analysis.  How much do I have

24   to risk, and what's my upside and what's my

CAROL RABER & ASSOCIATES (312) 446-6926

1    downside.

2        Q.   And he tried to be conservative in that

3    respect?

4        A.   Well, I don't know what he tried to be.

5            I think that he liked Vicki and was                01:38PM

6    looking to help her if it made sense to him.  I

7    wouldn't say he was being conservative or --

8            What's the opposite of conservative,

9    radical or aggressive?

10           I think he decided he liked Vicki and           01:38PM

11   her ideas.  I know Nicole liked Vicki and her

12   ideas.

13           We had a Hanukah party and invited their

14   family.  The Terrys welcomed them into their

15   family.                                                  01:38PM

16       Q.   Now you said earlier that Vicki was

17   charismatic and she had a lot of ideas but was

18   not a business person.

19       A.   Well, she was apparently incapable of

20   keeping records without somebody else doing it.        01:38PM

21   I can't say she wasn't a businesswoman.  She went

22   out and sold a ton of things.  She came up with

23   these ideas, she created the product.  She gave

24   us 40 other things she had in process.  She

1  products.

2         For example, how much tin is in a tin

3  can is important to Campbell Soup.  So they'll

4  buy a piece of equipment that will measure the

5  amount of tin in a tin can.                                    01:40PM

6         So she imported these precision testing

7  equipment pieces and sold them.  And she sold her

8  company for a nice amount of money.

9         And they both had their office in the

10 office where I was practicing law.                             01:40PM

11    Q.   Were you ever law partners with Gene

12 Terry?

13    A.   Yes.  Well, we were co-shareholders of a

14 law practice at one time, but he was never an

15 active attorney during that time.  He owned part        01:40PM

16 of a firm that I bought into by buying out

17 another fellow names Bill Lange who was then

18 about 75 years old.  And so Gene was a

19 non-practicing lawyer that by virtue of having

20 owned part of it owned part of a law firm that I        01:40PM

21 bought into.  That didn't last very long.

22    Q.   So at this 10-hour meeting at your

23 home --

24    A.   I'm not sure it was 10.  It might have

1    going to argue that today because it doesn't have

2    to --

3         A.   And I disagree about your

4    characterization as well.  We can agree to

5    disagree.                                          01:46PM

6         Q.   Right, we can agree to disagree.

7         MR. CROOKS:  The judge wouldn't rule based

8    on the deposition.

9         MS. KROL:  Right.

10   BY MS. KROL:                                       01:46PM

11        Q.   Do you know what the financial condition

12   of Kids Count -- and I'm using that generally for

13   the LLC and in the corporation -- was on/or

14   around November of 1998?

15        A.   I knew what they represented to us as    01:46PM

16   set forth in the memoranda because they -- I'm

17   sorry, I don't know if I knew that to be true.

18             I knew that this is what they

19   represented it to be, that they had receivables,

20   that they had debts, that they had loans, and     01:46PM

21   that they had assets.  And, nonetheless, we put a

22   value -- we all agreed on the value of the

23   company as $2 1/2 million.

24        Q.   And were you aware that there was an

1      A.   That's -- well, it speaks for itself.

2  But that's a number that's up there, 200- to

3  $250,000, as cash flows shall require, during

4  that period of time."

5      Q.   And is that an investment in the                    01:48PM

6  business?

7      A.   I'm not sure what you mean by that.

8  Even a loan is an investment in the business.

9      Q.   Did the Terrys contemplate receiving

10  stock in return for the investment?                          01:48PM

11      A.   What the Terrys essentially received was

12  a loan convertible into ownership.  So it was

13  like stock, but they could treat it as a loan for

14  their own purposes.

15          What they got was a loan that was          01:48PM

16  convertible with an option to convert it into an

17  ownership interest, 10 percent for 250,000.

18  Again, establishing the value at 2 1/2 million.

19      Q.   And was this loan/investment being made

20  to the corporation or to the LLC?                            01:49PM

21      A.   It was being made to Kids Count

22  Entertainment, Inc., and Kids Count

23  Entertainment, LLC.

24          Kids Count -- it's defined as -- let's

CAROL RABER & ASSOCIATES (312) 446-6926

1    see.

