KIDS COUNT ENTERTAINMENT, L.L.C.

### AMENDED & RESTATED
### OPERATING AGREEMENT

Effective as of March 20, 1998

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS OPERATING AGREEMENT
HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF
1933 OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS
MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY
TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR
EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL
RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

011.142800.2



EXHIBIT
C

# OPERATING AGREEMENT

## GLOSSARY OF TERMS

Term                                                           Section Reference

"Act" ................................................................................... Article I

"Additional Interests" ........................................................... Article I

"Advisory Board" .................................................................. Section 6.2

"Affiliate" ............................................................................. Article I

"Agreement" ......................................................................... Article I

"Approved Sale" .................................................................... Section 7.6

"Business Days" .................................................................... Article I

"Capital Account" ................................................................. Article I

"Code" .................................................................................. Article I

"Company" ........................................................................... Article I

"Confidential Information" .................................................... Section 6.6

"Gross Asset Value" .............................................................. Article I

"Independent Third Party" ..................................................... Article I

"Interest" ............................................................................... Article I

"Interest Holder" .................................................................. Article I

"Invested Capital" ................................................................. Article I

"Involuntary Withdrawal" ..................................................... Article I

"Majority Holders" ............................................................... Article I

"Managing Member" ............................................................. Section 6.1

<u>Term</u>                                                                      <u>Section Reference</u>

"Member" ................................................................................. Article I

"Permitted Transferee" ................................................................ Article I

"Person" .................................................................................. Article I

"Prior Agreement" .......................................................................Preamble

"Profit and Losses" ..................................................................... Article I

"Sale of the Company" ................................................................. Article I

"Securities Act" ......................................................................... Article I

"Transfer" ................................................................................. Article I

# AMENDED & RESTATED

## OPERATING AGREEMENT

### OF

## KIDS COUNT ENTERTAINMENT, L.L.C.
### an Illinois Limited Liability Company

This **AMENDED & RESTATED OPERATING AGREEMENT** (this "Agreement") is effective as of March 20, 1998 by those persons who execute this Agreement on the date hereof and from time to time thereafter, and amends and restates in its entirety that certain Operating Agreement dated as of March 24, 1997, as amended by that certain Amendment No. 1 to Operating Agreement dated as of December 31, 1997 and effective as of March 24, 1997 (as so amended, the "Prior Agreement").

## ARTICLE I

### DEFINITIONS

"Act" means the Illinois Limited Liability Company Act, as amended from time to time.

"Additional Interests" means (i) any Interests in the Company, whether now authorized or not, (ii) any rights, options or warrants to purchase any such Interests or to purchase securities that may become convertible into, exercisable for or exchangeable for such Interests, (iii) any securities convertible into, exercisable for or exchangeable for Interests and (iv) notes or debt securities containing equity or profit participation features; provided, however, Additional Interests shall not include (a) securities offered by the Company pursuant to a public offering registered under the Securities Act, (b) securities issued as a dividend on, subdivision of or other distribution in respect of all Interests, (c) securities issued upon conversion, exercise or exchange of any previously issued Additional Securities, (d) securities issued pursuant to the acquisition of another Person by the Company by merger, by purchase of substantially all of the assets of such other entity or by other reorganization whereby the Company ends up owning, directly or indirectly, greater than fifty percent (50%) of the voting power of such entity or otherwise controls such entity.

"Affiliate" with respect to any Member shall mean: (i) any Person controlling, controlled by or under common control with said Member (including any partnership in which such Member serves as a general partner or any corporation in which such Member owns greater than 10% of the issued and outstanding voting capital stock); and (ii) any officer, director, trustee or general partner of any Person so controlling, controlled by or under common control with said Member.

"Agreement" means this Agreement, as amended, modified or supplemented from time to time.

"Business Days" means any day on which business is ordinarily conducted in the State of Illinois, which excludes all United States national, Illinois and bank holidays.  If any notice or other communication is required to be delivered, pursuant to the terms of this Agreement, on a day which is not a Business Day, such notice shall not be required to be delivered until the next Business Day after the original required delivery date.

"Capital Account" means, with respect to each Interest Holder, the account maintained for the Interest Holder on the books of the Company which will initially equal the cash or other consideration contributed by such Interest Holder to the Company, and throughout the term of the Company will be (i) increased by the amount of (A) income and gains allocated to such Interest Holder pursuant to Article V and (B) any cash or fair market value of property (as determined by the Majority Holders) subsequently contributed by such Interest Holder to the Company and (ii) decreased by the amount of (A) losses and deductions allocated to such Interest Holder pursuant to Article V and (B) the amount of distributions in cash and the fair market value (as determined by the Majority Holders) of distributions of property (net of liabilities secured by the property that the Interest Holder is considered to assume or take subject to) distributed to such Interest Holder.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" means the limited liability company formed in accordance with this Agreement.

