**ASHMAN & STEIN**
ATTORNEYS AT LAW
150 NORTH WACKER DRIVE
SUITE 3000
CHICAGO, ILLINOIS 60606

TELEPHONE
(312) 782-3484

FACSIMILE
(312) 782-4279

November 15, 2006

<u>By Facsimile 312/641-5220</u>
Mr. Tom Crooks
Three First National Plaza
Suite 1950
Chicago, IL 60602

Re:   <u>Soskin, et. al v. Esralew</u>
      <u>Our File No. E-6111</u>

Dear Tom:

You have probably already received Judge Goldgar's Order denying our motion for summary judgment. Accordingly, I have enclosed our proposed stipulations in accordance with his Final Pretrial Order, together with the Exhibits we will include in our Exhibit list. Each of our proposed stipulations is cited to the record in our recently filed 7056-1 Statement.

Please advise if you are willing to stipulate to these facts and documents. Thank you.

Sincerely,
ASHMAN & STEIN

Carey M. Stein

Encl.

CMS:arg
\\Workgroup\disk 1\carey\ACTIVE\esralew adv soskin\correspondence\Crooks ltr 11-15-06.wpd


EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| VICKI ESRALEW<br><br>Debtor, | )<br>)<br>)<br>)<br>)<br>)<br>) |
| ROLLIN SOSKIN, et. al.<br><br>Plaintiffs<br><br>v.<br><br>VICKI ESRALEW<br><br>Defendant | )<br>)<br>)<br>)  No. 04 A 3774<br>)<br>)  Judge Goldgar<br>)<br>)<br>)<br>) |

## STIPULATIONS

The parties hereto stipulate to the following facts:

1. In 1993, Vicki Esralew ("Esralew") organized an Illinois company called Enviar Roads, Inc., which eventually changed its name to Imagine Software Corporation and, then, Kids Count Entertainment, Inc.

2. Kids Count Entertainment LLC ("Kids Count") is an Illinois limited liability company currently existing and in good standing in the State of Illinois.

3. At all relevant times, the "managing member" of Kids Count was Kids Count Entertainment, Inc.

4. Eugene Terry ("Terry") is retired, after practicing law until he was about 55. His JD is from University of Chicago; and he has also taken accounting courses over the years to

1

understand the basics of financial statements.

5. Rollin Soskin ("Soskin") was employed by Terry's firm and later became a partner in same.

6. Terry was responsible for making financial decisions while owning and operating a company known as Precision Carbide and is familiar with financial statements. He has reviewed in excess of 100 balance sheets during his career; and has inspected others. He also has extensive familiarity with business plans, strategic plans and marketing plans.

7. Soskin has been an attorney since 1979, a CPA since 1975, and is also the trustee of several trusts. He is a general practitioner with a heavy emphasis on estate planning, tax and business transactions. He does anything a businessman needs.

8. Soskin acted as a registered agent for Enivar Roads, Inc. and Kids Count Entertainment, Inc. until 1993.

9. In June or July of 1998, Esralew told Soskin about a new business venture and invited him to come see her operation.

10. Soskin met with Esralew in October 1998, and Esralew asked him if he knew of any possible investors in Kids Count.

11. When Soskin met with Esralew, she didn't have any financial statements for the past 4 or 5 months.

12. Soskin believed that Esralew's ideas had merit and that she just needed proper investors. He thought about the Terrys, who were successful in business and had money to invest.

13. Soskin knew that another corporate entity was the manager of Kids Count.

14. Soskin understood the purpose of Kids Count to be the creation and sale of child

2

friendly, nonviolent/educational product.

15. Soskin introduced Esralew to Terry and Terry's wife, Nicole, during the first ten days of November.

16. Esralew impressed the Terrys as someone who was creative but could not run a business.

17. The Terrys met with Esralew, either at Esralew's house or Soskin's house, for at least 4 - 5 hours, during which Terry learned about the background and business of Kids Count.

18. Terry never requested documents regarding the creation of the company but knew it was an limited liability company.

19. Esralew told Soskin and the Terrys that she was convinced that if the company could get an infomercial on the air before Christmas, it would be a huge success, but that the company needed funding to produce an infomercial.

20. After meeting with Esralew, the Terrys did some field work to determine where Kids Count's products were sold.

21. Terry also asked for a six month cash flow statement, as the investment he was considering making in Kids Count was to get the company through 3 - 6 months.

22. After receiving a six month cash flow statement, which he believes was prepared by Soskin, Terry reduced the projected salaries for Soskin and Esralew, requested further information about placement fees, and prepared a memorandum for Soskin regarding the investment he was prepared to make in the business and detailing the amount of money he was willing to invest in the company to get through the production of an infomercial.

