Exhibits A, B, C to Plaintiff's Response to Defendant's Motion in Limine to Exclude Testimony of Robert Blagman and Peter Abruzzo:

    A.    Affidavit of Robert Blagman

    B.    Affidavit of Peter Abruzzo

    C.    Excerpts of Eugene Terry deposition

**EXHIBIT A**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In Re: ) | |
| ) | |
| ) | Case No. 04-B-24393 |
| VICKI E. ESRALEW ) | Chapter 7 |
| ) | |
| Debtor. ) | |
| ROLLIN J. SOSKIN, EUGENE ) | |
| TERRY, NICOLE TERRY and ) | |
| TERRY'S COMPANY, INC. ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Adversary Proceeding |
| ) | No. 04 A 3774 |
| ) | |
| VICKI E. ESRALEW, ) | Judge Goldgar |
| Defendant. ) | |

Affidavit of Robert Blagman

Robert Blagmen, after first being duly sworn on oath, deposes and states:

1. I have personal knowledge of the statements made in this affidavit and if called upon to testify could so testify in open court.

2. I was hired in the Fall of 1998 to produce a television commercial for Kids Count Entertainment, L.L.C. I dealt directly with Vicki Esralew and her husband, Robert Aren.

3. Based upon conversations I had with Vicki Esralew during October and November of 1998 she knew that if we started filming the television commercial immediately after Thanksgiving it would not give us enough time to complete the post production work and have the commercial on the air in time for an effective Christmas sales campaign.

4. In the Fall of 1998 there were outstanding invoices to Kids Count based on work my company had done. After November 22, 1998 I was directed by Esralew to resubmit the bills and

they were then paid.

5. In December of 1998 and early 1999 I traveled to Chicago three times in order to meet with potential investors in Kids Count that Esralew arranged for me to talk to. Esralew said that she was hoping to get financing from these people in order to buy out Soskin and the Terrys and move forward without them. Esralew told me she wanted to get financing through Peter Abruzzo or contacts made through a Dr. Leonard Makowka. Each time I traveled to Chicago to meet with the potential investors I was instructed by Esralew not to let Mr. Soskin or the Terrys know I was coming to town and not to tell them that I was working with Esralew and Aren to find other investors to replace them.

6. During December of 1998 and January of 1999 I was constantly given direction by Esralew that contradicted what I was being told by Mr. Soskin. Esralew directed me to lie to Mr. Soskin on many occasions. I was told by Esralew during this time period to withhold information about Peter Abruzzo from Soskin and the Terrys.

7. I met with Dr. Makowka at Esralew's home in December of 1998 to discuss a possible investment by people he knew. I was directed by Esralew to make up a story about what I was in town for and not to tell Soskin or the Terrys that I was meeting with Dr. Makowka about a possible investment.

8. Based upon the dealings I had with Esralew the second half of 1998 and first half of 1999 and having had an opportunity to observe her engage not only with Soskin and the Terrys, but also a number of potential investors, I came to the conclusion that she uses people for their money and then drops them so she can look for the next person to give her money.

9. Attached to this affidavit is a true and correct copy of a letter dated May 23, 1999 which I sent to Mr. Soskin and the Terrys. On page 4 of that letter I explained to them for the first

time the problems I was having months earlier when Esralew was directing me to withhold information from and even lie to Soskin and the Terrys.

Executed this _____ day of February, 2006.

_____<br>Robert Blagman

SUBSCRIBED AND SWORN
To before me this _____ day of February, 2006

_____
Notary Public

**EXHIBIT B**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In Re: )
)
VICKI E. ESRALEW )     Case No. 04-B-24393
)     Chapter 7
Debtor )
_____)
)
ROLLIN J. SOSKIN, EUGENE )
TERRY, NICOLE TERRY and )
TERRY'S COMPANY, INC. )
Plaintiffs; )
)
vs )     Adversary Proceeding
)     No. 04 A 3774
VICKI E. ESRALEW )
Defendant, )     Judge Goldgar

### Affidavit of Peter Abruzzo

Peter Abruzzo, after first being duly sworn on oath, deposes and states:

1. I have personal knowledge of the statements made in this affidavit and if called upon to testify could so testify in open court.

