Exhibits D and 16 to Plaintiff's Response to Defendant's Motion in Limine to Exclude
Testimony of Robert Blagman and Peter Abruzzo:

      D.      Excerpts of Rollin Soskin deposition

      16.     May 23, 1999 memo from Robert Blagman to Rollin Soskin, Gene Terry
and Nicole Terry; May 23, 1998 agreement between Robert Blagman and Vicki Esralew.

**EXHIBIT D**

1    Terrys and weren't even to be deposited anymore

2    into Kids Count Entertainment because they shut

3    us out and were depositing funds received by the

4    company into accounts other than the agreed-upon

5    accounts and they were making expenditures.          01:55PM

6         Q.   Let me back you up.   I wanted to talk

7    about the Terrys' investment.

8         A.   Okay.

9         Q.   They purchased inventory, they made

10   receivable loans.                                    01:55PM

11             Were there other monies advanced?

12        A.   Sure.   They paid out directly $50,000

13   for a media buy of Blagman & Associates and they

14   paid out about $100,000 to do the infomercial in

15   cash -- check.                                       01:55PM

16        Q.   So the media buy was 50,000?

17        A.   I believe so.

18        Q.   And then another hundred?

19        A.   Right.

20        Q.   If you take a look at paragraph 2 of the   01:55PM

21   agreement, it indicates that in addition to the

22   two to $250,000 investment, the Terrys will

23   deposit the sum of $27,000 into a bank account in

24   the name of Kids Count.

CAROL RABER & ASSOCIATES (312) 446-6926

1    raise money.  She wasn't making any --

2         Q.   I asked --

3         A.   Yes, the company was in horrible shape

4    because she didn't do anything for it except lock

5    us out.                                                    02:24PM

6              It was pretty much then that we found

7    out --

8         Q.   There's nothing pending right now.

9         A.   Okay.

10             It's hard to just answer --

11        Q.   I'm sorry?

12        A.   I said it's hard to just answer the

13   question because --

14        Q.   I know.

15        THE WITNESS:  Off the record for a second.

16                  (Discussion off record.)

17   BY MS. KROL:

18        Q.   The memorandum agreement refers to a

19   short time frame.  It recognizes that there's a

20   short time frame.                                          02:25PM

21        A.   If you say so.

22        Q.   Well, let me see if I can find it on

23   here.

24        A.   Telling the time frame during which the

CAROL RABER & ASSOCIATES (312) 446-6926

1    Terrys will be investing money?

2         Q.   That's right.

3         A.   That was based on Vicki's

4    representations as to how fast we would be

5    generating money from the infomercials, how we          02:25PM

6    would be making money hand over fist to make

7    additional media buys out of profits, out of

8    sales.

9         Q.   So the intent, the idea was to create an

10   infomercial?                                             02:26PM

11        A.   We did.   The day we signed this thing --

12   yeah, the day we signed this thing or the next

13   day, she already had the crews -- as soon as the

14   Terrys committed, she had crews ready to shoot

15   the infomercial.   She had found space or Robert         02:26PM

16   Blagman had; they had camera people there.   You

17   know, I was in Florida when they started.   I

18   didn't get there until the second day of

19   shooting.   But they were -- I could be wrong,

20   actually this was the 22nd.   The shooting started       02:26PM

21   over Thanksgiving.   But they -- they couldn't

22   wait to get started on the infomercial.

23        Q.   So they made the infomercial?

24        A.   Oh, yeah.   That $150,000 was spent

1    within days of signing the agreement, the first

2    150- for the media buy and the infomercial.

3         Q.   Did it air?

4         A.   You bet.

5         Q.   What was --                                   02:27PM

6         A.   Although it took forever to get the

7    post-production work done.  You know --

8              You don't want me to expand on the

9    answers, but I've got to tell you Robert Blagman

10   told us -- she told us we can get it on within a      02:27PM

11   week if we do the shooting.  We'd get it on by

12   December 7th or December 10th, we'll have a good

13   2 1/2 weeks until Christmas, we'll make a

14   fortune.

15             Robert Blagman told us that she knew         02:27PM

16   from the beginning that there was no way this was

17   getting on the air before Christmas or at least

18   much before Christmas.  I think we finally got on

19   the 23rd of December.  And it's not because of

20   any delay on our part.                                 02:27PM

21        Q.   But you just said that she had

22   production people there the next day.

23        A.   Well, she had it set up -- well,

24   actually, if you read Robert Blagman's letter,

CAROL RABER & ASSOCIATES (312) 446-6926

1    apparently she hired Robert Blagman in September,

2    so she couldn't have been in that desparate of

3    straits that she didn't think she wasn't going to

4    have somebody paying for this commercial.

5       Q.   So Mr. Blagman was already --                02:27PM

6       A.   Her media buy consultant and infomercial

7    expert.

8       Q.   He was already there and familiar with

9    what was going to be done?

10      A.   Well, when you say "there," I mean I'm      02:28PM

11   sure --

12      Q.   Well, in place.  He had been retained?

13      A.   Yeah.  Because actually as I was

14   re-reading his letter today, it turns out the

15   first -- I realized she used part of our money to   02:28PM

16   pay for services provided before we were ever in

17   the deal.  He had trips to see her and expenses

18   with her from September on.  She wasn't supposed

19   to be paying pre-existing debts with our money.

20      Q.   But his debt was in the production of       02:28PM

21   this infomercial, wasn't it?