2              (Witness reading.)

3              I'm sorry, could you repeat that

4    question?

5       Q.   Was the investment/loan being made to          01:49PM

6    the corporation or to the LLC?

7       A.   I'm pretty sure it was treated as a loan

8    to all -- both to Bob and to Vicki because they

9    all, I believe, agreed to undertake the

10   obligation for it.  That's my recollection.  I        01:50PM

11   haven't read through this in a while.

12             If you want me to, I will take the time

13   to read through the whole thing and see who is

14   responsible for it.  But that's up to you.

15             The loan was definitely for the purposes      01:50PM

16   of promoting the activities of Kids Count

17   Entertainment, LLC.

18      Q.   Whose idea was it to format this influx

19   of cash as a loan that was convertible to

20   ownership?                                              01:50PM

21      A.   Gene Terry's.  And it was done as an

22   secured loan was part of the reason.  As a

23   stockholder, he would be last in line as a

24   creditor.  As a secured creditor, he would be

1       A.   Well, we felt that Gene Terry was first

2   in line on the assets for the LLC for several

3   reasons.  I believe he was first in line as a

4   lienholder against the LLC, against its assets.

5           And I believe that if -- that we felt          01:52PM

6   that if Robert Lieper or -- that Harris Bank

7   would never be the one -- the party in interest

8   in that lien, that they would -- I think Robert

9   Lieper had put up a CD or something, they would

10  take the money, assign him the lien, and he would    01:52PM

11  be unable to claim that he had any equity

12  transfer rights from his lien on corporate assets

13  to the LLC assets because he had voluntarily had

14  the corporation put the assets in the LLC and

15  received an interest in the new asset without        01:52PM

16  changing his recording or his security interest.

17          So his -- he transmitted the assets

18  himself and left them open to the creditors of

19  the new entity.

20      Q.   When did you or Mr. Terry, if you know,      01:52PM

21  conduct this analysis of this --

22      A.   I'm not sure.  I think that was probably

23  after the fact.  Oh, no.  That was probably in

24  May of 1999 when Vicki turned her back on us and

1   we were still interested in making a viable

2   company out of this, and she just said that she

3   wouldn't participate.

4          So we wanted to know who, if anybody --

5   you know, if we had to buy out anybody else to          01:53PM

6   own the assets and keep going.

7          But nobody went into this just for an

8   infomercial.

9          Q.   This lien that you're talking about with

10  Harris Bank predated this agreement, correct?          01:53PM

11         A.   The lien, yes.  The lien that they took

12  on the assets of Kids Count Entertainment, Inc.,

13  predated it.

14         Q.   How much did the Terrys actually invest?

15  There is a range in the agreement.                     01:53PM

16         A.   I'm sure at one time they had invested

17  well over 220,000 I'm pretty sure.  And other

18  times I think when this was all wound up, they

19  had 180,000 or so into it, in that vicinity.

20         I'm sure that they are in the schedules         01:54PM

21  and the papers that we produced for you.

22         I'm sure with interest it's over

23  $260,000 now that is owed to them.  But the --

24  I'm sure they had -- you know, they made several

CAROL RABER & ASSOCIATES (312) 446-6926

1    types of investments.  They bought inventory

2    directly to sell to the company.

3         Q.   And let me stop you there.  How much did

4    they purchase in inventory?

5         A.   I don't know without financial records        01:54PM

6    in front of me.

7              They made receivable loans.

8         Q.   And would that have been a form of a

9    check written to Kids Count?

10        A.   Absolutely.                                    01:54PM

11        Q.   Do you know how much in receivable?

12        A.   No.  Vicki has all the financial records

13   and hasn't let us see them.

14             I hope you're going to turn them over

15   when we do our discovery.  Or have you already          01:54PM

16   turned over your stuff?

17        Q.   Everything had been turned over.

18        A.   Including the financial records?

19        Q.   If they existed they were turned over.

20        A.   If they existed.                               01:54PM

21             And, by the way, then there's no

22   question in my mind --

23             And Vicki and Bob signed things saying

24   they understood all receivables belonged to the

1  Terrys and weren't even to be deposited anymore

2  into Kids Count Entertainment because they shut

3  us out and were depositing funds received by the

4  company into accounts other than the agreed-upon

5  accounts and they were making expenditures.          01:55PM

6      Q.   Let me back you up.  I wanted to talk

7  about the Terrys' investment.