"Gross Asset Value" means, with respect to any asset, the asset's basis for Federal income tax purposes, except that the initial Gross Asset Value of any asset contributed by an Interest Holder to the Company shall be the gross fair market value of such asset, so determined by the contributing Interest Holder and the Managing Member.

"Independent Third Party" means any Person who, immediately prior to a contemplated Sale of the Company, does not own in excess of 5% of Interests (on a fully-diluted basis), who is not controlling, controlled by or under common control with any such 5% owner of Interests and who is not the spouse or descendent (by birth or adoption) of any such 5% owner of Interests.

"Interest" means an ownership interest in the Company having such rights, preferences and obligations of Interests as specified in this Agreement.  Interests are owned by Members as set forth on Schedule A hereto, as amended from time to time.

"Interest Holder" means any Person who holds an Interest, whether as a Member or as an unadmitted assignee of a Member.

"Invested Capital" means the aggregate capital contribution in Interests made by a holder thereof.

-2-

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

    (i)    the Member: (A) makes an assignment for the benefit of creditors; (B) files a voluntary petition of bankruptcy; is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding; (C) seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for; or liquidation of the Member or of all or any substantial part of the Member's properties; (D) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in subsections (A) through (C);

    (ii)    if the Member is a partnership or another limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

    (iii)    if the Member is a corporation, the dissolution of the corporation or the revocation of its charter; or

    (iv)    if the Member is an individual, his or her death or legal incompetency.

"Majority Holders," means the holder or holders of a majority of Interests at any time.

"Member" means each Person signing this Agreement as a Member and any Person who subsequently is admitted as a Member of the Company pursuant to Section 7.3 below.

"Permitted Transferee" with respect to a Person means (i) a transferee taking an Interest pursuant to applicable laws of descent or distribution, (ii) a trust whose beneficiary(ies) is such Person, such Person's spouse or a descendant of such Person and (iii) an Affiliate of such Person.

"Person" means and includes any individual, corporation, partnership, association, limited liability company, trust, estate or other entity.

"Profits and Losses" means the income and losses of the Company as determined in accordance with the method of accounting followed by the Company for Federal income tax purposes, including, any separately stated items under Code Section 702(a).

"Sale of the Company" means the sale of the Company to an Independent Third Party or affiliated group of Independent Third Parties pursuant to which such party or parties acquire (i) a majority of Interests in the Company (whether by sale of Interests or merger or

otherwise) or (ii) all or substantially all of the company's assets, determined on a consolidated basis.

"Securities Act" means the Securities Act of 1933, as amended.

"Transfer" means any sale, disposition, assignment, pledge, hypothecation, encumbrance or other direct or indirect transfer of any Interest or any interest therein.

## ARTICLE II

## ORGANIZATIONAL MATTERS

Section 2.1.   Organization.   The Company was organized on March 21, 1997.

Section 2.2.   Name of the Company.   The name of the Company is "Kids Count Entertainment, L.L.C." The Company may do business under that name and under any other name or names which the Managing Member selects subject to Section 1-20 of the Act.

Section 2.3.   Purpose.   The purpose of the Company is to engage in the business of the development, manufacture, sale and distribution of computer, music, audio, video and other products for children (the "Business") or to engage in any other lawful act or activity for which a Company may be organized under the Act.

Section 2.4.   Term.   The term of the Company shall continue until December 31, 2046 unless sooner terminated as provided in this Agreement.

Section 2.5.   Registered Office.   The initial registered agent of the Company in the State of Illinois shall be Vicki Esrafew and the initial registered office of the Company shall be located at 3100 Dundee Road, Suite 205, Northbrook, Illinois 60062, or at any other place within the State of Illinois which the Managing Member selects.

## ARTICLE III

## CAPITAL AND CONTRIBUTIONS

Section 3.1.   Interests.   The Company shall issue Interests with such rights, preferences and obligations as set forth in this Agreement.  Holders of Interests shall be entitled to one vote per Interest held; provided that such Interest Holder is also a Member. Notwithstanding anything to the contrary herein, no Person shall be entitled to vote with respect to any Interests unless such Person is a Member.  All Interests issued hereunder from time to time shall be represented by a Certificate of Interests issued by the secretary or assistant secretary of the Company.

Section 3.2.   Capital Contributions.   As of the effective date of this Agreement (unless otherwise indicated on Schedule A hereto), the Members have contributed to the Company cash or property in the amounts set forth on Schedule A hereto.

Section 3.3.    Additional Capital Contributions.  If at any time the Managing Member deems it to be in the best interest of the Company to raise additional equity capital to properly carry out the Company's business and operations, the Managing Member, in its sole discretion, shall have the right to raise additional equity capital for infusion into the Company by causing the Company to issue interests to one or more Persons, and to admit the persons investing such capital as additional Members.