23. Esralew, Soskin and the Terrys thereafter had several meetings, including a 10

3

hour marathon meeting at Soskin's house during which Esralew gave sales projections, the parties looked at spreadsheets showing possible projected revenues and expense based upon certain assumptions, and Terry asked Soskin him to help Esralew develop proper documents for him to analyze as an investor.

24. Terry insisted that Soskin be involved in the process of determining whether to make an investment in Kids Count.

25. Soskin produced spreadsheets from the information Esralew had given to Terry, and he, Terry and Esralew all asked questions and provided input.

26. All of the parties agreed that the value of Kids Count in November 1998 was $2.5 million.

27. From the time the parties were first introduced, they were talking everyday and a substantial amount of time was spent meeting and discussing things before an agreement was reached.

28. On November 22, 1998, the parties entered into a Memorandum of Agreement ("Agreement") which was prepared by Soskin after 2 or 3 drafts with input from all of its parties.

29. Each party properly investigated the circumstances and condition of Kids Count. before entering into the Agreement.

30. At the time the Agreement was signed, 94% of Kids Count was owned by Kids Count Entertainment, Inc. and 6% was owned by unrelated parties.

31. Terry and Soskin agreed that Kids Count owed $809, 533 to outside creditors and $196, 445 to Esralew at the time the Agreement was signed.

4

32. At the time the Agreement was signed, Soskin understood that the parties agreed that he and the Terrys were to have equal control over the use of Kids Count funds and that the Terrys were to invest money as needed over a limited period of time for limited uses.

33. At the time Terry signed the Agreement, he had Kids Count's financial statement, had asked additional questions and had modified his initial proposal.

34. All of the information Terry had been given seemed sufficient to make a decision to make an investment in Kids Count; and he believes that all of the other questions he had were answered.

35. Terry and Soskin were to be directors of Kids Count and Esralew was to be responsible for designing new products.

36. Esralew had represented herself to Terry and Soskin to be only a creative type of person who needed help with day to day management.

37. Esralew told Terry and Soskin that she wasn't good at management.

38. Terry was only willing to invest in Kids Count if Soskin was involved to manage the details.

39. Soskin was to help with cash flow issues and check authorization because Esralew claimed those things had caused past failures in the history of the company.

40. Soskin believed that Esralew was incapable of keeping records without someone else doing it.

41. Terry wanted Esralew freed up to focus on the creative side of the business.

42. Shortly after the Agreement was signed, Terry advised Esralew and Soskin that he wanted to meet twice a month with them to discuss the status of the company.

5

43. The documents Terry relied upon to loan money to Kids Count indicated that Kids Count would require between $200,000 and 250,000 from December 1998 through February 1999.

44. Terry was to receive a note convertible into a 10% ownership interest of Kids Count, based upon the $2.5 million valuation he had placed on the company.

45. It was Terry's idea to treat the investment as a loan convertible into ownership so that he would be a secured creditor rather than a stockholder.

45. Harris Bank had a lien on the assets of Kids Count Entertainment, Inc., but Soskin and Terry felt that Terry was first in line on the assets of Kids Count.

46. Kids Count's products were Jack's Attic, Jack's House, an exercise video, Music called Home, and a partially completed game called Spuzzled.[Esalew Dep. pp. 123, 124]

47. The purpose of Terry's investment was to provide cash flow to produce infomercials for which Terry and his wife submitted suggestions.

48. Terry was not prepared to invest a lump sum, but was prepared to invest as much as $250,000, depending on what the company needed as far as cash flow.

49. Terry watched the company's sales figures and deposited checks day to day or week to week for the cash flow required, based upon information Soskin presented to him.

50. Terry knew that sometimes there was not enough cash flow to cover payables during the first four months of 1999.

51. Terry saw communications to Soskin from Joanne Livingston, one of Kids Count's employees, seeking immediate assistance with cash flow issues.

52. Soskin was in charge of accounts payables and accounts receivables; nothing

6

could go out of the company without his approval.

53. The Terrys made receivable loans by writing check to Kids Count.

54. A $27,000 loan to Kids Count by the Terrys, based upon receivables from Discovery Toys, was repaid. [Soskin Dep. pp 43 - 45]

55. Terry believes that the money he advanced to Kids Count was a loan and that he had the right to convert his loan into stock of the company or just get paid back with interest.