2. During and after October, 1998 I had personal conversations with Vicki Esralew and her husband Robert Aren, concerning the possible investment by me of both money and time in their company, Kids Count Entertainment, LLC.

3. During November, 1998 I became aware that they were also negotiating with Eugene Terry, Nicole Terry, and Rollin Soskin, but was asked by Vicki Esralew to keep our conversations confidential while she dealt with the Terrys, and Soskin. Our conversations continued through November and December, even though I have subsequently been made aware that Esralew and Aren signed an agreement with Soskin and the Terrys in November, 1998.

Case 04-03774 Doc 95-1 Filed 12/04/06 Entered 12/04/06 11:55:35 Desc Exhibit
02/20/2006 14:53 8473299998 Exhibits A B C SOSKIN GUTOF ROMANOF PAGE 04/05
Page 8 of 15

Feb 20 06 03:12p p.3
02/20/2006 14:37 8473299998 SOSKIN GUTOF ROMANOF PAGE 03/04

4. During all of my conversations with Esralew and Aren, they were asking that I use my personal management skills and experience to run the company, leaving Esralew free to create new products. I was not aware at that time that Esralew and Aren had agreed to equal management control with Soskin and the Terrys.

5. It was not until sometime in January, 1999 that I was introduced to Soskin and the Terrys for discussions concerning my possible involvement in the company.

6. Although negotiations between Esralew and myself did not result in an agreement with Soskin and the Terrys, Soskin and the Terrys continued to welcome my involvement at Esralew's request.

7. In addition to my negotiations with Soskin and the Terrys, Esralew continued to request that I introduce her to others who might be interested in investing in the company, including Jim Robinson of Morgan Creek Productions. Throughout the negotiations, Esralew promised that if I would introduce her to someone who would invest in the company, she would sell me part of her own shares in the company. To my knowledge, this was not prohibited by her agreement with Soskin and the Terrys.

8. In or about April, 1999 I did in fact arrange a meeting for Esralew with Mr. Robinson. Upon return from that meeting, Esralew advised that Robinson was very interested and prepared to invest in the company, but that he was only interested in her as the "talent" and Esralew then indicated that she would not honor her agreement to sell me part of her interest in the company, despite the apparent willingness of my referral to invest.

Case 04-03774   Doc 95-1   Filed 12/04/06   Entered 12/04/06 11:55:35   Desc Exhibit
Exhibits A    B    C    Page 9 of 15

02/20/2006  14:53    8473299998    SOSKIN GUTOF ROMANOF    PAGE 05/05
Feb 20 06 03:15p    p.1
02/20/2006  14:37    8473299998    SOSKIN GUTOF ROMANOF    PAGE 04/04

Further affiant sayth naught:

Executed this 19 of February, 2006

Peter Abruzzo

Subscribed and Sworn to before me
this 19 day of February, 2006.

Notary Public

KIMBERLY L. AMBROSE
NOTARY PUBLIC
OFFICIAL SEAL
STATE OF ILLINOIS
MY COMMISSION EXPIRES
SEPTEMBER 22, 2009

### Affidavit of Peter Abruzzo

**EXHIBIT C**

### Page 38

1  projected cash flow --
2    A.  Right.
3    Q.  -- statements and then you came to an
4  understanding and an agreement and you signed --
5    A.  We met on this. I mean, in fact I think it was
6  either that evening or the next day. We met -- I don't
7  remember the exact place we met. That might have been at
8  Rollin's house again. It might have been at her house. We
9  met to discuss these particular things and that's when the
10 discussion came up in regard to an attorney, when the
11 discussion came up in regard to who's going to get salaries,
12 when -- those particular points. Whether I could do this or
13 not. And some of these questions were answered like
14 insurance and so forth. And that was the sum and substance
15 of the -- of the meeting.
16   Q.  And you were satisfied at that point with the
17 information you were given?
18   A.  Well, I had had -- all the information I had been
19 given up to this period seemed to me to be sufficient for me
20 to make a decision to make this investment.
21   Q.  And then you entered into that memorandum of
22 agreement on November 22nd?
23   A.  Correct.
24   Q.  Now, if you look at the memorandum agreement --
25 and I'm going to ask -- it indicates -- paragraph number one