22      A.   No, not -- he -- his billing for after

23   the infomercial and beyond was part of this.

24   Whatever research they did, beforehand and

1    design, she did before, to get to the point where

2    she told us what she wanted to do.

3           And I hadn't even noticed that until I

4    read that letter today.

5           Q.    Did Robert Blagman do anything other          02:28PM

6    than purchase media in the confines of producing

7    this infomercial?

8           A.    I suspect he introduced Vicki to the

9    people who shot the commercial.

10          Q.    But his services that were rendered were       02:29PM

11   rendered generally to help in the production of

12   this infomercial; is that correct?

13          A.    From the time I met him on forward they

14   were.  Well, with the production of the

15   infomercial and the buying of our time going          02:29PM

16   forward.

17          And he was terrible, and she was to be

18   supposed to be our expert in that area.

19          Q.    So the infomercial ended up being made

20   and aired on television.  And how did it do?          02:29PM

21          A.    It got a lot of response.  And normally

22   when you get a response, you should convert

23   90 percent of the calls to purchases; and we were

24   converting less than 50 percent, and that was

1    because the script was so bad and confusing, but

2    that's something that Vicki wrote.  So Nicole and

3    I finally rewrote the script and started getting

4    a better response; but by then we were about out

5    of media money and Vicki was turning her back on          02:30PM

6    us and talking about letting other people run the

7    company.  So the Terrys stopped being interested

8    in putting in more money to buy more media time

9    because we still had money left.  And --

10        Q.  Let me back you up.                               02:30PM

11             What time frame?  The original

12   commercial ran, you said --

13        A.  December 23rd through maybe January 20th

14   or something, or beyond.  You know, Vicki --

15   understand Vicki told us that before -- and my           02:30PM

16   understanding from knowing her before was her

17   jobs before this company or outside of this

18   expand were buying and placing advertising time,

19   media time for Kraft Foods and Nevada Bob's, and

20   she worked at WGN I think part of the time at one        02:30PM

21   point -- I'm not sure.  She was our media buying

22   expert, and she wanted to go in this direction.

23   And somehow we found out that she never oversaw

24   what Blagman did.

1          And, you know, now I look back -- and

2     common experience will tell you that if you see

3     -- if you want somebody to get your phone number

4     from an infomercial, you've got to run it two or

5     three times every half hour so that people can          02:31PM

6     get a pen after the first time they see something

7     they like.  These people -- she and Robert

8     Blagman -- were running a commercial once an hour

9     on a channel and not running it again.  And they

10    spent $35,000 or more running single-shot              02:31PM

11    infomercials where nobody who was interested

12    could write down a phone number.  So the number

13    of calls was limited.

14         The script was horrible and confusing

15    which she had written with the telemarketing          02:31PM

16    company.  And Nicole and I finally redid it.  But

17    they were trying to sell three products and

18    additional add-ons and...

19         Q.   So it didn't work?

20         A.   Yeah.  But not because it wasn't a good     02:31PM

21    informercial and not because it wasn't a good

22    product.

23         Q.   Blagman was supposed to be the expert in

24    the media buy, wasn't he?

CAROL RABER & ASSOCIATES (312) 446-6926

1      A.   No, he was the purchasing agent.  Vicki

2   was supposed to be the media in the media buy.

3   But we all listened to Robert and we followed his

4   and Vicki's recommendations.  But Vicki wasn't

5   paying attention to it.                                    02:32PM

6      Q.   Did he make recommendations?  Did Vicki

7   make recommendations outside of Blagman's

8   recommendations?

9      A.   She had a whole ongoing relationship

10  with him outside of our knowledge that he later        02:32PM

11  acknowledged to us.  She gave him instructions

12  and told him to spend some our media money on

13  other things.   She --

14     Q.   Other things like what?

15     A.   His other expenses unrelated to media        02:32PM

16  buys.

17     Q.   Which would have been what?

18     A.   Paying off the film syndicate that made

19  part of the movie.  That wasn't part of --

20          They gave us a fixed price, or he            02:32PM

21  represented a fixed price and he represented X

22  dollars for the media buy.  Well, he started

23  paying his prior time for time that he spent with

24  her, and phone calls, and trips that he made to

1    her, with her, before we were involved.  He

2    included his times for his trips to Chicago to

3    bring somebody out to -- potentially an investor

4    to make other contact for our business, which she

5    told us that he didn't come so we wouldn't come          02:33PM

6    to the meeting and kept secret from us.

7             This is all in Blagman's letter, okay,

8    which was written in May coincidentally of 1999,

9    that she told him to lie to us, okay.  But

10   meanwhile from our money he charged and she told        02:33PM

11   him to pay for those trips.  So our money didn't

12   all get spent on media buys.

13        Q.   What else --

14        A.   And it was --

15        Q.   -- was Blagman doing --                        02:33PM

16        A.   What else was he doing?

17        Q.   For Kids Count.

18        A.   He was supposed to be monitoring the

19   results with us.  But he was dealing with Vicki.

20   That was Vicki's area.                                   02:33PM

21        Q.   I'm confused because you're telling me

22   that he had bills that she used money to pay --

23        A.   It's all in the documents that were

24   produced.

1      Q.   I looked through the documents.

2      A.   You did?  You went through them all?

3      Q.   (Nodding.)

4      A.   Okay.

5      Q.   That's why I cancelled, I told Tom I was          02:34PM

6      going through the documents.