8      A.   Okay.

9      Q.   They purchased inventory, they made

10  receivable loans.                                     01:55PM

11         Were there other monies advanced?

12      A.   Sure.  They paid out directly $50,000

13  for a media buy of Blagman & Associates and they

14  paid out about $100,000 to do the infomercial in

15  cash -- check.                                        01:55PM

16      Q.   So the media buy was 50,000?

17      A.   I believe so.

18      Q.   And then another hundred?

19      A.   Right.

20      Q.   If you take a look at paragraph 2 of the   01:55PM

21  agreement, it indicates that in addition to the

22  two to $250,000 investment, the Terrys will

23  deposit the sum of $27,000 into a bank account in

24  the name of Kids Count.

CAROL RABER & ASSOCIATES (312) 446-6926

1          A.    Right, they did that.   And that was

2     based on specific receivables which when those

3     came in, they were repaid.

4          Q.    Was that put into the bank account of

5     the corporation or the LLC?                           01:56PM

6          A.    The LLC.   That's my recollection anyway.

7     I'm sure the records will show it, but I believe

8     it to be the LLC.   It should have been the LLC.

9          Q.    And that anticipated -- it was

10    anticipated that that loan of 27,000 was going to     01:56PM

11    be secured by --

12               How did the number of 27,000 come

13    about?

14         A.    Vicki had these two receivables --

15    12,855 and another one for 18,000, or so, from        01:57PM

16    Discovery Toys.   Discovery Toys seemed to be

17    paying on schedule.

18               And the number was -- the number that

19    Vicki said she needed in the company, $27,000; so

20    Gene wrote a check for $27,000.   And I think --      01:57PM

21    my recollection -- yeah, 12,855 was something to

22    be scheduled in December, so Gene would get

23    12,000 back immediately and then the balance of

24    the next payment due from Discovery Toys.

1      Q.   So those were existing receivables?

2      A.   Yes.

3      Q.   And he loaned against those --

4      A.   Yes.  And he agreed to make -- I

5   shouldn't say -- he made further receivable loans      01:57PM

6   when the additional receivables arose.  They did

7   nothing but try and help her and this company.

8      Q.   Paragraphs 3 through 9 of that agreement

9   indicate that you and Eugene Terry and Nicole

10  Terry were to retain certain control over the use      01:58PM

11  of the Kids Count funds.

12     A.   Well, equal control of them with Vicki

13  and Bob.

14     Q.   Yes.

15          And how was that control to be               01:58PM

16  maintained?

17     A.   Well, I think that the agreement speaks

18  for itself.  She needed a second signature to

19  make a disbursement in excess of $2,000.

20          I don't think No. 4 deals with any           01:58PM

21  control issue.

22          No. 5 doesn't deal with any control

23  issue.

24          I'm sorry, you said 3 through 5?

CAROL RABER & ASSOCIATES (312) 446-6926

1    for services.

2         Q.   Right, I understand that.  But --

3         A.   Okay.  Well, what's the problem?

4         Q.   Well, let me go on and we don't need to

5    belabor that point.                                  02:04PM

6         A.   Okay.

7         Q.   Paragraph 11 of the memorandum

8    agreement --

9         A.   Yep.

10        Q.   -- talks about, represents that the        02:04PM

11   parties investigated the facts and circumstances

12   and condition of Kids Count; correct?

13        A.   Uh-huh.

14        Q.   I think that you need to say "yes."

15        A.   Yes.  I'm sorry.  And I instruct people    02:04PM

16   to that when I take depositions.

17                       (Discussion off record.)

18   BY MS. KROL

19        Q.   How you know that each party conducted

20   an investigation?                                    02:04PM

21        A.   Each party represented that they made

22   such investigation.  I don't know what they did

23   or didn't do, although I can certainly tell that

24   you that a lot of people spent a lot of time

1    together going through this for three weeks or

2    for two weeks after they made a decision to go

3    forward.