Section 3.4.    Capital Accounts; Return of Capital.  A separate Capital Account shall be maintained for each Interest Holder. Members shall not be paid interest on their capital contributions to the Company.  No Interest Holder shall be entitled to a return of its Invested Capital except as provided for in this Agreement and, in any event, only to the extent that cash or other property of the Company is available therefor.  If an Interest Holder is to receive a return of a capital contribution, the Interest Holder shall not have the right to receive anything but cash in return of such Interest Holder's capital contribution.  No Member shall be required to restore any negative Capital Account.

Section 3.5.    Loans.  If the Managing Member so approves, any Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms upon which the Managing Member and such Member agree.

## ARTICLE IV

## DISTRIBUTIONS AND REDEMPTIONS

Section 4.1.    Distributions Generally.  Subject to the provisions of this Article IV, the Managing Member shall have the right to determine whether, and to what extent, distributions shall be made by the Company to the Interest Holders.

Section 4.2.    Distributions.  When and to the extent the Managing Member determines in its sole discretion that, after providing for the Company's present and anticipated debts and obligations, capital needs, expenses and reasonable reserves for contingencies, it is appropriate and in the best interest of the Company to make distributions, such distributions shall be made to all Interest Holders holding Interests, pro rata (according to percentage of ownership of Interests), as of the last day of the month immediately preceding the month in which such distribution is made, to all Interest Holders holding Interests.

Section 4.3.    Distributions with Respect to Tax.  The Interest Holders hereby agree and acknowledge that the Company may decide not to make any distributions in any given year, even if the Interest Holders are allocated profits in such year, and thus may need to pay income taxes on such allocated profit without receiving a distribution from the company.

Section 4.4.  .  In-Kind Distributions.  At any time, and from time to time, in the sole discretion of the Managing Member, the Company may distribute to its Interest Holders securities or other property held by the Company.  To the extent the Managing Member determines in its sole discretion to distribute such property, the property will be distributed among the Interest Holders in the same proportions as cash equal to the fair market value of

such property (as determined in the reasonable good faith judgment of the Managing Member) would be distributed among the Interest Holders pursuant to **Section 4.2**. The Managing Member may require as a condition of distribution of securities hereunder that the Interest Holders execute and deliver such documents as the Managing Member may deem necessary or appropriate to ensure compliance with all federal and state securities laws which apply to such distribution and any further transfer of the distributed securities, and may appropriately legend the certificates which represent such securities to reflect any restriction on transfer with respect to such laws.

## ARTICLE V

## ALLOCATIONS OF PROFITS AND LOSSES

Section 5.1.    Tax and Capital Account Allocations. Effective January 1, 1998, except as otherwise required by Code Section 704 and the regulations thereunder, Profits and Losses for any Fiscal Year shall be allocated among the Interest Holders pro rata based on their percentage ownership of Interests.

Section 5.2.    Section 704(c) Allocations. In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the company shall, solely for tax purposes, be allocated among the Interest Holders so as to take account of any variation between the adjusted basis of such property to the Company for Federal income tax purposes and its initial Gross Asset Value, including, but not limited to, special allocations to a contributing Member that are required under Code Section 704(c) to be made upon distribution of such property to any of the noncontributing Members. In the event the Gross Asset Value of any property of the Company is adjusted, subsequent allocations of income, gain, loss and deduction with respect to such property shall take account of any variation between the adjusted basis of such property for Federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the Managing Member in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this **Section 5.2** are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, an Interest Holder's Capital Account or share of Profits or Losses, other items or distributions pursuant to any provision of this Agreement.

## ARTICLE VI

## MANAGEMENT POWER, RIGHTS AND DUTIES: ADVISORY BOARD

Section 6.1.    Management.

(a)    Managing Member. The business and affairs of the Company shall be managed by Kids Count Entertainment, Inc., an Illinois corporation, which shall serve as the

managing member (the "Managing Member") of the company who may from time to time
delegate power to the Advisory Board pursuant to Section 6.2.

(b)    General Powers. Except as may be delegated to the Advisory Board, the
Managing Member shall have full, exclusive, and complete discretion, power, and authority,
subject to any other provisions of this Agreement, to manage, control, administer, and operate
the business and affairs of the Company, and to make all decisions affecting such business and
affairs, including, without limitation to:

> (i)    execute and deliver, for and on behalf of the Company, any and
> all documents and instruments which may be necessary or desirable to carry on
> the business of the Company;

> (ii)    prepare or contract for the preparation of, all requisite reports on
> behalf of the Company;

> (iii)    acquire by purchase, lease or otherwise, any real or personal
> property, tangible or intangible;

> (iv)    sell, dispose, trade, or exchange Company assets in the ordinary
> course of the Company's business;

> (v)    enter into agreements and contracts and to give receipts, releases
> and discharges;

> (vi)    borrow money for and on behalf of the Company;

> (vii)    purchase liability and other insurance to protect the Company's
> properties and business;

> (viii)    make any and all expenditures which the Managing Member, in
> its sole discretion, deems necessary or appropriate in connection with the
> management of the affairs of the Company and the carrying out of its
> obligations and responsibilities under this Agreement, including, without
> limitation, all legal, accounting and other related expenses incurred in
> connection with the organization and financing and operation of the Company;

> (ix)    enter into any kind of activity necessary to, in connection with or
> incidental to the accomplishment of the purposes of the Company; and

> (x)    direct or delegate any Person to take all actions and execute all
> documents or instruments as are necessary to carry out the intentions and
> purposes of the above duties and powers.