56. Terry was also given a security interest and an assignments of Kids Count's receivables.

57. Some of Terry's advances to Kids Count were repaid from its receivables.

58. Terry was not asked to advance additional funds to the company in January 1999.

59. Kids Count had contracted with Robert Blagman ("Blagman") to produce an infomercial before meeting the Terrys.

60. Blagman was to produce the infomercial and choose air times because Kids Count was not an expert at picking times.

61. Kids Count started shooting the infomercial right after the Agreement was signed, over Thanksgiving weekend.

62. Blagman purchased the media and introduced Esralew to the people who shot the commercial.

63. Soskin thinks Blagman was terrible.

64. It took forever to get post-production work done on the infomercial.

65. Soskin believed that the script for the infomercial was so bad and confusing that he and Terry's wife finally rewrote it.

66. Terry doesn't believe Blagman succeeded in what was represented to him.

67. Terry doesn't believe Blagman did a good job buying media time.

68. Kids Count's infomercial aired from December 23, 1998 through about January 20, 1999.

69. Kids Count's informercial resulted in a lot of response, but less than 50% of the calls were converted into purchases.

70. By the time Kids Count started getting a better response from the infomercial, it was out of media money.

71. Terry believes that Esralew gave her best effort to make the infomercial a success.

72. In late January of 1999, Terry expressed his belief that the informercial would "not produce a positive cash flow" but that Esralew "has done a fantastic job getting us this far".

73. In late January of 1999, Terry believed that one of the reasons the infomercial was not successful was that Esralew was not being perceived by consumers as an "expert" and that an alternative would be "to hire an educational expert or organization to endorse the product and then redo the ad", however, he recognized that this would require more funds than Kids Count had or to which it had access.

74. In late January of 1999, Terry suggested that Kids Count seek out new investors.

75. Blagman owed Kids Count either time or money.

76. It was decided that only Soskin would deal with Blagman.

77 On May 3, 1999, Soskin informed Blagman by letter that he had "been asked to file claims against you for breach of contract, breach of fiduciary duty and conversion of funds".

78. On May 9, 2003, Blagman wrote Soskin that he "would no longer communicate

8

with (Esralew)"

79. Terry knew Kids Count was in financial trouble and that his investment was at risk.

80. Terry did not independently seek any investors.

81. None of the Plaintiffs disagreed with Esralew's desire to bring new investors into Kids Count.

82. Terry met with Peter Abruzzo ("Abruzzo") to discuss investing capital into the company, but Abruzzo did not bring any new investors into the company.

83. Soskin also met with Abruzzo in February 1999, to discuss a potential investment, however, he didn't negotiate with Abruzzo.

88. Esralew asked Terry to meet with a Joanne Marlowe regarding a potential investment, however, Terry asked Soskin to meet with Marlowe instead.

89. Terry is not aware of any additional investors actually investing money in Kids Count.

90. By February 1999, Kids Count's business was about the same as it was before Soskin and the Terrys got involved.

91. On April 28, 1999, Terry, Soskin and Esralew met to discuss the status of the company, raising money, a possible bankruptcy and calling a creditors meeting.

92. At the April 28, 1999 meeting, Soskin said that some of the options Kids Count should consider were bankruptcy and an assignment for the benefit of creditors. The participants in this meeting also discussed cutting back all overhead costs to a minimum as well as having Esralew travel around the country to promote the company's products, but no discussion as to

9

how this travel would be funded; and no plan of any kind was put into operation.

93.  By May of 1999, Kids Count was unable to pay its bills.

94.  Soskin has no idea what business Kids Count did after May 1999.

95.  On November 15, 2000, Esralew wrote to the Terrys with a plan to pay Kids Count's creditors, including the Terrys, by licensing Kids Count's products to a new company to be formed; and sought the Terry's consent to this arrangement.

96.  On and after January 1, 2000, Kids Count entered into distribution and licensing agreements for the purpose of continuing to sell Kids Count products, including agreements with Vickilew, LLC., a Delaware limited liability company, and Good Sector LLC, another Illinois limited liability corporation. All of these agreements recite that Kids Count is the owner of the products and copyrights for the products to be sold and provide that Kids Count was to be paid marketing fees and/or minimum and percentage royalty payments in connection with such sales.

| Plaintiff: | Defendant |
|---|---|
| By: _____ | By: _____ |
| One of her attorneys | One of their attorneys |
| | |
| Carey Stein | Thomas Crooks |
| ASHMAN & STEIN #37710 | Three First National Plaza |
| 150 North Wacker Drive | 70 W. Washington |
| Suite 3000 | Suite 1950 |
| Chicago, Illinois 60606 | Chicago, IL. 60602 |

\\Workgroupdisk_Fcarey\ACTIVE\esralew adv soskin\Trial\proposed stips.wpd

11