### Page 39

1  indicates that you would invest 200 to 250 thousand dollars
2  as December 1998 through February 1999. Is that correct?
3    A.  Correct.
4    Q.  And did you in fact invest that amount of money?
5    A.  The amount -- the total amount of money invested
6  was around 200,000.
7    Q.  Were you reviewing financial documentation -- it
8  indicates as cash flow shall require, is that right?
9    A.  Right, that's correct.
10   Q.  So you were periodically reviewing cash flow
11 statements to determine how much to invest, how much money
12 to put in?
13   A.  We -- we would get -- are you saying were there
14 formal, written cash flows produced by computer or an
15 accountant? No. What we had was almost day to day how much
16 sales we had made, how much -- how much more money was
17 needed, put in more money, etcetera, etcetera, write a check
18 to deposit. So it was almost like day to day, week to week
19 we were reviewing what was -- what cash flow required.
20   Q.  And would you make a request for that information
21 to somebody or would somebody just --
22   A.  A request for somebody -- yeah, generally I --
23 Rollin -- or he'd present it to me, yes.
24   Q.  Why did you -- what was -- what was your
25 understanding that your -- in -- of your investment? What

### Page 40

1  was it going to go to?
2    A.  To produce -- the purpose of the investment was to
3  produce the intro commercials that were in the hopper so to
4  speak, that were going to produce the cash flow that was
5  going to provide the company, etcetera, etcetera.
6    Q.  And were those infomercials produced?
7    A.  Were they produced? Yes.
8    Q.  Did you see them?
9    A.  Yes.
10   Q.  Did you see them on television?
11   A.  I think we saw one in Chicago. Okay.
12   Q.  What did you think?
13   A.  What did I think? I think -- I think it -- you
14 want to know what I think?
15   Q.  Did it look professional?
16   A.  Yes. We had some suggestions. When I say we I'm
17 usually referring to my wife. We had some suggestions to
18 make which we submitted.
19   Q.  When you look at paragraph one of that memorandum
20 agreement and it says that you will invest 200 to 250
21 thousand dollars between December of '98 and February of '99
22 as cash flow requires. Who would determine what the cash
23 flow required? Did you determine that?
24   A.  Who would determine that? It was my understanding
25 when I submitted this, and I believe it was the

### Page 41

1  understanding of everybody, that we did not know at that
2  particular time whether the first week we produced $200,000
3  worth of profit, two million dollars worth of profit. Do
4  you understand? We didn't think it would produce five
5  dollars worth of profit, okay? We had projections and I --
6  I'd say prospectuses and all kinds of things.
7    Q.  But anything was possible?
8    A.  Anything was possible? Well, sure, anything is
9  possible. I mean --
10   Q.  But I mean with respect to the cash flow needs of
11 the company you didn't know? It could --
12   A.  Yeah, but I was what --
13   Q.  Go ahead.
14   A.  I was not prepared to put in 200 or 250 thousand
15 dollars and now you do with it what you want. How much is
16 required now for the first week? What does Blagman want,
17 what does this one want, what does that one want? And we
18 need -- it's 40 -- I'm making up figures. It's $42,000 and
19 our revenues are only 40,000 so we're short $2,000. We may
20 be short the -- the money doesn't come in -- it was on
21 credit cards -- for a week so we may be short for a week and
22 therefore I was prepared -- I wasn't prepared to put in a
23 million dollars but I was prepared to put in, depending on
24 what the cash flow showed from the informationals up to 200
25 to 250 thousand dollars. And it showed about 200,000 as I

Page 54

1 that she was a creative kind of person, that she would
2 develop the products, okay? That whatever was involved in
3 regard to management she would perform, that it was really
4 -- what she needed was direction, okay, help on -- on
5 certain things which she was in my opinion frightened of,
6 okay?
7  Q. You were aware that she was desperate for a --
8 someone to come in to run the company, the day to day
9 running of the company, is that correct?
10  A. Yeah, she wanted somebody to -- yes. She was
11 desperate for money more than she was desperate for somebody
12 to run the company.
13  Q. Why did you wink at me?
14  A. Wink at you?
15  Q. We are taking a video dep --
16  A. Because -- yes, I winked because I assumed that
17 you knew that -- that --
18  Q. I don't assume anything, Mr. Terry.
19  A. Okay, then I won't wink anymore.
20  Q. I think that's probably something your attorney
21 would tell you not to do.
22  A. But no, I could have changed my -- because you're
23 such an attractive -- so I could have done that.
24  Q. Okay. You practiced law for a considerable period
25 of time, didn't you, Mr. Terry?