7           Now I lost my train of thought.

8      A.   You said you were confused.

9      Q.   Well, you seem to take exception with

10     the use of funds to pay some of Blagman's bills.        02:34PM

11     And I'm not clear on why those bills would not

12     have been part of his responsibility to Kids

13     Count to advance the infomercial on the products.

14     A.   The money that was given to Blagman in

15     trust for him to spend was only for media              02:35PM

16     purchases.  Anything else should have been billed

17     to the company directly and outside of that

18     money.

19          This is basically how Vicki spent --

20     this is one way Vicki spent our money without two      02:35PM

21     signatures over $2,000 on numerous occasions.

22     She directed Blagman to pay other things out of

23     that money that was directed for media buys.  And

24     that's what they were used for, something other

1    May of 1999, were you aware that the company

2    needed additional money to meet operational

3    expenses in May of 1999, early May of 1999,

4    around the time of that Lincolnshire meeting?

5         A.   Of course.  Vicki shut us out, shut down          02:54PM

6    the operations, wasn't doing a thing because she

7    was spending all her time going out to find an

8    additional equity contributor, somebody to put up

9    more money.  And she was only looking for

10   millions.                                                   02:54PM

11        The Terrys offered to go forward.  And

12   she was trying to commit to Peter Abruzzo and

13   some guy in Philadelphia who brought TV Guide and

14   people like that.

15        Q.   How much money did the Terrys offer to           02:54PM

16   put in?

17        A.   No specific amount.  We were trying to

18   sit down to set up a plan of what should be done

19   and to regroup and move forward.  She didn't want

20   any part of it.                                             02:54PM

21        Q.   Did they put additional money in at this

22   time?

23        A.   No, because she walked away from us.

24        She wouldn't agree to do the things that

CAROL RABER & ASSOCIATES (312) 446-6926

1        A.    That's right.

2        Q.    What consideration did she accept from

3   you?

4        A.    She accepted my introduction to the

5   Terrys; my service for hundreds of hours,                03:10PM

6   hundreds and hundreds of hours; she accepted my

7   -- you know, she accepted everything I did for

8   this company and did for her.  And then --

9   including at the end of the memorandum it says

10  "acceptance of these items constitutes the               03:10PM

11  agreement of all of the foregoing terms."  And

12  all a sudden she denies I am an owner in

13  pleadings in the Lake County matter.

14        I mean, she specifically contradicted

15  this agreement.                                          03:10PM

16        Q.    You allege in paragraph 30 that Vicki

17  did not intend to honor the agreement at the time

18  it was entered into?

19        A.    Right.  That's right.

20        Q.    What information do you have to assert?      03:10PM

21        A.    I have information from Robert Blagman,

22  I have information from Peter Abruzzo that she

23  was negotiating with them even after she signed

24  the agreement with us -- before and after.

1      Q.   Negotiating with them to do what?

2      A.   I'm sorry, negotiating with Pete Abruzzo

3  to take over the company, to invest in the

4  company, to have him run the company.  Which was

5  not anywhere mentioned to us, not anywhere                    03:11PM

6  anticipated in our agreement.  She was only

7  negotiating things in violation of the agreement

8  she signed with us -- before and after.  And I'm

9  talking about immediately.

10     Q.   And when did you meet Robert Blagman?          03:11PM

11     A.   At the commercial shooting.

12     Q.   Which was?

13     A.   Which was about Thanksgiving.

14     Q.   Of 1998?

15     A.   That's correct.                                03:11PM

16     Q.   You never knew him or met him before

17 that?

18     A.   No.

19     Q.   Subparagraph (c), did we do subparagraph

20 (c) already?                                               03:12PM

21     A.   Yes, the 29, yes.

22     Q.   Was Blagman involved with new investors?

23     A.   He brought a fellow named Dr. Leonard

24 Makawka, M-a-k-a-w-k-a, out to meet -- he had

1    recommended that he had all kinds of connection

2    and money to come in and influential friends in

3    the industry.

4         Q.   Who did he represent this to?

5         A.   To Vicki and to Gene Terry and Nicole          03:12PM

6    Terry and myself.

7         Q.   When?

8         A.   He came to one of our meetings.  I think

9    that he was at the Terrys' house for dinner with

10   the Arens also and with my family, and it was        03:12PM

11   probably the Hanukah party -- it might have been

12   the Hanukah party.  No, I think it was after that

13   because he was -- that's when we met him again or

14   saw him again.

15        But he was involved in our                       03:12PM

16   conversations.  We had meetings, at first, every

17   couple of weeks at the outside and, you know,

18   reviewed with him on a speakerphone what was

19   going on.

20        And at some point we agreed we needed to         03:12PM

21   -- you know, Vicki wanted to, and we didn't

22   disagree if she wanted to go in that direction,

23   to bring in other investors and do things bigger

24   and better and blah, blah, blah.  You know, we

1    were following her creative instincts because we

2    thought they were good.

3         Q.    And the memorandum agreement talks about

4    that possibility, right?

5         A.    Right.    Although in our mind I think we          03:13PM

6    thought that would be when we got bigger and

7    ready to go public, or something like that, or

8    somebody wanted to buy us out.    But, I mean,

9    again just generally that she wanted a limit on

10   it.    So that's what she suggested, we didn't come     03:13PM

11   up with that.