4             So how do I know?  I know that they met

5    on numerous occasions, some of which I was            02:05PM

6    present.  They corresponded and spoke on numerous

7    occasions.  And the only way I know that anybody

8    did is that they represented through this

9    agreement that they did.

10        Q.   Did the Terrys review documentation          02:05PM

11   regarding Kids Count before they entered into

12   this agreement?

13        A.   Documentation?  Could you be more

14   specific?

15        Q.   Business plans, financial information,        02:05PM

16   projections, sales, bank statements.

17        A.   Okay.  When you say did they review

18   those things, do you mean that we created it

19   together or that Vicki had from before we were

20   ever involved?                                         02:05PM

21        Q.   I want to say independent information

22   that was reviewed, not something that was created

23   as a result of this meeting.  Something that was

24   reviewed and then culminated in --

CAROL RABER & ASSOCIATES (312) 446-6926

1    BY THE WITNESS:

2        A.   I would say the business was doing about

3    the same as it had done before we were involved

4    in terms of its sales of products to retail

5    outlets --                                                      02:12PM

6    BY MS. KROL:

7        Q.   Okay --

8        A.   -- and that the TV -- and that the TV

9    project was not doing well.

10       Q.   It did just require a yes or no.  But...             02:12PM

11       MR. CROOKS:   I don't think it did.

12       MS. KROL:   But that's being -- we don't need

13   to argue.  I really don't want to argue.

14   BY MS. KROL:

15       Q.   Let's talk about --                                   02:12PM

16       A.   I'm making you jump all over.

17       Q.   Yes.

18            Well, that February 24th letter

19   refers to the fact that -- that letter also

20   contemplates another drafting; does it not?                    02:13PM

21       A.   Uh-huh.

22       Q.   Is that yes?

23       A.   "Yes."

24       Q.   Was there another document drafted as

CAROL RABER & ASSOCIATES  (312) 446-6926

1   Terrys will be investing money?

2        Q.   That's right.

3        A.   That was based on Vicki's

4   representations as to how fast we would be

5   generating money from the infomercials, how we          02:25PM

6   would be making money hand over fist to make

7   additional media buys out of profits, out of

8   sales.

9        Q.   So the intent, the idea was to create an

10  infomercial?                                             02:26PM

11       A.   We did.  The day we signed this thing --

12  yeah, the day we signed this thing or the next

13  day, she already had the crews -- as soon as the

14  Terrys committed, she had crews ready to shoot

15  the infomercial.  She had found space or Robert          02:26PM

16  Blagman had; they had camera people there.  You

17  know, I was in Florida when they started.  I

18  didn't get there until the second day of

19  shooting.  But they were -- I could be wrong,

20  actually this was the 22nd.  The shooting started        02:26PM

21  over Thanksgiving.  But they -- they couldn't

22  wait to get started on the infomercial.

23       Q.   So they made the infomercial?

24       A.   Oh, yeah.  That $150,000 was spent

CAROL RABER & ASSOCIATES (312) 446-6926

1    within days of signing the agreement, the first

2    150- for the media buy and the infomercial.

3         Q.   Did it air?

4         A.   You bet.

5         Q.   What was --                                    02:27PM

6         A.   Although it took forever to get the

7    post-production work done.  You know --

8              You don't want me to expand on the

9    answers, but I've got to tell you Robert Blagman

10   told us -- she told us we can get it on within a    02:27PM

11   week if we do the shooting.  We'd get it on by

12   December 7th or December 10th, we'll have a good

13   2 1/2 weeks until Christmas, we'll make a

14   fortune.

15             Robert Blagman told us that she knew       02:27PM

16   from the beginning that there was no way this was

17   getting on the air before Christmas or at least

18   much before Christmas.  I think we finally got on

19   the 23rd of December.  And it's not because of

20   any delay on our part.                               02:27PM

21        Q.   But you just said that she had

22   production people there the next day.

23        A.   Well, she had it set up -- well,

24   actually, if you read Robert Blagman's letter,

CAROL RABER & ASSOCIATES (312) 446-6926

1    design, she did before, to get to the point where

2    she told us what she wanted to do.

3           And I hadn't even noticed that until I

4    read that letter today.

5           Q.   Did Robert Blagman do anything other          02:28PM

6    than purchase media in the confines of producing

7    this infomercial?