No person dealing with the Company need inquire into the validity or propriety of any document or instrument executed in the name of the Company by the Managing Member, or as to the authority of the Managing Member in executing the same.

(c) <u>Removal of Managing Member</u>. Notwithstanding the foregoing to the contrary, if any one or more of the following events occurs, the Majority Holders may remove the Managing Member and elect a new Managing Member:

(i) the Managing Member's willful or intentional violation or reckless disregard of the Managing Member's duties to the Company; or

(ii) the occurrence of any of the events described in the definition of Involuntary Withdrawal with respect to the Managing Member.

The determination of whether one or more of such events exist shall be made by the Majority Holders and shall be final, binding and not reviewable unless the decision was based on a material mistake of law or fact or was arbitrary and capricious.

(d) <u>Officers</u>. The Managing Member may appoint officers of the Company in its sole discretion, which may include a president, one or more vice presidents, a secretary and one or more assistant secretaries. Any number of offices may be held by the same person. The Managing Member may choose such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Managing Member. The initial officers of the Company are as follows:

Vicki Esralew                 President, Chief Executive Officer and Secretary

James Craig Carter        Vice President and Chief Operating Officer

(i) The Chief Executive Officer shall be the principal executive officer of the Company and shall, in general, supervise and control all of the business and affairs of the Company, unless otherwise provided by the Managing Member. The Chief Executive Officer shall have general powers of supervision and shall be the final arbiter of all differences between officers of the Company, and her decision as to any matter affecting the Company shall be final and binding as between the officers of the company subject only to the Managing Member's direction. In general, the Chief Executive Officer shall perform all duties incident to the office of the president and such other duties as the Managing Member may from time to time prescribe.

(ii) In the absence of the Chief Executive Officer or in the event of her inability or refusal to act, the President shall perform the duties of the Chief Executive Officer and when so acting, shall have all the powers of and be subject to all the restrictions upon the Chief Executive Officer. In general, the President shall perform all duties incident to the office of President and such

other duties and have such other powers as the Chief Executive Officer or the Managing Member may from time to time prescribe.

(iii)     The Secretary or Assistant Secretary shall attend all meetings of the Members and record all proceedings of such meetings in a book to be kept for that purpose and shall perform such duties as may be prescribed by the Managing Member, under whose supervision the Secretary or Assistant Secretary shall be. The Secretary shall have custody of the Company seal and shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by his or her signature or by the signature of an Assistant Secretary. The Managing Member may give general authority to any other officer to affix the seal of the Company and to attest the affixing of signatures.

(e)     Limitation on Authority of Members. No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member. This **Section 6.1** supersedes any authority granted to the Members pursuant to the Act. Any Member who takes any action or binds the Company in violation of this **Section 6.1** shall be solely responsible for any loss and expense incurred by the company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

Section 6.2.     Advisory Board. In order to assist the Managing Member in the operations of the Company, there shall be formed an advisory board (the "Advisory Board") consisting of up to nine individuals, with the size of the Advisory Board to initially be two (2) individuals. The size of the Advisory Board shall be determined from time to time by the Managing Member and members of the Advisory Board will be appointed by the Managing Member. Advisory Board members shall serve without compensation. The Advisory Board shall have all such powers as designated by the Managing Member from time to time. Members of the Advisory Board may be removed by the Managing Member, with or without cause at any time, and the Managing Member may designate a replacement individual to serve on the Advisory Board. Any action to be taken or approvals to be given by the Advisory Board shall be deemed so taken or given only if consented to by a majority of those individuals comprising such Advisory Board at the time. The Advisory Board shall carefully consider the strategy and business operations of the Company and advise the Managing Member with respect to its findings and recommendations of such actions as it considers to be in the best interest of the Company; provided, however, that unless specifically delegated in writing to the Advisory Board by the Managing Member, the Advisory Board shall have no power or authority to manage, control, administer or operate the business or affairs of the Company. Moreover, neither the Advisory Board nor any Member thereof shall be an agent of the Company having power to act on behalf of or bind the Company.

Section 6.3. Meetings of and Voting by Members.