Page 55

1  A. Yes.
2  Q. Let me ask you one question before we go there.
3  A. Okay.
4  Q. You said that you had suggested that Mr. Soskin is
5 going to work so many hours in the company. That was
6 something that you had made a suggestion of, correct? Do
7 you recall that?
8  A. Suggest? No, I insisted on it.
9  Q. And how many hours was he supposed to work?
10  A. Boy, I don't remember the exact terms but it was
11 written down as something. In the final agreement -- is it
12 in here or -- one minute. Here we go. Here, 60 hours --
13 look at paragraph eight. In -- in Exhibit number 1, which
14 is the memo I wrote, number eight relates to the hours.
15  Q. And that was done at your -- put in there at your
16 insistence?
17  A. The 60 -- yeah, I believe the 60 was put in at my
18 insistence. I knew I wanted him involved for the reason
19 that I just gave. As -- whether it was 60 or 20, I believe
20 it was my suggestion 60.
21  Q. Do you think you put in 60 hours? Is that 60
22 hours --
23  A. It's the last -- the second to the last paragraph.
24  Q. Mm-hmm. 60 hours a month?
25  A. A month, yeah. Well, I meant a month.

Page 56

1  Q. Do you think he put in 60 hours a month?
2  A. I do.
3  Q. Did you ever see billing from him indicating that
4 he had put in 60 hours a month?
5  A. No.
6  Q. Now, let me ask you a question about the
7 infomercials. Did Vicki Esralew work on that infomercial?
8  A. Yes. To the best of my knowledge, yes.
9  Q. Do you think she gave her best effort to make that
10 infomercial a success?
11  A. Yes.
12  Q. Why do you think the infomercial didn't work,
13 didn't generate the sales that you had hoped or that
14 everyone I guess had hoped?
15  A. Okay. There were several reasons. Number one, I
16 was told that we were going to be on before Christmas --
17 Christmas season was the -- and I think in one of the memo
18 you'll find the term Christmas season which would be before
19 Christmas, because that was the big period when -- as we all
20 know that's when people are out shopping and buying things.
21 That was the most important thing. We never succeeded in
22 that, okay? As I recall the first commercial was the 28th,
23 I believe, of December. It might even have gone to January.
24 I'm not certain. That was the first one that we had.
25 Number two, the -- the -- the times that we had, okay, might

Page 57

1 have been better used, the time that was involved was better
2 used, okay? And she was checking the times that were being
3 used, okay, and the various reasons why --
4  Q. Let me -- let me back you up --
5  A. -- we were on at 3:00 in the morning instead of
6 2:00 in the morning.
7  Q. Let me back you up. You say she. You mean Vicki
8 Esralew --
9  A. Vicki, yes.
10  Q. -- was checking the times?
11  A. Yes, we would get the --
12  Q. Let me -- let me ask you a question. Do you know
13 Robert Blagman?
14  A. Do I know -- yes.
15  Q. And who is Robert Blagman?
16  A. Robert Blagman is the person that the company
17 hired to produce -- to be involved in producing the
18 infomercial and putting on the -- choosing the times -- a
19 medium (sic) buyer I think the term used.
20  Q. Media buyer?
21  A. I think he's -- he was -- would be involved in the
22 medium buying, advice in regard to the infocommercials,
23 generally things of that nature because as I understood it
24 that particular thing we weren't experts on.
25  Q. When you say we weren't experts?