12         Anyway, so yes, he introduced us to

13   Leonard Makawla.    Again, you should read his

14   letter.    And he said that he would come to town

15   with Leonard Makawla and introduce him to us, and    03:13PM

16   that he could help us and so forth.

17        Q.    Where is Blagman located?

18        A.    At that time in Los Angeles I believe.

19        Q.    Has he relocated?

20        A.    I'm not sure.    I just...                     03:13PM

21        Q.    When was the last time you had any

22   contact with him?

23        A.    Oh, let's see.    Let's see, probably

24   within the last four months.

1       Q.   Four months?

2       A.   Uh-huh.

3       Q.   What did that contact concern, this

4   case?

5       A.   Yeah, arranging a time for his                 03:14PM

6   deposition.

7       Q.   Are you going to take his deposition?

8       A.   Good chance.

9       Q.   When?

10      A.   I don't know yet.  I have to arrange          03:14PM

11   that with him because we haven't -- got a

12   settlement offer from you, and responded, and we

13   thought that we might actually be going somewhere

14   with that.  But we will do that probably in

15   California unless he can fly to here.                  03:14PM

16      Q.   What firm is he affiliated with?

17      A.   I don't know his current firm, but he

18   used to have something called Blagman Media

19   something or Blagman Media Resources.  It's in

20   the documents.  I don't know.  There is a bunch        03:14PM

21   of correspondence and billing from him.  He's had

22   a bunch of companies.  He had a company that he

23   was part of like the Home Shopping Network of

24   Europe.  You know, I mean he's an entrepreneurial

1    media guy.  But I don't know if his existing

2    company that he had then is still in existence.

3    But he's got another company now.  That's why it

4    is a little hard to track him down at first.

5        Q.   Subparagraph (d) of the complaint          03:15PM

6    alleges that Vicki refused to take steps

7    necessary to perfect your interest?

8        A.   (D)?

9        Q.   Yes.

10       A.   What number (d)?                            03:15PM

11       Q.   Subparagraph.  29, subparagraph (d).

12       A.   Right.  No, that would be about

13   management.  Maybe it's 31.

14       Q.   That could be?

15       A.   Yep, 31(d).                                 03:15PM

16       Q.   31(d)?

17       A.   Right.

18       Q.   I missed that, I'm sorry?

19            What time frame are we talking about

20   there that she failed to take over or refused to   03:15PM

21   take steps necessary to perfect your interest and

22   that of the Terrys?

23       A.   From November 22nd 1998 to the present

24   moment.  It turns out that the LLC agreement

CAROL RABER & ASSOCIATES (312) 446-6926

1    provides that the manager will take the steps

2    necessary to admit new members, make amendments,

3    and to do those things.

4        Q.   Was she asked to do those things?

5        A.   She agreed -- it was agreed by                      03:16PM

6    everybody.  First of all, she was obligated by

7    the LLC agreement to do that under the terms of

8    our memorandum agreement that constituted an

9    amendment or change in the relationship.

10       Let's go back.  She didn't take the              03:16PM

11   steps to remove Alan Young and his group from the

12   LLC agreement; she didn't keep it updated or

13   amend it at any time that I'm aware of, okay; she

14   told us she didn't have it when we signed this

15   agreement; we didn't learn about the agreement         03:16PM

16   until January of 1999 when a bank said, If you

17   don't give us a copy of your agreement, we're

18   going to call your loan.

19       So she finally produced it and we sent

20   it on to them.  And, you know -- didn't spend          03:16PM

21   much time looking at it because our agreement

22   superceded it.  It said the terms of our

23   agreement would be deemed an amendment or

24   constitute an amendment and the documents would

1    be conformed.

2         When we sued her and she tried coming up

3    with defenses that the agreement had never been

4    amended, we looked through it and determined that

5    she was the one obligated to amend it, as the                03:17PM

6    manager.

7         Q.   Did anyone ever ask her to take those

8    steps to make her aware that she was to make

9    changes to the agreement?

10        A.   She was the only one who had the             03:17PM

11   agreement that was familiar with it, so I don't

12   know the answer to your question.

13        Q.   But it's your belief that the memorandum

14   agreement supercedes that in any event?

15        A.   Absolutely.                                   03:17PM

16        Here.   The parties -- No. 14 in the

17   memorandum agreement, Exhibit No. 1:   "The

18   parties agree that the operating agreement of the

19   limited liability company shall also be amended

20   to reflect the provisions hereof."   There it is.       03:17PM

21        Q.   But it doesn't say who is going to make

22   them.

23        A.   Okay.

24        Q.   Paragraph 32 of the complaint, Soskin

1    Deposition Exhibit No. 5 (sic) --

2         A.   Right.

3         Q.   -- talks about Vicki's "alleged other

4    acts of deception and bad faith relative to these

5    transactions."                                                  03:18PM

6         A.   Right.

7         Q.   What time frame are you talking about?

8         A.   From before we signed the agreement to

9    the present time.

10        Q.   What other acts of deception did Vicki     03:18PM

11   commit?

12        A.   She lied to us about where she was

13   going, what she was doing, what we owned; she

14   lied to us about, in particular, this Makala not

15   being in town; she hid from us the fact that she    03:18PM

16   was negotiating with other people to run the

17   company while she was agreeing that we would run

18   it together.  She -- she --

19        Q.   What evidence do you have to support?

20        A.   Look at Robert Blagman's letter, to       03:18PM

21   start with.  Robert Blagman's testimony, Peter

22   Abruzzo's testimony.

23        Q.   Peter Abruzzo's testimony?

24        A.   Uh-huh.

1     Q.   I didn't see anything --

2     A.   He's on our witness list.

3     Q.   I didn't see any testimony in the

4  documents.  What are you talking about?