8           A.   I suspect he introduced Vicki to the

9    people who shot the commercial.

10          Q.   But his services that were rendered were       02:29PM

11   rendered generally to help in the production of

12   this infomercial; is that correct?

13          A.   From the time I met him on forward they

14   were.  Well, with the production of the

15   infomercial and the buying of our time going         02:29PM

16   forward.

17          And he was terrible, and she was to be

18   supposed to be our expert in that area.

19          Q.   So the infomercial ended up being made

20   and aired on television.  And how did it do?         02:29PM

21          A.   It got a lot of response.  And normally

22   when you get a response, you should convert

23   90 percent of the calls to purchases; and we were

24   converting less than 50 percent, and that was

CAROL RABER & ASSOCIATES (312) 446-6926

1   because the script was so bad and confusing, but

2   that's something that Vicki wrote.  So Nicole and

3   I finally rewrote the script and started getting

4   a better response; but by then we were about out

5   of media money and Vicki was turning her back on      02:30PM

6   us and talking about letting other people run the

7   company.  So the Terrys stopped being interested

8   in putting in more money to buy more media time

9   because we still had money left.  And --

10      Q.   Let me back you up.                          02:30PM

11           What time frame?  The original

12   commercial ran, you said --

13      A.   December 23rd through maybe January 20th

14   or something, or beyond.  You know, Vicki --

15   understand Vicki told us that before -- and my        02:30PM

16   understanding from knowing her before was her

17   jobs before this company or outside of this

18   expand were buying and placing advertising time,

19   media time for Kraft Foods and Nevada Bob's, and

20   she worked at WGN I think part of the time at one     02:30PM

21   point -- I'm not sure.  She was our media buying

22   expert, and she wanted to go in this direction.

23   And somehow we found out that she never oversaw

24   what Blagman did.

1        A.    Under this agreement?

2        Q.    Uh-huh, yes.

3        A.    I was to provide services to this

4    company not less than 60 hours per month without

5    additional compensation over and above the $4,000          02:41PM

6    a month that I was to receive.

7        Q.    What was the Terrys' responsibility

8    under that agreement to Kids Count?

9        A.    The Terrys' responsibility was to invest

10   money as needed over a limited period of time for          02:41PM

11   limited circumstances -- or for limited uses, I

12   should say.

13       Q.    Were the services to be rendered by you,

14   as defined by your responsibilities, were those

15   limited?                                                    02:41PM

16       A.    Yes -- I'm sorry, were they limited?

17       Q.    Yes.

18       A.    No.   It says right here "It's understood

19   and agreed Soskin will not work exclusively for

20   Kids Count and has other business interests,                02:41PM

21   including a law practice."

22       Q.    So your responsibilities to Kids Count

23   was limited, correct?

24       A.    Correct.   I was not the founder and

CAROL RABER & ASSOCIATES (312) 446-6926

1        A.   No, nothing specific.

2             We were told later by Anthony Nasharr,

3    he tried to tell us that the company was

4    worthless.  So if you consider that financial

5    information.                                         02:57PM

6        Q.   When did he tell that you?

7        A.   Oh, about when he tried to buy us out

8    for pennies on the dollar because he must have

9    represented some investors that she was talking

10   to to go into the company or start a new company    02:57PM

11   actually -- with our assets.

12       Q.   Are you familiar with a company known as

13   Vickilew?

14       A.   I became aware of it later.

15       Q.   When did you become aware of it?           02:57PM

16       A.   After we had already filed our lawsuit

17   against it, wasn't it?  Yeah, we became aware

18   after we filed a lawsuit against Bob and Vicki

19   and Kids Count.

20       Q.   Do you know when the company was formed?   02:57PM

21       A.   Not offhand, no.  Ultimately I saw a

22   prospectus trying to raise $4 million.  So

23   sometime after -- again, I forget when our

24   underlying case here was, but sometime after

CAROL RABER & ASSOCIATES (312) 446-6926

1     Q.   Negotiating with them to do what?

2     A.   I'm sorry, negotiating with Pete Abruzzo

3  to take over the company, to invest in the

4  company, to have him run the company.  Which was

5  not anywhere mentioned to us, not anywhere          03:11PM

6  anticipated in our agreement.  She was only

7  negotiating things in violation of the agreement

8  she signed with us -- before and after.  And I'm

9  talking about immediately.