(a). A meeting of the Members may be called at any time by the Managing Member or the Majority Holders. Meetings of Members shall be held at the Company's principal place of business or at any other place designated by the majority Holders. Not less than ten (10) nor more than ninety (90) days before each meeting, the Majority Holders shall give written notice of the meeting to each Member entitled to vote at the meeting. The notice shall state the time, place and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of the Majority Holders constitute a quorum. A Member may vote either in person or by written proxy signed by the Member or by his, her or its duly authorized attorney in fact.

(b) Except as otherwise provided in this Agreement, the affirmative vote of the Majority Holders shall be required to approve any matter coming before the Members. In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument executed by the Majority Holders. Except as otherwise provided in this Agreement, wherever the Act requires unanimous consent to approve or take any action, that consent may be given in writing and, in all cases, shall mean, rather than the consent of all Members, the consent of the Majority Holders.

Section 6.4. Personal Services. No Member shall be required to perform services for the Company solely by virtue of being a Member, except as provided herein.

Section 6.5. Other Business Interests. Nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, of any Affiliate of any Member, or of any member of the Managing Member, to conduct any other business or activity whatsoever, and Members shall not be accountable to the Company or to any other Member with respect to that business or activity even if the business or activity competes with the Company's business; provided, however, that nothing in this Section 6.5 shall affect or supersede any such restrictions imposed on a Member by any other contract or agreement to which both the Company and/or any of its Affiliates and such Member are a party. The organization of the Company shall be without prejudice to their respective rights (or the rights of their respective Affiliates) to maintain, expand or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or such Member's Affiliates. Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their Affiliates. In any of those cases, those dealings and undertakings may or may not be at arm's length and on commercially reasonable terms, in each case as determined by the Majority Holders, in their sole discretion.

Section 6.6.   Confidential Information.   Each Member and Advisory Board member, while such Person is a Member or Advisory Board member, as the case may be, and thereafter, shall keep secret and retain in strictest confidence, and shall not, without the prior written consent of the Company, furnish, make available or disclose to any third party or use for the benefit of himself or herself or any third party, any Confidential Information. As used in this Agreement, "Confidential Information" shall mean any information relating to the business or affairs of the Company or the Business, including but not limited to information relating to financial statements, customer identities, potential customers, employees, suppliers, manufacturing and servicing methods, equipment, programs, strategies and information, analyses, profit margins, trade secrets or other proprietary information used by the Company in connection with the Business; provided, however, that Confidential Information shall not include any information which is in the public domain or becomes known in the industry through no wrongful act on the part of such Member or Advisory Board member, as the case may be. Each Member and Advisory Board member acknowledges that the Confidential Information is vital, sensitive, confidential and proprietary to the Company.

Section 6.7.   Liability and Indemnification.   The Managing Member shall not be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed by it, or failure to act, within the scope of the authority conferred on the Managing Member by this Agreement, except for acts, or failures to act, constituting fraud, gross negligence or an intentional breach of this Agreement. The Company shall indemnify the Managing Member for any act performed by it with respect to Company matters, as and to the full extent permitted by Illinois law. Amounts in respect of the indemnification provided hereunder may be advanced by the Company in the sole discretion of the Majority Holders. Whenever any indemnification has been paid to or expenses advanced to any party, such occurrence shall be reported to the Members prior to or with the next notice of a meeting of Members.

Section 6.8.   Power of Attorney.

(a)   Grant of Power.   Each Member constitutes and appoints the Chief Executive Officer as the Member's true and lawful attorney-in-fact, and in the Member's name, place and stead, to make, execute, sign, acknowledge, and file:

(i)   one or more articles of organization consistent with the terms of this Agreement;

(ii)   all documents (including amendments to articles of organization) which the attorney-in-fact deems appropriate to reflect any written amendment, change or modification of this Agreement effectuated in accordance with **Section 10.4** below;

(iii)   any and all other certificates or other instruments required to be filed by the Company under the laws of the State of Illinois or of any other state or jurisdiction, including, without limitation, any certificate or other instruments

necessary in order for the Company to continue to qualify as a limited liability company under the laws of the State of Illinois;

      (iv)   one or more applications to use an assumed name; and

      (v)   subject to the provisions of **Section 8.1**, all documents which may be required to dissolve and terminate the Company and to cancel its Articles of Organization.

    (b)   Irrevocability. The foregoing power of attorney is irrevocable and is coupled with an interest, and, to the extent permitted by applicable law, shall survive the death or disability of a Member. It also shall survive the Transfer of an Interest, except that if the transferee is approved for admission as a Member, this power of attorney shall survive the delivery of the assignment for the sole purpose of enabling the attorney-in-fact to execute, acknowledge and file any documents needed to effectuate the substitution. Each Member shall be bound by any representations made by the attorney-in-fact acting in good faith pursuant to this power of attorney, and each Member hereby waives any and all defenses which may be available to contest, negate or disaffirm the action of the attorney-in-fact taken in good faith under this power of attorney.