Page 58

1  A. Kids Count and Kids Entertainment Count.
2  Q. Did you ever meet Mr. Blagman?
3  A. Yes, I met him I believe once.
4  Q. When?
5  A. Oh, boy, I can't remember the date. I don't
6  remember -- I believe it was in January of '99. But I don't
7  -- I'm not sure of that. I have to look at -- through the
8  files which are --
9  Q. Who else was there at that meeting?
10 A. At that meeting present as I recall was my wife --
11 it was at my house. It was my wife, I was present. I can't
12 recall who else was present. Who else was present? Unless
13 I go to find a memo or something I really don't know exactly
14 who was present at that -- it was at my house though. I --
15 I know my wife was present. I believe Rollin but I cannot
16 -- unless I look at the records.
17 Q. And you'd indicated that he was hired to be
18 involved in producing the commercial and choosing the times
19 and media buying, is that correct?
20 A. He was hired -- and advising us what should sell
21 and what should not, that type of thing, yes.
22 Q. And did he do his job?
23 A. Did he do his job? Okay? It's difficult for me
24 to tell you that because I wasn't there with the day to day.
25 Did he succeed in what we -- what we -- what was represented

Page 59

1  to me? No. Why he didn't --
2  Q. Well, let me ask you --
3  A. Yeah --
4  Q. -- did you think he did -- if he did his job do
5  you think he did a good job?
6  A. Do I think he did a good job? It's very difficult
7  for me to answer that question because the fact that we
8  weren't successful means that the thing failed. Under the
9  circumstances did he do a good job, under the circumstances
10 being what we approved to him, okay, the infocommercial,
11 okay, whether -- that type of thing? It could be he did a
12 bad job. He should have advised us to do this and he should
13 have advised us to do that. So it's difficult to say. If
14 you ask me a specific thing, did he buy good media time?
15 The answer is no. Did he do this? The answer might be yes.
16 Q. Was he paid for his job?
17 A. Yes. As far as I know, yes.
18 Q. And how often did you communicate with Mr.
19 Blagman?
20 A. Did I personally communicate with Mr. Blagman? It
21 was not on a weekly basis. It was two times that I directly
22 spoke to him. With regard to Mr. Blagman I either spoke
23 about him, what was happening, with either Vicki or Rollin.
24 Q. So you would primarily communicate about him with
25 Vicki and Rollin, is that right?

Page 60

1  A. Yes.
2  Q. And was there ever a decision -- do you recall a
3  decision being made between the parties, you and your wife
4  and Rollin and Vicki and maybe Mr. Aren, that Mr. Soskin
5  would primarily deal with Mr. Blagman?
6  A. There was -- there was one time, okay, when there
7  was a meeting and -- and there was -- Vicki and Rollin, they
8  believed that -- well, Blagman owed us time but -- I don't
9  know what it was, the billing or something, but he owed us
10 either time or money, and that Rollin should send out a -- a
11 strong letter to him, that type of thing. So there was that
12 incident, okay? And I recall at this time -- repeat the
13 question again? Did I deal directly with him or --
14 Q. No, do you recall a meeting -- and I -- my
15 recollection of the documents indicates that it might have
16 taken place sometime in late April or early May where the
17 parties, yourself --
18 A. Yes.
19 Q. -- and your wife and Ms. Esralew, Mr. Aren and Mr.
20 Soskin met and discussed Mr. Blagman?
21 A. Yes.
22 Q. Do you recall that meeting -- at that meeting a
23 decision being made that only Mr. Soskin would deal with Mr.
24 Blagman?
25 A. Not that only Mr. -- no. It is only Mr. Soskin

Page 61

1  that would deal with Mr. Blagman? No.
2  Q. Should communicate with Mr. Blagman about --
3  A. Only he should do it? On this particular subject,
4  what was owed to us? Yes.
5  Q. And do you know if Mr. Soskin had communication
6  with Mr. Blagman after that point?
7  A. To the best of my knowledge he did.
8  Q. And what type of communication would that have
9  been?
10 A. I believe he sent him a letter.
11 Q. Do you know if he spoke with him?
12 A. I don't not recall whether he spoke to him or not.
13 Q. Did you ever give Mr. Blagman cigars?
14 A. Yes.
15 Q. When was that?
16 A. Okay. At the meeting that I related at my home
17 when I met him, one of the things I did was give him two
18 very good cigars, which he thanked me very much for.
19 Q. And that was a meeting in January about '99 at
20 your house?
21 A. Well, I cannot remember the exact -- it might have
22 been January or February but I cannot remember the exact --
23 the date. I'd have to refresh my memory going through the
24 files and so forth. But I don't remember exactly. But I
25 remember the meeting, I mean, where it was and who was --