5     A.   I'm saying there will be testimony from            03:19PM

6  Peter Abruzzo.

7     Q.   I'm asking you about documents.

8     A.   Oh, I'm sorry, you said what other

9  evidence.

10     Q.   What documents do you have to support          03:19PM

11  that?

12     A.   Right now I have Robert Blagman's letter

13  and not much more.  I'm sorry, I take that back.

14  I have records of what our -- well, again, it's

15  reflected in Blagman's letter.  But I have              03:19PM

16  records about the deception with Abruzzo in

17  Blagman's letter, I have evidence about Makawla's

18  visit that she lied to us; and that she told him

19  to lie to us -- Blagman.  There's a summary of it

20  in Blagman's letter.                                     03:19PM

21     Q.   Let's talk about Peter Abruzzo?  Who is

22  Peter Abruzzo?

23     A.   Peter Abruzzo is a very successful guy

24  whose father started Modern Tuxedo.  Peter took

CAROL RABER & ASSOCIATES (312) 446-6926

1    it and rolled up the tuxedo industry, so he

2    probably combined from 50 to 100 stores across

3    the country by buying up little tuxedo shops.  He

4    owns part of a bank; he owns racehorses.  He

5    lives in Long Grove.  I don't know how Vicki came          03:20PM

6    in touch with him in the first place, but he's a

7    guy that she also enticing to invest in the

8    company and run it with her at the same time that

9    she was talking to us.

10        Q.   When did you meet Pete Abruzzo?                   03:20PM

11        A.   For the first time, I'd say probably

12   February of 1999.

13        Q.   And how did that meeting come about?

14        A.   She had mentioned him a couple of times

15   as somebody that might be willing to invest more        03:20PM

16   money after the TV campaign didn't work out and

17   so she brought him to up one of our meetings so

18   we could hear what his ideas were.

19        Q.   And how did that meeting go?  How you

20   end up?                                                    03:20PM

21        A.   Well, we ended up that we were happy to

22   hear his proposals.  There were some proposals

23   from a lawyer that were, I'm sure, among the

24   papers that we gave you, things going back and

1   forth, I think with a lawyer on his behalf about

2   if he was going to run it, what was going to

3   happen to our interest, and so forth.  I don't

4   recall offhand exactly what the terms were.

5   There was some issue about it though.                          03:21PM

6        Q.  So you had started negotiating with

7   Peter Abruzzo?

8        A.  No.  Vicki -- if Vicki wanted to go in

9   that direction, we were willing to let her say

10  who would run the bus, drive the bus.  We didn't            03:21PM

11  care.  I shouldn't say we didn't care, we were

12  flexible.  We were interested in building up a

13  business.  We always believed the ideas were

14  good, the products were good, they were going to

15  have a mass appeal and, if handled properly, the           03:21PM

16  company could be very successful.

17       Q.  So Peter Abruzzo was going to come in

18  and invest money and operate the business?

19       A.  No.  Peter Abruzzo was a guy who had a

20  bunch of contacts.  He wasn't going to operate             03:21PM

21  the business.  He had a bunch of contacts with

22  people in the entertainment business.  He set up

23  some meetings for Vicki.

24            And, of course, you know, towards the

CAROL RABER & ASSOCIATES (312) 446-6926

1   end of the day sometime in April or May of 1999,

2   of course, Vicki -- or maybe it was after -- I

3   mean, all of a sudden, Vicki calls me up, Peter

4   has threatened to kill me and blah, blah, blah.

5   And it turns out that Peter set up her up with a            03:22PM

6   meeting with -- what's his name -- Jim Robinson,

7   I think was his name, the business manager for

8   Kevin Costner's company that makes films and

9   stuff, some big money guys, okay.  And when she

10  went to see Jim Robinson, supposedly -- depending          03:22PM

11  on whether you believe Peter or Vicki -- Jim

12  Robinson said to Vicki, in her version, that he

13  would only do the deal if she got rid of anybody

14  else, including Peter.  Or Peter's version,

15  according to him, that Vicki said she could get           03:22PM

16  rid of us and that she didn't need the rest of us

17  if she was working with Robinson.

18         Okay, either way she claims that Peter

19  threatened to kill her when she tried to cut him

20  out of the deal.                                           03:22PM

21         Q.   What deal?  Was there a deal struck?

22         A.   If -- that depends.  Do you believe

23  Vicki about anything?  She said they were

24  interested, they were going to invest, but they

1   didn't want anybody else if they were going to

2   invest.  They wanted to run it, so she was going

3   to negotiate with them.