10    Q.   And when did you meet Robert Blagman?       03:11PM

11    A.   At the commercial shooting.

12    Q.   Which was?

13    A.   Which was about Thanksgiving.

14    Q.   Of 1998?

15    A.   That's correct.                             03:11PM

16    Q.   You never knew him or met him before

17  that?

18    A.   No.

19    Q.   Subparagraph (c), did we do subparagraph

20  (c) already?                                       03:12PM

21    A.   Yes, the 29, yes.

22    Q.   Was Blagman involved with new investors?

23    A.   He brought a fellow named Dr. Leonard

24  Makawka, M-a-k-a-w-k-a, out to meet -- he had

1    recommended that he had all kinds of connection

2    and money to come in and influential friends in

3    the industry.

4         Q.   Who did he represent this to?

5         A.   To Vicki and to Gene Terry and Nicole          03:12PM

6    Terry and myself.

7         Q.   When?

8         A.   He came to one of our meetings.  I think

9    that he was at the Terrys' house for dinner with

10   the Arens also and with my family, and it was       03:12PM

11   probably the Hanukah party -- it might have been

12   the Hanukah party.  No, I think it was after that

13   because he was -- that's when we met him again or

14   saw him again.

15        But he was involved in our                      03:12PM

16   conversations.  We had meetings, at first, every

17   couple of weeks at the outside and, you know,

18   reviewed with him on a speakerphone what was

19   going on.

20        And at some point we agreed we needed to       03:12PM

21   -- you know, Vicki wanted to, and we didn't

22   disagree if she wanted to go in that direction,

23   to bring in other investors and do things bigger

24   and better and blah, blah, blah.  You know, we

CAROL RABER & ASSOCIATES (312) 446-6926

1　it and rolled up the tuxedo industry, so he

2　probably combined from 50 to 100 stores across

3　the country by buying up little tuxedo shops.　He

4　owns part of a bank; he owns racehorses.　He

5　lives in Long Grove.　I don't know how Vicki came　　03:20PM

6　in touch with him in the first place, but he's a

7　guy that she also enticing to invest in the

8　company and run it with her at the same time that

9　she was talking to us.

10　　　　Q.　When did you meet Pete Abruzzo?　　03:20PM

11　　　　A.　For the first time, I'd say probably

12　February of 1999.

13　　　　Q.　And how did that meeting come about?

14　　　　A.　She had mentioned him a couple of times

15　as somebody that might be willing to invest more　　03:20PM

16　money after the TV campaign didn't work out and

17　so she brought him to up one of our meetings so

18　we could hear what his ideas were.

19　　　　Q.　And how did that meeting go?　How you

20　end up?　　03:20PM

21　　　　A.　Well, we ended up that we were happy to

22　hear his proposals.　There were some proposals

23　from a lawyer that were, I'm sure, among the

24　papers that we gave you, things going back and

CAROL RABER & ASSOCIATES (312) 446-6926

1    forth, I think with a lawyer on his behalf about

2    if he was going to run it, what was going to

3    happen to our interest, and so forth. I don't

4    recall offhand exactly what the terms were.

5    There was some issue about it though.                   03:21PM

6        Q.   So you had started negotiating with

7    Peter Abruzzo?

8        A.   No.  Vicki -- if Vicki wanted to go in

9    that direction, we were willing to let her say

10   who would run the bus, drive the bus. We didn't        03:21PM

11   care. I shouldn't say we didn't care, we were

12   flexible. We were interested in building up a

13   business. We always believed the ideas were

14   good, the products were good, they were going to

15   have a mass appeal and, if handled properly, the       03:21PM

16   company could be very successful.

17       Q.   So Peter Abruzzo was going to come in

18   and invest money and operate the business?

19       A.   No.  Peter Abruzzo was a guy who had a

20   bunch of contacts. He wasn't going to operate          03:21PM

21   the business. He had a bunch of contacts with

22   people in the entertainment business. He set up

23   some meetings for Vicki.

24            And, of course, you know, towards the