## ARTICLE VII

## TRANSFERS OF INTERESTS; ADMISSION OF MEMBERS

    Section 7.1.   Restrictions on Transfer. No holder of Interests may Transfer any Interest without the consent of the Majority Holders, as of the date such consent is sought, which consent may be withheld in their sole discretion, notwithstanding any other provisions hereof. In addition, no Member may Transfer any Interests (except Transfers (i) pursuant to an effective registration statement under the Securities Act, (ii) pursuant to the laws of descent and distribution or (iii) to a Permitted Transferee) without first delivering to the Company an opinion of counsel (reasonably acceptable in form and substance to the Managing Member) that neither registration nor qualification under the Securities Act and applicable state securities laws is required in connection with such Transfer. Any certificate representing Interests will bear the following Legend:

        "THE INTERESTS REPRESENTED BY THIS CERTIFICATE
        HAVE NOT BEEN REGISTERED UNDER THE SECURITIES
        ACT OF 1933, AS AMENDED, AND THEY MAY NOT BE
        SOLD OR OFFERED FOR SALE IN THE ABSENCE OF AN
        EFFECTIVE REGISTRATION STATEMENT UNDER THAT
        ACT AS TO SAID INTERESTS OR AN OPINION, IN FORM
        AND SUBSTANCE SATISFACTORY TO THE COMPANY
        AND GIVEN BY COUNSEL SATISFACTORY TO THE
        COMPANY, THAT SUCH REGISTRATION IS NOT
        REQUIRED. THE INTERESTS REPRESENTED BY THIS
        CERTIFICATE ARE ALSO SUBJECT TO CERTAIN

RESTRICTIONS ON TRANSFER SET FORTH IN THE
OPERATING AGREEMENT OF THE COMPANY, A COPY
OF WHICH OPERATING AGREEMENT CAN BE OBTAINED
AT THE PRINCIPAL OFFICES OF THE COMPANY."

Section 7.2.   Acceptance of Transfer. No Transfer of Interests shall be deemed effective, unless and until the transferee shall execute a written instrument, in a form reasonably satisfactory to counsel for the Company, agreeing to be bound by all of the terms and provisions of this Agreement and all amendments and supplements hereto, to the same extent and on the same terms as the transferor thereof.

Section 7.3.   Admission of Members or Transfers of Economic Interests. Upon the admission to the Company of a Member, the Managing Member shall amend this Agreement, and any Schedules hereto, to reflect such admission. No transferee shall be admitted as a Member without the approval of the Majority Holders, it being agreed that the Majority Holders have the right, in their sole discretion, to withhold approval of any such transferee as a Member. If a transferee of any Interest is not admitted as a Member pursuant to the operation of this Article VII, such transferee shall instead succeed to the economic interests the Company so transferred, be it Profits, Losses and/or capital, but shall not succeed to any other rights (including voting rights) of the transferor as a Member; and such non-transferred rights shall remain with the transferor so long as such transferor is alive and competent or maintains its existence, as the case may be.

Section 7.4.   Withdrawal of Members. No Member shall have the right to withdraw from the Company, except in the case of an Involuntary Withdrawal. Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the Member so withdrawing shall thereupon become an Interest Holder but shall not become a Member. If the Company is continued pursuant to Section 8.1(c) below, neither the successor Interest Holder, nor the predecessor Member shall be entitled to receive in liquidation of the withdrawing Member's Interest the fair market value of such Interests as of the date of the Involuntary Withdrawal.

Section 7.5.   Employee Options. Notwithstanding anything to the contrary herein, the Managing Member may from time to time issue to employees, Advisory Board members and consultants of the Company Additional Interests provided, however, that the Managing Member shall not issue Additional Interests to such persons in excess of 10% of the outstanding Interests of the Company.

Section 7.6.   Sale of the Company.

(a)   Approved Sale. Notwithstanding anything herein to the contrary, if the Majority Holders approve a Sale of the Company (the "Approved Sale"), then each Member and Interest Holder will consent to and raise no objections to the Approved Sale, and if the Approved Sale is structured as a sale of Interests, then each Member and Interest Holder will agree to sell all of the Interests on substantially the same terms and conditions as approved by

the Majority Holders. Each Member and Interest Holder will take any and all actions which Majority Holders deem necessary in connection with the consummation of the Approved Sale.

(b)    Expenses. Each Member and any other holders of Interests will bear their pro rata share (based upon the total number of Interests sold) of the costs of any sale of Interests pursuant to an Approved Sale to the extent such costs are incurred for the benefit of all Interest Holders and are not otherwise paid by the Company. Costs incurred by Members and the other Interest Holders on their own behalf, will not be considered costs of the transaction contemplated hereunder.