Page 62

1 and that I gave him cigars.
2   Q. Was -- was Vicki Esralew present at that meeting?
3   A. I cannot recall whether she --
4   Q. Had the info --
5   A. I'm trying to refresh my memory with -- asking my
6 wife.
7   Q. Had the infomercial been aired by that point?
8   A. I believe it had. I believe it had and we were in
9 the process of -- I believe, but I'd have to check my files,
10 we were in the process at that time of continuing them. I
11 believe they -- they continued through February, the
12 infomercials. Not as strong as -- as in January but they
13 sort of petered out.
14   Q. Were you aware of the lack of success of the
15 infomercial at that point when you met with Mr. Blagman at
16 your home?
17   A. We -- at that particular point in time they had
18 failed. Whether we could tweak them by doing something else
19 or change things or so forth, I believe that was part of the
20 discussion. What -- what -- it was a general discussion,
21 you know, the details but the -- the types they were and how
22 this product sells and sometimes you have to wait and things
23 of that nature as a director would be. I did not discuss
24 with him to do this time or that time or to change this one
25 or change that one. General -- a management discussion.

Page 63

1   Q. Did you discuss with him your disappointment in
2 the results of the infomercial?
3   A. Yes, that's why -- yes, we did tell him we didn't
4 think they were successful.
5   Q. Did you ever meet with Mr. Blagman without Vicki
6 Esralew's knowledge?
7   A. No.
8   Q. Did you ever communicate with Mr. Blagman without
9 Vicki Esralew's knowledge?
10   A. Did I? No.
11   Q. Do you know if Mr. Soskin communicated with Mr.
12 Blagman without Vicki Esralew's knowledge?
13   A. I -- whether he did or -- I do not know.
14   Q. You do not know?
15   A. No.
16   Q. Did Vicki Esralew ever ask you to help raise money
17 for the company to keep it operating?
18   A. To help raise money? Yes.
19   Q. Did you in fact help raise money to keep the
20 company operating?
21   A. During the relationship with -- with Kids Count
22 and Vicki there were various people that she had contacted
23 who had indicated that they might invest in the company.
24 Some of them were mentioned already in that position.
25   Q. I'm asking you not who she contacted. Did you

Page 64

1 ever arrange meetings with potential investors or contact
2 anyone that might be interested in bringing --
3   A. I believe I spoke --
4   Q. -- capital into the --
5   A. -- with --
6   Q. -- company?
7   A. -- Abruzzo. I believe we had a meeting with him.
8 He was one of the parties that was involved.
9   Q. Was Mr. Abruzzo someone that you brought?
10   A. No.
11   Q. No. Did you independently of -- of Vicki Esralew
12 or Bob Aren -- did you --
13   A. Okay.
14   Q. -- did you bring any potential investors to the --
15 the business?
16   A. Not that I can recall.
17   Q. If not, why not? You knew the company was in
18 financial distress, correct?
19   A. Correct.
20   Q. And they were looking for people to put some money
21 in to keep the business going. Why wouldn't you have
22 brought people that might be interested to look at the
23 business?
24   A. Because Vicki had indicated to us that she had
25 several resources, Abruzzo and three or four others, that

Page 65

1 she was going to take care of. They were very interested.
2 That perhaps we were going to get financing in 60 days.
3 These guys know how to do it, etcetera, etcetera. And we
4 relied on that.
5   Q. So you knew the company was in financial distress.
6 You had approximately $200,000 invested in this company,
7 whether an investment or a loan, and you didn't go out to
8 help seek investors, is that correct?
9   A. Independently go out and seek investors?
10   Q. Yes.
11   A. No.
12   Q. But you are aware of investors that Ms. Esralew --
13 potential investors that she brought to the business --
14   A. Yes.
15   Q. -- to try to raise money? And did you ever attend
16 any of the meetings that she had arranged with potential
17 investors?
18   A. Yes.
19   Q. And how many of those meetings would you say you
20 attended?
21   A. I attended the meeting with Abruzzo. I believe to
22 the best of my recollection that the meeting that I had with
23 Blagman at our house, he had somebody -- a doctor somebody
24 -- I forgot the name. In fact, I -- I believe that Vicki
25 had produced the -- a resume, a four or five page resume.