4       Q.  "Them" being Abruzzo?

5       A.  No, them being Jim Robinson or them                    03:23PM

6   being this guy that bought out TV Guide and put

7   it on cable TV and, you know, TV Guide magazine

8   in Philadelphia.  I don't know, Robinson was in

9   Michigan or someplace.

10      But she would go to see these people;           03:23PM

11  come back saying either, yeah, they're very

12  interested, very interested when she was trying

13  to string us along; or tell Peter Abruzzo, Yeah,

14  they're only interested if you guys aren't

15  involved.  And, of course, if Peter is the one          03:23PM

16  that referred her, we would call the people and

17  get a different story.  And --

18      Q.  But she actually met with these people?

19  She went out and --

20      A.  Yes, yes, right.  And then she tried to        03:23PM

21  cheat everybody that referred her that brought

22  her to the dance.  You know, as soon as she heard

23  somebody might be interested, she was going to do

24  it for herself.  And, of course, she made a lot

1   of enemies by that.  Definitely.  Peter Abruzzo

2   is -- you know, he doesn't like her because she

3   will double-deal anybody for herself.

4        And when you hear it from one person,

5   okay, maybe.  When you hear it from two or three     03:24PM

6   people, maybe.  When you hear it from every

7   partner she ever had --

8      Q.  I don't have another question for you.

9      A.  That means we're done?

10     Q.  We're done.     03:24PM

11     A.  Okay.

12   THE COURT REPORTER:  Signature?

13   MR. CROOKS:  We'll reserve signature.

14   MS. KROL:  We'll reserve signature.  I am

15   going to ask you to write it.

16         (Further deponent saith not.)

17         (Signature reserved.)

18

19

20

21

22

23

24

1    STATE OF ILLINOIS  )
                        )  SS:
2    COUNTY OF C O O K  )

3              I, CAROL RABER, Certified Shorthand

4    Reporter for the State of Illinois, do hereby

5    certify that on the 10th day of November, 2005

6    A.D., the deposition of the witness, ROLLIN J.

7    SOSKIN called by the Defendant, was taken before

8    me, reported stenographically and was thereafter

9    reduced to typewriting through computer-aided

10   transcription.

11             The said deposition was taken at

12   105 W. Madison Street, Suite 1100, Chicago,

13   Illinois, and there were present Counsel as

14   previously set forth.

15             The said witness, ROLLIN J. SOSKIN,

16   was first duly sworn to tell the truth, the whole

17   truth, and nothing but the truth, and was then

18   examined upon oral interrogatories.

19             I further certify that the

20   foregoing is a true, accurate and complete record

21   of the questions asked of and answers made by the

22   said witness, at the time and place hereinabove

23   referred to.

24             The signature of the witness was

CAROL RABER & ASSOCIATES (312) 446-6926

**EXHIBIT 16**

# BLAGMAN
## M E D I A   I N T E R N A T I O N A L

May 23, 1999

To:    Rollin Soskin
       Gene Terry
       Nicole Terry

Fr:    Robert Blagman

Re:    Kids Count next steps and review

First I would like to cover the opportunities that can support the next steps in marketing the Kids Count products. I have spent the past few weeks speaking with colleagues and checking out what can be done, with little or no further investment. As I said, I will do all I can, for the three of you, in getting it done.

The numerous options:

- Placing the product on a shopping network:   I have spoken and met with the national representative for HSN. I have also met with Transactional Marketing Consultants (a firm that represents HSN). We can, pending product approval, place Kids Count on HSN on a consignment basis. This could be very good.

  Their suggestion is that we do not use Vicki for HSN. The ad campaign we used featured her as the spokesperson. That did not work and will not work. The product is king and unless we support it that way we will not give Kids Count the proper exposure it deserves. As per my discussions, the story of Vicki's "creation" is not a strong one and in fact weakens the product. The product must be featured on it's own.

  I suggest we move on this as soon as you would like. We will need to send products to HSN and my contacts for evaluation and scripting. Even though Vicki appeared on QVC or HSN in the past, there is new management and systems that will bring Kids Count to the air. Their on-air salespeople have more credibility then Vicki and will give the products the best platform.

- Per Inquiry television: There are two companies that will run your commercials in exchange for a % of sales. You basically play as go based on profits. There is a set-up fee with one of the companies of approximately $750. You can contract directly with them.

Exhibit
16

00131

- **Outbound marketing:** I have spoken with Real Marketing Inc. they can do outbound telemarketing focusing on a data base that features your demographic buyer. They receive a % of the profits and Kids Count is sold directly to the software / family consumer.

- **Marketing packages:** We can "sell" Kids Count products to a company like Guthy Renker. I spoke with an associate of the company and they may be willing to take it on in conjunction with other kid's products. I know Greg Renker and can follow up upon your approval.

- **Retail:** I can connect with Direct To Retail which is the main retail company in my business. We can also sell products at a great discount to certain discount chains. This is up to you, should you want me to follow up.

- **Radio:** The scripts were written with ideas on how radio may work. We can follow through with these plans as well.

From all my discussions, the consensus shows that the product needs to be featured without the on-air services of Vicki. It is best to use Vicki as a foundational element, speaking to consumers and supporting the values of the products. Since she herself hired people to create the products, her credibility is weakened. What this means is, that since she did not create the technology and ideas behind the software, write the music for the CD's or create the actual workout, her involvement should only be that of a "cheerleader" behind the brand. If she actually designed the software, wrote the music and actually was IN the workout tape, her involvement would have been more appealing and applicable.

I can move ahead on all of this immediately. I will need products to distribute to our possible "partners". We also need to choose who will be the point person at your end to deal with all these companies and contracts. I may also suggest that you (Rollin) come out to Los Angeles to meet personally with my contacts. I can also work directly with a new agency, should you decide to contract elsewhere.

Now I would like to address your letter and the history of my involvement with Kids Count. I could document specific items to make a "case" for myself. Instead, I would like to just go over the major points and also subjectively discuss my sense of some problematic issues.