## ARTICLE VIII

## DISSOLUTION OF THE COMPANY

Section 8.1.    Events of Dissolution. The Company shall be dissolved upon the happening of any of the following events:

(a)    when the period fixed for its duration in Section 2.4 has expired;

(b)    upon the written agreement of the Majority Holders; or

(c)    upon the occurrence of an Involuntary Withdrawal, unless, within ninety (90) days after the occurrence of the Involuntary Withdrawal there is at least one (1) remaining Member and such remaining Member or the Majority Holders, as the case may be, elect to continue the business of the Company pursuant to the terms of this Agreement.

Section 8.2.    Procedure for Winding Up and Dissolution. If the Company is dissolved, the Managing Member shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Interest Holders who are creditors, in satisfaction of the liabilities of the Company, and then to the Interest Holders in accordance with Section 4.2.

Section 8.3.    Filing of Certificate of Cancellation. If the Company is dissolved, the Managing Member shall promptly file a Certificate of Cancellation with the Secretary of State of Illinois. If there is no Managing Member, the Certificate shall be filed by the Members; if there are no remaining Members, the Certificate shall be filed by the last Person to be a Member; if there are no remaining Members, or a Person who last was a Member, the Certificate shall be filed by the legal or personal representatives of the Person who last was a Member.

## ARTICLE IX

## BOOKS AND RECORDS

Section 9.1.    Bank Accounts. All funds of the Company shall be deposited in a bank account or accounts maintained in the Company's name. The Managing Member shall

determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the individuals who will have authority with respect to the accounts and the funds therein.

Section 9.2.    Books and Records.  The Company shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business.  The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company, a copy of the Certificate of Formation and this Agreement and all amendments to the Certificate of Formation and this Agreement; a current list of the names and last known business, residence, or mailing addresses of all Members; and the Company's federal, state or local tax returns.  The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member, or such Member's duly authorized representative at any and all reasonable times during normal business hours.

Section 9.3.    Annual Accounting Period.  The annual accounting period of the Company shall be its taxable year.  The Company's taxable year shall be determined by the Managing Member and shall initially be the twelve month period ended December 31 of each year, subject to the requirements and limitations of the Code.

Section 9.4.    Reports.  Within seventy-five (75) days after the end of each taxable year of the Company, the Secretary shall cause to be sent to each Person who was an Interest Holder at any time during the accounting year then ended an annual compilation report, prepared by the Company's independent accountants in accordance with generally accepted accounting principles.  In addition, the Secretary shall cause monthly financial reports, prepared by the Company, to be promptly sent to each Person who was an Interest Holder at the end of such month.  Furthermore, within seventy-five (75) days after the end of each taxable year of the Company, the Secretary shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended, that tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year.

Section 9.5.    Tax Matters Person.  The Managing Member shall be the Company's "tax matters person" and, as such, shall have all powers and responsibilities provided in Code Section 6221, et seq. or such other provisions as may become applicable to limited liability companies.

Section 9.6.    Tax Elections.  The Managing Member shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754.  The decision to make or not make an election shall be at the Managing Member's sole discretion.

## ARTICLE X

## MISCELLANEOUS

Section 10.1.  Notices, Consents, etc.  Any notices, consents or other communications required to be sent or given hereunder by any of the Members shall in every case be in writing and shall be deemed properly served if (a) delivered personally, (b) sent by registered or certified mail, in all such cases with first class postage prepaid, return receipt requested, (c) delivered by a recognized overnight courier service or (d) sent by facsimile transmission to each Member at the addresses as set forth on Schedule A, or at such other addresses as may be furnished in writing by such Member.  Date of service of such notice shall be (w) the date such notice is personally delivered, (x) five (5) days after the date of mailing if sent by certified or registered mail, (y) one (1) Business Day after date of delivery to the overnight courier if sent by overnight courier or (z) the next succeeding Business Day after transmission by facsimile.

Section 10.2.  Public Announcements.  No Member shall make any public announcement or filing with respect to the transactions provided for herein without the prior consent of the Managing Member, unless such party has been advised by counsel such disclosure is required by applicable law.  To the extent reasonably feasible, any press release or other announcement or notice regarding the transactions contemplated by this Agreement shall be made by the Managing Member or any other party designated by the Managing Member.

Section 10.3.  Severability.  Should any provision of this Agreement be held to be enforceable only if modified, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon each Member with any such modification to become a part hereof and treated as though originally set forth in this Agreement.  The Members further agree that any court or arbitrator is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the Members as embodied herein to the maximum extent permitted by law.  The Members expressly agree that this Agreement as so modified shall be binding upon and enforceable against each of them.  In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been set forth herein.

Section 10.4.  Amendment and Waiver.  This Agreement may be amended, or any provision of this Agreement may be waived, by the Majority Holders.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other breach.

Section 10.5.  Documents.  Each Member will execute all documents and take such other actions as the Managing Member may reasonably request in order to consummate the transactions provided for herein and to accomplish the purposes of this Agreement.

Section 10.6.  Counterparts.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Members hereto and delivered to the Managing Member.