In the spirit of working together and resolving all our issues, please read the following knowing that my main goal was to create success. I plan to continue working directly with you in accomplishing the initial goals you set forth when you contracted with Vicki.

• The Contract:

The contract is attached. Some important points: All travel was to be covered. I have not yet charged Kids Count for any trip related to Kids Count except for one that involved the Thanksgiving weekend and the taping of the spots. I can supply you with all my travel expenses should you care to see them. I traveled to Chicago on at least ten occasions to meet with Vicki concerning Kids Count. In addition I flew to New York to meet with Parent Magazine executives to negotiate a back end deal for Kids Count (again these bills have not been passed on to Kids Count).

Commissions are earned on all media negotiated and placed. This was agreed to as per the contract (page 1 of the contract). We placed many of thousands of dollars more that what had run. We only charged commission on a sum totaling a portion of the full bookings.

The telephone expenses are very extensive. As you are aware Vicki and I spoke on a daily basis (sometimes more than once per day, sometimes lasting as long as one hour per call) from September 1998 through February 1999. "Normal" client contact requires many calls, but the amount attributed to this account is extensive. These bills are also available.

When an agency receives a check from a client, it is used for all expenses required to support and finance a campaign and all associated matters (dubbing, FedEx, travel etc...). Unless the funds are clearly (in writing) earmarked for one element of another, the funds (in our case $45,000) is used to service the full account.

Now let's cover some of the other issues.

The media money I reported that was available during our February 17th meeting was wrong. The mistake and my remark were based on the reports supplied on telemarketing and sales results. The figures displayed were net and I quoted them as gross. (Please see the attached reports). The reports are dated prior to the meeting date and reflect net numbers. It wasn't until I returned to LA that I realized the total amount remaining was not grossed up.

The media that ran on the weekend of February 21 ($5,309.50 net) ran as ordered. During our meeting I called in to cancel the airings. It was too late to cancel the airings due to log limitations of the stations. Television stations require at least one week to cancel inventory booked.

There was also the question of paying The Film Syndicate. As per the Film Syndicate contract no masters can be released unless payment was received in full. This is a standard of the industry. There is no way around it. I called Vicki and mentioned that I would pay The Film Syndicate for the final edits. Unless payment was issued, we would not have been back on the air. The check was written on 2/12 following a call to Vicki (prior to our meeting on February 17). This allowed the tapes to be shipped to the stations for the following weekend's airings. I also mentioned during the meeting on February 17 that I paid The Film Syndicate all monies' due them. I realize you may not remember me saying this, but I clearly recall when I said it (it was just as I was handing the billing and expense paperwork to you [Rollin]).

The way we "make" money as an agency is actually during media rollout and fees attributed to services rendered. By my count BMI has lost a great deal of time and money servicing Kids Count I realize what happened may have been sloppy, but it was all in line and according to the signed contract.

Please understand that working with Kids Count started out wonderful then turned bizarre. It was the bizarre nature of the account and the "sneaking" around that in many ways caused today's "problems". Allow me to now cover the issues I had to deal with. Again, my intention is not to create havoc. I did my best under poor and confusing circumstances.

I traveled to Chicago to meet with Vicki at least three times and was asked to not tell the three of you. I was meeting with other potential investors, arranged by Vicki, to help buy you out and then move ahead without you. Vicki was not happy with your involvement and wanted to shift Kids Count to either Peter Abruzzo or as yet unknown contacts via Dr. Leonard Makowka. Although you now know about Abruzzo, these meetings took place before you were told about him.

I was getting direction from Vicki and Bob and a different direction from you. I was placed in a position to lie (which made me quite uncomfortable). I was not allowed to talk about Abruzzo's involvement during our dinner at the Terry house. My first meeting with Abruzzo was the weekend of the first shoot in November.

I was also at Vicki's home with Dr. Makowka during one visit when we were asked to create a story and not reveal he was there to consider a possible investment and take over by his contacts in LA. Vicki felt a meeting with you would turn Dr. Makowka "off" and bring "your group" into the future picture. Dr. Makowka was actually in Chicago even though you were told he was not.

I was in the middle of all this and it was not pleasant. During this time we were also trying to make the existing campaign work.

My comments may seem self serving, but please understand, the truth is the truth. I am upset that I had spent so much time on this account and have been put through this secretive craziness. I was getting directions from all parties, yet Vicki contracted us - so I followed her direction. I had supportive feelings for Vicki and believed in her strength and devotion, unfortunately it was one sided. I do not like being attacked or taken advantage of especially when I put so much personal and business time into Kids Count.

I can offer more details but I do hope this serves to illustrate a picture of what I was dealing with. Again, I state my commitment to all three of you to help turn a profit for Kids Count. I have not and will not communicate with Vicki unless I am instructed to by you. All opportunities available to us will not require her direct involvement. I can also have you meet with Dr. Makowka and my other associates directly. As I said should you need further documentation or more specific details of conversations, please let me know.

I will be in Chicago at some point during the week of May 31, perhaps we can get together (that may work better then responding with a letter). This week I will be traveling to New York and Canada, but available through my office.

Take care and I look forward to working together.