Section 10.7.  Expenses.  Each of the Members shall pay all costs and expenses incurred or to be incurred by it, him or her, as the case may be, in negotiating and preparing this Agreement and in closing and carrying out the transactions contemplated by this Agreement.

Section 10.8.  Governing Law.  This Agreement shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Agreement shall be governed by, the laws of the State of Illinois, without giving effect to provisions thereof regarding conflict of laws.

Section 10.9.  Headings.  The subject headings of Articles and Sections of this Agreement are included for purposes of convenience only and shall not affect the construction of interpretation of any of its provisions.

Section 10.10. Assignment.  Except as otherwise specifically provided herein, this Agreement will be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, heirs, administrators, executors, successors and permitted assigns.

Section 10.11. Entire Agreement.  This Agreement, the Preamble and all the Schedules attached to this Agreement (all of which shall be deemed incorporated in the Agreement and made a part hereof) and all other agreements between or among any of the parties hereto dated of even date herewith set forth the entire understanding of the Members with respect to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether written or oral, of the Members (including without limitation the Prior Agreement) and shall be modified or amended only as provided herein.

Section 10.12. Interpretative Matters.  Unless the context otherwise requires, (a) all references to Articles, Sections or Schedules are to Articles, Sections or Schedules in this Agreement, (b) each accounting term not otherwise defined in this Agreement has the meaning assigned to it in accordance with GAAP and (c) words in the singular or plural include the singular and plural and pronouns stated in either the masculine, the feminine or neuter gender shall include the masculine, feminine and neuter.

Section 10.13. Construction. Each Member hereto agrees that this Agreement is the product of negotiations between sophisticated parties and individuals, all of whom were represented by counsel, and each of whom had an opportunity to participate in, and did participate in, the drafting of each provision hereof. Accordingly, ambiguities in this Agreement, if any, shall not be construed strictly or in favor of or against any party hereto but rather shall be given a fair and reasonable construction.

\* \* \* \* \* \*

(The next page is the signature page)

-18-

IN WITNESS WHEREOF, the parties have executed this Amended & Restated Operating Agreement as of the date first written above.

KIDS COUNT ENTERTAINMENT, INC.,
an Illinois corporation

By: _____
    Vicki Esralew, President

**ROBERT LEEPER**

_____

Robert Leeper

## SCHEDULE A

## MEMBERSHIP INTERESTS

| Name and Address of Member | Number Units | Capital Contribution | Participating Percentage |
|---|---|---|---|
| Kids Count Entertainment, Inc. 310 Dundee Road, Suite 205 Northbrook, Illinois 60062 | 9,500 | Those assets of Kids Count Entertainment, Inc. set forth in that certain Contribution Agreement dated March 24, 1997 by and between Kids Count Entertainment, Inc. and the Company. | 95% |
| Robert Leeper 10 West Pine Avenue Roselle, Illinois 60172 | 500 | $150,000 | 5% |
| TOTAL | 10,000 | | 100% |

**EXHIBIT D**

## JOINDER AGREEMENT

This JOINDER AGREEMENT is executed as of the _____ day of _____,
1998 by and between _____ ("Additional Member"), and Kids
Count Entertainment, Inc. (the "Majority Member"), for itself and as Managing Member of
Kids Count Entertainment, L.L.C. (the "Company").

WHEREAS, Additional Member desires to become a member of the Company; and

WHEREAS, the existing members of the Company are bound by the terms of that
certain Amended and Restated Operating Agreement dated as of March 20, 1998 (the
"Operating Agreement"); and

WHEREAS, it is a condition to the Additional Member's admission as a member of the
Company that it execute this Joinder Agreement and thereby become a party to the Operating
Agreement;

NOW THEREFORE, in consideration of the foregoing and for other good and valuable
consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby
agree as follows:

1.    Additional Member acknowledges that it has received a copy of the Operating
Agreement. The Majority Member represents to Additional Member that such copy is
accurate and complete.

2.    This Agreement shall be effective at such time, if any, that the Company accepts
Additional Member's subscription for membership interests in the Company (the "Effective
Date"). The Majority Member shall note the Effective Date next to its signature on this
Agreement.

3.    Additional Member agrees to be bound to all the terms and conditions of the
Operating Agreement as if Additional Member was an original signatory thereto.

4.    The provisions of the Operating Agreement shall remain in full force and effect,
and shall not be modified, changed or affected by this Joinder Agreement except that as of the
Effective Date Additional Member shall be deemed to be a party to the Operating Agreement.

IN WITNESS WHEREOF, the parties have executed this Joinder Agreement as of the date first written above.

ADDITIONAL MEMBER:

_____
[print name]

By:_____
    Its:_____

MAJORITY MEMBER:

**Kids Count Entertainment, Inc.**, for itself and as Managing Member of Kids Count Entertainment, L.L.C.

Effective Date:_____, 1998   By:_____
                                      Vicki Esralew, President