# BLAGMAN
## M E D I A   I N T E R N A T I O N A L

Vicki Esralew
Kids Count                                          September 23, 1998
3100 Dundee Rd
Suite 205
Northbrook, Il 60062

Dear Vicki,

The following, when signed by you in the space provided below and returned to us, will
constitute an agreement under which we will provide exclusive advertising and marketing
services to Kids Count. This is our standard agreement with clients, please make
alterations or suggestion so that we can get rolling in a way that works for you. (Hard
copy to follow).

I.    Exclusive Agency for Placement Services

You have engaged Blagman Media International to be the exclusive direct response
advertising and marketing agency for Kids Count.
         *(ff)  ↓ for television*

II.    Charges for Placement Services

Our compensation for handling the advertising of your products will be the normal agency
commission allowed us by various media, 15%. (If we buy television time for which such
media provides no agency commission, you will pay us the contract price plus a 17.65%
agency commission - this is a rare occurrence). Commissions are earned on all media
negotiated and placed.

A.    Media - All media will be billed in advance of the month in which it runs based on
contracts (purchase orders) entered into with stations. A reconciliation invoice will
be issued subsequently for each month based on final station invoices/affidavits.
Detailed media reports displaying all results and analysis will be faxed and / or e-
mailed on a weekly basis (with daily reports made available as needed).

All media is payable at least 17 days prior to the first air date for the entire test
flight for applicable media providers. All media that follows the test whether it be
a secondary test or rollout is due for each month, two weeks prior to the first air
date of that month's media schedule. All stations will be paid in advance of their
air dates (industry standard).

1901 AVENUE OF THE STARS, SUITE 1710   •   LOS ANGELES, CALIFORNIA  90067      PHONE 310.788.5444       FAX 310.788.6440

B:      $3,300 per month (for the initial two months, payable in advance, first payment upon signing, each subsequent payment due the first of each month) creative consultation, commercial and offer development, telemarketing and fulfillment set-up and maintenance and all other aspects over and above commissions due for media planning and buying and post buy reporting. Each month thereafter will be considered on a month by month basis since much of the work will have already been determined and set-up. Generally the fee drops to $1,000 for the ongoing consultation and maintenance if needed as determined by Kids Count.

C:      Creative charges are to be determined. The fee is generally $5,000 - $7,000 for general script consultation and "call to action" scripting. This fee is waived for Kids Count and absorbed in the previous compensation.

III.    Other Charges

A.      All out-of-pocket expenses incurred in servicing your account including, but not limited to, shipping charges, messenger service/air freight and authorized travel by agency personnel outside our immediate area will be billed at our net cost with documentation.

B.      You agree to provide Blagman Media International with such financial statements and other evidence of creditworthiness as Blagman Media International may, from time to time, request. Blagman Media International reserves the right to require payment in advance and or other form of credit protection acceptable to Blagman Media International in the event it determines that your financial condition or liquidity creates an uncertainty as to your ability to comply with payment terms of the Agreement. All direct response advertising is payable in advance.

IV.     Submission, Warranties, and Indemnities

We agree to submit all advertising and related materials to you prior to release to any media. You agree and warrant that your approval of such material verifies that the content therein is truthful and legal and that your product will perform as indicated within said material. If any lawsuit or other proceeding, whether instituted by any governmental body or any other person or organization is brought or threatened against Blagman Media International, or any of its affiliates, executives, or employees, you will



indemnify and hold harmless  Blagman Media International, or its affiliates, executives, or employees, as appropriate, for any and all damages resulting therefrom, including, but not limited to, actual damages, punitive damages and fines and the legal fees and other costs incurred in defending the said lawsuit or other proceeding. Blagman Media International hereby indemnifies Kids Count  in the event that Kids Count incurs damages due to the invasion of privacy or liable/slander committed by Blagman Media International.

V.   <u>Legal</u>

Blagman Media International reserves the right, in the event any amounts claimed by Blagman Media International hereunder remain unpaid, to institute arbitration proceedings at the written election of  Blagman Media International, which proceedings shall be conducted in Los Angeles, California under the then current rules of the American Arbitration Association, and any award rendered therein in favor of  Blagman Media International may be enforced in any court of  competent jurisdiction. Nothing contained in this paragraph shall limit or deprive  Blagman Media International of its rights to resort to judicial enforcement of any of your obligations incurred hereunder.

This agreement shall be interpreted in accordance with the laws of the State of California or the State of Illinois.  In the event legal action becomes necessary to enforce any portion of this agreement, the nonbreaching party will be entitled to reasonable attorney's fees in addition to any relief awarded.

VI.   <u>Publicity</u>

Any and all news releases or other public disclosures of Blagman Media International's relationship with Kids Count must first have authorization from either party.

VII.   <u>Term</u>

Your appointment of  Blagman Media International as your exclusive broadcast advertising agency for those products that are assigned to us shall commence upon the date hereof and shall continue until this agreement is terminated.  This agreement may be terminated by either party  at any time upon 60 days written notice, except that the warranties and indemnities provided herein shall survive the cancellation of this agreement.



00128

If the above meets with your approval, we would appreciate your signing the acceptance and returning it to us at your earliest convenience. If you have any changes or modifications, please call us so that we may discuss them.

We look forward to a long and mutually profitable relationship.

Sincerely yours,

Robert Blagman
President

ACCEPTED THIS 26 DAY OF September, 1998

For:    (Print company name - Kids Count)

Kids Count Entertainment

By:    (Print name - Vicki Esralew)

Vicki Esralew

(Signature of Vicki Esralew)

00139